**Appeal Nos. 2013-1307, 1313**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

### I/P ENGINE, INC.,

*Plaintiff-Cross Appellant,*

v.

### AOL INC., GOOGLE INC., IAC SEARCH & MEDIA, INC., GANNETT COMPANY, INC., AND TARGET CORPORATION,

*Defendants-Appellants.*

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## IN CASE NO. 2:2011-cv-512,
## JUDGE RAYMOND A. JACKSON.

### BRIEF FOR DEFENDANTS-APPELLANTS

Dave Nelson
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
500 West Madison St., Suite 2450
Chicago, IL 60661
(312) 705-7400
(312) 705-7401 (fax)

David A. Perlson
Emily C. O'Brien
Antonio R. Sistos
Margaret P. Kammerud
QUINN EMANUEL URQUHART
& SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600
(415) 875-6700 (fax)

*Attorneys for Defendants-Appellants AOL Inc., Google Inc., IAC
Search & Media, Inc., Gannett Company, Inc., and Target Corporation.*

(Continued on next page)
NON- CONFIDENTIAL

Daryl L. Joseffer
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Suite 200
Washington, D.C. 20006
(202) 737-0500
(202) 626-3737 (fax)

Adam M. Conrad
KING & SPALDING LLP
100 N Tryon Street
Suite 3900
Charlotte, NC 28202
(704) 503-2600
(704) 503-2622

*Attorneys for Defendant-Appellant Google Inc.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

*I/P Engine, Inc. v. AOL Inc., et al.*

Appeal Nos. 2013-1307, 1313

## CERTIFICATE OF INTEREST

Counsel for the Defendants-Appellants certifies as follows:

**1. The full name of every party or amicus represented by me is:**

AOL Inc., Google Inc., IAC Search & Media, Inc., Gannett Company, Inc., Target Corporation

**2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:**

Gannett Co., Inc.

**3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:**

a) AOL Inc. – AOL has no corporate parent. Filings made with the Securities and Exchange Commission indicate that Dodge & Cox and FMR LLC each own ten percent (10%) or more of AOL's stock.

b) Google Inc. – None.

c) IAC Search & Media, Inc. – IAC/InterActiveCorp, a publicly traded company, owns all of the stock of IAC Search & Media, Inc.

d) Gannett Company, Inc. – None.

e) Target Corporation – None.

**4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:**

Quinn Emanuel Urquhart & Sullivan:  David A. Perlson, David L. Bilsker, Robert Wilson, David A. Nelson, Jennifer Kash, Emily C. O'Brien, Margaret P.

Kammerud, Antonio R. Sistos, Howard Chen, Jennifer Ghaussy, Jennifer Polse, Joshua L. Sohn, Sarah Agudo; <u>Kaufman & Canoles</u>: Stephen E. Noona; <u>Finnegan Henderson Farabow Garrett & Dunner</u>: Robert L. Burns, II.


Dated July 22, 2013                         Respectfully submitted,

                                                By: <u>*/s/ David A. Perlson*</u>
                                                       David A. Perlson
                                                       QUINN EMANUEL URQUHART
                                                       & SULLIVAN, LLP
                                                       50 California Street, 22nd floor
                                                       San Francisco, CA 94131
                                                       Telephone: (415) 875-6316
                                                       Facsimile: (415) 875-6700
                                                       davidperlson@quinnemanuel.com
                                                       *Attorney for Defendants-Appellants*

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................... 1

JURISDICTIONAL STATEMENT ..................................................................... 2

STATEMENT OF THE ISSUES ......................................................................... 2

INTRODUCTION ............................................................................................... 2

STATEMENT OF THE CASE ........................................................................... 5

STATEMENT OF FACTS ................................................................................. 5

    A.    The Parties ................................................................................. 5

    B.    Technology Background ............................................................ 6

        1.    The Asserted Patents ...................................................... 6

        2.    The Prior Art Combined Content Filtering and
              Collaborative Filtering in the Search Context ............ 8

        3.    The Accused Systems ................................................... 10

    C.    The District Court Denies Summary Judgment Without
       Explanation ............................................................................. 12

    D.    The Parties' Theories at Trial ................................................ 13

        1.    Plaintiff's Infringement Theory and Trial Strategy ................. 13

        2.    Plaintiff's Damages Theory ......................................... 15

    E.    The Jury Verdict ..................................................................... 17

    F.    Defendants' Post-Trial Motions ........................................... 17

SUMMARY OF ARGUMENT ......................................................................... 17

STANDARD OF REVIEW ............................................................................... 21

ARGUMENT ....................................................................................21

I.    PLAINTIFF FAILED TO SHOW INFRINGEMENT...............................21

      A.    The Accused Systems Do Not "Combine" Content and
            Feedback Data ..................................................................22

      B.    Plaintiff Failed to Prove the "Filtering the Combined
            Information" and "Demand Search" Limitations................................28

            1.    No Attempt to Show "Filtering the Combined
                  Information" Under the Plain Reading of the Limitation.........29

            2.    No Mention of "Demand Search" ............................................30

      C.    Defendants Are Entitled to New Trial .................................32

II.   THE ASSERTED CLAIMS ARE INVALID .............................................34

      A.    All Asserted Claims Are Obvious As A Matter Of Law ...................34

            1.    The Prior Art Discloses Every Element of the Asserted
                  Claims ......................................................................................35

            2.    The Only Supposed Missing Element Would Have Been
                  an Obvious Addition as a Matter of Law..................................36

            3.    No Secondary Considerations Rebut the Obviousness
                  Showing ....................................................................................41

      B.    Culliss Anticipates All Asserted Claims............................................45

            1.    Culliss Discloses Content Analysis .........................................46

            2.    Culliss Discloses Filtering .......................................................47

III.  JMOL OF NO DAMAGES IS REQUIRED .................................................49

      A.    Because Plaintiff Submitted No Evidence of Post-Complaint
            Damages, JMOL of No Damages Should be Granted ......................50

      B.    Plaintiff's Damages Theory Should Have Been Excluded.................54

1.    Plaintiff's Expert Failed To Properly Apportion The
      Royalty Base ...........................................................................54

2.    Dr. Becker's Opinions as to the Royalty Rate and Form
      Were Based on Non-Comparable Licenses and Ignored
      Real-World Transactions Involving the Asserted Patents........58

CONCLUSION.......................................................................................65

Note regarding nature of redacted confidential material

Confidential material subject to protective order has been deleted from the non-confidential version of this brief.  Each of the deleted portions describes Google financial information that has been designated confidential by Google.

# TABLE OF AUTHORITIES

**Page**

## Cases

*Agrizap Inc. v. Woodstream Corp.*,
520 F.3d 1337 (Fed. Cir. 2008) ................................................35, 41

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
314 F.3d 1313 (Fed. Cir. 2003) ......................................................49

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
406 F.3d 1365 (Fed. Cir. 2005) ......................................................47

*Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*,
555 F.3d 984 (Fed. Cir. 2009) .......................................................34

*Bid for Position, LLC v. AOL, LLC*,
601 F.3d 1311 (Fed. Cir. 2010) ................................................10, 11

*Comark Comm'ns, Inc. v. Harris Corp.*,
156 F.3d 1182 (Fed. Cir. 1998) ......................................................29

*Constant v. Advanced Micro-Devices, Inc.*,
848 F.2d 1560 (Fed. Cir. 1988) ......................................................40

*Cornell Univ. v. Hewlett-Packard Co.*,
609 F. Supp. 2d 279 (N.D.N.Y. 2009) ...........................................56

*Decca Ltd. v. U.S.*,
544 F.2d 1070 (Ct. Cl. 1976) .........................................................49

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004) ................................................22, 30

*Eolas Tech., Inc. v. Microsoft Corp.*,
270 F. Supp. 2d 997 (N.D. Ill. 2003) .............................................32

*In re GPAC Inc.*,
57 F.3d 1573 (Fed. Cir. 1995) .......................................................43

*Gasoline Products Co. v. Champlin Ref. Co.*,
283 U.S. 494 (1931) ......................................................................64

*Gen. Elec. Co. v. Int'l Trade Comm'n*,
685 F.3d 1034 (Fed. Cir. 2012) ......................................................21

*Geo. M. Martin Co. v. Alliance Mach. Sys. Int't LLC*,
618 F.3d 1294 (Fed. Cir. 2010) ......................................................42

*Graham v. John Deere Co. of Kansas City*,
383 U.S. 1 (1966).........................................................................34

*Gregg v. Ham,*
  678 F.3d 333 (4th Cir. 2012) ................................................................21

*Integra Lifesciences I, Ltd. v. Merck KGaA,*
  331 F.3d 860 (Fed. Cir. 2003),
  *vacated on other grounds,* 545 U.S. 193 (2005) ...............................61

*KSR Int'l Co. v. Teleflex Inc.,*
  550 U.S. 398 (2007) ......................................................................3, 34

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*
  694 F.3d 51 (Fed. Cir. 2012) ...........................................15, 54, 57, 60

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.,*
  485 F.3d 1157 (Fed. Cir. 2007) .............................................................41

*Lucent Tech., Inc. v. Gateway, Inc.,*
  580 F.3d 1301 (Fed. Cir. 2009) ..................................................15, 54

*Markman v. Lehman,*
  987 F. Supp. 25 (D. D.C. 1997) ............................................................44

*Micro Chem., Inc. v. Lextron, Inc.,*
  317 F.3d 1387 (Fed. Cir. 2003) ............................................................21

*Parallel Networks, LLC v. Abercrombie & Fitch Co.,*
  704 F.3d 958 (Fed. Cir. 2013) ...............................................................25

*Perfect Web Techs., Inc. v. InfoUSA, Inc.,*
  587 F.3d 1324 (Fed. Cir. 2009) .............................................................39

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.,*
  491 F.3d 1342 (Fed. Cir. 2007) ...........................................27, 40, 48, 50

*ResQNet.com, Inc. v. Lansa, Inc.,*
  594 F.3d 860 (Fed. Cir. 2010) ..............................................................58

*Scantibodies Lab., Inc. v. Immutopics, Inc.,*
  374 F. App'x 968, 971 ...........................................................................27

*Smith & Nephew, Inc. v. Rea,*
  -- F.3d -- 2013 WL 3388454 (Fed. Cir. July 9, 2013) ...........................40

*SmithKline Beecham Corp. v. Apotex Corp.,*
  403 F.3d 1331 (Fed. Cir. 2005) .............................................................47

*Soverain Software LLC v. Newegg Inc.,*
  705 F.3d 1333 (Fed. Cir. 2013) ..................................................34, 42

*Sparks v. Gilley Trucking Co.,*
  992 F.2d 50 (4th Cir. 1993) .................................................................32

*Talkington v. Atria Reclamelucifers Fabrieken BV,*
  152 F.3d 254 (4th Cir. 1998) ..............................................................21

*Transclean v. Bridgewood Servs.*,
  290 F.3d 1364 (Fed. Cir. 2002) ........................................................49

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) .............................................*passim*

*United States v. Buck*,
  324 F.3d 786 (5th Cir. 2003) ...........................................................52

*Veritas Operating Corp. v. Microsoft Corp.*,
  562 F. Supp. 2d 1141 (W.D. Wash. 2008) .......................................43

*Weisgram v. Marley Co.*,
  528 U.S. 440 (2000)..........................................................50, 52, 63

*Whirlpool Corp. v. LG Elecs., Inc.*,
  2006 WL 2035215 (W.D. Mich. July 18, 2006) .............................27

*Whitserve v. Computer Packages, Inc.*,
  694 F.3d 10 (Fed. Cir. 2012) ...........................................................52

*In re Wildewood Litig.*,
  52 F.3d 499 (4th Cir. 1995) .............................................................21

## Statutes

28 U.S.C. § 1295(a)(1).........................................................................2

28 U.S.C. § 1338(a) .............................................................................2

Fed. R. Civ. P. 49(b)(4) ......................................................................42

Fed. R. Civ. P. 50(a) .....................................................................16, 54

Fed. R. Evid. 403 ................................................................................32

## <u>Statement of Related Cases</u>

No other appeal in or from this action has previously been before this or any other appellate court.  Appellants are aware of no cases pending before this Court that will directly affect or be directly affected by this Court's decision in this appeal.

## Jurisdictional Statement

This is an appeal from a final judgment of patent infringement entered on November 20, 2012.  Jurisdiction was based upon 28 U.S.C. § 1338(a). Defendants' notice of appeal was timely filed on April 4, 2013, two days after the district court denied Defendants' renewed motions for judgment as a matter of law. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## Statement of the Issues

1.  Whether Defendants are entitled to judgment as a matter of law or a new trial on infringement because Plaintiff produced no evidence – only conclusory expert testimony contrary to the claim language and the accused products' undisputed functionality – on at least three claim limitations: combining information, filtering the combined information, and making a demand search.

2.  Whether Defendants are entitled to judgment as a matter of law on invalidity because the asserted claims were anticipated or obvious.

3.  Whether Defendants are entitled to judgment as a matter of law on damages because Plaintiff presented no admissible evidence of damages during the relevant time frame.

## Introduction

Plaintiff I/P Engine accuses Defendant Google, Inc.'s AdWords and AdSense for Search systems, which display advertisements on web pages, of infringing two patents that recite a "search engine" or "search system."  The claimed system

combines two prior-art information filtering methods: filtering based on document content and filtering based on collaborative feedback from other users. But trying to apply these search patents to the accused advertising systems is akin to trying to place the proverbial square peg in a round hole. The accused advertising products do not "combine" content data and collaborative feedback data, as required by the asserted claims; instead, Plaintiff's expert testified that the accused products use content-based data to <u>look up</u> feedback data. The expert went on to side-step another claim limitation (filtering of <u>combined</u> information) by testifying that the accused products filter a <u>different kind</u> of information, and he completely ignored a third limitation (a demand search). This Court has repeatedly held that such conclusory expert testimony, unmoored from the claim language, is insufficient as a matter of law.

Moreover, the claimed combination of content and collaborative feedback data was anticipated by at least one prior art reference and obvious in light of a number of others. A patent must claim more than "the predictable use of prior art elements according to their established functions." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). But the asserted claims simply combine two prior art filtering methods according to their intended purpose to produce their intended and predictable result (improved filtering). Indeed, artisans had previously recognized that "content-based filtering and automated collaborative filtering . . . are complementary techniques."

(A5427.)  Even if it were not anticipated, therefore, the claimed combination was obvious as a matter of law.

Significantly, the jury did not disagree; it made only some underlying findings of fact without opining on whether the patents were obvious.  And the district court gave no analysis for its conclusion of non-obviousness.  The only entity that has provided a reasoned analysis of obviousness, the Patent and Trademark Office ("PTO"), has <u>rejected</u> all of the asserted claims based on the same art presented at trial.  Especially because obviousness is a question of law subject to *de novo* review, this Court can and should endorse the PTO's reasoned decision, not the district court's silence.

This case also provides a textbook example of how not to handle damages.  The jury awarded over $30 million for just one year of infringement, with no evidence to support that amount.  Although the district court held that Plaintiff was entitled only to post-suit damages, Plaintiff presented <u>no</u> evidence of damages for that one-year, post-suit period.  Instead, it presented only an aggregate damages proposal for an approximately seven-year period from 2005 through the verdict.  Even as to that time period, the expert's testimony was inadmissible because it did exactly what this Court has held to be impermissible – failing to apportion the royalty base to the allegedly infringing feature of the accused products, relying on inapposite licenses, and ignoring real-world transactions.  In that respect as well, Plaintiff failed to prove its case,

entitling Defendants to judgment as a matter of law that Plaintiff has failed to prove damages.

## Statement of the Case

Plaintiff I/P Engine filed this lawsuit on September 15, 2011, accusing Defendants Google, AOL, IAC Search & Media, Target, and Gannett of infringing U.S. Patent Nos. 6,314,420 ("the '420 Patent") and 6,775,664 ("the '664 Patent"). (A248-74.)  The jury returned a verdict on November 6, 2012, finding that all Defendants infringed all asserted claims, that all asserted claims were not anticipated, and awarding $30,496,155 in damages across the Defendants. (A4173.)

On November 20, 2012, the district court ruled that the asserted claims were not obvious (A39-40) and entered judgment for Plaintiff in accordance with the jury verdict.  (A57-58.)  The district court denied Plaintiff's and Defendants' post-trial motions for judgment as a matter of law and/or new trial on April 2, 2013. (A60-67.)  Plaintiff filed its Notice of Appeal on April 3, 2013 (A4558-60); Defendants filed their Notice of Appeal on April 4, 2013.  (A4561-64.)

## Statement of Facts

### A.    The Parties

Defendant Google Inc. is a leading technology company that offers online search, email, maps, and web browsing services, as well as the accused advertising services.  (A2893; A2895.)  The other defendants in this case (AOL, IAC, Target,

5

and Gannett) are accused of infringement only by virtue of using Google's accused advertising systems.  (A1957.)

Plaintiff I/P Engine is a company formed in 2011 (A2045-46) whose business plan is to acquire intellectual property and then license or enforce it. (A2051.)  It bought the Asserted Patents for $3.2 million in 2011, using money from an investment firm.  (A2046.)  In 2012, after this suit was underway, I/P Engine merged with and became a subsidiary of Vringo, Inc.  (A2046-47.)  Vringo is a 27-employee company (A2034) whose "business strategy is to develop and license mobile technologies and intellectual property."  (A2037.)  Just as I/P Engine holds the Asserted Patents, Vringo has other subsidiaries that hold other patents on Vringo's behalf.  (A2034.)  Before its merger with Vringo, I/P Engine had no revenue, products, or services.  (A2053.)

### B.    Technology Background

####        1.    The Asserted Patents

The Asserted Patents relate to the filtering of Internet search results and claim the combination of two techniques known in the prior art – content-based filtering and collaborative filtering.  (A206, 2:20-27; A217, 23:33-44.)[1]  As Plaintiff summarized in its *Markman* brief, "[c]ontent-based filtering is a process

---

[1]    Although the Asserted Patents' specifications are substantively identical, their line numbers are slightly different.  Unless otherwise noted, all specification citations are taken from the '420 Patent.

of determining relevance by extracting features such as text from an informon[2] (or

information item).  Collaborative filtering, on the other hand, determines relevance

based on feedback from other users – it looks to what items other users with

similar interests or needs found to be relevant."  (A487.)  The Patents use these

known techniques to filter informons  returned in response to user search queries.

(A217, 23:33-44.)

Plaintiff accused Defendants of infringing claims 10, 14, 15, 25, 27, and 28

of the '420 Patent and claims 1, 5, 6, 21, 22, 28, 28, and 38 of the '664 Patent.

Claim 10 of the '420 Patent recites "[a] search engine system comprising:

> **[a]** a system for scanning a network to make a demand search for
> informons relevant to a query from an individual user;

> **[b]** a content-based filter system for receiving the informons from the
> scanning system and for filtering the informons on the basis of
> applicable content profile data for relevance to the query; and

> **[c]** a feedback system for receiving collaborative feedback data from
> system users relative to informons considered by such users;

> **[d]** the filter system combining pertaining feedback data from the
> feedback system with the content profile data in filtering each
> informon for relevance to the query."[3]

---

[2]  "Informon" is a coined term from the Asserted Patents that can be all or
part of a text, video, or audio file.  (A207, 3:30-35.)  The agreed construction of
informon was "information entity of potential or actual interest to the
[individual/first] user."  (A8.)

[3]  For the Court's convenience, Defendants have added bracketed letters
denoting the various claim steps or elements.

(A219.)  '420 claim 25 is substantially similar, but cast as a method claim.  (A220.)

Claim 1 of the '664 Patent, a continuation-in-part of the '420 Patent, recites

"[a] search system comprising:

> **[a]** a scanning system for searching for information relevant to a
> query associated with a first user in a plurality of users;
>
> **[b]** a feedback system for receiving information found to be relevant
> to the query by other users; and
>
> **[c1]** a content-based filter system for combining the information from
> the feedback system with the information from the scanning system
> and;  **[c2]** for filtering the combined information for relevance to at
> least one of the query and the first user."

(A246.)  '664 claim 26 is substantially similar, but cast as a method claim.  (*Id.*)

None of the asserted dependent claim limitations are at issue in this appeal.

### 2.    The Prior Art Combined Content Filtering and Collaborative Filtering in the Search Context

The Asserted Patents acknowledge that search engines, collaborative

filtering, and content-based filtering were all well-known in the art.  (A206, 1:20-

26.)  The purported innovation in the patents was to improve search engines by

combining content-based filtering and collaborative filtering to more effectively

filter search results.  (*Id.*, 2:20-27.)  At the time of the invention, however, prior

artisans had already recognized that "content-based filtering and automated

collaborative filtering [ACF] are complementary techniques, and the combination

of ACF with some easily extractable features of documents is a powerful

information filtering technique."  (A5427 ("WebHound" MIT Master's Thesis

published in 1995).)  Nor was WebHound the only prior art reference to reach this

conclusion.  For example, the 1997 "Fab" research paper, published in the

Communications of the ACM scholarly journal, states: "By combining both

collaborative and content-based filtering systems, Fab may eliminate many of the

weaknesses found in each approach."  (A5511.)  And the Rose patent, filed in 1994

by engineers at Apple Computer Inc., states: "[t]he prediction of relevance is

carried out by combining data pertaining to the content of each item of information

with other data regarding correlations of interests between users . . . user

correlation data is obtained from feedback information provided by users."

(A5414, Abstract.)

    These references also perform their content/collaborative filtering on <u>search

results</u>.  WebHound states: "a WEBHOUND like front-end to a popular search

engine such as Lycos, could enable users . . . to filter the results of their searches . .

. in a personalized fashion."  (A5502.)  And Rose states: "[t]he relevance predicting

technique of the present invention . . . can be employed to filter messages provided

to a user in an electronic mail system and search results obtained through an on-

line text retrieval service."  (A5420, 2:51-55.)

    During prosecution of the '420 Patent, the PTO explained that the use of

content/collaborative filtering to filter search results was not novel.  (A5341.)  The

PTO instead based its Notice of Allowability on the fact that the '420 Patent

performed content/collaborative filtering on a "wire" (*id.*), which according to the Patent is a stored query that is updated over time. (A206, 1:56-60.) While many of the '420 claims recite a "wire," none of the asserted claims do.

### 3.     The Accused Systems

Plaintiff accused Google's AdWords, AdSense for Search, and AdSense for Mobile Search systems of infringement. AdWords is the online advertising system Google uses for display of advertisements next to search results on www.google.com. (A2944-45.) AdSense for Search and AdSense for Mobile Search are Google services through which other companies show advertisements along with Google search results on their websites. (A2888-89.) Plaintiff accused the non-Google Defendants of infringement through their use of the two AdSense systems. Plaintiff's theory of infringement was identical for all three systems. (A2482; A2869.)

AdWords includes a self-service advertising feature, which allows advertisers to come to Google and create their own advertisements to be shown. (A2896.) Each time an end user enters a search query on Google.com, AdWords runs an auction for the ad space available on the search results page displayed to the end user. (A2897; *see also Bid for Position, LLC  v. AOL, LLC*, 601 F.3d 1311, 1312 (Fed. Cir. 2010).) The auction is a type of modified "second-price auction," which allows advertisers to submit their maximum bid for ad space yet

often pay much less than this maximum bid.  (A2898-99; *Bid for Position*, 601 F.3d at 1312-13.)  The auction ranks and places ads based on the advertiser's maximum bid, the ad's predicted click-through rate, or pCTR, and other factors. (A2897; A2953.)

Plaintiff accused only the use of pCTR to disable certain ads from participating in the auctions for ad space.[4]  (A2346-49.)  It made no allegations regarding the vast majority of AdWords functionality and technology, including the self-service feature of AdWords, the keyword-bidding, the auction, the ranking and placement of ads (including the use of pCTR for ranking and placement), or the cost-per-click payment model.

To calculate a pCTR, the "Smart Ads" component of the accused systems analyzes Google logs that store click activity of all users in connection with all ads that have been shown to users.  (A2899.)  Smart Ads uses that analysis to calculate odds multipliers (or "weights") for selected "attributes" of the analyzed ads. (A2963.)  An attribute contains characteristics that may occur when a given ad is paired with a given query.  Each of those characteristics is called a "feature."  For example, a feature of an ad could be that it was for the Amazon.com landing page. (A2962-63.)  A feature of a query could be that it was for "running shoes."  (*Id.*)

---

[4]    After the jury verdict, Defendants eliminated these disabling steps that Plaintiff accused of infringement.  (*See* A4605-08; A4637-38, ¶¶ 8-12.)

An attribute could contain both features: the landing page domain name is Amazon.com, and the query is for "running shoes." (A2963.) If the model is configured to create an attribute that includes both features, Smart Ads would learn an odds multiplier for that attribute. (A2963-65.) The odds multiplier for the various attributes are derived from user click data and are used to calculate a prediction of how likely it is that a candidate ad containing those attributes will be clicked on by a user. (A2966; A2969.) When Smart Ads computes a pCTR for an ad, including a pCTR used for disabling, it does so by determining the appropriate attributes, looking up the odds multipliers for those attributes, then adding together the odds multipliers and performing a straightforward calculation on the result. (A2967.)

### C.    The District Court Denies Summary Judgment Without Explanation

On September 12, 2012, Defendants moved for summary judgment of non-infringement, invalidity, and laches. (A638-79.) The day after Defendants filed their Reply, the district court denied the motion in a four-sentence order that did not address the arguments of either party, stating only: "Having carefully reviewed the parties' pleadings, the Court finds that summary judgment is inappropriate at this time as there are genuine issues of material fact in dispute." (A1848.)

### D.    The Parties' Theories at Trial

#### 1.    Plaintiff's Infringement Theory and Trial Strategy

Before trial, Defendants moved *in limine* to preclude Plaintiff from relying on non-technical, public marketing documents for its infringement case.  (A1399-1404.)  Defendants argued that "oversimplified documents directed at laypersons" are not probative of how the accused systems actually work, particularly compared against truly probative evidence such as source code.  (A1400-01.)  The district court declined to rule on this motion.  (A1852.)  Defendants also challenged Plaintiff's expert's reliance on these marketing documents in a pre-trial *Daubert* motion.  (A1753, fn. 9.)  The district court denied this *Daubert* motion in a three-sentence order.  (A38.)

Plaintiff then relied on these public marketing documents for its infringement case at trial, over Defendants' repeated objections.  (A2238-41; A2253-54.)  Plaintiff's infringement expert, Dr. Frieder, characterized the asserted claims as a combination of four elements, represented by a "color scheme" presented to the jury: (1) searching for information relevant to a query (yellow), (2) content-based analysis (blue), (3) collaborative analysis (green), and (4) combining the content and collaborative analysis to filter the searched information (purple):



**US PATENT 6,314,420**

**25.** A method for operating a search engine system comprising:

scanning a network to make a demand search for informons relevant to a query from an individual user;

receiving the informons in a content-based filter system from the scanning system and filtering the informons on the basis of applicable content profile data for relevance to the query;

receiving collaborative feedback data from system users relative to informons considered by such users; and

combining pertaining feedback data with the content profile data in filtering each informon for relevance to the query.

PX 1                                46                                PDX 123

(A2277, A5548.)  In his element-by-element discussion of how the accused systems allegedly meet the blue "content" limitations, the green "collaborative" limitations, and the purple "combining" limitations, Dr. Frieder relied exclusively on PX-338, one of the marketing documents to which Google had objected. (A2338-45; A2424-28; A2462-64; A2468-71; A5543-46; A5549-51; A5553-58.) PX-338 was a three-page screenshot from Google's public AdWords Help webpage for advertisers.  It explained in general terms how Google gives advertisements a "Quality Score" reflecting their overall quality, but provided no technical details concerning the operation of the accused systems.  (A129-31.)

14

Plaintiff also insinuated that Google had copied the Asserted Patents, as opposed to developing the accused systems itself.  The district court had previously granted Defendants' motion *in limine* to preclude Plaintiff from offering evidence of copying.  (A35.)  Yet Plaintiff, over Defendants' objection, repeatedly insinuated that Google had copied the Asserted Patents because Google supposedly had no "development" story and because one Google patent cites the '420 Patent.  (A1975; A3841; A3851-52.)  As Plaintiff told the jury in its Opening Statement:

> I don't believe you'll see any Google documents that explain how the system that's accused of infringement was developed.  I don't know how Google came up with this technology, but I do know how Ken Lang and Don Kosak [the inventors of the Asserted Patents] came up with the technology.  And, in fact, the evidence will show that before Google launched its Smart[Ads] system, it had actually cited '420 Patent in a patent application of its own on another subject.

(A1975.)

### 2.    Plaintiff's Damages Theory

Before trial, Defendants filed a *Daubert* motion to exclude the opinions of Plaintiff's damages expert, Dr. Stephen Becker.  (A1479-A1509.)  Defendants argued that Dr. Becker's damages analysis was a textbook example of what this Court has said <u>not</u> to do for patent damages, in such cases as *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012), *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), and *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009).  For example, Defendants argued

that Dr. Becker failed to apportion his royalty base to reflect revenue attributable to the Asserted Patents (as opposed to other aspects of the accused systems) and relied on licenses to other patents while ignoring real-world economic transactions involving the Asserted Patents.  In a two-sentence order, the district court denied Defendants' *Daubert* motion, again without addressing any of Defendants' arguments.  (A37-38.)  Defendants renewed their objection to Dr. Becker's non-apportioned royalty base during trial (A2803-07), but the district court "deferred" its ruling.  (A2808-09.)  Defendants renewed their objection yet again in a Rule 50(a) motion arguing that Plaintiff had failed to prove damages.  (A2860-67.)  The district court denied this motion in a brief oral order that again did not specifically address Defendants' arguments.  (A2883-84.)

In presenting its damages case, Plaintiff chose to provide the jury with only aggregate numbers from the entire 2005-2012 time period.  Plaintiff did not break these numbers down by quarter or year.  (A3808-09; A4150-59.)  Before closing argument, however, the district court ruled that Plaintiff's pre-Complaint damages were barred by laches.  (A3655-61.)  Because Plaintiff provided no evidence of a damages number or royalty base for the post-Complaint period, Defendants moved for judgment as a matter of law on damages.  The district court, however, let the damages case go to the jury.  (A3818-19; A3823-26.)  In closing argument,

16

Plaintiff then asked the jury to calculate damages using "memory and judgment," based on a demonstrative bar chart never admitted into evidence.  (A3863; A5562.)

### E.    The Jury Verdict

The jury found all claims infringed by all Defendants, found all claims not anticipated, and awarded $30,496,155 total damages across the Defendants. (A4163-73.)  The jury also answered certain obviousness-related interrogatories on the scope of the prior art, any differences between the claims and the art, and secondary considerations.  (A4170-73.)  The district court later issued a two-page order that recited some of the jury's interrogatory responses and concluded, with no analysis, that the claims were not obvious.  (A39-40.)

### F.    Defendants' Post-Trial Motions

On December 18, 2012, Defendants filed renewed motions for judgment as a matter of law on non-infringement, invalidity, and damages.  (A4252-84; A4316-47; A4352-83.)  The district court denied all three motions.  (A60-65.)  Again, the district court did not address Defendants' arguments, but instead denied the motions in a series of two-page orders that quoted the applicable legal standards and then simply stated that Defendants failed to meet them.  (*Id.*)

## <u>Summary of Argument</u>

I.  This Court should reverse the judgment of infringement because Plaintiff and its expert disregarded or attempted to rewrite multiple claim limitations of both Asserted Patents.  The plain and ordinary meaning of the claim language, and the

undisputed facts concerning the operation of the accused systems, show that those systems do not infringe for at least three reasons. First, all asserted claims require <u>combining</u> content data with feedback data. Plaintiff's expert, however, testified that the accused systems use content-based attributes to <u>look up</u> corresponding feedback-based odds multipliers. Using one piece of data to look up another piece of data does not "combine" those two pieces. Plaintiff glossed over this crucial issue by relying on high-level marketing documents, but those documents say nothing about the required combination. Even if they did, this Court has held that non-technical marketing materials are insufficient to prove infringement as a matter of law.

Second, the asserted '664 claims require filtering "the combined information." Plaintiff alleged that "the combined information" in the accused systems is the pCTR. Yet Plaintiff admitted that pCTR is not and cannot be filtered. Instead, Plaintiff alleged that <u>advertisements</u> are filtered <u>based on</u> their pCTR. But the '664 claims require filtering the combined information, not filtering "based on" the combined information. Plaintiff cannot add the words "based on" to the limitation of "filtering the combined information" in an attempt to stretch this limitation to cover the accused systems.

Third, the asserted '420 claims include the limitation of making a "demand search." Plaintiff utterly ignored this element, never even reciting the district

court's construction of "demand search," much less articulating why the accused systems meet this element. No reasonable jury could find infringement on that vacant record.

Alternatively, Defendants are entitled to a new trial on infringement. Plaintiff's suggestion to the jury that it rely on non-authoritative marketing documents in considering infringement, rather than the undisputed functionality shown by the source code, misled and confused the jury. So did Plaintiff's repeated insinuation that Defendants "copied" the Asserted Patents – an insinuation that was unsupported by any evidence and that was highly prejudicial.

II. The district court erred as a matter of law by finding the asserted claims non-obvious. There is no dispute that the prior art used hybrid content-based and collaborative filtering to filter search results. Plaintiff's <u>only</u> alleged difference between the asserted claims and the prior art was to say that the prior art does not use the search query when filtering the results of that search. In the words of Plaintiff's trial metaphor, the prior art threw search <u>results</u> "over the wall" to a content/collaborative filter, but did not throw the search <u>query</u> that produced those results "over the wall" as well. While the jury agreed that this difference existed between the claims and the prior art, neither the jury nor the district court made any finding on whether it would have been obvious to provide the search query as well as the results to the filter. As a matter of law, it would have been. The

Asserted Patents themselves teach that "conventional search engines" filtered search results using the query itself, not just the results.

Indeed, the Culliss reference anticipated the Asserted Patents by filtering Internet articles based on scores that comprise a combination of content data and collaborative feedback data. Plaintiff sought to distinguish Culliss by arguing that Culliss lacks content analysis and filtering, but Culliss expressly discloses these very concepts.

III. Plaintiff introduced no damages evidence at all for the post-Complaint period, the only period for which Plaintiff was entitled to damages due to laches. Judgment that Plaintiff has failed to prove damages is required on this basis alone. Furthermore, the aggregate (pre- and post-Complaint) damages numbers that Plaintiff did provide were inadmissible and infected by severe legal error. Specifically, Plaintiff's damages expert failed to properly apportion a royalty base, relied on non-comparable third-party licenses to other patents, and ignored real-world transactions involving the Asserted Patents. In other words, Plaintiff mimicked what this Court has said not to do when proving damages. Because Plaintiff's damages analysis is unreliable and inadmissible under this Court's decisions as a matter of law, Plaintiff failed to prove damages, entitling Defendants to judgment as a matter of law for this reason as well.

## **Standard of Review**

Applying Fourth Circuit law, this Court reviews a district court's denial of judgment as a matter of law *de novo* and must determine whether, under correct legal standards, there was substantial evidence to support the jury verdict. *In re Wildewood Litig.,* 52 F.3d 499, 502 (4th Cir. 1995). This Court reviews the denial of a motion for new trial for abuse of discretion. *Gregg v. Ham*, 678 F.3d 333, 342 (4th Cir. 2012).

Evidentiary determinations are also reviewed under the law of the regional circuit. *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003). In the Fourth Circuit, evidentiary rulings, "including the decision to admit or exclude expert evidence under *Daubert*" are reviewed for abuse of discretion. *Talkington v. Atria Reclamelucifers Fabrieken BV*, 152 F.3d 254, 265 (4th Cir. 1998).

## **Argument**

## **I.    PLAINTIFF FAILED TO SHOW INFRINGEMENT**

"For infringement, every element or limitation of a claim of the patent must be found in the accused device, literally or in accordance with the doctrine of equivalents." *Gen. Elec. Co. v. Int'l Trade Comm'n*, 685 F.3d 1034, 1042 (Fed. Cir. 2012). Because the functionality of the accused systems is undisputed, this case turns on a straightforward application of the claim language to the undisputed facts. Plaintiff and its expert sought to avoid the inevitable conclusion of non-

21

infringement by contradicting the plain and ordinary meanings of claim terms or ignoring certain claim elements altogether.  But experts are not free to "contradict" the plain language of the claims in opining "that a critical claim limitation is found in the accused device."  *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004).  Accordingly, the district court should have granted JMOL of no infringement.

### A.    The Accused Systems Do Not "Combine" Content and Feedback Data

All asserted claims of both Patents require <u>combining</u> content and feedback data.  ('420 claim 10 ("combining pertaining feedback data from the feedback system with the content profile data"); '420 claim 25 (same); '664 claim 1 ("a content-based filter system for combining the information from the feedback system with the information from the scanning system"); '664 claim 26 ("combining the information found to be relevant to the query by other users with the searched information.").)  Plaintiff's infringement expert, Dr. Frieder, testified that this "combining" of content data and collaborative feedback data into a single score was part of the "heart and soul" of the invention.  (A2308.)

The district court declined to construe "combining," stating instead that this term should get its "plain and ordinary meaning."  (A2, fn.1.)  Under this plain and ordinary meaning, "combining" two pieces of data would require merging or blending them in some fashion.  Plaintiff said as much in its Opening Statement,

telling the jury that "when you put those two things together, <u>you get two high numbers, you combine them to get an overall score</u> . . . So that was the solution. Combine content data with collaborative analysis to produce an overall score." (A1963.)  Plaintiff took a similar position in its *Markman* brief, stating that "[<u>i]n its ordinary usage</u>, 'combining' two things means that the individual pieces are <u>united or merged</u> . . ."  (A502 (emphases added).)

Not only does the plain meaning of "combining" require some merger or blending of two pieces of data, but the Patents do as well.  Figure 6 of the Asserted Patents' shared specification, which Dr. Frieder used to illustrate the "heart and soul" of the "entire invention" (A2308), shows that the "Content Data" score and "Collaborative Data" score are mathematically combined into one "Complete Rating Predictor" score.  (A5542; A212, 14:56-60.)  In Dr. Frieder's specific example presented to the jury of how Figure 6 works, the "Content Data" score of 7 is combined with the "Collaborative Data" score of 5, resulting in a merged score of 6.  (A5542.)

Plaintiff produced no evidence that content and feedback data are in fact "combined" in the accused systems.  Instead, Dr. Frieder argued that this limitation was met because the accused systems use certain content-based attribute templates (the alleged content data) to <u>look up</u> corresponding odds multipliers (the alleged feedback data), which are in turn used along with numerous other odds multipliers

23

to calculate the pCTR score for advertisements.  (A2381-83; A2386.)  As described above, the attribute templates look for the presence of characteristics in a given ad (such as the landing page of the ad or the presence of certain phrases in the ad).  Once the attributes of a given ad are determined, those attributes are used to look up corresponding odds multipliers that are generated from the feedback (click data) of all prior users.  *See* Statement of Facts, pages 11-12, *supra*.  But using one piece of data to <u>look up</u> another piece of data does not "combine" those two pieces under any ordinary understanding of "combine."

Indeed, Dr. Frieder freely conceded that the alleged content-based data (the attribute) is never merged in any way with the alleged feedback data (the odds multiplier).  Rather, one piece of data is simply used to look up the other:

Q:  Well, the attribute is not combined with the odds multiplier at all, is it?

A:  <u>I'm taking the particular value and using it as a lookup and to get the particular feedback data</u>.  So I view it as combined, yes.

Q:  It's a lookup.  It tells you where it is?

A:  It gives you the corresponding value.

Q:  Right.  So you don't take the attribute and merge it together with whatever the odds multiplier value is, right?

A:  I am combining it because I'm taking the two sources and combining them, but, <u>no, I'm not merging them together, no</u>.

(A2547 (emphasis added).)[5]

Dr. Frieder's mere *ipse dixit* that "I view it as combined" (A2547) is insufficient to show that the look-up operation actually does "combine" content and feedback under the plain meaning of the term. As this Court recently held, in the very context of a "combining" limitation, *ipse dixit* expert assertions on what such a limitation requires cannot create a factual dispute or support an infringement finding. *Parallel Networks, LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958, 970 (Fed. Cir. 2013).

Again, there is no factual dispute the accused systems merely use attributes of the current advertisement to look up feedback-based odds multipliers. (A2547.) Thus, the pCTR is generated entirely from feedback, not from a "combination" of content and feedback. The accused systems calculate pCTR by adding up odds multipliers (A2386; A2967), and the odds multipliers reflect purely user feedback – namely, user clicks.[6] (A2969.) There is no "content score" that is or could be combined with the odds multipliers' feedback score.

---

[5] When discussing the source code of the accused systems, Dr. Frieder likewise stated: "What actually happens is these are a whole bunch of [attribute] templates. As I said, it creates a string, and it will take that string and look it up in the database and get the appropriate odds multiplier. Then you will take all of the combination of the odds multipliers and you will use that to create a score, indicator, a goodness factor . . . they call it a pCTR." (A2386 (emphasis added).)

[6] As Dr. Frieder himself stated, "that odds multiplier is the collaborative representation of all the harvesting of the information . . . . So that's the

25

Notably, Plaintiff and Dr. Frieder based their infringement case primarily on high-level marketing materials that do not discuss attributes, odds multipliers, or look-ups at all.  Specifically, in his element-by-element analysis of the asserted claims, Dr. Frieder relied <u>exclusively</u> on the PX-338 marketing document to support his opinion that the accused systems combine content data with collaborative feedback data.  (A2338-45; A2424-28; A2462-64; A2468-71; A5543-46; A5549-51; A5553-58.) Dr. Frieder put blue boxes around PX-338 passages talking about Google's use of "keyword/ad relevance" and "keyword/search relevance" to determine ad quality, and labeled these passages as "content."  (A5545; A5551; A5555; A5558.)  He put green boxes around PX-338 passages talking about Google's use of "your keyword's past click-through rate" to determine ad quality, and labeled these passages as "collaborative."  (*Id.*)  He then argued that Google's alleged use of both blue "content" data and green "collaborative" data amounts to the claimed "combination" of content and collaborative feedback.  (A2338-45; A2424-28; A2462-64; A2468-71.)  But the fact that the pCTR calculation process somehow uses content and collaborative data – which is the only thing PX-338 shows, even with Dr. Frieder's annotations –

---

collaborative component."  (A2383.)

does nothing to show that the pCTR is a <u>combination</u> of content and collaborative information.

In any event, marketing materials cannot prove infringement as a matter of law. *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1351-52 (Fed. Cir. 2007). In *PharmaStem*, this Court affirmed the lower court's judgment as a matter of law that overturned the jury's verdict of infringement, finding advertising materials to be insufficient evidence of infringement where scientific proof was lacking. *Id.* at 1351-52. Other opinions have reached similar conclusions. *Scantibodies Lab., Inc. v. Immutopics, Inc.*, 374 F. App'x 968, 971 (Fed. Cir. May 6, 2010) ("The use of language in marketing materials often means something quite different from the language used in a patent.") (A5563-66); *Whirlpool Corp. v. LG Elecs., Inc.*, 2006 WL 2035215, at *8 (W.D. Mich. July 18, 2006) (granting summary judgment or non-infringement because "marketing materials cannot override the actual operation of the [product].") (A5567-75.) Here, as detailed above, the actual "look up" functionality of the accused products is undisputed, and cannot be overcome through Plaintiff's reference to these marketing materials.

Defendants are alternatively entitled to a new trial due to Plaintiff's improper argument that the jury ignore the source code of the accused systems in favor of these non-authoritative marketing documents. Plaintiff openly encouraged the jury

to ignore the source code. (A1972: "Google's evidence about how the system works primarily is source code. I can't understand source code. I can't read that . . . . You don't need to be an expert in source code, ladies and gentlemen, to decide this case.") Plaintiff instead urged the jury to base its analysis on the marketing documents (A1974), and even sought to discredit Defendants' expert for relying on the source code instead of the marketing documents. (A3856: "Dr. Ungar, their expert, never relied on a single Google document. He played this legal gotcha game of saying disregard all the documents and focus only on the source code . . . .") This argument was flagrantly improper. Analyzing source code is not a "legal gotcha game." Rather, source code is what defines and dictates the actual operation of a computer system, and Plaintiff's own expert admitted that source code is the proper way that the accused systems should be analyzed. (A2446.) Plaintiff's argument to the contrary inherently confused and prejudiced the jury's infringement inquiry, and warrants a new trial.

### B.    Plaintiff Failed to Prove the "Filtering the Combined Information" and "Demand Search" Limitations

Plaintiff did not even try to argue that the accused systems meet the limitations of "filtering the combined information" and making a "demand search" for information entities. Rather than arguing that the accused systems "filter[] the combined information," Plaintiff added words to this limitation by alleging that the

accused systems filter advertisements "based on" or "using" the combined information.  And Plaintiff ignored the "demand search" limitation altogether.

      1.   <u>No Attempt to Show "Filtering the Combined Information"<br>Under the Plain Reading of the Limitation</u>

All of the asserted '664 claims contain the element of "filtering the combined information."  (Claim 1 ("<u>filtering the combined information</u> for relevance to at least one of the query and the first user"); claim 26 (same).)  Dr. Frieder testified that the "combined information" in the accused systems is an advertisement's pCTR.  (A2555.)  Yet Dr. Frieder admitted that pCTR is <u>not</u> filtered in the accused systems.  (A2555-57.)  Instead, Dr. Frieder asserted that the accused systems filter <u>advertisements</u> "based on" or "using" the advertisements' pCTR.  (A2556 ("I'm filtering out ads <u>using the pCTR.</u>"); A2557 ("To me it was very clear that on filtering <u>based of the pCTR</u> . . . .") (emphases added).)  But the '664 claim language requires "filtering the combined information," not filtering <u>something else</u> "based on" or "using" the combined information.

Notably, unlike the '664 Patent, claim 10[b] of the '420 Patent does include the requirement of "filtering the informons <u>on the basis of</u> applicable content profile data . . ."  That confirms the inadequacy of Plaintiff's theory, because "[t]here is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Comark Comm'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).  Dr. Frieder, however, testified that his

opinion of infringement for these two very different filtering elements rested on the "same evidence, same sources." (A2465-66.) That defies the plain language of the claims and therefore cannot support the jury's verdict. *See Dynacore*, 363 F.3d at 1278.

Because Plaintiff made no showing that the accused systems "filter the combined information," and instead added words to this element, Defendants are entitled to judgment as a matter of law as to the asserted '664 claims.

### 2.    No Mention of "Demand Search"

The asserted '420 claims contain the limitation of "scanning a network <u>to make a demand search</u> for informons relevant to a query from an individual user." ('420 claims 10, 25.) The district court construed "demand search" as "a single search engine query performed upon a user request." (A19.)

Yet when Dr. Frieder explained his infringement opinions for "scanning a network to make a demand search," he focused exclusively on the "scanning a network" sub-element. He produced no evidence or explanation at all regarding the "demand search" sub-element. (A2335-38; A2423-24.) He did not even mention the court's construction of this term, let alone show why the accused systems satisfy the construction. Nor could he: The construction of "demand search" was "a single <u>search engine query performed</u> upon a user request," but Plaintiff accused only advertising systems and repeatedly stated that no <u>search</u>

engine was accused. (A1960 ("This case is not about search engine results. It's not about looking for information. It's about advertising."); *see also* A1969-70 (distinguishing "the technology at issue in this case" from Google's "search engine technology").) As a matter of logic and language, only a search engine can make or perform a search engine query. Because the accused systems are indisputably not search engines, they could not make or perform a search engine query.

This simple fact is underscored by Plaintiff's allegations on the "scanning a network" sub-element in which the demand search limitation appears. Plaintiff alleged that the accused systems "scan a network" by doing an internal look-up for candidate ads stored on Google's databases. (A2336-37 ("You are finding the candidate ads that are stored . . . . They are scattered on a whole diverse machine.").) Thus, to satisfy the rest of the claim language, that internal ad lookup would have "to make a demand search," *i.e.* to perform a search engine query. Plaintiff, however, made no showing that Google's internal ads look-up performs a search engine query, or that the ads look-up constitutes any form of search engine activity. Nor could it as, again, Plaintiff itself argued that no search engine was even accused.

Thus, unable to show that the accused systems make a "search engine query," as required by the construction of "demand search," Plaintiff simply ignored the "demand search" sub-element altogether. Accordingly, Plaintiff has

31

not carried its burden of proof as to this sub-element, requiring judgment in

Defendants' favor as to the asserted '420 claims as a matter of law.

### C.    Defendants Are Entitled to New Trial

In the alternative, Defendants are entitled to new infringement trial due to

Plaintiff's repeated and improper insinuation that Google copied the Asserted

Patents.  As discussed above, Plaintiff insinuated that Google copied the Asserted

Patents because Google supposedly had no "development" story and because one

Google patent cited the '420 Patent.  (A1975; A3841; A3851-52.)  Plaintiff defied

the district court's ruling *in limine* to make these copying allegations.  And such

copying allegations are "highly prejudicial." *Eolas Tech., Inc. v. Microsoft Corp.*,

270 F. Supp. 2d 997, 1005 (N.D. Ill. 2003).

As another court held in granting a new trial based on improper copying

allegations: "the Court cannot now say Uniloc's abundance of copying 'evidence'

was harmless insofar as its likelihood to confuse, distract and taint consideration of

the other issues . . . . Microsoft's arguments that insinuation about copying would

pass for proof were correct." *Uniloc USA, Inc. v. Microsoft Corp.*, 640 F. Supp. 2d

150, 184 (D.R.I. 2009), *rev'd on other grounds*, 632 F.3d 1292 (Fed. Cir. 2011).

So here too, Plaintiff's legally improper "insinuation about copying" was highly

prejudicial, should never have been allowed, and warrants a new trial.  Fed. R.

Evid. 403; *Sparks v. Gilley Trucking Co.*, 992 F.2d 50, 53 (4th Cir. 1993) (ordering

a new trial when the court could not be certain that the erroneous admission of evidence did not adversely affect the outcome of the case). These arguments inherently prejudiced the jury's infringement inquiry by substituting "insinuation about copying" for proof of infringement. *Uniloc*, 640 F. Supp. 2d at 184.

Defendants are also entitled to a new trial due to the improper inclusion of jury instructions related to indirect infringement and the doctrine of equivalents. Plaintiff presented no evidence, expert testimony, or argument at trial that Defendants infringed indirectly or under the doctrine of equivalents. Thus, there would have been no basis to support a jury verdict of infringement under either theory. Yet, Plaintiff sought jury instructions on both doctrines. The district court granted Plaintiff's request, finding that DOE and indirect infringement were "reasonably raised by evidence in the case" (A3834), though Plaintiff never presented any such evidence.[7] Moreover, the verdict form did not include separate questions on indirect infringement or DOE. Instead, the verdict form simply asked if each of the Defendants infringed the asserted claims. (A4164-68.) To the extent the jury may have answered the infringement questions in the affirmative based on either indirect infringement or DOE, a new trial is required.

---

[7] It is clear that the jury was confused by the Court's instructions, as it asked a question about "third-party infringement" – language used in connection with indirect infringement – that made no sense whatsoever. (A3997 (announcing the jury's question of "Is there a date to use when considering the question of third-party infringement?").)

## II.    THE ASSERTED CLAIMS ARE INVALID

The asserted claims are obvious as a matter of law because they simply combine two prior-art filtering techniques: content-based filtering and collaborative filtering.  All of the claims' elements were well-known in the art, which contained explicit suggestions to combine these two complementary techniques.  Indeed, one of the prior art references, Culliss, squarely anticipates the claims by disclosing a search engine system that filters Internet articles based on scores that comprise a combination of content data and collaborative feedback data.

### A.    All Asserted Claims Are Obvious As A Matter Of Law

Obviousness is a question of law, based on underlying facts.  *Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1336 (Fed. Cir. 2013).  The obviousness inquiry considers: (1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations.  *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

Because obviousness is a question of law that this Court reviews *de novo*, this Court and the Supreme Court have admonished district courts to provide an "explicit" analysis of the issue.  *KSR*, 550 U.S. at 418; *Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 993 (Fed. Cir. 2009).  A

reasoned analysis of obviousness is especially important here because the jury did not reach that question; it answered only targeted interrogatories on "preliminary factual questions." (A4170-72.) Nonetheless, the district court kept its reasoning under wraps. In a two-page order deeming the patents non-obvious, the court cited no case law; quoted portions of the special verdict without elaboration; said nothing about other aspects of the verdict; made no additional factual findings; and provided no legal analysis. (A39-40.)

Thus, it falls to this Court, "as the appellate court to ensure that the law has been correctly applied to the facts" and to undertake the legal analysis *de novo*. *Agrizap Inc. v. Woodstream Corp.*, 520 F.3d 1337, 1343 (Fed. Cir. 2008). The PTO has made this Court's task easier by finally rejecting all asserted claims of the '420 Patent in light of the same prior art that was before the district court, and by non-finally rejecting all asserted claims of the '664 Patent as well. The PTO's analysis is not only sound, it is the only reasoned decision on point.

1.   The Prior Art Discloses Every Element of the Asserted Claims

At trial, Plaintiff characterized the asserted claims as a combination of four color-coded elements for purposes of infringement: (1) searching for information relevant to a query (yellow), (2) content-based analysis (blue), (3) collaborative analysis (green), and (4) combining the content and collaborative analysis to filter the searched information (purple). (A2277.) As explained in the Statement of

Facts, *supra*, these elements are plainly disclosed in the three obviousness references raised at trial: WebHound [a.k.a. Lashkari] (A5425-5510), Rose (A5414-24), and Fab (A5511-17).  (*See* A5511 ("By combining both collaborative and content-based filtering systems, Fab may eliminate many of the weaknesses found in each approach."); A5427 ("content-based filtering and automated collaborative filtering are complementary techniques, and the combination of ACF with some easily extractable features of documents is a powerful information filtering technique."); A5414, Abstract ("[t]he prediction of relevance is carried out by combining data pertaining to the content of each item of information with other data . . . obtained from feedback information provided by users."); A5502 (explaining how WebHound's content/collaborative filtering can be performed on search results); A5420, 2:51-55 (explaining how Rose's content/collaborative filtering can be performed on search results).)

Based on these disclosures, Defendants' invalidity expert Dr. Ungar testified on a claim-by-claim basis how these references render obvious every asserted claim.  (A3149-53;  A3162-65.)

## 2. The Only Supposed Missing Element Would Have Been an Obvious Addition as a Matter of Law

In the face of Defendants' obviousness evidence, Plaintiff's only response was that these references performed content/collaborative filtering on search results, but did not "tightly integrate" search and filtering by using the search query

36

in the filtering process.  Plaintiff's trial metaphor, as shown in the following

demonstrative of its validity expert Dr. Carbonell, was that these prior art

references throw search results "over the wall" to a content/collaborative filtering

system but do not also throw the search <u>query</u> over the wall so it too could be used

in the filtering process:



(A3689-90; A3728-29; A3735; A5561.)  In other words, Plaintiff's non-

obviousness position rests on whether it would be obvious to throw the query "over

the wall" along with the search results.

Initially, Dr. Carbonell reads in a limitation that is simply not there.  The

claims do not require throwing both the search query and the search results "over

the wall."  As the PTO found in the pending re-examination of the '420 Patent,

"[t]here is no claim language to exclude any alleged 'over-the-wall' approach in the

prior art, which simply 'combines' the two types of data in sequential steps."

(A4574.)[9]  In other words, the claim requirement of using content/collaborative

filtering to filter search results "for relevance to the query" is met by prior art

references that throw only the search results "over the wall" to a

content/collaborative filter, because those search results are then filtered for further

relevance to the query that generated them.  (*See id.* ("the relevant claim language

[] broadly recites 'combining pertaining feedback data from the feedback system

with the content profile data in filtering each informon for relevance to the query' .

. . . Therefore, a so-called 'over-the-wall' approach in the prior art would anticipate

the claimed invention.").)

---

[9]   This Final Office Action rejected all asserted '420 claims as invalid over, *inter alia*, WebHound and Rose.  (A4565-4600.)  The claims currently stand as rejected.  The PTO has also thus far issued a Non-Final Office Action rejecting every asserted '664 claim as anticipated or obvious over, *inter alia*, Rose.  (A5576-85.)

But even if Dr. Carbonell's claim interpretation were correct, that still leaves the question of whether it would be <u>obvious</u> to throw the query "over the wall," along with the results that indisputably were already thrown "over the wall," so that the content/collaborative filter could directly use the query when filtering. Notably, this was <u>not</u> a question answered by either the jury or the district court. Although the jury answered interrogatories stating that the prior art was different from the claims because the prior art did not "tightly integrate" search and filtering by filtering search results for relevance to the query, they did <u>not</u> answer any interrogatories as to whether it would be <u>obvious</u> to bridge this difference between the claims and the art – *i.e.,* whether it would be obvious to "tightly integrate" search and filtering by throwing the search query over the wall and directly using it for filtering. (A4170-72.) The district court did not answer this question any more than the jury did, as it simply recited the jury findings and then stated with no further analysis that the claims were not obvious. (A39-40.)

This Court should answer the question in the affirmative: it <u>would</u> be obvious as a matter of law to use the search query when filtering search results (*i.e.*, to throw the search query "over the wall" to a filtering system along with the search results). Indeed, this technique is obvious as a matter of sheer common sense. If you are filtering search results generated through a query, it simply makes sense to keep the query and use that also for filtering. (A3172-73; *Perfect*

*Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1328 (Fed. Cir. 2009) ("Common sense has long been recognized to inform the analysis of obviousness if explained with sufficient reasoning.").)

Further, the Asserted Patents state that "conventional search engines initiate a search in response to an individual user's query <u>and use content-based filtering to compare the query to accessed network informons</u> . . ."  (A206, 2:15-18 (emphasis added).)  Thus, using the search query for filtering – the very thing that Plaintiff alleged was missing from Defendants' obviousness references – was a conventional technique according to the Asserted Patents themselves.  This admission is dispositive: Plaintiff cannot now allege that using the query for filtering is a non-obvious innovation when the Asserted Patents admit that this technique was in the prior art.  *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988) ("A statement in a patent that something is in the prior art is binding on the applicant and patentee for determinations of anticipation and obviousness."); *PharmaStem*, 491 F.3d at 1362 (same).  As this Court recently held, even expert testimony about the supposed non-obviousness of a technique cannot overcome an admission from the patent-in-suit that such technique was in the prior art.  *See Smith & Nephew, Inc. v. Rea*, -- F.3d --, 2013 WL 3388454, at *7 n.6 (Fed. Cir. July 9, 2013) ("Expert opinions that are contrary to admissions in the specification [about the prior art] do not create a factual issue.").  Thus, using the search query

for filtering was a conventional prior art technique as a matter of law, despite Dr. Carbonell's unsupported opinion to the contrary.

        3.    <u>No Secondary Considerations Rebut the Obviousness Showing</u>

Secondary considerations "simply cannot overcome" the "strong prima facie case of obviousness" discussed above. *Agrizap*, 520 F.3d at 1344; *see also Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007); (A4170-72.) Indeed, Plaintiff introduced virtually no evidence on secondary considerations; that topic occupied only about two of the more than 2,000 pages of trial testimony generated by the three-week trial. (A3742-43.) For that reason as well, secondary considerations "do not weigh heavily in the obviousness analysis" in this case. *Allergan, Inc. v. Sandoz Inc.*, -- F.3d --, 2013 WL 1810852, at *6 (Fed. Cir. May 1, 2013). The district court implicitly acknowledged as much by not citing the jury's findings on secondary considerations in its order holding the claims non-obvious. (A39-40.)

In any event, the jury's findings are at best a mixed bag that sheds little light on the ultimate question of obviousness. Some of the jury's findings support a conclusion of <u>obviousness</u>; others relate to secondary considerations that neither side even addressed; and the jury inconsistently attributed some secondary considerations to one Asserted Patent but not the other, even though there was never any alleged difference between the two Patents on this score.

First, the jury found that the '664 Patent had been independently invented by others. (A4172.) This supports the obviousness of the '664 Patent. *See Geo. M. Martin Co. v. Alliance Mach. Sys. Int't LLC*, 618 F.3d 1294, 1305-06 (Fed. Cir. 2010). As neither party distinguished the two patents from each other for purposes of obviousness, the same finding should logically apply to the '420 Patent as well. (*See* A3730 (Plaintiff referring to the Asserted Patents monolithically as "the Lang and Kosak invention" for purposes of obviousness).)

Next, the jury found that there were unsuccessful attempts by others to find the solution provided by the '420 invention, but not the '664 invention. (A4170; A4172.) Here too, given that neither party distinguished the two Patents from each other for purposes of obviousness, these findings are internally inconsistent and cannot rebut the obviousness case. If anything, these inconsistent jury answers suggest the need for a new trial on obviousness, rather than rebutting the *prima facie* obviousness case. Fed. R. Civ. P. 49(b)(4).

On the issue of commercial success, Plaintiff presented no evidence that the Asserted Patents were ever used commercially by anyone who owned them. (A2185; A2192-94; A3170.) *Cf. Soverain*, 705 F.3d at 1346 (finding no commercial success where patentees' system "was abandoned by its developers and almost all of its original users"). While Plaintiff may argue that the commercial success of Google's Smart Ads system shows non-obviousness, Plaintiff never

even tried to show a nexus between Smart Ads' commercial success and the

Asserted Patents. *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (for

secondary indicia of non-obviousness to be accorded substantial weight, the

"proponent must establish a nexus between the evidence and the merits of the

claimed invention").  Nor <u>could</u> Plaintiff have shown the requisite nexus.

Plaintiff's own damages expert agreed that the accused Smart Ads component of

the accused systems includes numerous technologies <u>not</u> claimed by the Asserted

Patents (A2772), and further admitted that he did not evaluate whether the patented

technology is the basis of customer demand for Smart Ads.  (A2773.)

    As for copying, Plaintiff insinuated that Google copied the invention

because Google supposedly had no "development" story.  (A1975; A3841; A3851.)

This is no evidence at all.  It was <u>Plaintiff's</u> burden to prove copying, and Plaintiff

could not meet this burden by merely claiming that <u>Google</u> did not produce

evidence of how it developed its system.

    Plaintiff also introduced evidence that one of Google's own patents cited the

'420 Patent (A2104-05) and used this fact to support its insinuation of copying.

(A1975; A3852-53.)  But the mere citation of the '420 Patent in a single Google

patent is no evidence of copying either.  *Cf. Veritas Operating Corp. v. Microsoft

Corp.*, 562 F. Supp. 2d 1141, 1285 (W.D. Wash. 2008) (the mere citation of an

asserted patent in one of defendant's own patents does not show that the defendant even <u>knew</u> of the asserted patent).

The jury found acceptance by others as shown by praise or licensing (A4171-72) even though Dr. Carbonell was unaware of any praise for the claimed inventions (A3788) and even though Plaintiff introduced no licenses in its validity case.  Similarly, the jury found "unexpected results" (A4171-72) even though Plaintiff offered no evidence of this secondary consideration.  The word "unexpected" never even appears in Dr. Carbonell's testimony.

The jury also found a "long-felt need" (A4170-72), but the only supposed evidence of this secondary consideration was Dr. Carbonell's statement that WebHound, Rose, and Fab discussed the need to combine search and filtering, yet combined them in an inferior way.  (A3742-43.)  Merely stating that these references were inferior does not show a "need" for the supposedly superior method in the Asserted Patents.  Further, these references date back only to the mid-1990's and thus cannot show a "long-felt" anything in relation to the Asserted Patents, which have a 1998 priority date.  *Markman v. Lehman*, 987 F. Supp. 25, 43 (D. D.C. 1997) ("Establishing a long-felt need requires a showing that others skilled in the art in fact perceived a need <u>and that this perception persisted over a long period of time</u> . . . .") (emphasis added).

For the foregoing reasons, there certainly was no sufficient evidence of secondary considerations that could overcome the strong *prima facie* obviousness case.

## B.    Culliss Anticipates All Asserted Claims

The asserted claims are also squarely anticipated by the Culliss patent (A5518-32), which discloses a search engine system that ranks and filters Internet articles based on scores that include a combination of content and collaborative feedback.  Specifically, Culliss gives Internet articles a "key term score" for significant terms or words.  (A5521, 3:56-66 ("The present invention maintains an index of key words, terms, data or identifiers in English or other languages . . . . [A] key term score is associated with each article for each of the key terms.").)  This key term score can be initially set to reflect the content of the article, specifically how many times each key term appears in the article (*i.e.*, content analysis).  (A5526, 14:34-36.)  An article's key term score can then be increased when search engine users who query those key terms select that article from the search results list (*i.e.*, collaborative feedback analysis).  (A5521, 3:10-66, 4:37-49.)  Articles are presented to end-users in descending order of their overall key term scores.  (A5522, 5:7-17.)  In some embodiments, Culliss also filters out certain articles based on their key term scores.  (A5525, 12:1-5.)

At trial, Defendants' invalidity expert Dr. Ungar explained how Culliss meets every limitation of the asserted claims.  (A3201-25.)  Dr. Ungar's testimony was undisputed for most elements.  Plaintiff's validity expert, Dr. Carbonell, opined only that Culliss does not disclose "content analysis" or "filtering":

> Q:    Now, on your direct examination I think you said that you thought Culliss didn't disclose filtering and didn't disclose content-based analysis; is that right?
>
> A:    That's right.

(A3779.)  Plaintiff confirmed this to the district court, stating that Dr. Carbonell "talked about two things that were missing and he didn't talk about anything else in the reference."  (*Id.*)  Thus, the issue before the Court as to anticipation is limited to whether Culliss in fact discloses content analysis and filtering.

### 1.    Culliss Discloses Content Analysis

Culliss discloses content analysis because it looks to how often a key term appears in an article: "the scores can be initially set to correspond with the frequency of the term occurrence in the article."  (A5526, 14:34-36.)  This is an analysis of the article's content.  (A3202.)  Plaintiff never disputed this.

Instead, Dr. Carbonell opined that Culliss' repeated feedback-based adjustments will dilute and "swamp" the content portion of the scores to insignificance over time.  (A3714; A3787-88.)  But this theory – even if correct or supported – cannot show that the content portion of the scores is <u>absent</u> from Culliss.  Even "trace amounts" of a claimed element in a prior art reference suffices

for anticipation.  *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1345 (Fed. Cir. 2005).  Thus, even if the content portion of Culliss' scores were diluted to insignificance, it still exists, and that is dispositive for anticipation.[8]

In any event, Dr. Carbonell's "swamping" theory has no support in Culliss itself.  Rather, Culliss states that the feedback can both raise an article's key term score when the article is clicked on and lower that score when the article is not clicked on.  (A5521, 4:37-45; A5527, 15:12-19 (stating that an article's score can get a "+1" when selected and a "- 1" when not selected).)  Thus, these positive and negative feedback adjustments can mostly cancel each other out, leaving a significant or even dominant role for the content score to play in setting an article's overall score.  In other words, Dr. Carbonell's position that the initial content value will always be swamped by the feedback data is just one of many potential scenarios that Culliss contemplates.  Focusing on only one aspect of the reference, while ignoring others, is no basis to avoid an anticipation finding.  *Arthrocare Corp. v. Smith & Nephew, Inc.*, 406 F.3d 1365, 1372 (Fed. Cir. 2005).

### 2.    Culliss Discloses Filtering

Culliss discloses "filtering" in an embodiment where articles' key terms include "rating" key terms like X-rated, G-rated, etc.  Like the other key term

---

[8]    Dr. Carbonell's "swamping" theory also ignores the obvious fact that the content-based portion of the scores plays a dominant role early in the operation of

scores, the rating key term scores can be initially set by content analysis (A5526, 14:23-25) and then altered by user feedback.  (A5525, 11:47-51.)  Culliss also states that articles with X-rated scores above a threshold may be filtered out and not displayed to searchers who entered G-rated queries.[10]  (*Id.*, 11:8-12:41; 12:1-5: "X-Rated material can then be screened entirely from the rating key term of G-Rated by precluding articles entirely from the search results which have a key term probability score or comparison score for the rating key term X-Rated above a predetermined threshold.")

Dr. Carbonell testified that the filtering by rating key terms in Culliss is based only on user feedback, not content.  (A3718.)  But Culliss plainly states that the "rating key terms may be associated with words or other information in the article" and that "the scores can be initially set to correspond with the frequency of the term occurrence in the article."  (A5526, 14:23-25, 14:34-36.)  Again, and as Plaintiff never disputed, an analysis of "words" and "terms" in an article is a content analysis.  (A3202.)  Plaintiff cannot distinguish Culliss based on expert testimony that defies the plain language of Culliss itself.  *PharmaStem*, 491 F.3d at

---

Culliss, before the repeated user feedback supposedly dilutes or swamps the content portion to insignificance.

[10]    Culliss knows whether a given user's query is G-rated or X-rated because the system "would permit or require the user to enter a rating key term in the search query.  The invention would then operate in a similar manner for the rating key terms as described above for the key terms alone . . ."  (A5525, 11:40-42.)

1361 (directing JMOL of invalidity, despite expert testimony to the contrary, where the expert testimony "cannot be reconciled . . . with the prior art references themselves.").

Dr. Carbonell also argued that Culliss is non-enabled because it does not provide "a workable filtering." (A3717.) But Culliss is a patent. It presumptively is enabled, a presumption that Plaintiff must rebut with "persuasive" evidence. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1355 (Fed. Cir. 2003). Plaintiff provided no such persuasive evidence.

Instead, Dr. Carbonell said that some G-rated searchers might have to view X-rated articles before the articles could be labeled as X-rated and filtered out of subsequent G-rated search results. (A3719.) But, at most, this means that Culliss' X-rated filtering is not perfect, not non-enabled. *Decca Ltd. v. U.S.*, 544 F.2d 1070, 1077 (Ct. Cl. 1976) ("The mere fact that the system has some drawbacks, or that under certain postulated conditions it may not work . . . does not detract from the operability of the disclosed equipment to perform its described function.").[9]

## III. JMOL OF NO DAMAGES IS REQUIRED

Plaintiff at all times bore "the burden of proving the amount of reasonable royalty damages it is entitled to recover." *Transclean v. Bridgewood Servs.*, 290

---

[9] Dr. Carbonell also contended that Culliss may improperly label articles as X-rated just because adults like them. (A3718-A3719.) Nowhere does Culliss

49

F.3d 1364, 1376 (Fed. Cir. 2002).  Having failed to present sufficient evidence of

damages to meet its burden, JMOL – rather than remanding for a new trial – on

damages is appropriate.  *Weisgram v. Marley Co.*, 528 U.S. 440 (2000).

### A.   Because Plaintiff Submitted No Evidence of Post-Complaint Damages, JMOL of No Damages Should be Granted

The district court's laches ruling limited Plaintiff to damages that accrued

after the filing of the Complaint on September 15, 2011.  (A3660-61.)  But it is

undisputed that Plaintiff put no post-Complaint damages number into evidence:

"plaintiff concedes that Dr. Becker [Plaintiff's damages expert] did not provide a

number for the amount of damages from September 15, 2011 forward."  (A3817.)

Nor did Plaintiff introduce evidence of a post-Complaint royalty base from which

post-Complaint damages could be calculated.

Rather, even though Plaintiff knew full well that Defendants were pursuing a

laches defense, Plaintiff had its damages expert testify about Defendants' allegedly

apportioned revenue base for 2005 through 2012 as aggregate totals, as shown in

this demonstrative from trial:

---

actually say that.  Again, Plaintiff cannot distinguish Culliss through expert
testimony that has no support in Culliss itself.  *PharmaStem*, 491 F.3d at 1361.

CONFIDENTIAL MATERIAL SUBJECT TO PROTECTIVE ORDER

(A2686-87; A5560.)

With no evidence in the record regarding the alleged base and damages for the post-Complaint period, Plaintiff presented the jury at closing argument with a modified version of a demonstrative not admitted into evidence (over Defendants' objection) and asked the jury to calculate damages using their "memory and judgment":



(A3863; A5562.)  But demonstrative charts are not "evidence" as a matter of law. *United States v. Buck*, 324 F.3d 786, 790 (5th Cir. 2003); *Whitserve v. Computer Packages, Inc.*, 694 F.3d 10, 32 fn. 16 (Fed. Cir. 2012).  Thus, while the jury ultimately awarded running royalty damages of $30,496,155 (A4173), there is simply no admitted <u>evidence</u> to support a damage number of that amount.

*Weisgram* is on-point.  In *Weisgram*, the Supreme Court affirmed the Court of Appeals' grant of JMOL to defendant Marley, given the Court of Appeals' conclusion that plaintiff Weisgram's trial evidence was insufficient to support a plaintiff verdict.  *Weisgram,* 528 U.S. at 445-46.  In approving the Court of Appeals' decision to enter JMOL rather than remand for a new trial, the Supreme Court noted that "although Weisgram was on notice every step of the way that

Marley was challenging his experts, he made no attempt to add or substitute other evidence." *Id.* at 456.

Similarly, here, Plaintiff "was on notice every step of the way" that its ability to collect a full measure of damages from 2005 to the present was hotly disputed, because Defendants were pressing a laches defense that – if successful – would limit the damages period to 2011-present. (A674-77.) Yet Plaintiff chose not to introduce evidence of damages on a yearly or quarterly basis, so that it would have a post-Complaint damages number in evidence in case Defendants' laches defense proved successful.

In post-trial briefing, Plaintiff blamed its failure to submit post-Complaint damages on the timing of the district court's laches ruling. Plaintiff claimed it had no idea the court might decide laches before the case was submitted to the jury, such that post-Complaint damages would need to be in evidence for the jury's consideration. (A4433.) But Plaintiff can point to nothing in the record where the court stated that laches would be decided only after the jury verdict. To the contrary, four Declarations of Plaintiff's own counsel state: "The Court did not indicate when it would take this evidence [on laches] or when the record on the non-jury issues would be complete." (A4544, ¶ 2; A4547, ¶ 2; A4550, ¶ 2; A4555, ¶ 2.) And Plaintiff itself moved for judgment of no laches on October 30, 2012, days before the case was submitted to the jury, thus showing its understanding that

the Court would not necessarily wait until <u>after</u> the jury verdict to take laches

evidence and decide the laches issue.  (A3626; A3630-32.)

### B.    Plaintiff's Damages Theory Should Have Been Excluded

Even apart from the utter lack of damages evidence for the applicable time

period, Plaintiff's expert's testimony on damages was inadmissible under *Daubert*

and legally insufficient to support the jury verdict.  Plaintiff's expert, Dr. Becker,

mis-apportioned the royalty base, tried to justify an overly broad royalty base by

manipulating the royalty rate, and used non-comparable third-party licenses while

ignoring real-world transactions involving the Asserted Patents.  Defendants raised

these issues in their *Daubert* motion to exclude Dr. Becker's damages opinions

(A1479-1509), their motion to strike Dr. Becker's testimony (A2803-07), and their

Rule 50(a) motion on damages (A2859-67), all of which the district court denied

without substantive commentary.

### 1.    Plaintiff's Expert Failed To Properly Apportion The Royalty Base

It is black-letter law that where a patent covers only one part of a multi-

component system, a plaintiff cannot include revenue attributable to the entire

system in the royalty base.  *LaserDynamics*, 694 F.3d at 67; *Uniloc*, 632 F.3d at

1318-19; *Lucent*, 580 F.3d at 1336-39.  This rule is derived from the requirement

that the patentee "give evidence tending to separate or apportion the defendant's

profits and the patentee's damages between the patented feature and the unpatented features." *Uniloc*, 632 F.3d at 1318 (citation omitted).

Dr. Becker testified that he attempted to apportion a proper royalty base by relying on a document that on its face is a "DRAFT" of a Google document titled "Revenue Force June 26, 2006." Dr. Becker relied on the following chart in this draft document:



(A2656; A2763; A5559.) The chart has bars corresponding to "Cumulative Product Impact on RPM" (Revenue Per Thousand Queries) from "SmartASS" (referred to as "Smart Ads" at trial), "Spam," "Disabling," "Promotion," and other features. Literally with a ruler, Dr. Becker manually measured the size of the color-coded portions of the bars on a printout to estimate the supposed percentage impacts on revenue of "SmartASS," "Disabling," and "Promotion." (A2656-57;

A2769-71.)  He then used these manual measurements as the basis of his alleged

CONFIDENTIAL: Subject to Protective Order total royalty base.  (A2658-59.)

As an initial matter, Dr. Becker's manual measuring of bars in a draft chart with a ruler was not a valid economic technique.  But even if it were, Dr. Becker improperly swept <u>all</u> the revenue increase allegedly attributable to Smart Ads into his royalty base, even though there is no dispute that Smart Ads is a complex, multi-component system of which the Asserted Patents are only alleged to be one part.  For example, Plaintiff presented testimony that one aspect of Smart Ads is the generation of a predicted clickthrough rate (pCTR) for an advertisement, one use of which was an essential part of its infringement theory.  (A2313-16; A2319; A2374; A2430; A2545-46; A2555-56; A2899.)  Yet Plaintiff's technical expert, Dr. Frieder, agreed that the calculation of pCTR using Smart Ads was <u>Google's</u> invention and <u>not</u> taught by the patents.  (A2563-64.)  Dr. Frieder also did not accuse the ranking and placement of ads using pCTR of infringing the Asserted Patents (A2564), instead accusing only the disabling or "filtering" of certain ads using pCTR.  (A2346-49.)  Dr. Becker likewise agreed that Smart Ads "includes a lot more than just the technology that's accused of infringement."  (A2772.)  Yet he failed to apportion out the value of these non-accused Smart Ads technologies or their contribution to Defendants' revenues.  (A2773).  This was error.  *See Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283-85 (N.D.N.Y. 2009)

(Rader, C.J., sitting by designation) (even if a plaintiff makes <u>some</u> effort to apportion a royalty base from defendant's overall revenues, the royalty base must be rejected if it is not limited to value attributable to the patented technology.).

Dr. Becker testified that he attempted to account for his overly broad royalty base (*i.e.*, all of Smart Ads' revenue) by adjusting his royalty <u>rate</u> down.  (A2773 ("The only thing I have done is to value SmartAds, the thing that I have to assume is infringing, <u>recognize that there is many other things in it that Google contributed, and that's why we're talking about a 3 and a half percent royalty on it</u>...") (emphasis added).)  But this is precisely what this Court has said <u>not</u> to do.

In *LaserDynamics*, the plaintiff's damages expert testified that he accounted for a royalty base that included revenue attributable to unpatented aspects of the accused product by adjusting the royalty rate down by one-third.  694 F.3d at 69.  He offered, however, no "economic analysis to quantitatively support the one-third apportionment."  *Id*.  This Court deemed this adjustment arbitrary and ruled that admission of the expert's testimony warranted a new trial.  *Id.* at 70.

Similarly, in *Uniloc*, the plaintiff argued that the royalty base need not be properly apportioned "if the royalty rate is low enough."  *Uniloc*, 632 F.3d at 1319.  This Court rejected that argument, stating that "the Supreme Court and this court's precedents do not allow consideration of the entire market value of accused products for minor patent improvements <u>simply by asserting a low enough royalty</u>

rate." *Id*. at 1320 (emphasis added). Indeed, such an argument defeats the purpose of the apportionment rule, which is to prevent prejudice to the defendant caused by parading before the jury an inflated revenue figure that is only tenuously connected to the infringing technology. *See id*.

      2.      <u>Dr. Becker's Opinions as to the Royalty Rate and Form Were Based on Non-Comparable Licenses and Ignored Real-World Transactions Involving the Asserted Patents</u>

This Court "has long required district courts performing reasonable royalty calculations to exercise vigilance when considering past licenses to technologies *other* than the patent in suit." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (emphasis in original). These licenses must be "commensurate with what the defendant has appropriated." *Id.* at 872. "If not, a prevailing plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question." *Id*. It is "particularly troubling" when the district court admits testimony from a damages expert who disregards actual licenses to the patents-in-suit and instead relies on "extremely high rates" in unrelated licenses. *Id*. at 870. Unfortunately, this is just what happened here.

Specifically, Dr. Becker based his opinion of both the royalty rate and form of payment on licenses to different patents from a third-party Internet advertising company, Overture Services, to various other third-parties. Dr. Becker admitted

that he did not even look for other third-party agreements that might be comparable to the specific hypothetical negotiation in this case.  Instead, he opted to use the same Overture agreements that he had relied on in a previous case.  (A2741.)  Dr. Becker based his 3.5% royalty rate on these Overture agreements, which had running royalty rates of 3-5%.  (A2638-39; A2739-40.)[11]

However, Plaintiff and Dr. Becker failed to provide any justification for their assertion that the value of the technology claimed in the Overture patents is comparable to the technology claimed in the Asserted Patents.  For example, Plaintiff introduced no evidence about the breadth or importance of the Overture claims as compared to the breadth or importance of the asserted claims.  Dr. Becker also conceded that the Overture licensees were in radically different negotiating positions against Overture than Google would have been in a negotiation with Lycos (the Asserted Patents' former owner and counterparty to the hypothetical negotiation).  (A2742-47.)  For example, Overture was practicing the Overture patents (A2742-43), while Dr. Becker had no evidence of whether Lycos practiced the Asserted Patents.  (A2745.)  The Overture licensees were also not

---

[11]    At certain points during his testimony, Dr. Becker referred to these Overture agreements as the "Yahoo" agreements (A2638-A2639), after the company (Yahoo!) that bought Overture.  (A2742.)

"household name brands" or "global technology leaders," (A2743-44), unlike

Google.  Dr. Becker did not account for any of these differences.[10]

In contrast to the non-comparable Overture agreements, the record contains

at least two agreements underline{involving the Asserted Patents} that objectively show what

would have resulted from a hypothetical negotiation.  These agreements were

improperly ignored by Dr. Becker.  *LaserDynamics*, 694 F.3d at 80 (rejecting

expert's reliance on "irrelevant evidence to the exclusion of the many licenses

expressly for the [patent-in-suit].").

For example, Dr. Becker ignored Lycos' sale of the Asserted Patents, along

with six other patents, to Plaintiff in 2011 for a lump-sum payment of just $3.2

million.  (A1989; A2045-46; A2708-09; A2716; A2722; A2787.)  At the time of

this sale, Lycos would have been well-aware of Google's Smart Ads system, which

was a matter of public knowledge,[11] and any potential patent infringement claims it

would have had based on the Asserted Patents.  (*See* A5127-28 (public "AdWords

Post" published in 2005 about the accused functionality); A49 ("The language

included in the AdWords Post [] is significantly similar to the language utilized by

the Plaintiff in its complaint.").)  But Dr. Becker ignored this $3.2 million sale by

---

[10]    Dr. Becker also had no evidence of the actual amounts that any of the
Overture licensees ultimately paid under their agreements.  (A2740.)

[11]    Lycos was also using the accused systems as early as 2005, as shown by
the testimony of Lycos' 30(b)(6) deposition witness.  (A4205-07.)

Lycos, which included the Asserted Patents, and instead opined that Lycos (the licensor in the hypothetical negotiation) would have demanded no less than a running royalty from Google totaling nearly $500 million through November 2012 (and counting).

Dr. Becker also ignored the fact that in October 2004, Daum Communications bought the entire Lycos company, which owned the Patents at the time, for $95 million. (A2717-18.) This transaction occurred only about seven months after the hypothetical negotiation date that Dr. Becker used in his analysis. (*Id*.) Yet, Dr. Becker unreasonably opined that Google would have agreed to pay Lycos a running royalty amounting to over $493 million[12] just seven months after the <u>entire company</u> was sold for $95 million. (A2720-21.) The jury's award of nearly $30.5 million for one year of infringement is also greatly disproportionate to the $95 million sale price of all of Lycos. *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003), *vacated on other grounds*, 545 U.S. 193 (2005) (holding that a $15 million royalty award was unreasonable given that the entire company that held the asserted patents was sold for only $20 million).

---

[12]    After applying his 3.5% royalty rate to his (mal-apportioned) royalty base, and assuming that Plaintiff could collect damages for the entire pre-Complaint and post-Complaint period, Dr. Becker calculated a damages award of roughly $493 million.

The <u>form</u> of Dr. Becker's proposed royalty – a running royalty whereby Google agreed to pay Lycos a percentage of its revenue – was also based entirely on third-party or generalized evidence and ignored real-world transactions involving the Asserted Patents and the parties. The only "case-specific" evidence Dr. Becker cited was the fact that the third-party Overture licenses were in running-royalty form. (A2696-99.) But these licenses are not remotely comparable to the hypothetical negotiation, as discussed above, and so they cannot support Dr. Becker's running-royalty opinion.

By contrast, Dr. Becker ignored compelling evidence that the hypothetical negotiation would have resulted in a lump-sum agreement. All prior transactions involving the Asserted Patents were transfers of ownership in exchange for a lump-sum payment. (A5394; A2717-18.) Further, the only Google license agreement in evidence was for a lump-sum amount. (A5533.) Dr. Becker testified also that Google had a preference for lump sum agreements. (A2739.) As for the other party to the hypothetical negotiation, Lycos's 30(b)(6) representative testified that Lycos did not have any strong preferences regarding running royalty versus lump-sum agreements. (A4230.) Dr. Becker further testified that Lycos would have "viewed Google as a very attractive licensee" and "would have been willing to license the patents-in-suit to Google on attractive terms." (A2747.) Thus, it was

improper for Dr. Becker to assume that Lycos would not have honored Google's

demonstrated preference for lump-sum agreements in the hypothetical negotiation.

For all these reasons, Dr. Becker's evidence and analysis was legally

insufficient to carry Plaintiff's burden of proving damages.  Defendants are

therefore entitled to judgment as a matter of law that Plaintiff failed to prove

damages.

\* \* \*

Defendants respectfully clarify that they are <u>not</u> seeking a <u>new trial</u> on

damages.  Plaintiff had a full and fair opportunity to prove damages, but

squandered this opportunity by submitting a damages analysis that failed to

provide <u>any</u> post-Complaint damages and that failed to articulate an admissible or

legally cognizable damages theory.  Where (as here) Plaintiff had a full and fair

opportunity to prove damages yet failed to submit legally sufficient or even

admissible evidence to do so, the appropriate remedy to is grant JMOL of no

damages.  The Court should not allow Plaintiff a "second bite at the apple" by

giving Plaintiff another chance to submit proper damages evidence on remand.  *See*

*Weisgram*, 528 U.S. at 444 (Court of Appeals may enter judgment against the

verdict winner, rather than remanding for a new trial, where the verdict winner

"has had a full and fair opportunity to present the case" yet failed to introduce

legally sufficient evidence to support the verdict).

But if this Court <u>does</u> decide that a new trial is the appropriate remedy for Plaintiff's improper damages case, then the new trial should be for <u>all</u> issues, not just damages.  The Supreme Court has held that a partial new trial "may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." *Gasoline Products Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931).  In *Gasoline Products*, the Supreme Court reversed a lower court order limiting a new trial to damages and remanded for a new trial on liability as well because "the question of damages on the counterclaim is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial." *Id.*

Such is the case here: the question of damages is "interwoven" to a large extent with the question of infringement.  Not only did Plaintiff's running royalty damages theory depend on the extent of Defendants' alleged infringement, but a significant issue in <u>both</u> parties' damages case was whether there were viable non-infringing alternatives to the Asserted Patents.  (A2483-84; A2701-02; A3113-14; A3125-30.)  This, of course, requires an analysis of what infringes and does not infringe the Asserted Patents.

## Conclusion

For the foregoing reasons, Defendants respectfully request judgment of a matter of law or a new trial on non-infringement and invalidity, judgment as a matter of law that Plaintiff has failed to prove damages, or, alternatively, a new trial on all issues.


DATED: July 22, 2013                QUINN EMANUEL URQUHART &
                                     SULLIVAN, LLP


                                     By  */s/ David A. Perlson*
                                     David A. Perlson
                                     QUINN EMANUEL URQUHART &
                                     SULLIVAN LLP
                                     50 California Street, 22nd Floor
                                     San Francisco, California 94111
                                     (415) 875-6600
                                     (415) 875-6700 (fax)
                                     davidperlson@quinnemanuel.com

                                     *Attorney for Defendants-Appellants AOL*
                                     *Inc., Google Inc., IAC Search & Media,*
                                     *Inc., Target Corp., and Gannett Co., Inc.*

# ADDENDUM

## TABLE OF CONTENTS

| Docket | Document Description | Pages |
|--------|---------------------|-------|
| 705 | Order Number 2 – Pre-Trial Motions | A29-A38 |
| 799 | Memorandum Order | A39-A40 |
| 801 | Judgment | A57-A58 |
| 905 | Order | A60-A61 |
| 906 | Order | A62-A63 |
| 907 | Order | A64-A65 |
|  | US Patent No. 6,314,420 | A195-A220 |
|  | US Patent No. 6,775,664 | A221-A247 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

```
┌─────────────────────────────┐
│           FILED             │
│                             │
│        OCT 1 2 2012         │
│                             │
│  CLERK, US DISTRICT COURT   │
│        NORFOLK, VA          │
└─────────────────────────────┘
```

I/P ENGINE, INC.,

      Plaintiff,

V.                                    CIVIL ACTION NO. 2:11cv512

AOL INC., *et al.*,

      Defendants.

### *ORDER NUMBER 2 - PRE-TRIAL MOTIONS*

Before the Court are remaining motions to exclude evidence and witnesses from trial in the above-styled matter filed by both Plaintiff and Defendants. These matters have been fully briefed by the Parties. The Court finds that oral arguments of these motions will not aid its decisional process. Having reviewed the motions and related materials, the Court finds these matters ripe for judicial determination. For the reasons stated herein, and pursuant to the inherent authority to make evidentiary rulings prior to trial, *see Luce v. United States*, 469 U.S. 38, 41 n.4 (1984), the Court resolves the Parties' motions as outlined below.

### I. I/P Engine's *Motions in Limine*

#### A.    Plaintiff's First *Motion in Limine* to Exclude Inadmissible Evidence

While the Court resolved a majority of the issues related to Plaintiff's First *Motion in Limine*, two items remained outstanding. First, Plaintiff's sought to exclude evidence concerning recent offers and other negotiations for, and the 2011 purchase price of, the patent portfolio that included the patents-in-suit ("Item 2"). Second, Plaintiff's sought to exclude evidence concerning Plaintiff's failure to practice the inventions claimed in the patents ("Item 6"). The Court has determined that these items will be addressed at trial upon further consideration.

**A29**

Accordingly, Plaintiff's First *Motion in Limine* as to Items 2 and 6 is **DEFERRED**.

**B.     Plaintiff's Second Motion in Limine to Preclude Non-Comparable License Agreements**

To determine a reasonable royalty to remedy any patent infringement, parties traditionally engage in a hypothetical negotiation employing the 15 factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1119-20 (S.D.N.Y. 1970)("The *Georgia-Pacific* Factors") to guide their calculations. Factor Two of that test permits consideration of "[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit." *Id.* The Federal Circuit has provided guidelines in recent cases regarding how to determine whether a patent is "comparable" for the purposes of determining a reasonable royalty. First, "there must be a basis in fact to associate the royalty rates used in prior licenses to particular hypothetical negotiations at issue in the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011). In other words, the Federal Circuit has "determined that a patentee could not rely on license agreements that were radically different from the hypothetical agreement under consideration to determine a reasonable royalty." *Id (quoting Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327-1328 (Fed. Cir. 2009))(internal quotations omitted).

Next, the Federal Circuit requires that the past licensing agreements must be of the same subject matter as the patents in the instant case so that the finder of fact may "adequately evaluat[e] the probative value of those agreements." *Id.*, at 1328. The Federal Circuit has also directed that parties attempting to use comparable licenses to account for "the technological and economic differences between them." *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010) (*quoting ResQNet.com, Inc. v. Lansa, Inc,*, 594 F.3d 860, 873 (Fed. Cir. 2010)). Furthermore, "the trial court must carefully tie proof of damages to the

2

**A30**

claimed invention's footprint in the market place." *Id.,* at 869. Finally, the Federal Circuit has observed that "the hypothetical reasonable royalty calculation occurs before litigation and that litigation itself can skew the results of the hypothetical negotiation." *Id.,* at 872. As a result district courts are directed to be mindful of whether the comparable license at issue was negotiated under circumstances that might have influenced the value and form of the resulting royalty. *Id.,* 872-73. Plaintiff has sought to exclude licenses between Google and Disney and Google and Carl Meyer. Plaintiff also seeks to exclude seven licensing agreements between Google and a number of companies as well as agreements between Lycos, Inc. and Tivo/Blockbuster/Netflix. According to Defendants, these agreements were offered for the sole purpose of supporting the assertion that Google only enters into lump sum royalty agreements.

With respect to the Lycos, Inc. and Tivo/Blockbuster/Netflix agreements, the Court finds that they are inadmissible. By Dr. Ugone's own admission (which Defendants do not contest), these licenses cannot be considered comparable, which is why he placed no value or importance on their settlement amounts. Defendants argue that despite the fact that the agreements are not comparable, they are still relevant and admissible evidence to show Google's preferences toward lump sum royalty payments. However, the Federal Circuit has made clear that non-comparable licensing cannot be used as the basis for determining a reasonable royalty. Because the form of the royalty is equally important as the amount of the royalty, the Court concludes that if an agreement is non-comparable as to one aspect of the royalty question, it is non-comparable as to all aspects.

Furthermore, the Court believes that the introduction of these agreements, even if for the purpose of showing Google's preferred form of royalty, is likely to confuse the jury and allow them to give impermissible weight to the amounts of the lump sum payments associated with

3

**A31**

those agreements. Accordingly, for the reasons outlined above and under the Court's discretion under Fed. R. Evid. 403, Plaintiff's Second *Motion in Limine* to Preclude Non-Comparable License Agreements as to the Lycos, Inc. and Tivo/Blockbuster/Netflix agreements is **GRANTED**.

The Court's reasoning with respect to the Lycos agreements is equally applicable to the seven agreements Defendants wish to offer, which by their own admission are non-comparable, and are again solely offered for the purpose of showing a preference by Google for lump sum royalty payments. Non-comparable licenses cannot be used to determine either the form or amount of a reasonable royalty. Accordingly, for the reasons outlined above and under the Court's discretion under Fed. R. Evid. 403, Plaintiff's Second *Motion in Limine* to Preclude Non-Comparable License Agreements between Google and other third parties, as outlined in Plaintiff's memorandum in support of this motion, is **GRANTED**.

With respect to the Google and Carl Meyer Agreement, there is a disagreement as to whether the technology underlying the agreement is comparable for the purposes of permitting it to inform Defendants' reasonable royalty calculation. In a case involving a similar disagreement, the U.S. District Court in the District of Connecticut found that "the question of a reasonable royalty rate and the similarity of licensing agreements as a basis of reference for arriving at a reasonable royalty rate, are questions of fact." *Sargent Mfg. Co. v. Cal-Royal Prods.*, 2012 U.S. Dist. LEXIS 105260 (D. Conn. July 27, 2012). The district court reached its conclusion based on a number of Federal Circuit's precedents:

> [T]here must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." [*Uniloc* 632 F.3d] at 1317. Where no analogous licenses are available as a frame of reference, expert testimony may be offered opining on a reasonable royalty rate, provided that such testimony "carefully tie[s] proof of damages to the claimed invention's footprint in

4

**A32**

the marketplace." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010).

Id. Given it is the province of the jury to determine what a reasonable royalty as well as to determine the factual basis of said royalty, the Court finds that the question of whether the technology underlying the Google-Meyer Agreement is similar enough to be comparable for the purposes of determining a reasonable royalty is one for the jury. Accordingly, Plaintiff's Second *Motion in Limine* to exclude the Google-Meyer Agreement is **DENIED**.

Additionally, the Court's reasoning with respect to the Google-Meyer Agreement is equally applicable to the Google-Disney Agreement. As there is a dispute to whether the technology underlying the Google-Disney Agreements is comparable, the jury must resolve the dispute in the context of determining a reasonable royalty for damages. Consequently, Plaintiff's Second *Motion in Limine* to exclude the Google-Disney Agreement is **DENIED**.

Accordingly, Plaintiff's Second *Motion in Limine* to Preclude Non-Comparable License Agreements (ECF No. 333) is **GRANTED-IN-PART and DENIED-IN-PART**.

### C. Plaintiff's Motion to Exclude Opinions and Testimony of Dr. Keith R. Ugone

Federal Rule of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. To determine a reasonable royalty to remedy any patent infringement, parties traditional engage in a hypothetical negotiation employing the 15 factors set forth in *Georgia-Pacific Corp.* to guide their calculations. Plaintiff asserts that Defendants' damages rebuttal

5

**A33**

witness, Dr. Keith Ugone, uses an impermissible method ("the proxy" or "yardstick" method) to calculate his measure of damages based on non-comparable licensing agreements. Plaintiff also asserts that Dr. Ugone, despite not being a technical expert, will be elicited to give technical testimony. Defendants argue that they are not using a new or untested measure of damages in a patent suit and that any use of an analogy related home valuation in a real estate market is misinterpreted.

Regardless of whether Defendants are actually using a new approach for calculating damages, the Court has found no case law, nor has any been suggested to it, describing or supporting the use of any "yardstick" or "proxy" approach to measuring of damages. Accordingly, the Court **GRANTS** Plaintiff's Motion Exclude Opinions and Testimony of Keith R. Ugone as to any testimony using a "yardstick" or "proxy" methodology or the use of the real estate valuations analogies in this context. Dr. Ugone is free to present expert opinion using established methods of calculating damages, including the hypothetical negotiation approach guided by the *Georgia-Pacific* Factors, which he purports to use.

With respect to specific evidence concerning non-comparable agreements, the Court incorporates its findings above concerning said agreements into its decision regarding Dr. Ugone's testimony. Finally, the Court finds that while Dr. Ugone may provide the underlying basis of his analysis to the jury, he may not provide technical expert opinion. The Court will be mindful of this prohibition at trial. Accordingly, Plaintiff's Motion to Exclude Opinions and Testimony of Dr. Keith R. Ugone (ECF No. 340) is **GRANTED-IN-PART and DENIED-IN-PART**.

6

**A34**

**D.** **Plaintiff's Daubert Motion and Fourth *Motion in Limine*, to Exclude Lyle Ungars New Theory of Invalidity and Opinions Regarding Claim Construction.**

Having reviewed the motions and related pleadings, the Court finds that Dr. Ungars new theory of invalidity is not violative of Rule 26 procedures. Furthermore, the Court finds that Plaintiff has neither been surprised nor prejudiced by this new theory under Fourth Circuit precedent on this issue. *See Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). Accordingly, Plaintiff's motion as to Dr. Ungars' new theory of invalidity is **DENIED**.

With respect to any opinion or testimony Dr. Ungars intends to give that is contrary to the Court claim construction order, such testimony is not relevant and would likely cause jury confusion. As such, Plaintiff's motion as to Dr. Ungars' use of rejected claim constructions is **GRANTED**. Accordingly, Plaintiff's Daubert Motion and Fourth Motion in Limine, to Exclude Lyle Ungars New Theory of Invalidity and Opinions Regarding Claim Construction. (ECF No. 357) is **DENIED-IN-PART** and **GRANTED-IN-PART**.

## II. Defendants' Motions

**A.** **Defendants' *Motion in Limine* No. 1 to Preclude Plaintiff from Introducing Evidence on Willful Infringement, Pre-Suit Knowledge, or Copying**

Rule 8 of the Federal Rules of Civil Procedure require that a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief; and [] a demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8. After reviewing the arguments on this motion, the Court finds that Plaintiff failed to adequately plead willful infringement in its complaint as required by Rule 8. Accordingly, Defendant's *Motion in Limine* #1 (ECF No. 299) is **GRANTED**.

7

**A35**

**B.** **Defendants' *Motion in Limine* No. 2 to Exclude Evidence of Entire Market Value of Accused Products and of Defendants' Size, Wealth and Overall Revenues**

Although damage awards based on gross speculation may not be sustained, *see Wordtech Sys., Inc v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1321–22 (Fed. Cir. 2010), a district court may consider a hypothetical negotiation between a willing licensor and a willing licensee as a tool to fix a royalty rate that is adequate to compensate a patentee for infringement. *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 869–70 (Fed. Cir. 2003). In cases where "small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 2012 U.S. App. LEXIS 18441, *32-33 (Fed. Cir. Aug. 30, 2012). As a result, the Federal Circuit has found that "it is generally required that royalties be based not on the entire product, but instead on the "smallest salable patent-practicing unit."" *Id.* (*quoting Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009)). The "Entire Market Value Rule" serves as an exception to this generally practiced rule against entire product damages calculations. According to the Federal Circuit, "[i]f it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product. *Id.* (internal citation omitted). Taken together, it is clear that "patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable patent-practicing unit, without showing that the demand for the entire product is attributable to the patented feature." *Id.*, at *34-35.

At Final-Pre Trial Conference, Defendants essentially asked for reconsideration of the

8

**A36**

Court's previous denial of their *Motion in Limine* No. 2. Having again reviewed the relevant case law, the Court declines to reconsider its decision. I/P Engine, through its damages expert, is prepared to offer evidence at trial that "patented technology forms a substantial basis of the consumer demand of the accused products" through discovered documents showing increased revenue specifically attributed to patented technologies, presumably reflecting increased consumer demand. The sufficiency of this evidence in determining a reasonable royalty is a question for the jury. If questions arise as to whether Dr. Becker's trial testimony adequately supports application of the Entire Market Value Rule, they can be addressed through cross-examination or through relevant trial motions. Accordingly, motion for reconsideration of the Court's previous denial of their *Motion in Limine* No. 2 is **DENIED**.

### C. Defendants' Motion to Dismiss as to AOL Inc., Gannett Co., Inc., IAC Search & Media, Inc., and Target Corporation

The Federal Circuit has held that "the parties that make and sell an infringing device are joint tort-feasors with parties that purchase an infringing device for use or resale ...." *Shockley v. Arcan Inc.*, 248 F.3d 1349, 1364 (Fed. Cir. 2001). As a result, AOL, Gannett, IAC Search & Media, and Target Corporation may be jointly and severally liable for any alleged infringement with their co-defendant, Google, Inc., and the Plaintiff has alleged such. Furthermore, I/P Engine's damages expert, Dr. Becker, has provided specific damages calculations as to AOL, Inc., Gannett Co., and Target Corporation. Accordingly, Defendants' *Motion to Dismiss* (ECF No. 293) is **DENIED**.

### D. Defendants' Motion to Exclude the Testimony of Dr. Stephen L. Becker

Having reviewed the motion and related pleadings, the Court finds that objections to Dr. Becker's testimony are best resolved at trial during the course of examination as they generally

9

**A37**

go to the weight of the evidence and should be resolved by the jury. Accordingly, Defendants'

Motion to Exclude the Testimony of Dr. Stephen L. Becker (ECF No. 319) is **DENIED**.

     **E.**     **Defendants' Motion To Exclude (Preclude) The Testimony Of Dr. Ophir Frieder From Testifying Regarding Untimely Opinions That Were Not Disclosed In His Original Expert Report And Opinions That He Now Concedes Are Incorrect**

Having reviewed the motions and related pleadings, the Court finds that the supplemental

report filed by Dr. Frieder is not violative of Rule 26 procedures. Furthermore, the Court finds

that Defendants have neither been surprised nor prejudiced by the supplemental report under

Fourth Circuit precedent on this issue. *See Southern States Rack & Fixture, Inc. v. Sherwin-*

*Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). Accordingly, Defendants' Motion To Exclude

(Preclude) The Testimony Of Dr. Ophir Frieder From Testifying Regarding Untimely Opinions

That Were Not Disclosed In His Original Expert Report And Opinions That He Now Concedes

Are Incorrect (ECF No. 327) is **DENIED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel and parties of

record.

**IT IS SO ORDERED.**

Raymond A. Jackson
United States District Judge

Norfolk, Virginia
October /2 , 2012

10

**A38**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



FILED

NOV 20 2012

CLERK, US DISTRICT COURT
NORFOLK, VA

I/P ENGINE, INC.,

        **Plaintiff,**

V.

                                   **CIVIL ACTION NO. 2:11cv512**

AOL INC., *et al.,*

        **Defendants.**

## *MEMORANDUM ORDER*

At issue is whether the Defendants have proven, by clear and convincing evidence, that the '420 Patent and the '664 Patent are obvious and thus invalid. As part of the jury verdict form, the Court posed interrogatories to the jury to resolve any factual disputes underlying the question of nonobviousness. Neither party objected to the Court's posing of interrogatories to the jury on factual questions underlying nonobviousness. By stipulation, the parties agreed as to both the '420 Patent and the '664 Patent that the level of ordinary skill in the field that someone would have had at the time the claimed invention was made is "an individual with a bachelor's degree in computer science with at least 2 years of experience." The jury returned a verdict making underlying factual determinations on nonobviousness.

Specifically, with respect to the '420 patent, the jury found that "[n]o prior art applies because (1) the Bowman and Culliss references identified by Defendants lack any content analysis and filtering for relevance to the query and (2) other references identified by Defendants relate to profile system that do not disclose a tightly integrated search systems and could not filter information relevant to the query." As to the question of whether there were any differences between the claimed invention and the prior art at the time of the claimed invention,

**A39**

the Jury found that "[t]he Bowman and Culliss references did not disclose either limitation (b) (a

content-based filter and could not filter information relevant to the query or (d) (combining

feedback data with content profile data) of independent claims 10 and 25. The other asserted

references – Rose, Lashkari, and Fab, were profile systems that did not disclose a tightly

integrated search system, and could not filter information relevant to the query."

As to the '664 Patent, the Jury found that "[n]o prior art applies because (1) the Bowman

and Culliss references identified by Defendants lack any content analysis and filtering for

relevance to the query and (2) other references identified by Defendants relate to profile system

that do not disclose a tightly integrated search systems and could not filter information relevant

to the query." As to the question of whether there were any differences between the claimed

invention and the prior art at the time of the claimed invention, the Jury found that "[t]he

Bowman and Culliss references do not disclose limitation (c) of the independent claims 1 and 26,

because those references do not have a content-based filter that could not filter information

relevant to a query, or combine information from a feedback system with content profile data.

The other asserted references – Rose, Lashkari, and Fab, were profile systems that did not

disclose a tightly integrated search system, and could not filter information relevant to the

query."

Having considered the Jury's determinations, the Court finds that the Defendants have

failed to prove, by clear and convincing evidence, that the '420 Patent or the '664 Patent are

obvious. The Clerk is directed to send copies of this Order to all counsel of record.

**IT IS SO ORDERED.**

Norfolk, Virginia
November 20, 2012

Raymond A. Jackson
United States District Judge

**A40**

# UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
Norfolk Division

I/P ENGINE, INC.,

     Plaintiff.

v.

AOL INC., et. al.,

     Defendants.

```
┌─────────────────────────┐
│         FILED           │
│                         │
│      NOV 2 0 2012        │
│                         │
│  CLERK, US DISTRICT COURT │
│      NORFOLK, VA         │
└─────────────────────────┘
```

**JUDGMENT IN A CIVIL CASE**

CASE NUMBER:  2:11cv512

[X]  **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[ ]  **Decision by Court.** This action came for determination before the Court. The issues have been considered and a decision has been rendered.

     **IT IS ORDERED AND ADJUDGED** that plaintiff, I/P Engine, Inc., recover of defendant, Google, Inc., the sum of Fifteen Million Eight Hundred Thousand Dollars and 00/100 ($15,800,000.00). The Running Royalty Rate is 3.5%.

     **IT IS FURTHER ORDERED AND ADJUDGED** that plaintiff I/P Engine, Inc., recover of defendant AOL, Inc., the sum of Seven Million Nine Hundred Forty-Three Thousand Dollars and 00/100 ($7,943,000.00).

     **IT IS FURTHER ORDERED AND ADJUDGED** that plaintiff I/P Engine, Inc., recover of defendant IAC Search & Media, Inc., the sum of Six Million Six Hundred Fifty Thousand Dollars and 00/100 ($6,650,000.00).

     **IT IS FURTHER ORDERED AND ADJUDGED** that plaintiff I/P Engine, Inc., recover of defendant Gannett Co., Inc., the sum of Four Thousand Three Hundred Twenty-Two Dollars and 00/100 ($4,322.00).

     **IT IS FURTHER ORDERED AND ADJUDGED** that plaintiff I/P Engine, Inc., recover of defendant Target Corp., the sum of Ninety-Eight Thousand Eight Hundred Thirty-Three Dollars and 00/100 ($98,833.00).

**A57**

Date:  __November 20, 2012__                    FERNANDO GALINDO, CLERK


                                                By: _____/s/_____
                                                Patrice L. Thompson, Deputy Clerk

Form of judgment approved in accordance
with Rule 58, FRCivP, July 20, 2012


_____
Raymond A. Jackson
**United States District Judge**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

**I/P ENGINE, INC.,**

        **Plaintiff,**

**V.**

                                          **CIVIL ACTION NO. 2:11cv512**

**AOL INC.,** *et al.,*

        **Defendants.**

## ***ORDER***

Before the Court is Defendants' Renewed Motion for a Judgment as a Matter of Law on

Invalidity (ECF No. 820), pursuant to Federal Rule of Civil Procedure 50(b). As an alternative

to granting Defendants' Renewed Motion for a Judgment as a Matter of Law on Invalidity, the

Defendants seek a new trial on invalidity, pursuant to Federal Rule of Civil Procedure Rule

59(a). Rule 50 permits a district court, if it "finds that the jury would not have a legally

sufficient evidentiary basis to find for the party on that issue" to "resolve the issue against the

party...[or] grant a motion for judgment as a matter of law[.]" F.R.C. P. 50(a). As to motions

under Rule 50, only admissible evidence can be considered when determining whether there is a

legally sufficient evidentiary basis to support a jury's verdict. *Weisgram v. Marley Co.*, 528 U.S.

440, 454 (U.S. 2000). Rule 59(a) instructs that "[t]he court may, on motion, grant a new trial on

all or some of the issues--and to any party...after a jury trial, for any reason for which a new trial

has heretofore been granted in an action at law in federal court[.]" As a general matter,

disturbing a jury's verdict by ordering a new trial under Rule 59(a) is an extreme remedy only

warranted in a narrow set of circumstances:

**A60**

> On such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that [1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Atlas Food Sys. & Servs. v. Crane Nat'l Vendors*, 99 F.3d 587, 594 (4th Cir. 1996). Further, "[o]n a Rule 59 motion, courts may make credibility judgments in determining the clear weight of the evidence." *Attard Indus. v. United States Fire Ins. Co.*, 2010 U.S. Dist. LEXIS 119119 (E.D. Va. Nov. 9, 2010) (citation omitted). Finally, "the court will search the record for evidence that could reasonably lead the jury to reach its verdict, drawing all reasonable inferences in favor of the verdict winner." 12 MOORE'S FEDERAL PRACTICE - Civil § 59.13 (3d ed. 1997).

Having reviewed the parties' memoranda, the Court first finds that there is a legally sufficient evidentiary basis for the jury's verdict on anticipation as well as the Court's determination on non-obviousness. Furthermore, the Court finds that the jury's verdict on anticipation and the Court's determination on non-obviousness are not against the clear weight of the evidence, nor based on evidence that is false, or will result in a miscarriage of justice. Defendants have raised issues that have already been resolved by the Court in prior rulings and orders. Accordingly, Defendants' Renewed Motion for a Judgment as a Matter of Law on Invalidity (ECF No. 820) is **DENIED**. The Clerk is **DIRECTED** to send a copy of this Order to counsel and parties of record.

**IT IS SO ORDERED.**

Norfolk, Virginia
April 2 , 2013

Raymond A. Jackson
United States District Judge

2

**A61**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**

FILED

APR - 2 2013

CLERK, US DISTRICT COURT
NORFOLK, VA

**I/P ENGINE, INC.,**

        **Plaintiff,**

**V.**

**AOL INC., *et al.,***

        **Defendants.**

**CIVIL ACTION NO. 2:11cv512**

### *ORDER*

Before the Court is Defendants' Renewed Motion for a Judgment as a Matter of Law on

Non-Infringement (ECF No. 831), pursuant to Federal Rule of Civil Procedure 50(b).  As an

alternative to granting the Defendants' Renewed Motion for a Judgment as a Matter of Law on

Non-Infringement, the Defendants seek a new trial on infringement, pursuant to Federal Rule of

Civil Procedure Rule 59(a).  Rule 50 permits a district court, if it "finds that the jury would not

have a legally sufficient evidentiary basis to find for the party on that issue" to "resolve the issue

against the party…[or] grant a motion for judgment as a matter of law[.]" F.R.C. P. 50(a).  As to

motions under Rule 50, only admissible evidence can be considered when determining whether

there is a legally sufficient evidentiary basis to support a jury's verdict. *Weisgram v. Marley Co.*,

528 U.S. 440, 454 (U.S. 2000).  Rule 59(a) instructs that "[t]he court may, on motion, grant a

new trial on all or some of the issues--and to any party…after a jury trial, for any reason for

which a new trial has heretofore been granted in an action at law in federal court[.]"  As a

general matter, disturbing a jury's verdict by ordering a new trial under Rule 59(a) is an extreme

remedy only warranted in a narrow set of circumstances:

> On such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that [1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Atlas Food Sys. & Servs. v. Crane Nat'l Vendors*, 99 F.3d 587, 594 (4th Cir. 1996). Further, "[o]n a Rule 59 motion, courts may make credibility judgments in determining the clear weight of the evidence." *Attard Indus. v. United States Fire Ins. Co.*, 2010 U.S. Dist. LEXIS 119119 (E.D. Va. Nov. 9, 2010) (citation omitted). Finally, "the court will search the record for evidence that could reasonably lead the jury to reach its verdict, drawing all reasonable inferences in favor of the verdict winner." 12 MOORE'S FEDERAL PRACTICE - Civil § 59.13 (3d ed. 1997).

Having reviewed the parties' memoranda, the Court first finds that there is a legally sufficient evidentiary basis for the jury's verdict. Furthermore, the Court finds that the verdict is not against the clear weight of the evidence, nor was the verdict of the jury based on evidence that is false, or will a miscarriage of justice result. Defendants have raised issues that have already been resolved by the Court in prior rulings and orders. Accordingly, Defendants' Renewed Motion for a Judgment as a Matter of Law on Non-Infringement (ECF No. 831) is **DENIED**. The Clerk is **DIRECTED** to send a copy of this Order to counsel and parties of record.

**IT IS SO ORDERED.**

Norfolk, Virginia
April ___, 2013

/s/
Raymond A. Jackson
United States District Judge

2

**A63**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Norfolk Division**



FILED

APR - 2 2013

CLERK, US DISTRICT COURT
NORFOLK, VA

**I/P ENGINE, INC.,**

      **Plaintiff,**

**V.**                                           **CIVIL ACTION NO. 2:11cv512**

**AOL INC.,** *et al.,*

      **Defendants.**

*ORDER*

    Before the Court is Defendants' Renewed Motion for a Judgment as a Matter of Law on

Damages (ECF No. 833), pursuant to Federal Rule of Civil Procedure 50(b).  As an alternative to

granting the Defendants' Renewed Motion for a Judgment as a Matter of Law on Damages, the

Defendants seek a new trial on all issues, pursuant to Federal Rule of Civil Procedure Rule 59(a).

Rule 50 permits a district court, if it "finds that the jury would not have a legally sufficient

evidentiary basis to find for the party on that issue" to "resolve the issue against the party…[or]

grant a motion for judgment as a matter of law[.]" F.R.C. P. 50(a).  As to motions under Rule

50, only admissible evidence can be considered when determining whether there is a legally

sufficient evidentiary basis to support a jury's verdict. *Weisgram v. Marley Co.*, 528 U.S. 440,

454 (U.S. 2000).  Rule 59(a) instructs that "[t]he court may, on motion, grant a new trial on all or

some of the issues--and to any party…after a jury trial, for any reason for which a new trial has

heretofore been granted in an action at law in federal court[.]"  As a general matter, disturbing a

jury's verdict by ordering a new trial under Rule 59(a) is an extreme remedy only warranted in a

narrow set of circumstances:

**A64**

> On such a motion it is the duty of the judge to set aside the verdict and grant a new trial, if he is of the opinion that [1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict.

*Atlas Food Sys. & Servs. v. Crane Nat'l Vendors*, 99 F.3d 587, 594 (4th Cir. 1996). Further, "[o]n a Rule 59 motion, courts may make credibility judgments in determining the clear weight of the evidence." *Attard Indus. v. United States Fire Ins. Co.*, 2010 U.S. Dist. LEXIS 119119 (E.D. Va. Nov. 9, 2010) (citation omitted). Finally, "the court will search the record for evidence that could reasonably lead the jury to reach its verdict, drawing all reasonable inferences in favor of the verdict winner." 12 MOORE'S FEDERAL PRACTICE - Civil § 59.13 (3d ed. 1997).

Having reviewed the parties' memoranda, the Court first finds that there is a legally sufficient evidentiary basis for the jury's verdict. Furthermore, the Court finds that the verdict is not against the clear weight of the evidence, nor was the verdict of the jury based on evidence that is false, or will a miscarriage of justice result. Defendants have raised issues that have already been resolved by the Court in prior rulings and orders. Accordingly, Defendants' Motion for Judgment as a Matter of Law on Damages or New Trial (ECF No. 833) is **DENIED**. The Clerk is **DIRECTED** to send a copy of this Order to counsel and parties of record.

**IT IS SO ORDERED.**

Norfolk, Virginia
April 2, 2013

Raymond A. Jackson
United States District Judge

**A65**

US006314420B1

(12) **United States Patent**

Lang et al.

(10) Patent No.: **US 6,314,420 B1**

(45) Date of Patent: *Nov. 6, 2001

(54) **COLLABORATIVE/ADAPTIVE SEARCH ENGINE**

(75) Inventors: **Andrew K. Lang**; **Donald M. Kosak**, both of Pittsburgh, PA (US)

(73) Assignee: **Lycos, Inc.**, Waltham, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/204,149**

(22) Filed: **Dec. 3, 1998**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/627,436, filed on Apr. 4, 1996, now Pat. No. 5,867,799.

(51) Int. Cl.$^7$ ................................................. **G06F 17/30**

(52) U.S. Cl. ..................................... **707/3**; 707/10; 707/2; 707/5

(58) Field of Search ........................... 707/1, 10, 102, 707/3, 2, 5

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,019,961 | * | 5/1991 | Addesso et al. | 364/192 |
| 5,117,349 | * | 5/1992 | Tirfing et al. | 707/5 |
| 5,249,262 | * | 9/1993 | Baule | 395/66 |
| 5,471,610 | * | 11/1995 | Kawaguchi et al. | 707/4 |
| 5,537,586 | * | 7/1996 | Amram et al. | 707/3 |
| 5,544,049 | * | 8/1996 | Henderson et al. | 364/419.19 |
| 5,563,998 | * | 10/1996 | Yaksich et al. | 395/149 |
| 5,563,999 | * | 10/1996 | Yaksich et al. | 395/149 |

| | | | | |
|---|---|---|---|---|
| 5,608,447 | * | 3/1997 | Farry et al. | 348/7 |
| 5,649,186 | * | 7/1997 | Ferguson | 707/10 |
| 5,842,199 | * | 11/1998 | Miller et al. | 707/2 |
| 5,867,799 | * | 2/1999 | Lang et al. | 707/1 |
| 5,983,214 | * | 11/1999 | Lang et al. | 707/1 |
| 6,006,222 | | 12/1999 | Culliss | 707/5 |
| 6,014,665 | | 1/2000 | Culliss | 707/5 |
| 6,029,161 | * | 2/2000 | Lang et al. | 707/1 |
| 6,078,916 | | 6/2000 | Culliss | 707/5 |
| 6,182,068 | | 1/2001 | Culliss | 707/5 |

OTHER PUBLICATIONS

Michael Persin, Document Filtering for Fast Ranking, Proceeding of the seventeenth annual international ACM–SIGIR conference on research and development in information retrieval, Jul. 6, 1994, pp. 339–348.*

* cited by examiner

*Primary Examiner*—Thomas Black
*Assistant Examiner*—Frantz Coby
(74) *Attorney, Agent, or Firm*—Testa, Hurwitz & Thibeault, LLP

(57) **ABSTRACT**

A search engine system is provided for a portal site on the internet. The search engine system employs a regular search engine to make one-shot or demand searches for information entities which provide at least threshold matches to user queries. The search engine system also employs a collaborative/content-based filter to make continuing searches for information entities which match existing wire queries and are ranked and stored over time in user-accessible, system wires corresponding to the respective queries. A user feedback system provides collaborative feedback data for integration with content profile data in the operation of the collaborative/content-based filter. A query processor determines whether a demand search or a wire search is made for an input query.

**36 Claims, 10 Drawing Sheets**



U.S. Patent

Nov. 6, 2001

Sheet 1 of 10

US 6,314,420 B1

A196



FIG.1

U.S. Patent

Nov. 6, 2001    Sheet 2 of 10    US 6,314,420 B1

**A197**



*FIG. 2*



*FIG. 3*



*FIG. 4*



*FIG.5*

U.S. Patent

Nov. 6, 2001

Sheet 6 of 10

US 6,314,420 B1

A201



NOTE: IRP=INDEPENDENT
       RATING PREDICTOR

      UP=UNCERTAINTY
         PREDICTOR

FIG. 6

U.S. Patent

Nov. 6, 2001

Sheet 7 of 10

US 6,314,420 B1

**A202**

TOP MIND POOL
ALL USERS

501

502a

SUB
MIND POOL

502b

SUB
MIND POOL

502c

SUB
MIND POOL

505a

USERS

505b

USERS

SUB-SUB
MIND POOL

SUB-SUB
MIND POOL

SUB-SUB
MIND POOL

SUB-SUB
MIND POOL

SUB-SUB
MIND POOL

SUB-SUB
MIND POOL

SUB-SUB
MIND POOL

503a

503b

503c

503d

503e

503f

503g

USERS

USERS

USERS

USERS

USERS

USERS

USERS

504a

504b

504c

504d

504e

504f

504g

*FIG. 7*





FIG. 8



**FIG. 9**

A204

U.S. Patent

Nov. 6, 2001

Sheet 10 of 10

US 6,314,420 B1

A205



WIRE RETURNS TO USERS RELEVANT INFORMONS LIST

ADAPTIVE FEEDBACK DATA FOR OTHER USER CONTENT PROFILES

ADAPTIVE FEEDBACK DATA FOR USER CONTENT PROFILE

COLLABORATIVE
FEEDBACK
DATA

FEEDBACK PROCESSOR-
FEEDBACK DATA FOR
CONSIDERED INFORMONS

74C

INFORMON RATINGS

INFORMON RATINGS

62C

60C

INDIVIDUAL
USER
STATION

QUERY
PROCESSOR

EXISTING WIRES

CREDIT WIRE

80FD

76C

64C

OTHER
USER
STATIONS

COLLABORATIVE/
CONTENT-BASED
FILTER
STRUCTURE

66C

WIRE
MEMORY

72C

SPIDER-
CONTINOUS
INFORMON
ACQUISITION

68C

MEMORY

70C

SEARCH
ENGINE
(DEMAND)

CONTENT-
BASED
FILTER
STRUCTURE

MEMORY

78CM

SPIDER-
INFORMON
ACQUISITION
ON DEMAND

78C

DEMAND SEARCH
RETURN PROCESSOR

82C

DEMAND
SEARCH
MEMORY

80C

NETWORK

WEB
SITE
A

WEB
SITE
M

FIG. 10

US 6,314,420 B1

1

# COLLABORATIVE/ADAPTIVE SEARCH ENGINE

This application is a continuation-in-part of copending application Ser. No. 08/627,436 filed on Apr. 4, 1996 now U.S Pat. No. 5,867,799, the entire contents of which are hereby incorporated by reference.

## BACKGROUND OF THE INVENTION

The present invention relates to information processing systems for large or massive information networks, such as the internet, and more particularly to such information systems especially adapted for operation in portal and other web sites wherein a search engine operates with collaborative and content-based filtering to provide better search responses to user queries.

In the operation of the internet, a countless number of information are available for downloading from any of at least thousands of sites for consideration by a user at the user's location. A user typically connects to a portal or other web site having a search capability, and thereafter enters a particular query, i.e., a request for information relevant to a topic, a field of interest, etc. Thereafter, the search site typically employs a "spider" scanning system and a content-based filter in a search engine to search the internet and find information which match the query. This process is basically a pre-search process in which matching informons are found, at the time of initiating a search for the user's query, by comparing informons in an "informon data base" to the user's query. In essence, the pre-search process is a short term search for quickly finding and quickly identifying information entities which are content matched to the user's query.

The return list of matching informons can be very extensive according to the subject of the query and the breadth of the query. More specific queries typically result in shorter return lists. In some cases, the search site may also be structured to find web sites which probably have stored informons matching the entered query.

Collaborative data can be made available to assist in informon rating when a user actually downloads an informon, considers and evaluates it, and returns data to the search site as a representation of the value of the considered informon to the user.

In the patent application which is parent to this continuation-in-part application, i.e. Ser. No. 08/627,436, filed by the present inventors on Apr. 4, 1996, now U.S. Pat. No. 5,867,799 and hereby incorporated by reference, an advanced collaborative/content-based information filter system is employed to provide superior filtering in the process of finding and rating informons which match a user's query. The information filter structure in this system integrates content-based filtering and collaborative filtering to determine relevancy of informons received from various sites in the Internet or other network. In operation, a user enters a query and a corresponding "wire" is established, i.e., the query is profiled in storage on a content basis and adaptively updated over time, and informons obtained from the network are compared to the profile for relevancy and ranking. A continuously operating "spider" scans the network to find informons which are received and processed to determine relevancy to the individual user's wire or to wires established by numerous other users.

The integrated filter system compares received informons to the individual user's query profile data, combined with collaborative data, and ranks, in order of value, informons

2

found to be relevant. The system maintains the ranked informons in a stored list from which the individual user can select any listed informon for consideration.

As the system continues to feed the individual user's "wire", the stored relevant informon list typically changes due to factors including a return of new and more relevant informons, adjustments in the user's query, feedback evaluations by the user for considered informons, and updatings in collaborative feedback data. Received informons are similarly processed for other users' wires established in the information filter system. Thus, the integrated information filter system performs continued long-term searching, i.e., it compares network informons to multiple users' queries to find matching informons for various users' wires over the course of time, whereas conventional search engines initiate a search in response to an individual user's query and use content-based filtering to compare the query to accessed network informons typically to find matching informons during a limited, short-term search time period.

The present invention is directed to an information processing system especially adapted for use at internet portal or other web sites to make network searches for information entities relevant to user queries, with collaborative feedback data and content-based data and adaptive filter structuring, being used in filtering operations to produce significantly improved search results.

## SUMMARY OF THE INVENTION

A search engine system employs a content-based filtering system for receiving informons from a network on a continuing basis and for filtering the informons for relevancy to a wire or demand query from an individual user. A feedback system provides feedback data from other users.

Another system controls the operation of the filtering system to filter for one of a wire response and a demand response and to return the one response to the user. The filtering system combines pertaining feedback data from the feedback system with content profile data in determining the relevancy of the informons for inclusion in at least a wire response to the query.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an diagrammatic representation of an embodiment of an information filtering apparatus according to the present invention.

FIG. 2 is an diagrammatic representation of another embodiment of an information filtering apparatus according to the present invention.

FIG. 3 is a flow diagram for an embodiment of an information filtering method according to the present invention.

FIG. 4 is a flow diagram for another embodiment of an information filtering method according to the present invention.

FIG. 5 is a flow diagram for yet another embodiment of an information filtering method according to the present invention.

FIG. 6 is an illustration of a three-component-input model and profile with associated predictors.

FIG. 7 is an illustration of a mind pool hierarchy.

FIG. 8 is a logic diagram illustrating a search selection feature of the invention;

FIG. 9 is a functional block diagram of an embodiment of the invention in which an integrated information processing

US 6,314,420 B1

3

system employs a search engine and operates with combined collaborative and content-based filtering, which is preferably adaptive, to develop responses to user queries.

FIG. 10 shows another and presently preferred embodiment of the invention in which an information processing system includes an integrated filter structure providing collaborative/adaptive-content-based filtering to develop longer term, continuing responses to user queries, and a search engine structure which provides short term, demand responses to user queries, with the system directing user queries to the appropriate structure for responses.

## DETAILED DESCRIPTION OF THE EMBODIMENTS

The invention herein is preferably configured with an apparatus and method for information filtering in a computer system receiving a data stream from a computer network, in which entities of information relevant to the user, or "informons," are extracted from the data stream using content-based and collaborative filtering. The information filtering is long term in the sense that it operates on a continuing basis, and is both interactive and distributed in structure and method. It is interactive in that communication is substantially big-directional at each level of the filter. It is distributed in that all or part of the information filter can include a purely hierarchical (up-and-down/parent-child) structure or method, a purely parallel (peer-to-peer) structure or method, or a combination of hierachical and parallel structures and method.

As used herein, the term "informon" comprehends an information entity of potential or actual interest to a particular user. In general, informons can be heterogenous in nature and can be all or part of a textual, a visual, or an audio entity. Also, informons can be composed of a combination of the aforementioned entities, thereby being a multimedia entity. Furthermore, an informon can be an entity of patterned data, such as, a data file containing a digital representation of signals and can be a combination of any of the previously-mentioned entities. Although some of the data in a data stream, including informons, may be included in an informon, not all data is relevant to a user, and is not within the definition of an informon. By analogy, an informon may be considered to be a "signal," and the total data stream may be considered to be "signal +noise." Therefore, an information filtering apparatus is analogous to other types of signal filters in that it is designed to separate the "signal" from the "noise."

Also as used herein, the term "user" is an individual in communication with the network. Because an individual user can be interested in multiple categories of information, the user can be considered to be multiple clients each having a unique profile, or set of attributes. Each member client profile, then, is representative of a particular group of user preferences. Collectively, the member client profiles associated with each user is the user profile. The present invention can apply the learned knowledge of one of a user's member clients to others of the user's member clients, so that the importance of the learned knowledge, e.g., the user's preference for a particular author in one interest area as represented by the member client, can increase the importance of that particular factor, A's authorship, for others of the user's member clients. Each of the clients of one user can be associated with the individual clients of other users insofar as the profiles of the respective clients have similar attributes. A "community" is a group of clients, called member clients, that have similar member client profiles,

4

i.e., that share a subset of attributes or interests. In general, the subset of shared attributes forms the community profile for a given community and is representative of the community norms, or common client attributes.

The "relevance" of a particular informon broadly describes how well it satisfies the user's information need. The more relevant an informon is to a user, the higher the "signal" content. The less relevant the informon, the higher the "noise" content. Clearly, the notion of what is relevant to a particular user can vary over time and with context, and the user can find the relevance of a particular informon limited to only a few of the user's potentially vast interest areas. Because a user's interests typically change slowly, relative to the data stream, it is preferred to use adaptive procedures to track the user's current interests and follow them over time. Provision, too, is preferred to be made for sudden changes in interest, e.g., taking up antiquarian sword collecting and discontinuing stamp collecting, so that the method and apparatus track the evolution of "relevance" to a user and the communities of which the user is a member. In general, information filtering is the process of selecting the information that a users wishes to see, i.e., informons, from a large amount of data. Content-based filtering is a process of filtering by extracting features from the informon, e.g., the text of a document, to determine the informon's relevance. Collaborative filtering, on the other hand, is the process of filtering informons, e.g., documents, by determining what informons other users with similar interests or needs found to be relevant.

The system apparatus includes a filter structure having adaptive content based filters and adaptive collaborative filters, which respectively include, and respond to, an adaptive content profile and an adaptive collaboration profile. As used herein, the term "content-based filter" means a filter in which content data, such as key words, is used in performing the filtering process. In a collaborative filter, other user data is used in performing the filtering process. A collaborative filter is also sometimes referred to as a "content" filter since it ultimately performs the task of finding an object or document having content relevant to the content desired by a user. If there are some instances herein where the term "content filter" is used as distinguished from a collaborative filter, it is intended that the term "content filter" mean "content-based filter." The adaptive filters each are preferred to include at least a portion of a community filter for each community serviced by the apparatus, and a portion of a member client filter for each member client of the serviced communities. For this reason, the adaptive filtering is distributed in that each of the community filters perform adaptive collaborative filtering and adaptive content filtering, even if on different levels, and even if many filters exist on a given level. The integrated filtering permits an individual user to be a unique member client of multiple communities, with each community including multiple member clients sharing similar interests. The adaptive features permit the interests of member clients and entire communities to change gradually over time. Also a member client has the ability to indicate a sudden change in preference, e.g., the member client remains a collector but is no longer interested in coin collecting.

The filter structure also implements adaptive credibility filtering, providing member clients with a measure of informon credibility, as judged by other member clients in the community. For example, a new member client in a first community, having no credibility, can inject an informon into the data flow, thereby providing other member clients in other communities with the proposed informon, based on the

respective community profile and member client profiles. If the other member clients believe the content of the informon to be credible, the adaptive credibility profile will reflect a growing credibility. Conversely, feedback profiles from informon recipients that indicate a lack of credibility cause the adaptive credibility profile, for the informon author to reflect untrustworthiness. However, the growth and declination of credibility are not "purely democratic," in the sense that one's credibility is susceptible to the bias of others' perceptions, so the growth or declination of one's credibility is generally proportional to how the credibility of the new member client is viewed by other member clients.

Member clients can put their respective reputations "on the line," and engage in spirited discussions which can be refereed by other interested member clients. The credibility profile further can be partitioned to permit separate credibility sub-profiles for the credibility of the content of the informon, the author, the author's community, the reviewers, and the like, and can be fed back to discussion participants, reviewers, and observers to monitor the responses of others to the debate. The adaptive credibility profiles for those member clients with top credibility ratings in their communities may be used to establish those member clients as "experts" in their respective communities.

With this functionality, additional features can be implemented, including, for example, "instant polling" on a matter of political or consumer interest. In conjunction with both content and collaborative filtering, credibility filtering, and the resulting adaptive credibility profiles, also may be used to produce other features, such as on-line consultation and recommendation services. Although the "experts" in the communities most closely related to the topic can be afforded special status as such, member clients from other communities also can participate in the consultation or recommendation process.

In one embodiment of the consultation service, credibility filtering can be augmented to include consultation filtering. With this feature, a member client can transmit an informon to the network with a request for guidance on an issue, for example, caring for a sick tropical fish. Other member clients can respond to the requester with informons related to the topic, e.g., suggestions for water temperature and antibiotics. The informons of the responders can include their respective credibility profiles, community membership, and professional or avocational affiliations. The requester can provide feedback to each of the responders, including a rating of the credibility of the responder on the particular topic. Additionally, the responders can accrue quality points, value tokens, or "info bucks," as apportioned by the requester, in return for useful guidance.

Similarly, one embodiment of an on-line recommendation service uses recommendation filtering and adaptive recommendation profiles to give member clients recommendations on matters as diverse as local auto mechanics and world-class medieval armor refurbishers. In this embodiment, the requester can transmit the informon to the network bearing the request for recommendation. Other member clients can respond to the requester with informons having specific recommendations or dis-recommendations, advice, etc. As with the consultation service, the informons of the responders can be augmented to include their respective credibility profiles, community membership, and professional or avocational affiliations. A rating of each recommendation provided by a responder, relative to other responders' recommendations, also can be supplied. The requester can provide feedback to each of the responders, including a rating of the credibility of the responder on the particular

topic, or the quality of the recommendation. As before, the responders can accrue quality points, value tokens, or "info bucks," as apportioned by the requester, in return for useful recommendation.

Furthermore, certain embodiments are preferred to be self-optimizing in that some or all of the adaptive filters used in the system dynamically seek optimal values for the function intended by the filter, e.g., content analysis, collaboration, credibility, reliability, etc.

The filter structure herein is capable of identifying, the preferences of individual member clients and communities, providing direct and inferential consumer preference information, and tracking shifts in the preferences whether the shifts be gradual or sudden. The consumer preference information can be used to target particular consumer preference groups, or cohorts, and provide members of the cohort with targeted informons relevant to their consumer preferences. This information also may be used to follow demographical shifts so that activities relying on accurate demographical data, such as retail marketing, can use the consumer preference information to anticipate evolving consumer needs in a timely manner.

To provide a basis for adaptation, it is preferred that each raw informon be processed into a standardized vector, which may be on the order of 20,000 to 100,000 tokens long. The learning and optimization methods that ultimately are chosen are preferred to be substantially robust to the problems which can be presented by such high-dimensional input spaces. Dimensionality reduction using methods such as the singular value decomposition (SVD), or auto-encoding neural networks attempt to reduce the size of the space while initially retaining the information contained in the original representation. However, the SVD can lose information during the transformation and may give inferior results. Two adaptation/learning methods that are presently preferred include the TF-IDF technique and the MDL technique.

FIG. 1 illustrates one embodiment of an information filtering apparatus 1 structured for search engine implementation in accordance with the invention as described subsequently herein in connection with FIGS. 8 and 9. In general, a data stream is conveyed through network 3, which can be a global internet work. A skilled artisan would recognize that apparatus 1 can be used with other types of networks, including, for example, an enterprise-wide network, or "intranet." Using network 3, User #1 (5) can communicate with other users, for example, User #2 (7) and User #3 (9), and also with distributed network resources such as resource #1 (11) and resource #2 (13).

Apparatus 1 is preferred to be part of computer system 16, although User #1 (5) is not required to be the sole user of computer system 16. In one present embodiment, it is preferred that computer system 16 having information filter apparatus 1 therein filters information for a plurality of users. One application for apparatus 1, for example, could be that user 5 and similar users may be subscribers to a commercial information filtering service, which can be provided by the owner of computer system 16.

Extraction means 17 can be coupled with, and receives data stream 15 from, network 3. Extraction means 17 can identify and extract raw informons 19 from data stream 15.

Each of the raw informons 19 has an information content. Extraction means 17 uses the adaptive content filter, and at least part of the adaptive content profile, to analyze the data stream for the presence of raw informons. Raw informons are those data entities whose content identifies them as being "in the ballpark," or of potential interest to a community

7                                          8

coupled to apparatus 1. Extraction means 17 can remove duplicate informons, even if the informons arrive from different sources, so that user resources are not wasted by handling and viewing repetitive and cumulative information. Extraction means 17 also can use at least part of a community profile and a user profile for User #1 (5) to determine whether the informon content is relevant to the community of which User #1 is a part.

Filter means 21 adaptively filters raw informons 19 and produces proposed informons 23 which are conveyed to User #1 (5) by communication means 25. A proposed informon is a selected raw informon that, based upon the respective member client and community profiles, is predicted to be of particular interest to a member client of User 5. Filter means 21 can include a plurality of community filters 27a,b and a plurality of member client filters 28a–e, each respectively having community and member client profiles. When raw informons 19 are filtered by filter means 21, those informons that are predicted to be suitable for a particular member client of a particular community, e.g., User #1 (5), responsive to the respective community and member client profiles, are conveyed thereto. Where such is desired, filter means 21 also can include a credibility filter 35 which enables means 21 to perform credibility filtering of raw informons 19 according to a credibility profile.

It is preferred that the adaptive filtering performed within filter means 21 by the plurality of filters 27a,b, 28a–e, and 35, use a self-optimizing adaptive filtering so that each of the parameters processed by filters 27a,b, 28a–e, and 35, is driven continually to respective values corresponding to a minimal error for each individual parameter. Self-optimization encourages a dynamic, marketplace-like operation of the system, in that those entities having the most desirable value, e.g., highest credibility, lowest predicted error, etc., are favored to prevail.

Self-optimization can be effected according to respective preselected self-optimizing adaptation techniques including, for example, one or more of a top-key-word-selection adaptation technique, a nearest-neighbor adaptation technique, a term-weighting adaptation technique, a probabilistic adaptation technique, and a neural network learning technique. In one present embodiment of the invention, the term-weighting adaptation technique is preferred to be a TF-IDF technique and the probabilistic adaptation technique is preferred to be a MDL technique.

When user 5 receives proposed informon 23 from apparatus 1, user 5 is provided with multiple feedback queries along with the proposed informon. By answering, user 5 creates a feedback profile that corresponds to feedback response 29. User feedback response 29 can be active feedback, passive feedback, or a combination. Active feedback can include the user's numerical rating for an informon, hints, and indices. Hints can include like or dislike of an author, and informon source and timeliness. Indices can include credibility, agreement with consent or author, humor, or value. Feedback response 29 provides an actual response to proposed informon 23, which is a measure of the relevance of the proposed informon to the information need of user 5. Such relevance feedback attempts to improve the performance for a particular profile by modifying the profiles, based on feedback response 29.

A predicted response anticipated by adaptive filtering means 21 can be compared to the actual feedback response 29 of user 5 by first adaptation means 30, which derives a prediction error. First adaptation means 30 also can include prediction means 33, which collects a number of temporally-spaced feedback responses, to update the adaptive collaboration profile, the adaptive content profile, or both, with an adapted future prediction 34, in order to minimize subsequent prediction errors by the respective adaptive collaboration filter and adaptive content filter.

In one embodiment of the invention herein, it is preferred that prediction means 33 be a self-optimizing prediction means using a preselected learning technique.

Such techniques can include, for example, one or more of a op-key-word-selection learning technique, a nearest-neighbor learning technique, a term-weighting learning technique, and a probabilistic learning technique. First adaptation means 30 also can include a neural network therein and employ a neural network learning technique for adaptation and prediction. In one present embodiment of the invention, the term-weighting learning technique is preferred to be a TF-IDF technique and the probabilistic learning technique is preferred to be a MDL learning technique.

First adaptation means 30 further can include second adaptation means 32 for adapting at least one of the adaptive collaboration profiles, the adaptive content profiles, the community profile, and the user profile, responsive to at least one of the other profiles. In this manner, trends attributable to individual member clients, individual users, and individual communities in one domain of system 16 can be recognized by, and influence, similar entities in other domains (melding agent "minds"), contained within system 16 to the extent that the respective entities share common attributes.

Apparatus 1 also can include a computer storage means 31 for storing the profiles, including the adaptive content profile and the adaptive collaboration profile. Additional trend-tracking information can be stored for later retrieval in storage means 31, or may be conveyed to network 3 for remote analysis, for example, by User #2 (7).

FIG. 2 illustrates another preferred embodiment of information filtering apparatus 50, in computer system 51. Apparatus 50 can include first processor 52, second processor 53a,b, third processor 64a–d, and a fourth processor 55, to effect the desired information filtering. First processor 52 can be coupled to, and receive a data stream 56 from, network 57. First processor 52 can serve as a pre-processor by extracting raw informons 58 from data stream 56 responsive to preprocessing profile 49 and conveying informons 58 to second processor 53a,b.

Because of the inconsistencies presented by the nearly-infinite individual differences in the modes of conceptualization, expression, and vocabulary among users, even within a community of coinciding interests, similar notions can be described with vastly different terms and connotations, greatly complicating informon characterization. Mode variations can be even greater between disparate communities, discouraging interaction and knowledge-sharing among communities. Therefore, it is particularly preferred that processor 52 create a mode-invariant representation for each raw informon, thus allowing fast, accurate informon characterization and collaborative filtering. Mode-invariant representations tend to facilitate relevant informon selection and distribution within and among communities, thereby promoting knowledge-sharing, thereby benefitting the group of interlinked communities, i.e., a society, as well.

First processor 52 also can be used to prevent duplicate informons, e.g., the same information from different sources, from further penetrating, and thus consuming the resources of, the filtering process. Other processors 53a,b, 54a–d, also may be used to perform the duplicate informa-

US 6,314,420 B1

9

tion elimination function, but additionally may measure the differences between the existing informon and new informons. That difference between the content of the informon the previous time the user reviewed it and the content of the informon in its present form is the "delta" of interest. Processors 53a,b, 54a–d may eliminate the informon from further processing, or direct the new, altered informon to the member client, in the event that nature or extent of the change exceeds a "delta" threshold. In general, from the notion of exceeding a preselected delta threshold, one may infer that the informon has changed to the extent that the change is interesting to the user. The nature of this change can be shared among all of a user's member clients. This delta threshold can be preselected by the user, or by the preselected learning technique. Such processing, or "delta learning" can be accomplished by second processor 53a,b, alone or in concert with third processor 54a–d. Indeed, third processor 54a–d can be the locus for delta learning, where processor 54a–d adapts a delta learning profile for each member client of the community, i.e. user, thus anticipating those changes in existing informons that the user may find "interesting."

Second processor 53a,b can filter raw informons 58 and extract proposed community informons 59a,b therefrom. Informons 59a,b are those predicted by processor 53a,b to be relevant to the respective communities, in response to a community profiles 48a,b that are unique to the communities. Although only two second processors 53a,b are shown in FIG. 2, system 51 can be scaled to support many more processors, and communities. It is presently preferred that second processor 53a,b extract community informons 59a,b using a two-step process. Where processor 52 has generated mode-invariant concept representations of the raw informons, processor 53a,b can perform concept-based indexing, and then provide detailed community filtering of each informon.

Third processors 54a–d can receive community informons 59a,b from processors 53a,b, and extract proposed member client informons 61a–d therefrom, responsive to unique member client profiles 62a–d for respective ones of member clients 63a–d. Each user can be represented by multiple member clients in multiple communities. For example, each of users 64a,b can maintain interests in each of the communities serviced by respective second processors 53a,b, and each receive separate member client informons 61b,c and 61a,d, respectively.

Each member client 63a–d provides respective member client feedback 65a–d to fourth processor 55, responsive to the proposed member client informons 61a–d. Based upon the member client feedback 65a–d, processor 55 updates at least one of the preprocessing profile 49, community profiles 48a,b and member client profiles 62a–d. Also, processor 55 adapts at least one of the adaptive content profile 68 and the adaptive collaboration profile 69, responsive to profiles 49, 48a,b, and 62a–d.

Fourth processor 55 can include a plurality of adaptive filters 66a–d for each of the aforementioned profiles and computer storage therefor. It is preferred that the plurality of adaptive filters 66a–d be self-optimizing adaptive filters. Self-optimization can be effected according to a preselected self-optimizing adaptation technique including, for example, one or more of a top-key-word-selection adaptation technique, a nearest-neighbor adaptation technique, a term-weighting adaptation technique, and a probabilistic adaptation technique. Any of the adaptive filters 66a–d may include a neural network In one present embodiment of the invention, the term-weighting adaptation technique is pre-

10

ferred to be a TF-IDF technique and the probabilistic adaptation technique is preferred to be a MDL technique.

An artisan would recognize that one or more of the processors 52–55 could be combined functionally so that the actual number of processors used in the apparatus 50 could be less than, or greater than, that illustrated in FIG. 2. For example, in one embodiment of the present invention, first processor 52 can be in a single microcomputer workstation, with processors 53–55 being implemented in additional respective microcomputer systems. Suitable microcomputer systems can include those based upon the Intel® Pentium-Pro™ microprocessor. In fact, the flexibility of design presented by the invention allows for extensive scalability of apparatus 50, in which the number of users, and the communities supported may be easily expanded by adding suitable processors. As described in the context of FIG. 1, the interrelation of the several adaptive profiles and respective filters allow trends attributable to individual member clients, individual users, and individual communities in one domain of system 51 to be recognized by, and influence, similar entities in other domains, of system 51 to the extent that the respective entities in the different domains share common attributes.

The above described system operates in accordance with 100 for information filtering in a computer system, as illustrated in FIG. 3, which includes providing a dynamic informon characterization (step 105) having a plurality of profiles encoded therein, including an adaptive content profile and an adaptive collaboration profile; and adaptively filtering the raw informons (step 110) responsive to the dynamic informon characterization, thereby producing a proposed informon. The method continues by presenting the proposed informon to the user (step 115) and receiving a feedback profile from the user (step 120), responsive to the proposed informon. Also, the method includes adapting at least one of the adaptive content profile (step 125) and the adaptive collaboration profile responsive to the feedback profile; and updating the dynamic informon characterization (step 130) responsive thereto.

The adaptive filtering (step 110) in method 100 can be machine distributed adaptive filtering that includes community filtering (sub-step 135), using a community profile for each community, and client filtering (sub-step 140), similarly using a member client profile for each member client of each community. It is preferred that the filtering in sub-steps 135 and 140 be responsive to the adaptive content profile and the adaptive collaboration profile. Method 100 comprehends servicing multiple communities and multiple of users. In turn, each user may be represented by multiple member clients, with each client having a unique member client profile and being a member of a selected community. It is preferred that updating the dynamic informon characterization (step 130) further include predicting selected subsequent member client responses (step 150).

Method 100 can also include credibility filtering (step 155) of the raw informons responsive to an adaptive credibility profile and updating the credibility profile (step 160) responsive to the user feedback profile. Method 100 further can include creating a consumer profile (step 165) responsive to the user feedback profile. In general, the consumer profile is representative of predetermined consumer preference criteria relative to the communities of which the user is a member client. Furthermore, grouping selected ones (step 170) of the users into a preference cohort, responsive to the preselected consumer preference criteria, can facilitate providing a targeted informon (step 175), such as an advertisement, to the preference cohort.

**A210**

US 6,314,420 B1

11

FIG. 4 illustrates yet another preferred method 200. In general, method 200 includes partitioning (step 205) each user into multiple member clients, each having a unique member client profile with multiple client attributes and grouping member clients (step 210) to form a multiple communities with each member client in a particular community sharing selected client attributes with other member clients, thereby providing each community with a unique community profile having common client attributes.

Method 200 continues by predicting a community profile (step 215) for each community using first prediction criteria, and predicting a member client profile (step 220) for a member client in a particular community using second prediction criteria. Method 200 also includes the steps of extracting raw informons (step 225) from a data stream and selecting proposed informons (step 230) from raw informons. The proposed informons generally are correlated with one or more of the common client attributes of a community, and of the member client attributes of the particular member client to whom the proposed informon is offered. After providing the proposed informon to the user (step 235), receiving user feedback (step 240) in response to the proposed informons permits the updating of the first and second prediction criteria (step 245) responsive to the user feedback.

Method 200 further may include prefiltering the data stream (step 250) using the predicted community profile, with the predicted community profile identifying the raw informons in the data stream.

Step 230 of selecting proposed informons can include filtering the raw informons using an adaptive content filter (step 255) responsive to the informon content; filtering the raw informons using an adaptive collaboration filter (step 260) responsive to the common client attributes for the pertaining community; and filtering the raw informons using an adaptive member client filter (step 265) responsive to the unique member client profile.

It is preferred that updating the first and second prediction criteria (step 245) employ a self-optimizing adaptation technique, including, for example, one or more of a top-key-word-selection adaptation technique, a nearest-neighbor adaptation technique, a term-weighting adaptation technique, and a probabilistic adaptation technique. It is further preferred that the term-weighting adaptation technique be a TF-IDF technique and the probabilistic adaptation technique be a minimum description length technique.

The information filtering method shown in FIG. 5 provides rapid, efficient data reduction and routing, or filtering, to the appropriate member client. The method 300 includes parsing the data stream into tokens (step 301); creating a mode-invariant (MI) profile of the informon (step 305); selecting the most appropriate communities for each informon, based on the MI profile, using concept-based indexing (step 310); detailed analysis (step 315) of each informon with regard to its fit within each community; eliminating poor-fitting informons (step 320); detailed filtering of each informon relative to fit for each member client (step 325); eliminating poor-fitting informons (step 330); presenting the informon to the member client/user (step 335); and obtaining the member client/user response, including multiple ratings for different facets of the user's response to the informon (step 340).

It is preferred that coherent portions of the data stream, i.e., potential raw informons, be first parsed (step 301) into generalized words, called tokens. Tokens include punctuation and other specialized symbols that may be part of the

12

structure found in the article headers. For example, in addition to typical words such as "seminar" counting as tokens, the punctuation mark "S" and the symbol "Newsgroup:comp.ai" are also tokens. Using noun phrases as tokens also can be useful.

Next a vector of token counts for the document is created. This vector is the size of the total vocabulary, with zeros for tokens not occurring in the document. Using this type of vector is sometimes called the bag-of-words model. While the bag-of-words model does not capture the order of the tokens in the document, which may be needed for linguistic or syntactic analysis, it captures most of the information needed for filtering purposes.

Although, it is common in information retrieval systems to group the tokens together by their common linguistic roots, called stemming, as a next step it is preferred in the present invention that the tokens be left in their unstemmed form. In this form, the tokens are amenable to being classified into mode-invariant concept components.

Creating a mode-invariant profile (step 305), C, includes creating a conceptual representation for each informon, A, that is invariant with respect to the form-of-expression, e.g., vocabulary and conceptualization. Each community can consist of a "Meta-U-Zine" collection, M, of informons. Based upon profile C, the appropriate communities, if any, for each informon in the data stream are selected by concept-based indexing (step 310) into each M. That is, for each concept C that describes A, put A into a queue $Q_M$, for each M which is related to C. It is preferred that there is a list of Ms that is stored for each concept and that can be easily index-searched. Each A that is determined to be a poor fit for a particular M is eliminated from further processing. Once A has been matched with a particular M, a more complex community profile $P_M$ is developed and maintained for each M (step 315). If A has fallen into $Q_M$, then A is analyzed to determine whether it matches $P_M$ strongly enough to be retained or "weeded" out (step 325) at this stage.

Each A for a particular M is sent to each user's personal agent, or member client U of M, for additional analysis based on the member client's profile (step 325). Each A that fits U's interests sufficiently is selected for U's personal informon, or "U-Zine," collection, Z. Poor-fitting informons are eliminated from placement in Z (step 330). This user-level stage of analysis and selection may be performed on a centralized server site or on the user's computer.

Next, the proposed informons are presented to user U (step 335) for review. User U reads and rates each selected A found in Z (step 340). The feedback from U can consist of a rating for how "interesting" U found A to be, as well as one or more of the following:

Opinion feedback: Did U agree, disagree, or have no opinion regarding the position of A?

Credibility Feedback: Did U find the facts, logic, sources, and quotes in A to be truthful and credible or not?

Informon Qualities: How does the user rate the informons qualities, for example, "interestingness," credibility, funniness, content value, writing quality, violence content, sexual content, profanity level, business importance, scientific merit, surprise/unexpectedness of information content, artistic quality, dramatic appeal, entertainment value, trendiness/importance to future directions, and opinion agreement.

Specific Reason Feedback: Why did the user like or dislike A?
Because of the authority?
Because of the source?

**A211**

13

Because A is out-of-date (e.g. weather report from 3 weeks ago)?

Because the information contained in A has been seen already? (I.e., the problem of duplicate information delivery)

Categorization Feedback: Did U liked A? Was it placed within the correct M and Z?

Such multi-faceted feedback queries can produce rich feedback profiles from U that can be used to adapt each of the profiles used in the filtering process to some optimal operating point.

One embodiment of creating a MI profile (step 305) for each concept can include concept profiling, creation, and optimization. Broad descriptors can be used to create a substantially-invariant concept profile, ideally without the word choice used to express concept C. A concept profile can include positive concept clues (PCC) and negative concept clues (NCC). The PCC and NCC can be combined by a processor to create a measure-of-fit that can be compared to a predetermined threshold. If the combined effect of the PCC and NCC exceeds the predetermined threshold, then informon A can be assumed to be related to concept C; otherwise it is eliminated from further processing. PCC is a set of words, phrases, and other features, such as the source or the author, each with an associated weight, that tend to be in A which contains C. In contrast, NCC is a set of words, phrases, and other features, such as the source or the author, each with an associated weight that tend to make it more unlikely that A is contained in C. For example, if the term "car" is in A, then it is likely to be about automobiles. However, if the phrase "bumper car" also is in A, then it is more likely that A related to amusement parks. Therefore, "bumper car" would fall into the profile of negative concept clues for the concept "automobile."

Typically, concept profile C can be created by one or more means. First, C can be explicitly created by user U.

Second, C can be created by an electronic thesaurus or similar device that can catalog and select from a set of concepts and the words that can be associated with that concept. Third, C can be created by using co-occurrence information that can be generated by analyzing the content of an informon. This means uses the fact that related features of a concept tend to occur more often within the same document than in general. Fourth, C can be created by the analysis of collections, H, of A that have been rated by one or more U. Combinations of features that tend to occur repeatedly in H can be grouped together as PCC for the analysis of a new concept. Also, an A that one or more U have rated and determined not to be within a particular Z can be used for the extraction of NCC.

Concept profiles can be optimized or learned continually after their creation, with the objective that nearly all As that Us have found interesting, and belonging in M, should pass the predetermined threshold of at least one C that can serve as an index into M. Another objective of concept profile management is that, for each A that does not fall into any of the one or more M that are indexed by C, the breadth of C is adjusted to preserve the first objective, insofar as possible. For example, if C's threshold is exceeded for a given A, C's breadth can be narrowed by reducing PCC, increasing NCC, or both, or by increasing the threshold for C.

In the next stage of filtering, one embodiment of content-based indexing takes an A that has been processed into the set of C that describe it, and determine which M should accept the article for subsequent filtering, for example, detailed indexing of incoming A. It is preferred that a data structure including a database be used, so that the vector of

14

Ms, that are related to any concept C, may be looked-up. Furthermore, when a Z is created by U, the concept clues given by U to the information filter can be used to determine a set of likely concepts C that describe what U is seeking. For example, if U types in "basketball" as a likely word in the associated Z, then all concepts that have a high positive weight for the word "basketball" are associated with the new z. If no such concepts C seem to pre-exist, an entirely new concept C is created that is endowed with the clues U has given as the starting profile.

To augment the effectiveness of concept-based indexing, it is preferred to provide continual optimization learning. In general, when a concept C no longer uniquely triggers any documents that have been classified and liked by member clients U in a particular community M, then that M is removed from the list of M indexed into by C. Also, when there appears to be significant overlap between articles fitting concept C, and articles that have been classified by users as belonging to M, and if C does not currently index into M, then M can be added to the list of M indexed into by C. The foregoing heuristic for expanding the concepts C that are covered by M, can potentially make M too broad and, thus, accept too many articles. Therefore, it is further preferred that a reasonable but arbitrary limit is set on the conceptual size covered by M.

With regard to the detailed analysis of each informon A with respect to the community profile for each M, each A must pass through this analysis for each U subscribing to a particular M, i.e., for each member client in a particular community. After A has passed that stage, it is then filtered at a more personal, member client level for each of those users. The profile and filtering process are very similar for both the community level and the member client level, except that at the community level, the empirical data obtained is for all U who subscribed to M, and not merely an individual U. Other information about the individual U can be used to help the filter, such as what U thinks of what a particular author writes in other Zs that the user reads, and articles that can't be used for the group-level M processing.

FIG. 6 illustrates the development of a profile, and its associated predictors. Typically, regarding the structure of a profile 400, the information input into the structure can be divided into three broad categories: (1) Structured Feature Information (SFI) 405; (2) Unstructured Feature Information (UFI) 410; and (3) Collaborative Input (CI) 415. Features derived from combinations of these three types act as additional peer-level inputs for the next level of the rating prediction function, called (4) Correlated-Feature, Error-Correction Units (CFECU) 420. From inputs 405, 410, 415, 420, learning functions 425a–d can be applied to get two computed functions 426a–d, 428a–d of the inputs. These two functions are the Independent Rating Predictors (IRP) 426a–d, and the associated Uncertainty Predictors (UP) 428a–d. IRPs 426a–d can be weighted by dividing them by their respective UPs 428a–d, so that the more certain an IRP 426a–d is, the higher its weight. Each weighted IRP 429a–d is brought together with other IRPs 429a–d in a combination function 427a–d. This combination function 427a–d can be from a simple, weighted, additive function to a far more complex neural network function. The results from this are normalized by the total uncertainty across all UPs, from Certain=zero to Uncertain=infinity, and combined using the Certainty Weighting Function (CWF) 430. Once the CWF 430 has combined the IRPs 426a–d, it is preferred that result 432 be shaped via a monotonically increasing function, to map to the range and distribution of the actual ratings. This function is called the Complete Rating Predictor (CRP) 432.

US 6,314,420 B1

15

SFI **405** can include vectors of authors, sources, and other features of informon A that may be influential in determining the degree to which A falls into the categories in a given M. UFI **410** can include vectors of important words, phrases, and concepts that help to determine the degree to which A falls into a given M. Vectors can exist for different canonical parts of A. For example, individual vectors may be provided for subject/headings, content body, related information in other referenced informons, and the like. It is preferred that a positive and negative vector exists for each canonical part.

CI **415** is received from other Us who already have seen A and have rated it. The input used for CI can include, for example, "interestingness," credibility, funniness, content value, writing quality, violence content, sexual content, profanity level, business importance, scientific merit, surprise/unexpectedness of information content, artistic quality, dramatic appeal, entertainment value, trendiness/importance to future directions, and opinion agreement. Each CFECU **420** is a unit that can detect sets of specific feature combinations which are exceptions in combination. For example, author X's articles are generally disliked in the Z for woodworking, except when X writes about lathes. When an informon authored by X contains the concept of "lathes," then the appropriate CFECU **420** is triggered to signal that this is an exception, and accordingly a signal is sent to offset the general negative signal otherwise triggered because of the general dislike for X's informons in the woodworking Z.

As an example the form of Structured Feature Information (SFI) **405** can include fields such as Author, Source, Information-Type, and other fields previously identified to be of particular value in the analysis. For simplicity, the exemplary SFI, below, accounts only for the Author field. For this example, assume three authors A, B, and C have collectively submitted 10 articles that have been read, and have been rated as in TABLE 1 (following the text of this specification. In the accompanying rating scheme, a rating can vary between 1 and 5, with 5 indicating a "most interesting" article. If four new articles (**11, 12, 13, 14**) arrive that have not yet been rated, and, in addition to authors A, B, C, and a new author D has contributed, a simple IRP for the Author field, that just takes sums of the averages, would be as follows:

IRP(author)=weighted sum of
  average(ratings given the author so far)
  average(ratings given the author so far in this M)
  average(ratings given all authors so far in this M)
  average(ratings given all authors)
  average(ratings given the author so far by a particular user U)*
  average(ratings given the author so far in this M by a particular user U)*
  average(ratings given all authors so far in this M by a particular user U)*
  average(ratings given all authors by a particular user)*
* (if for a personal Z)

The purpose of the weighted sum is to make use of broader, more general statistics, when strong statistics for a particular user reading an informon by a particular author, within a particular Z may not yet be available. When stronger statistics are available, the broader terms can be eliminated by using smaller weights. This weighting scheme is similar to that used for creating CWFs **430**, for the profiles as a whole. Some of the averages may be left out in the actual storage of the profile if, for example, an author's average rating for a particular M is not "significantly" different from the average for the author across all Ms. Here,

16

"significance" is used is in a statistical sense, and frameworks such as the Minimum Description Length (MDL) Principle can be used to determine when to store or use a more "local" component of the IRP. As a simple example, the following IRP employs only two of the above terms:

IRP(author)=weighted sum of
  average (ratings given this author so far in this M)
  average (ratings given all authors so far in this M)

Table 2 gives the values attained for the four new articles.

It is preferred that an estimate of the uncertainty resulting from a positive or negative IRP be made, and a complex neural net approach could be used. However, a simpler method, useful for this example, is simply to repeat the same process that was used for the IRP but, instead of predicting the rating, it is preferred to predict the squared-error, given the feature vector. The exact square-error values can be used as the informon weights, instead of using a rating-weight lookup table. A more optimal mapping function could also be computed, if indicated by the application.

| | Token 1 | Token 2 | Token 3 | Token 4 |
|---|---|---|---|---|
| IRP pos. vector | 16.68 | 8.73 | 12.89 | 11.27 |
| IRP neg. vector | 15.20 | 8.87 | 4.27 | 5.04 |

The UPs then can be computed in a manner similar to the IRP's: comparisons with the actual document vectors can be made to get a similarity measure, and then a mapping function can be used to get an UP.

Making effective use of collaborative input (CI) from other users U is a difficult problem because of the following seven issues. First, there generally is no a priori knowledge regarding which users already will have rated an informon A, before making a prediction for a user U, who hasn't yet read informon A. Therefore, a model for prediction must be operational no matter which subset of the inputs happen to be available, if any, at a given time. Second, computational efficiency must be maintained in light of a potentially very large set of users and informons. Third, incremental updates of rating predictions often are desired, as more feedback is reported from users regarding an informon. Fourth, in learning good models for making rating predictions, only very sparse data typically is available for each users rating of each document. Thus, a large "missing data" problem must be dealt with effectively.

Fifth, most potential solutions to the CI problem require independence assumptions that, when grossly violated, give very poor results. As an example of an independence assumption violation, assume that ten users of a collaborative filtering system, called the "B-Team," always rate all articles exactly in the same way, for example, because they think very much alike. Further assume that user A's ratings are correlated with the B-Team at the 0.5 level, and are correlated with user C at the 0.9 level. Now, suppose user C reads an article and rates it a "5". Based on that C's rating, it is reasonable to predict that A's rating also might be a "5". Further, suppose that a member of the B-Team reads the article, and rates it a "2". Existing collaborative filtering methods are likely to predict that A's rating RA would be:

$$R_A = (0.9 \times 5 + 0.5 \times 2)/(0.9 + 0.5) = 3.93$$

In principle, if other members of the B-Team then read and rate the article, it should not affect the prediction of A's rating, $R_A$, because it is known that other B-Team members always rate the article with the same value as the first

**A213**

US 6,314,420 B1

17

member of the B-Team. However, the prediction for A by existing collaborative filtering schemes would tend to give 10 times the weight to the "2" rating, and would be:

$$R_A = (0.9 \times 5 + 10 \times 0.5 \times 2)/(0.9 + 10 \times 0.5) = 2.46$$

Existing collaborative filtering schemes do not work well in this case because B-Team's ratings are not independent, and have a correlation among one another of 1. The information filter according to the present invention can recognize and compensate for such inter-user correlation.

Sixth, information about the community of people is known, other than each user's ratings of informons. This information can include the present topics the users like, what authors the users like, etc. This information can make the system more effective when it is used for learning stronger associations between community members. For example, because Users A and B in a particular community M have never yet read and rated an informon in common, no correlation between their likes and dislikes can be made, based on common ratings alone. However, users A and B have both read and liked several informons authored by the same author, X, although Users A and B each read a distinctly different Zs. Such information can be used to make the inference that there is a possible relationship between user A's interests and user B's interests. For the most part, existing collaborative filtering systems can not take advantage of this knowledge.

Seventh, information about the informon under consideration also is known, in addition to the ratings given it so far. For example, from knowing that informon A is about the concept of "gardening", better use can be made of which users' ratings are more relevant in the context of the informartion in the informon. If user B's rating agrees with user D's rating of articles when the subject is about "politics", but B's ratings agree more with user D when informon A is about "gardening", then the relationship between User B's ratings and User D's ratings are preferred to be recognized to a greater extent than the relationship between User B and User C when making predictions about informon A.

With regard to the aforementioned fourth, sixth and seventh issues namely, making effective use of sparse, but known, information about the community and the informon, it is possible to determine the influence of user A's rating of an informon on the predicted rating of the informon for a second user, B. For example, where user A and user B have read and rated in common a certain number of informons, the influence of user A's rating of informon D on the predicted rating of informon D for user B can be defined by a relationship that has two components. First, there can be a common "mindset", $S_M$ between user A and user B and informon D, that may be expressed as:

$M_S$=profile(A) X profile(B) X DocumentProfile(D).

Second, a correlation may be taken between user A's past ratings and user B's past ratings with respect to informons that are similar to D. This correlation can be taken by weighting all informons E that A and B have rated in common by the similarity of E to D, $S_{ED}$:

$S_{ED}$=Weighted_Correlation(ratings(A),ratings(B))

Each of the examples can be weighted by

$$W_{pr} = \text{weight for rating pair (rating } (A, D), \text{ rating } (B, D))$$

$$= DocumentProfile\ (E) \times DocumentProfile(D)$$

Note that the "X" in the above equation may not be a mere multiplication or cross-product, but rather be a method for

18

comparing the similarity between the profiles. Next, the similarity of the member client profiles and informon content profiles can be compared. A neural network could be used to learn how to compare profiles so that the error in predicted ratings is minimized. However, the invention can be embodied with use of a simple cosine similarity metric, like that previously considered in connection with Unstructured Feature Information (UFI) can be used.

The method used is preferred to be able to include more than just the tokens, such as the author and other SFI; and, it is preferred that the three vectors for component also are able to be compared. SFIs may be handled by transforming them into an entity that can be treated in a comparable way to token frequencies that can be multiplied in the standard token frequency comparison method, which would be recognized by a skilled artisan.

Continuing in the ongoing example, the Author field may be used. Where user A and user B have rated authors K and L, the token frequency vector may appear as follows:

| User | Avg. Rating Given to Author K | # in sample | Avg. Rating Given to Author L | # in sample | Avg. Rating Given to Author M | # in sample |
|------|------|------|------|------|------|------|
| A | 3.1 | 21 | 1.2 | 5 | N/A | 0 |
| B | 4 | 1 | 1.3 | 7 | 5 | 2 |

Further, the author component of the member client profiles of user A and user B may be compared by taking a special weighted correlation of each author under comparison. In general, the weight is a function F of the sample sizes for user A's and user B's rating of the author, where F is the product of a monotonically-increasing function of the sample size for each of user A and user B. Also, a simple function G of whether the informon D is by the author or not is used. This function can be: G=q if so, and G=p<q if not, where p and q are optimized constraints according to the domain of the filtering system. When there has been no rating of an author by a user, then the function of the zero sample size is positive. This is because the fact that the user did not read anything by the author can signify some indication that the author might not produce an informon which would be highly rated by the user. In this case, the exact value is an increasing function H of the total articles read by a particular user so far, because it becomes more likely that the user is intentionally avoiding reading informons by that author with each subsequent article that has been read but is not prepared by the author. In general, the exact weighting function and parameters can be empirically derived rather than theoretically derived, and so is chosen by the optimization of the overall rating prediction functions. Continuing in the present example, a correlation can be computed with the following weights for the authors K, L and M.

| Author | Weight |
|--------|--------|
| K | F(21,1,not author) = log(21 + 1) × log(1 + 1) × G(not author) = 0.04 |
| L | F(5,7, author or D) = log(5 + 1) × log(7 + 1) × G(author) = 0.70 |

19

-continued

| Author | Weight |
|---|---|
| M | F(0.2, not author) |
| | $= H(26) \times \log(2 + 1) \times G(\text{not author})$ |
| | $= 0.02$ |

It is preferred that the logarithm be used as the monotonically-increasing function and that $p=1$, $q=0.1$. Also used are $H = \log(\text{sample}_{\text{size}}, 0.1)$ and an assumed rating, for those authors who are unrated by a user, to the value of "2." The correlation for the author SFI can be mapped to a non-zero range, so that it can be included in the cosine similarity metric. This mapping can be provided by a simple one-neuron neural network, or a linear function such as, $(\text{correlation}+1)*P_0$. Where the $P_0$ is an optimized parameter used to produce the predicted ratings with the lowest error in the given domain for filtering.

An artisan skilled in information retrieval would recognize that there are numerous methods that can be used to effect informon comparisons, particularly document comparisons. One preferred method is to use a TF-IDF weighting technique in conjunction with the cosine similarity metric. SFI including author, can be handled by including them as another token in the vector. However, the token is preferred to be weighted by a factor that is empirically optimized rather than using a TF-IDF approach. Each component of the relationship between user A's and user B's can be combined to produce the function to predict the rating of informon D for user B. The combination function can be a simple additive function, a product function, or a complex function, including, for example, a neural network mapping function, depending upon computational efficiency constraints encountered in the application. Optimization of the combination function can be achieved by minimizing the predicted rating error as an objective.

In addition to determining the relationship between two user's ratings, a relationship that can be used and combined across a large population of users can be developed. This relationship is most susceptible to the aforementioned first, second, third, and fifth issues in the effective use of collaborative input. Specifically, the difficulty with specifying a user rating relationship across a large population of users is compounded by the lack of a priori knowledge regarding a large volume of dynamically changing information that may have unexpected correlation and therefore grossly violate independence assumptions.

In one embodiment of the present invention, it is preferred that users be broken into distributed groups called "mindpools." Mindpools can be purely hierarchical, purely parallel, or a combination of both. Mindpools can be similar to the aforementioned "community" or may instead be one of many subcommunities. These multiple hierarchies can be used to represent different qualities of an article. Some qualities that can be maintained in separate hierarchies include: interestingness; credibility; funniness; valuableness; writing quality; violence content; sexual content; profanity level; business importance; scientific merit; artistic quality; dramatic appeal; entertainment value; surprise or unexpectedness of information content; trendiness or importance to future directions; and opinion agreement. Each of these qualities can be optionally addressed by users with a rating feedback mechanism and, therefore, these qualities can be used to drive separate mind pool hierarchies. Also, the qualities can be used in combinations, if appropriate, to develop more complex composite informon qualities, and more sublime mindpools.

20

FIG. 7 illustrates a preferred embodiment of a mind pool system 500. It is preferred that all users be members of the uppermost portion of the hierarchy, namely, the top mind pool 501. Mind pool 501 can be broken into sub-mindpools 502a–c, which separate users into those having at least some common interests. Furthermore, each sub-mind pool 502a–c can be respectively broken into sub-sub-mindpools 503a–b, 503c–d, 503e,f,g to which users 504a–g are respective members. As used herein, mind pool 501 is the parent node to sub-mindpools 502a–c, and sub-mindpools 502a–c are the respective parent nodes to sub-sub-mindpools 503a–g. Sub-pools 502a–c are the child nodes to mind pool 501 and sub-pools 503a–g are child nodes to respective mindpools 503a–c. Sub-pools 503a–g can be considered to be end nodes. Users 505a,b can be members of sub-mind pool 502a, 502c, if such more closely matches their interests than would membership in a sub-sub-mind pool 503a–g. In general, the objective is to break down the entire population of users into subsets that are optimally similar. For example, the set of users who find the same articles about "gardening" by author A to be interesting but nevertheless found other articles by author A on "gardening" to be uninteresting may be joined in one subset.

A processing means or mind pool manager may be used to handle the management of each of the mindpools 501, 502a–c, and 503a–g. A mind pool manager performs the following functions: (1) receiving rating information from child-node mind pool managers and from those users coupled directly to the manager; (2) passing rating information or compiled statistics of the rating information up to the manager's parent node, if such exists; (3) receiving estimations of the mind pool consensus on the rating for an informon from the manager's parent mind pool, if such exists; and (4) making estimations of the mind pool consensus on the rating for a specific informon for the users that come under the manager's domain; and (5) passing the estimations from function 4 down to either a child-node mind pool or, if the manager is an end node in the hierarchy, to the respective user's CWF, for producing the user's predicted rating. Function 4 also can include combining the estimations received from the manager's parent node, and Uncertainty Predictions can be estimated based on sample size, standard deviation, etc. Furthermore, as alluded to above, users can be allowed to belong to more than one mind pool if they don't fit precisely into one mind pool but have multiple views regarding the conceptual domain of the informon. Also, it is preferred that lateral communication be procided between peer managers who have similar users beneath them to share estimation information. When a rating comes in from a user, it can be passed to the immediate manager(s) node above that user. It is preferred that the manager(s) first decide whether the rating will effect its current estimation or whether the statistics should be passed upward to a parent-node. If the manager estimation would change by an amount above an empirically-derived minimum threshold, then the manager should pass that estimation down to all of its child-nodes. In the event that the compiled statistics are changed by more than another minimum threshold amount, then the compiled statistics should be passed to the manager's parent-node, if any ,and the process recurses upward and downward in the hierarchy.

Because no mind pool manager is required to have accurate information, but just an estimation of the rating and an uncertainty level, any manager may respond with a simple average of all previous documents, and with a higher degree of uncertainty, if none of its child-nodes has any rating information yet. The preferred distributed strategy

US 6,314,420 B1

21

tends to reduce the communication needed between processors, and the computation tends to be pooled, thereby eliminating a substantial degree of redundancy. Using this distributed strategy, the estimations tend to settle to the extent that the updating of other nodes, and the other users predictions are minimized. Therefore, as the number of informons and users becomes large, the computation and prediction updates grow as the sum of the number of informons and the number of users, rather than the product of the number of informons and the number of users. In addition, incremental updates can be accomplished by the passing of estimations up and down the hierarchy. Incremental updates of rating predictions continue to move until the prediction becomes stable due to the large sample size. The distributed division of users can reduce the effects of independent assumption violations. In the previous example with the B-Team of ten users, the B-Team can be organized as a particular mind pool. With the additional ratings from each of the B-Team members, the estimation from the B-Team mind pool typically does not change significantly because of the exact correlation between the members of that mind pool. This single estimation then can be combined with other estimations to achieve the desired result, regardless of how many B-Team members have read the article at any given time.

The mind pool hierarchies can be created by either computer- or human-guided methods. If the hierarchy creation is human-guided, there often is a natural breakdown of people based on information such as job position, common interests, or any other information that is known about them. Where the mind pool hierarchy is created automatically, because the previously described measure of the collaborative input relationship between users can be employed in a standard hierarchical clustering algorithm to produce each group of users or nodes in the mind pool hierarchy. Such standard hierarchical clustering algorithms can include, for example, the agglomerative method, or the divide-and-conquer method. A skilled artisan would recognize that many other techniques also are available for incrementally-adjusting the clusters as new information is collected. Typically, clustering is intended to (1) bring together users whose rating information is clearly not independent; and (2) produce mind pool estimations that are substantially independent among one another.

Estimations are made in a manner similar to other estimations described herein. For example, for each user or sub-mind pool (sub-informant), a similarity between the sub-informant and the centroid of the mind pool can be computed in order to determine how relevant the sub-informant is in computing the estimation. Uncertainty estimators also are associated with these sub-informants, so that they can be weighted with respect to their reliability in providing the most accurate estimation. Optionally, the informon under evaluation can be used to modulate the relevancy of a sub-informant. This type of evaluation also can take advantage of the two previously-determined collaborative information relationship components, thereby tending to magnify relationships that are stronger for particular types of informons than for others. Once a suitable set of weights are established for each user within a mind pool for a particular informon, a simple weighted-average can be used to make the estimation. It is preferred that the "simple" weighted average used is more conservative regarding input information that a simple independent linear regression. Also, the overall Uncertainty can be derived from the Uncertainty Predictions of the sub-informants, in a manner similar to the production of other uncertainty combination

22

methods described above. Approximations can be made by pre-computing all terms that do not change significantly, based on the particular informon, or the subset of actual ratings given so far to the mind pool manager.

As stated previously, the correlated-feature error-correction units (CFECUs) are intended to detect irregularities or statistical exceptions. Indeed, two objectives of the CFECU units are to (1) find non-linear exceptions to the general structure of the three aforementioned types of inputs (SFI, UFI, and CI); and (2) find particular combinations of informon sub-features that statistically stand out as having special structure which is not captured by the rest of the general model; and (3) trigger an additional signal to the CFECU's conditions are met, in order to reduce prediction error. The following exemplifies the CFECU operation.

|  | User B's Avg. Rating of of Informons About | |
|---|---|---|
|  | Gardening | Politics |
| Author A's Articles | 4.5 | 1.2 |
| Other Authors | 1.4 | 2 |
| Weighted by Topic | 1.68 | 1.87 |

|  | User B's number of Informons Read About | | Average over |
|---|---|---|---|
|  | Gardening | Politics | Topics |
| Author A's Articles | 7 | 40 | 1.69 |
| Other Authors | 70 | 200 | 1.84 |

In this example, it is desired that author A's informon D about gardening have a high predicted rating for user B. However, because the average rating for author A by user B is only 1.69, and the average rating for the gardening concept is only 1.68, a three-part model (SFI-UFI-CI) that does not evaluate the informon features in combination would tend to not rank informon D very highly. In this case, the first CFECU would first find sources of error in past examples. This could include using the three-part model against the known examples that user B has rated so far. In this example, seven articles that user B has rated, have an average rating of 4.5, though even the three-part model only predicts a rating of about 1.68. When such a large error appears, and has statistical strength due to the number of examples with the common characteristics of, for example, the same author and topic, a CFECU is created to identify that this exception to the three-part model has been triggered and that a correction signal is needed. Second, it is preferred to index the new CFECU into a database so that, when triggering features appear in an informon, for example, author and topic, the correction signal is sent into the appropriate CWF. One method which can be used to effect the first step is a cascade correlation neural network, in which the neural net finds new connection neural net units to progressively reduce the prediction error. Another method is to search through each informon that has been rated but whose predicted rating has a high error, and storing the informons profile.

When "enough" informons have been found with high error and common characteristics, the common characteristics can be joined together as a candidate for a new CFECU. Next, the candidate can be tested on all the samples, whether

US 6,314,420 B1

23

they have a high prediction or a low prediction error associated with them. Then, the overall error change (reduction or increase) for all of the examples can be computed to determine if the CFECU should be added to the informon profile. If the estimated error reduction is greater than a minimum threshold level, the CFECU can be added to the profile. As successful CFECU are discovered for users' profiles, they also can be added to a database of CFECU's that may be useful for analyzing other profiles. If a particular CFECU has a sufficiently broad application, it can be moved up in the filtering process, so that it is computed for every entity once. Also, the particular CFECU can be included in the representation that is computed in the pre-processing stage as a new feature. In general, the estimation of the predicted rating from a particular CFECU can be made by taking the average of those informons for which the CFECU responds. Also, the Uncertainty can be chosen such that the CFECU signal optimally outweighs the other signals being sent to the CWF. One method of self-optimization that can be employed is, for example, the gradient descent method, although a skilled artisan would recognize that other appropriate optimization methods may be used.

The invention of this continuation-in-part application, as shown in FIGS. 8 and 9, provides a collaborative and preferably adaptive search engine system in which elements of the structure and principles of operation of the apparatus of FIGS. 1–7 are applied. Accordingly, a search engine system of the invention, as preferably embodied, integrates collaborative filtering with adaptive content-based filtering to provide improved search engine performance. The acronym "CASE" refers to a search engine system of the invention, i.e., a collaborative, adaptive search engine.

In the operation of conventional search engines at portal web sites., user queries are searched on demand to find relevant informons across the web. Content-based filtering is typically used in measuring the relevacy of informons, and the search results are resented in the form of a list of informons ranked by relevancy.

The present invention combines collaborative filtering with content-based filtering in measuring informons for relevancy, and further preferably applies adaptive updating of the content-based filtering operation. In providing these results, the invention can be embodied as a search engine system in accordance with different basic structures. In the presently preferred basic structure, an integrated collaborative/content-based filter (FIGS. 1–7) is operated to provide ongoing or continuous searching for selected user queries, with a "wire" being established for each query. On the other hand, a regular search engine is operated to make immediate or short-term "demand" searches for other user queries on the basis of content-based filtering. This basic structure of the invention is especially beneficial for use in applying the invention to existing search engine structure.

Demand search results can be returned if no wire exists for an input query. Otherwise, wire search results are returned if a wire does exist, or collaborative ranking data can be applied from the wire filter structure to improve the results of the demand search from the regular search engine.

In the currently preferred embodiment, wires are created for the most common queries received by the search engine system. A suitable analysis is applied to the search engine operations to determine which queries are most common, and respective wires are then created for each of these queries. An analysis update can be made from time to time to make wire additions or deletions as warranted.

When a user makes a query for which a wire already exists, wire search results are preferably returned instead of

24

regular search engine results. As shown in the logic diagram of FIG. 7, a user provides a query as indicated by block 20C. The query is applied to a Lookup Table, as indicated by block 22C, block 24C applies a test to determine from the table whether a wire already exists for the new query. If so, block 26C returns results from the existing wire. Otherwise, block 28C commands a demand search by a regular query engine.

With the use of wire search returns, each user can review the returned results and provide feedback data about reviewed documents. Such feedback data is incorporated in the filter profiles used in processing informons for the wire. Therefore, when a future user makes substantially the same query, the wire will have been improved by the incorporation of previous users' feedback data. By analyzing documents which users rate as meeting a particular quality such as interestingness, the system can find common document features which can be used to return more like documents to future users who make substantially the same query.

Alternatively, all queries applied to a search engine system of the invention can set up new wires. After a search query is presented to the search engine system, a wire is created on the basis of the query terms, and all new documents subsequently received from the network are filtered by the new wire. A push-model may be used to send all passed, new documents to the user.

Among other basic search engine system structures, an integrated system can be employed in which collaborative and content-based filtering is structured to provide demand searches with or without collaborative filtering, or wire searches. In the operation of the preferred basic structure and other basic structures, a query processor can be employed, if needed, to make search-type assignments for user queries. Generally, basic search engine system structures of the invention are preferably embodied with the use of a programmed computer system.

Collaborative filtering employs additional data from other users to improve search results for an individual user for whom a search is being conducted. The collaborative data can be feedback informon rating data, and/or it can be content-profile data for agent mind melding which is more fully disclosed in Ser. No. 09/195,708 now pending, entitled INTEGRATED COLLABORATIVE/CONTENT-BASED FILTER STRUCTURE EMPLOYING SELECTIVELY SHARED, CONTENT-BASED PROFILE DATA TO EVALUATE INFORMATION ENTITIES IN A MASSIVE INFORMATION NETWORK, filed by the current inventors on Nov. 19, 1998, and hereby incorporated by reference.

Many types of user rating information can be used. For example, users can sort documents which they have read from best to worst. Alternatively, users can select on a scale (numeric, such as 1 to 10, or worded, such as good, medium, poor) how much they enjoyed reading a document. Further, user monitoring can measure time spent by users on each document, thereby indicating user interest (normalized by document length). Among other possibilities, the choices of documents for reading by other users can be simply used as an indication of interesting documents. In all cases, the feedback rating data can be based on interestingness or any of a variety of other document qualities, as described in connection with FIGS. 1–7.

Feedback ranking information can be used in a number of ways, and the invention is not limited by the method of feedback information use. Use methods range in spectrum from weighting relative ranks by a set amount (possibly equally, possibly heavy weighting one above the other) to dynamically adjusting the weight by measuring how statis-

**A217**

US 6,314,420 B1

25

tically significant the user feedback is. For example, if only one person has ranked an article, it may not be significant. However, if many people have consistently ranked an article the same, more credibility may be placed on the user's weighting.

FIG. 9 shows a generalized embodiment of the invention in which system elements in a CASE system 30C are integrally configured to provide wire and/or demand searches. A query processor 32C receives queries from an individual user 34C and other users 36C. A mode selector 38C responds to the currently processed query to set a content-based filter structure 40C for wire search operation or demand search operation. In the preferred application of the invention, the wire mode is selected only if a wire already exists, and wires exist only for those queries found to be commonly entered as previously described. In the demand search mode, the filter structure 40C can function similarly to a normal search engine.

Otherwise, various schemes can be used for determining whether a wire search or a demand search is made. For example, every query can call for a wire search, with a demand search being made the first time a particular query is entered and with wire searches being made for subsequent entries of the same query. As another example, the user may select a demand search, or, if continuing network searching is desired, the user may select a wire search.

The filter structure 40C operates in its set wire search mode or demand search mode, and employs content-based profiles 42C in content-based filtering (preferably multi-level as described in connection with FIGS. 1–7). Wire profiles 42C I are adaptively updated with informon-evaluation, feedback data from users respectively associated therewith. These profiles are used by the filter structure 40C in wire searches in the wire mode.

Demand profiles 42C2 are used by the filter structure 40C in demand searches in the demand mode. Collaborative profile data can be integrated with the wire profiles through agent mind melding 43C as previously explained.

A spider system 46C scans a network 44C to find informons for a current demand search, and to find informons with continued network scanning for existing wires. In selecting available informons for return, the spider system 46C uses a content threshold derived from the content-based profile for which an informon search is being conducted.

In many instances, it s preferable that the spider system 46C have a memory system 46CM which holds an informon data base wherein index information is stored from informons previously collected from the network. In this manner, demand searches can be quickly made from the spider memory 46CM as opposed to making a time consuming search and downloading in response to a search demand query from the search engine.

A search return processor 48C receives either demand search informons or wire search informons passed by the content-based filter structure 40C according to the operating mode of the latter, and includes an informon rating system which is like that of FIG. 6. The informon rating system combines content-based filtering data with collaborative feedback rating data, from users through a feedback processor 50C at least in the wire search mode and, if desired, in the demand search mode.

In the wire search mode, the processor 48C rates informons on a continuing basis as they are received from the network 44C through the spider system 46C as indicated by the reference character 48C1. In the demand search mode, the processor 48C rates informons returned by the spider system 46C in a demand search as indicated by the reference

26

character 48C2. Collaborative rating data is used in the informon rating process in the wire search mode, and if applied in the demand search mode, to the extent that collaborative data is available for the informons in the search return. Search results are returned to the users 34C and 36C from the search return processor 48C as shown in FIG. 9.

The invention is preferably embodied as shown in FIG. 10. A query processor 60C receives queries from an individual user 62C and other users 64C and determines whether a wire already exists for each entered query. If a wire exists, the query is routed to a collaborative/content-based filter structure 66C like that of FIGS. 1–7. A spider system 68C continuously scans a network 70C for informons providing a threshold-level match for content based profiles (i.e., preprocessing profiles at the top level of the preferred multi-level filter structure, at least one of which reflects the content profile of a current wire query). Informons which are passed by the filter 66C for existing wires are stored in a memory 72C according to the wire or wires to which they belong.

A feedback processor 74C is structured like the mind pool system of FIG. 7 to provide collaborative feedback data for integration with the content-based data in the measurement of informon relevancy by the filter 66C. An informon rating structure like that of FIG. 6 is employed for this purpose. Adaptive feedback data is applied from the users to the filter 66C as shown in order to update content profiles as previously described.

If no wire exists for a currently input query, the query is sent to a regular search engine where a content profile is established for content based filtering of informons returned by a spider system 78C in a demand search of the network 70C. The spider system 78C can have its own memory system 78CM as considered in connection with the spider 46C of FIG. 9.

Once filtering is performed on returned informons, those informons which provide a satisfactory match to the query are returned as a list to the user through a search return processor 80C. The processor 80C creates a new wire for the current query for which a demand search was made, if a demand search memory 82C indicates that the current query has been made over time with sufficient frequency to qualify as a "common" query for which a wire is justified. As indicated by dashed connector line 80FD, collaborative feedback data can be, and preferably is, integrated into the demand search processing by the processor 80C.

Many alterations and modifications may be made by those having ordinary skill in the art without departing from the spirit and scope of the invention. Therefore, it must be understood that the illustrated embodiments have been set forth only for the purposes of example, and that it should not be taken as limiting the invention as defined by the following claims. The following claims are, therefore, to be read to include not only the combination of elements which are literally set forth but all equivalent elements for performing substantially the same function in substantially the same way to obtain substantially the same result. The claims are thus to be understood to include what is specifically illustrated and described above, what is conceptually equivalent, and also what incorporates the essential idea of the invention.

US 6,314,420 B1

| 27 | | 28 |

TABLE 1

| Article | Author | Rating given |
|---------|--------|--------------|
| 1 | A | 5 |
| 2 | B | 1 |
| 3 | B | 2 |
| 4 | B | 5 |
| 5 | C | 2 |
| 6 | C | 2 |
| 7 | C | 1 |
| 8 | C | 2 |
| 9 | C | 2 |
| 10 | C | 2 |

TABLE 2

| Article | Author | IRP (author) | avg (author) | normalized weight | weight | avg (all auth) | normalized weight | weight |
|---------|--------|--------------|--------------|-------------------|--------|----------------|-------------------|--------|
| 11 | A | 5.00 | 3.12 | 0.86 | 2.40 | 0.49 | 0.14 | 4.65 |
| 12 | B | 2.67 | 0.23 | 0.32 | 2.40 | 0.49 | 0.66 | 2.49 |
| 13 | C | 1.83 | 6.00 | 0.92 | 2.40 | 0.49 | 0.06 | 1.86 |
| 14 | D | N/A | 0.00 | 0.00 | 2.40 | 0.49 | 1.00 | 2.40 |

What is claimed is:

1. A search engine system comprising:

a first system for receiving informons from a network on a continuing search basis, for filtering such informons for relevancy to a query from an individual user, and for storing a ranked list of relevant informons as a wire;

a second system for receiving informons from a network on a current demand search basis and for filtering such informons for relevancy to the query from the individual user; and

a third system for selecting at least one of the first and second systems to make a search for the query and to return the wire or demand search results to the individual user.

2. The system of claim 1 wherein the third system selects the first system to make a wire search only if a wire already exists for the query.

3. The system of claim 1 wherein:

a feedback system is provided for receiving collaborative feedback data from system users relative to informons considered by such users; and

at least the first system combines pertaining data from the feedback system with content profile data of the first system in filtering each informon for relevance to the query and inclusion in the wire.

4. The system of claim 3 wherein the first system includes a multi-level, content-based filter having descending levels including at least an upper preprocessing level, a middle user community level, and a bottom user level.

5. The method of claim 3 wherein the collaborative feedback data comprises active feedback data.

6. The method of claim 3 wherein the collaborative feedback data comprises passive feedback data.

7. The method of claim 6 wherein the passive feedback data is obtained by passively monitoring the actual response to a proposed informon.

8. The method of claim 3 wherein the collaborative feedback data comprises a combination of active feedback data and passive feedback data.

9. The system of claim 1 wherein adaptive user feedback data is applied at least to the first system to provide updating of content profile data employed therein.

10. A search engine system comprising:

a system for scanning a network to make a demand search for informons relevant to a query from an individual user;

a content-based filter system for receiving the informons from the scanning system and for filtering the informons on the basis of applicable content profile data for relevance to the query; and

a feedback system for receiving collaborative feedback data from system users relative to informons considered by such users;

the filter system combining pertaining feedback data from the feedback system with the content profile data in filtering each informon for relevance to the query.

11. The system of claim 10 wherein adaptive user feedback data is applied to the content-based filter to provide a learning component for content profile data employed therein.

12. The system of claim 10 wherein:

the scanning system further scans the network on a continuing basis to make a wire search for informons relevant to wire queries from system users; and

the filter system combines pertaining feedback data from the feedback system with applicable content profile data in filtering each wire informon for relevance to applicable wire query.

13. The system of claim 10 wherein the collaborative feedback data comprises active feedback data.

14. The system of claim 10 wherein the collaborative feedback data comprises passive feedback data.

15. The system of claim 14 wherein the passive feedback data is obtained by passively monitoring the actual response to a proposed informon.

16. The system of claim 10 wherein the collaborative feedback data comprises a combination of active feedback data and passive feedback data.

17. A search engine system comprising:

a content-based filtering system for receiving informons from a network on a continuing basis and for filtering the informons for relevancy to a wire or demand query from an individual user;

a feedback system providing feedback data from other users;

a system for controlling the operation of the filtering system to filter for one of a wire response and a demand response and to return the one response to the user; and

the filtering system combining pertaining feedback data from the feedback system with content profile data in determining the relevancy of the informons for inclusion in at least a wire response to the query.

18. The system of claim 17 wherein:

the content-based filtering system includes a collaborative/content based filter for filtering informons for relevancy to a wire query on a continuing basis; and

US 6,314,420 B1

29

the content-based filtering system includes a regular search engine for filtering informons for relevancy to a demand query.

19. The system of claim 18 wherein adaptive user feedback data is applied at least to the collaborative/content-based filter to provide learning for content profile data employed therein.

20. The search engine system of claim 17 wherein the feedback system provides active feedback data.

21. The search engine system of claim 17 wherein the feedback system provides passive feedback data.

22. The search engine system of claim 21 wherein the passive feedback data is obtained by passively monitoring the actual response to a proposed informon.

23. The system of claim 17 wherein the feedback system provides a combination of active feedback data and passive feedback data.

24. A method for operating a search engine system comprising:

receiving informons in a first system from a network on a continuing search basis, for filtering such informons for relevancy to a query from an individual user and for storing a ranked list of relevant informons as a wire;

receiving informons in a second system from a network on a current demand search basis for filtering such informons for relevancy to the query from the individual user; and

selecting at least one of the first and second systems to make a search for the query and to return the wire or demand search results to the individual user.

25. A method for operating a search engine system comprising:

scanning a network to make a demand search for informons relevant to a query from an individual user;

receiving informons in a content-based filter system from the scanning system and filtering the informons on the basis of applicable content profile data for relevance to the query;

receiving collaborative feedback data from system users relative to informons considered by such users; and

combining pertaining feedback data with the content profile data in filtering each informon for relevance to the query.

26. The method of claim 25 wherein the collaborative feedback data comprises active feedback data.

27. The method of claim 25 wherein the collaborative feedback data provides passive feedback data.

28. The method of claim 27 wherein the passive feedback data is obtained by passively monitoring the actual response to a proposed informon.

29. The method of claim 25 wherein collaborative feedback data comprises a combination of active feedback data and passive feedback data.

30

30. A method for operating a search engine system comprising:

receiving informons in a content-based filtering system from a network on a continuing basis and filtering the informons for relevancy to a wire or demand query from an individual user;

providing feedback data from other users;

controlling the operation of the filtering system to filter for one of a wire response and a demand response and to return the one response to the user; and

combining pertaining feedback data with content profile data in the filtering system in determining the relevancy of the informons for inclusion in at least a wire response to the query.

31. The method of claim 30 wherein the step of providing feedback data comprises providing active feedback data.

32. The method of claim 30 wherein the step of providing feedback data comprises providing passive feedback data.

33. The method of claim 32 wherein the passive feedback data is obtained by passively monitoring the actual response from at least one of the other users to a proposed informon.

34. The method of claim 30 wherein the step of providing feedback data comprises providing a combination of active feedback data and passive feedback data.

35. A search engine system comprising:

means for receiving informons from a network on a continuing search basis, for filtering such informons for relevancy to a query from an individual user, and for storing a ranked list of relevant informons as a wire;

means for receiving informons from a network on a current demand search basis and for filtering such informons for relevancy to the query from the individual user; and

means for selecting at least one of the first and second systems to make a search for the query and to return the wire or demand search results to the individual user.

36. A search engine system comprising:

means for content-based filtering informons received from a network on a continuing basis for relevancy to a wire or demand query from an individual user;

means for collecting feedback data from other users;

means for controlling the operation of the filtering means to filter for one of a wire response and a demand response and to return the one response to the user; and the filtering means combining pertaining feedback data from the feedback system with content profile data in determining the relevancy of the informons for inclusion in at least a wire response to the query.

* * * * *

**A220**

US006775664B2

(12) **United States Patent**
Lang et al.

(10) **Patent No.:     US 6,775,664 B2**
(45) **Date of Patent:        Aug. 10, 2004**

(54) **INFORMATION FILTER SYSTEM AND METHOD FOR INTEGRATED CONTENT-BASED AND COLLABORATIVE/ADAPTIVE FEEDBACK QUERIES**

(75) Inventors: **Andrew K. Lang**, Pittsburgh, PA (US); **Donald M. Kosak**, Pittsburgh, PA (US)

(73) Assignee: **Lycos, Inc.**, Waltham, MA (US)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 467 days.

(21) Appl. No.: **10/045,198**

(22) Filed:      **Oct. 22, 2001**

(65)          **Prior Publication Data**

US 2002/0120609 A1 Aug. 29, 2002

**Related U.S. Application Data**

(63) Continuation of application No. 09/204,149, filed on Dec. 3, 1998, now Pat. No. 6,314,420, which is a continuation-in-part of application No. 08/627,436, filed on Apr. 4, 1996, now Pat. No. 5,867,799, application No. 10/045,198, and a continuation-in-part of application No. 09/195,708, filed on Nov. 19, 1998, now Pat. No. 6,308,175, which is a continuation-in-part of application No. 08/627,436, filed on Apr. 4, 1996, now Pat. No. 5,867,794.

(51) Int. Cl.[7] ............................................ **G06F 17/30**
(52) U.S. Cl. .................... **707/3**; 707/5; 707/1; 707/10; 707/2
(58) Field of Search ............................ 707/1, 3, 5, 10, 707/2

(56)          **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,019,961 A | 5/1991 | Addesso et al. ............. | 364/192 |
| 5,117,349 A | 5/1992 | Tirfing et al. ................. | 707/5 |
| 5,249,262 A | 9/1993 | Baule ........................... | 395/66 |
| 5,471,610 A | 11/1995 | Kawaguchi et al. ........... | 707/4 |

| | | | |
|---|---|---|---|
| 5,537,586 A | 7/1996 | Amram et al. ................. | 707/3 |
| 5,544,049 A | 8/1996 | Henderson et al. ..... | 364/419.19 |
| 5,563,998 A | 10/1996 | Yaksich et al. ............. | 395/149 |
| 5,563,999 A | 10/1996 | Yaksich et al. ............. | 395/149 |
| 5,608,447 A | 3/1997 | Farry et al. .................... | 348/7 |
| 5,649,186 A | 7/1997 | Ferguson ..................... | 707/10 |
| 5,734,893 A | * 3/1998 | Li et al. ....................... | 707/4 |
| 5,842,199 A | 11/1998 | Miller et al. ................. | 707/2 |
| 5,867,799 A | * 2/1999 | Lang et al. .................... | 707/1 |
| 5,884,282 A | * 3/1999 | Robinson ..................... | 705/27 |

(List continued on next page.)

OTHER PUBLICATIONS

Persin, "Document Filtering for Fast Ranking", Proceedings of the Seventeenth Annual International ACM–SIGIR Conference on Research and Development in Information Retrieval, Jul. 6, 1994 pp. 339–348.

(List continued on next page.)

*Primary Examiner*—John E. Breene
*Assistant Examiner*—Kuen S. Lu
(74) *Attorney, Agent, or Firm*—Testa, Hurwitz & Thibeault, LLP

(57)          **ABSTRACT**

A search engine system is provided for a portal site on the internet. The search engine system employs a regular search engine to make one-shot or demand searches for information entities which provide at least threshold matches to user queries. The search engine system also employs a collaborative/content-based filter to make continuing searches for information entities which match existing wire queries and are ranked and stored over time in user-accessible, system wires corresponding to the respective queries. A user feedback system provides collaborative feedback data for integration with content profile data in the operation of the collaborative/content-based filter. A query processor determines whether a demand search or a wire search is made for an input query.

**38 Claims, 10 Drawing Sheets**



A221

US 6,775,664 B2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,983,214 A | | 11/1999 | Lang et al. ..................... | 707/1 |
| 6,006,222 A | | 12/1999 | Culliss .......................... | 707/5 |
| 6,014,665 A | | 1/2000 | Culliss .......................... | 707/5 |
| 6,029,141 A | * | 2/2000 | Bezos et al. .................... | 705/27 |
| 6,029,161 A | | 2/2000 | Lang et al. ..................... | 707/1 |
| 6,078,916 A | | 6/2000 | Culliss .......................... | 707/5 |
| 6,182,068 B1 | | 1/2001 | Culliss .......................... | 707/5 |
| 6,308,175 B1 | * | 10/2001 | Lang et al. ..................... | 707/10 |
| 6,314,420 B1 | * | 11/2001 | Lang et al. ..................... | 707/3 |

### OTHER PUBLICATIONS

Knowles, "Software Bots filter Web data; Agent Technology Delivers Customized Information for BBN's PIN", PC Week v.12, n17 May 1995 pp. 112–113.

Resnick et al., "Open Architecture for Collaboration Filtering of Netnews", Proceedings of the Conference on Computer Supported Cooperative Work, Oct. 1994 pp. 175–186.

Goldberg et al., "Using Collaborative Filtering to Weave an Information Tapestry", Communications of the ACM vol. 35, No. 12, Dec. 1992 pp. 61–70.

Sheth, "Learning Approach to Personalized Information Filtering", Massachusetts Institute of Technology, (Feb. 1994) pp. 1–74.

Dumais et al., "Using Latent Semantic Analysis to Improve Access to Textual Information", In Proceedings of CHI–88 Conference on Human Factors in Computing Systems, (1998, New York: ACM) 6 pp.

Evans et al., "A Summary of the CLARIT Project", Technical Report, Laboratory for Computational Linguistics, Carnegie–Mellon University, Sep. 1991, pp. 1–12.

Fischer et al., "Information Access in Complex, Poorly Structured Information Spaces", Human Factors in Computing Systems, CHI '91 Conference Proceedings, ACM, 1991 8 pp.

* cited by examiner

U.S. Patent

Aug. 10, 2004    Sheet 1 of 10

US 6,775,664 B2

**A223**



*FIG.1*

U.S. Patent

Aug. 10, 2004    Sheet 2 of 10    US 6,775,664 B2

A224



*FIG. 2*



*FIG. 3*



*FIG. 4*



*FIG. 5*

U.S. Patent    Aug. 10, 2004    Sheet 6 of 10    US 6,775,664 B2

A228

FIG. 6

NOTE: IRP=INDEPENDENT
RATING PREDICTOR

UP=UNCERTAINTY
PREDICTOR

U.S. Patent

Aug. 10, 2004

Sheet 7 of 10

US 6,775,664 B2

**A229**

```
                                    ┌─────────────┐  501
                                    │ TOP MIND POOL│
                                    │  ALL USERS   │
                                    └─────────────┘
        502a                              502b                 502c
     ┌──────────┐                    ┌──────────┐          ┌──────────┐
     │   SUB    │                    │   SUB    │          │   SUB    │
     │ MIND POOL│                    │ MIND POOL│          │ MIND POOL│
     └──────────┘                    └──────────┘          └──────────┘
 505a                                                                    505b
 ┌──────┐                                                           ┌──────┐
 │USERS │                                                           │USERS │
 └──────┘                                                           └──────┘
┌────────┐ ┌────────┐  ┌────────┐ ┌────────┐  ┌────────┐ ┌────────┐ ┌────────┐
│SUB-SUB │ │SUB-SUB │  │SUB-SUB │ │SUB-SUB │  │SUB-SUB │ │SUB-SUB │ │SUB-SUB │
│MIND POOL│ │MIND POOL│  │MIND POOL│ │MIND POOL│  │MIND POOL│ │MIND POOL│ │MIND POOL│
└────────┘ └────────┘  └────────┘ └────────┘  └────────┘ └────────┘ └────────┘
  503a       503b        503c       503d        503e       503f       503g
 ┌──────┐ ┌──────┐    ┌──────┐ ┌──────┐    ┌──────┐ ┌──────┐ ┌──────┐
 │USERS │ │USERS │    │USERS │ │USERS │    │USERS │ │USERS │ │USERS │
 └──────┘ └──────┘    └──────┘ └──────┘    └──────┘ └──────┘ └──────┘
  504a     504b        504c     504d        504e     504f     504g
```

*FIG. 7*





**FIG. 8**

A230

A231



FIG. 9



**FIG. 10**

US 6,775,664 B2

1

# INFORMATION FILTER SYSTEM AND METHOD FOR INTEGRATED CONTENT-BASED AND COLLABORATIVE/ADAPTIVE FEEDBACK QUERIES

This is a continuation of U.S. Ser. No. 09/204,149 filed Dec. 3, 1998 now U.S. Pat. No. 6,314,420, which is a continuation in part of U.S. Ser. No. 08/627,436, filed Apr. 4, 1996 now U.S. Pat. No. 5,867,799, the disclosures of which are hereby incorporated by reference herein.

This application is also a continuation in part of U.S. Ser. No. 09/195,708 filed Nov. 19, 1998 now U.S. Pat. No. 6,308,175, which is a continuation in part of U.S. Ser. No. 08/627,436, filed Apr. 4, 1996 now U.S. Pat. No. 5,867,794, the disclosures of which are hereby incorporated by reference herein.

## BACKGROUND OF THE INVENTION

The present invention relates to information processing systems for large or massive information networks, such as the internet, and more particularly to such information systems especially adapted for operation in portal and other web sites wherein a search engine operates with collaborative and content-based filtering to provide better search responses to user queries.

In the operation of the internet, a countless number of informons are available for downloading from any of at least thousands of sites for consideration by a user at the user's location. A user typically connects to a portal or other web site having a search capability, and thereafter enters a particular query, i.e., a request for informons relevant to a topic, a field of interest, etc. Thereafter, the search site typically employs a "spider" scanning system and a content-based filter in a search engine to search the internet and find informons which match the query. This process is basically a pre-search process in which matching informons are found, at the time of initiating a search for the user's query, by comparing informons in an "informon data base" to the user's query. In essence, the pre-search process is a short term search for quickly finding and quickly identifying information entities which are content matched to the user's query.

The return list of matching informons can be very extensive according to the subject of the query and the breadth of the query. More specific queries typically result in shorter return lists. In some cases, the search site may also be structured to find web sites which probably have stored informons matching the entered query.

Collaborative data can be made available to assist in informon rating when a user actually downloads an informon, considers and evaluates it, and returns data to the search site as a representation of the value of the considered informon to the user.

In the patent application which is parent to this continuation-in-part application, i.e. Ser. No. 08/627,436, filed by the present inventors on Apr. 4, 1996, and hereby incorporated by reference, an advanced collaborative/content-based information filter system is employed to provide superior filtering in the process of finding and rating informons which match a user's query. The information filter structure in this system integrates content-based filtering and collaborative filtering to determine relevancy of informons received from various sites in the internet or other network. In operation, a user enters a query and a corresponding "wire" is established, i.e., the query is profiled in storage on a content basis and adaptively updated over time,

2

and informons obtained from the network are compared to the profile for relevancy and ranking. A continuously operating "spider" scans the network to obtain informons which are received and processed for relevancy to the individual user's wire or to wires established by numerous other users.

The integrated filter system compares received informons to the individual user's query profile data, combined with collaborative data, and ranks, in order of value, informons found to be relevant. The system maintains the ranked informons in a stored list from which the individual user can select any listed informon for consideration.

As the system continues to feed the individual user's "wire", the stored relevant informon list typically changes due to factors including a return of new and more relevant informons, adjustments in the user's query, feedback evaluations by the user for considered informons, and updatings in collaborative feedback data. Received informons are similarly processed for other users' wires established in the information filter system. Thus, the integrated information filter system performs continued long-term searching, i.e., it compares network informons to multiple users' queries to find matching informons for various users' wires over the course of time, whereas conventional search engines initiate a search in response to an individual user's query and use content-based filtering to compare the query to accessed network informons typically to find matching informons during a limited, short-term search time period.

The present invention is directed to an information processing system especially adapted for use at internet portal or other web sites to make network searches for information entities relevant to user queries, with collaborative feedback data and content-based data and adaptive filter structuring, being used in filtering operations to produce significantly improved search results.

## SUMMARY OF THE INVENTION

A search engine system employs a content-based filtering system for receiving informons from a network on a continuing basis and for filtering the informons for relevancy to a wire or demand query from an individual user. A feedback system provides feedback data from other users.

Another system controls the operation of the filtering system to filter for one of a wire response and a demand response and to return the one response to the user. The filtering system combines pertaining feedback data from the feedback system with content profile data in determining the relevancy of the informons for inclusion in at least a wire response to the query.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagrammatic representation f an embodiment of an information filtering apparatus according to the present invention.

FIG. 2 is an diagrammatic representation of another embodiment of an information filtering apparatus according to the present invention.

FIG. 3 is a flow diagram for an embodiment of an information filtering method according to the present invention.

FIG. 4 is a flow diagram for another embodiment of an information filtering method according to the present invention.

FIG. 5 is a flow diagram for yet another embodiment of an information filtering method according to the present invention.

3                                                    4

FIG. **6** is an illustration of a three-component-input model and profile with associated predictors.

FIG. **7** is an illustration of a mindpool hierarchy.

FIG. **8** is a logic diagram illustrating a search selection feature of the invention;

FIG. **9** is a functional block diagram of an embodiment of the invention in which an integrated information processing system employs a search engine and operates with combined collaborative filtering and content-based filtering, which is preferably adaptive, to develop responses to user queries.

FIG. **10** shows another and presently preferred embodiment of the invention in which an information processing system includes an integrated filter structure providing collaborative/adaptive-content-based filtering to develop longer term, continuing responses to user queries, and a search engine structure which provides short term, demand responses to user queries, with the system directing user queries to the appropriate structure for responses.

## DETAILED DESCRIPTION OF THE EMBODIMENTS

The invention herein is preferably configured with an apparatus and method for information filtering in a computer system receiving a data stream from a computer network, in which entities of information relevant to the user, or "informons," are extracted from the data stream using content-based and collaborative filtering. The information filtering is long term in the sense that it operates on a continuing basis, and is both interactive and distributed in structure and method. It is interactive in that communication is substantially bi-directional at each level of the filter. It is distributed in that all or part of the information filter can include a purely hierarchical (up-and-down/parent-child) structure or method, a purely parallel (peer-to-peer) structure or method, or a combination of hierarchical and parallel structures and method.

As used herein, the term "informon" comprehends an information entity of potential or actual interest to a particular user. In general, informons can be heterogeneous in nature and can be all or part of a textual, a visual, or an audio entity. Also, informons can be composed of a combination of the aforementioned entities, thereby being a multimedia entity. Furthermore, an informon can be an entity of patterned data, such as a data file containing a digital representation of signals and can be a combination of any of the previously-mentioned entities. Although some of the data in a data stream, including informons, may be included in an informon, not all data is relevant to a user, and is not within the definition of an informon. By analogy, an informon may be considered to be a "signal," and the total data stream may be considered to be "signal+noise." Therefore, an information filtering apparatus is analogous to other types of signal filters in that it is designed to separate the "signal" from the "noise."

Also as used herein, the term "user" is an individual in communication with the network. Because an individual user can be interested in multiple categories of information, the user can be considered to be multiple clients each having a unique profile, or set of attributes. Each member client profile, then, is representative of a particular group of user preferences. Collectively, the member client profiles associated with each user is the user profile. The present invention can apply the learned knowledge of one of a user's member clients to others of the user's member clients, so that the importance of the learned knowledge, e.g., the user's preference for a particular author in one interest area as

represented by the member client, can increase the importance of that particular factor, A's authorship, for others of the user's member clients. Each of the clients of one user can be associated with the individual clients of other users insofar as the profiles of the respective clients have similar attributes. A "community" is a group of clients, called member clients, that have similar member client profiles, i.e., that share a subset of attributes or interests. In general, the subset of shared attributes forms the community profile for a given community and is representative of the community norms, or common client attributes.

The "relevance" of a particular informon broadly describes how well it satisfies the user's information need. The more relevant an informon is to a user, the higher the "signal" content. The less relevant the informon, the higher the "noise" content. Clearly, the notion of what is relevant to a particular user can vary over time and with context, and the user can find the relevance of a particular informon limited to only a few of the user's potentially vast interest areas. Because a user's interests typically change slowly, relative to the data stream, it is preferred to use adaptive procedures to track the user's current interests and follow them over time. Provision, too, is preferred to be made for sudden changes in interest, e.g., taking up antiquarian sword collecting and discontinuing stamp collecting, so that the method and apparatus track the evolution of "relevance" to a user and the communities of which the user is a member. In general, information filtering is the process of selecting the information that a users wishes to see, i.e., informons, from a large amount of data. Content-based filtering is a process of filtering by extracting features from the informon, e.g., the text of a document, to determine the informon's relevance. Collaborative filtering, on the other hand, is the process of filtering informons, e.g., documents, by determining what informons other users with similar interests or needs found to be relevant.

The system apparatus includes a filter structure having adaptive content-based filters and adaptive collaborative filters, which respectively include, and respond to, an adaptive content profile and an adaptive collaboration profile. As used herein, the term "content-based filter" means a filter in which content data, such as key words, is used in performing the filtering process. In a collaborative filter, other user data is used in performing the filtering process. A collaborative filter is also sometimes referred to as a "content" filter since it ultimately performs the task of finding an object or document having content relevant to the content desired by a user. If there are some instances herein where the term "content filter" is used as distinguished from a collaborative filter, it is intended that the term "content filter" mean "content-based filter." The adaptive filters each are preferred to include at least a portion of a community filter for each community serviced by the apparatus, and a portion of a member client filter for each member client of the serviced communities. For this reason, the adaptive filtering is distributed in that each of the community filters perform adaptive collaborative filtering and adaptive content filtering, even if on different levels, and even if many filters exist on a given level. The integrated filtering permits an individual user to be a unique member client of multiple communities, with each community including multiple member clients sharing similar interests. The adaptive features permit the interests of member clients and entire communities to change gradually over time. Also a member client has the ability to indicate a sudden change in preference, e.g., the member client remains a collector but is no longer interested in coin collecting.

US 6,775,664 B2

5

The filter structure also implements adaptive credibility filtering, providing member clients with a measure of informon credibility, as judged by other member clients in the community. For example, a new member client in a first community, having no credibility, can inject an informon into the data flow, thereby providing other member clients in other communities with the proposed informon, based on the respective community profile and member client profiles. If the other member clients believe the content of the informon to be credible, the adaptive credibility profile will reflect a growing credibility. Conversely, feedback profiles from informon recipients that indicate a lack of credibility cause the adaptive credibility profile, for the informon author, to reflect untrustworthiness. However, the growth and declination of credibility are not "purely democratic," in the sense that one's credibility is susceptible to the bias of others' perceptions, so the growth or declination of one's credibility is generally proportional to how the credibility of the new member client is viewed by other member clients.

Member clients can put their respective reputations "on the line," and engage in spirited discussions which can be refereed by other interested member clients. The credibility profile further can be partitioned to permit separate credibility sub-profiles for the credibility of the content of the informon, the author, the author's community, the reviewers, and the like, and can be fed back to discussion participants, reviewers, and observers to monitor the responses of others to the debate. The adaptive credibility profiles for those member clients with top credibility ratings in their communities may be used to establish those member clients as "experts" in their respective communities.

With this functionality, additional features can be implemented, including, for example, "instant polling" on a matter of political or consumer interest. In conjunction with both content and collaborative filtering, credibility filtering, and the resulting adaptive credibility profiles, also may be used to produce other features, such as on-line consultation and recommendation services. Although the "experts" in the communities most closely related to the topic can be afforded special status as such, member clients from other communities also can participate in the consultation or recommendation process.

In one embodiment of the consultation service, credibility filtering can be augmented to include consultation filtering. With this feature, a member client can transmit an informon to the network with a request for guidance on an issue, for example, caring for a sick tropical fish. Other member clients can respond to the requester with informons related to the topic, e.g., suggestions for water temperature and antibiotics. The informons of the responders can include their respective credibility profiles, community membership, and professional or vocational affiliations. The requester can provide feedback to each of the responders, including a rating of the credibility of the responder on the particular topic. Additionally, the responders can accrue quality points, value tokens, or "info bucks," as apportioned by the requester, in return for useful guidance.

Similarly, one embodiment of an on-line recommendation service uses recommendation filtering and adaptive recommendation profiles to give member clients recommendations on matters as diverse as local auto mechanics and world-class medieval armor refurbishers. In this embodiment, the requester can transmit the informon to the network bearing the request for recommendation. Other member clients can respond to the requester with informons having specific recommendations or disrecommendations, advice, etc. As with the consultation service, the informons of the respond-

6

ers can be augmented to include their respective credibility profiles, community membership, and professional or avocational affiliations. A rating of each recommendation provided by a responder, relative to other responders' recommendations, also can be supplied. The requester can provide feedback to each of the responders, including a rating of the credibility of the responder on the particular topic, or the quality of the recommendation. As before, the responders can accrue quality points, value tokens, or "info bucks," as apportioned by the requester, in return for the useful recommendation.

Furthermore, certain embodiments are preferred to be self-optimizing in that some or all of the adaptive filters used in the system dynamically seek optimal values for the function intended by the filter, e.g., content analysis, collaboration, credibility, reliability, etc.

The filter structure herein is capable of identifying the preferences of individual member clients and communities, providing direct and inferential consumer preference information, and tracking shifts in the preferences whether the shifts be gradual or sudden. The consumer preference information can be used to target particular consumer preference groups, or cohorts, and provide members of the cohort with targeted informons relevant to their consumer preferences. This information also may be used to follow demographical shifts so that activities relying on accurate demographical data, such as retail marketing, can use the consumer preference information to anticipate evolving consumer needs in a timely manner.

To provide a basis for adaptation, it is preferred that each raw informon be processed into a standardized vector, which may be on the order of 20,000 to 100,000 tokens long. The learning and optimization methods that ultimately are chosen are preferred to be substantially robust to the problems which can be presented by such high-dimensional input spaces. Dimensionality reduction using methods such as the singular value decomposition (SVD), or auto-encoding neural networks attempt to reduce the size of the space while initially retaining the information contained in the original representation. However, the SVD can lose information during the transformation and may give inferior results. Two adaptation/learning methods that are presently preferred include the TF-IDF technique and the MDL technique.

FIG. 1 illustrates one embodiment of an information filtering apparatus 1 structured for search engine implementation in accordance with the invention as described subsequently herein in connection with FIGS. 8 and 9. In general, a data stream is conveyed through network 3, which can be a global internetwork. A skilled artisan would recognize that apparatus 1 can be used with other types of networks, including, for example, an enterprise-wide network, or "intranet." Using network 3, User #1 (5) can communicate with other users, for example, User #2 (7) and User #3 (9), and also with distributed network resources such as resource #1 (11) and resource #2 (13).

Apparatus 1 is preferred to be part of computer system 16, although User #1 (5) is not required to be the sole user of computer system 16. In one present embodiment, it is preferred that computer system 16 having information filter apparatus 1 therein filters information for a plurality of users. One application for apparatus 1, for example, could be that user 5 and similar users may be subscribers to a commercial information filtering service, which can be provided by the owner of computer system 16.

Extraction means 17 can be coupled with, and receives data stream 15 from, network 3. Extraction means 17 can

**A235**

US 6,775,664 B2

7

identify and extract raw informons **19** from data stream **15**. Each of the raw informons **19** has an information content. Extraction means **17** uses an adaptive content filter, and at least part of the adaptive content profile, to analyze the data stream for the presence of raw informons. Raw informons are those data entities whose content identifies them as being "in the ballpark," or of potential interest to a community coupled to apparatus **1**. Extraction means **17** can remove duplicate informons, even if the informons arrive from different sources, so that user resources are not wasted by handling and viewing repetitive and cumulative information. Extraction means **17** also can use at least part of a community profile and a user profile for User #1 (**5**) to determine whether the informon content is relevant to the community of which User #1 is a part.

Filter means **21** adaptively filters raw informons **19** and produces proposed informons **23** which are conveyed to User #1 (**5**) by communication means **25**. A proposed informon is a selected raw informon that, based upon the respective member client and community profiles, is predicted to be of particular interest to a member client of User **5**. Filter means **21** can include a plurality of community filters **27***a,b* and a plurality of member client filters **28***a–e*, each respectively having community and member client profiles. When raw informons **19** are filtered by filter means **21**, those informons that are predicted to be suitable for a particular member client of a particular community, e.g., User #1 (**5**), responsive to the respective community and member client profiles, are conveyed thereto. Where such is desired, filter means **21** also can include a credibility filter which enables means **21** to perform credibility filtering of raw informons **19** according to a credibility profile.

It is preferred that the adaptive filtering performed within filter means **21** by the plurality of filters **27***a,b*, **28***a–e*, and **35**, use a self-optimizing adaptive filtering so that each of the parameters processed by filters **27***a,b*, **28***a–e*, and **35**, is driven continually to respective values corresponding to a minimal error for each individual parameter. Self-optimization encourages a dynamic, marketplace-like operation of the system, in that those entities having the most desirable value, e.g., highest credibility, lowest predicted error, etc., are favored to prevail.

Self-optimization can be effected according to respective preselected self-optimizing adaptation techniques including, for example, one or more of a top-key-word-selection adaptation technique, a nearest-neighbor adaptation technique, a term-weighting adaptation technique, a probabilistic adaptation technique, and a neural network learning technique. In one present embodiment of the invention, the term-weighting adaptation technique is preferred to be a TF-IDF technique and the probabilistic adaptation technique is preferred to be a MDL technique.

When user **5** receives proposed informon **23** from apparatus **1**, user **5** is provided with multiple feedback queries along with the proposed informon. By answering, user **5** creates a feedback profile that corresponds to feedback response **29**. User feedback response **29** can be active feedback, passive feedback, or a combination. Active feedback can include the user's numerical rating for an informon, hints, and indices. Hints can include like or dislike of an author, and informon source and timeliness. Indices can include credibility, agreement with content or author, humor, or value. Feedback response **29** provides an actual response to proposed informon **23**, which is a measure of the relevance of the proposed informon to the information need of user **5**. Such relevance feedback attempts to improve the performance for a particular profile by modifying the profiles, based on feedback response **29**.

8

A predicted response anticipated by adaptive filtering means **21** can be compared to the actual feedback response **29** of user **5** by first adaptation means **30**, which derives a prediction error. First adaptation means **30** also can include prediction means **33**, which collects a number of temporally-spaced feedback responses, to update the adaptive collaboration profile, the adaptive content profile, or both, with an adapted future prediction **34**, in order to minimize subsequent prediction errors by the respective adaptive collaboration filter and adaptive content filter.

In one embodiment of the invention herein, it is preferred that prediction means **33** be a self-optimizing prediction means using a preselected learning technique. Such techniques can include, for example, one or more of a top-key-word-selection learning technique, a nearest-neighbor learning technique, a term-weighting learning technique, and a probabilistic learning technique. First adaptation means **30** also can include a neural network learning technique therein and employ a neural network learning technique for adaptation and prediction. In one present embodiment of the invention, the term-weighting learning technique is preferred to be a TF-IDF technique and the probabilistic learning technique is preferred to be a MDL learning technique.

First adaptation means **30** further can include second adaptation means **32** for adapting at least one of the adaptive collaboration profiles, the adaptive content profiles, the community profile, and the user profile, responsive to at least one of the other profiles. In this manner, trends attributable to individual member clients, individual users, and individual communities in one domain of system **16** can be recognized by, and influence, similar entities in other domains (melding of agent "minds"), contained within system **16** to the extent that the respective entities share common attributes.

Apparatus **1** also can include a computer storage means **31** for storing the profiles, including the adaptive content profile and the adaptive collaboration profile. Additional trend-tracking information can be stored for later retrieval in storage means **31**, or may be conveyed to network **3** for remote analysis, for example, by User #2 (**7**).

FIG. **2** illustrates another preferred embodiment of information filtering apparatus **50**, in computer system **51**. Apparatus **50** can include first processor **52**, second processors **53***a,b*, third processors **64***a–d*, and a fourth processor **55**, to effect the desired information filtering. First processor **52** can be coupled to, and receive a data stream **56** from, network **57**. First processor **52** can serve as a pre-processor by extracting raw informons **58** from data stream **56** responsive to preprocessing profile **49** and conveying informons **58** to second processors **53***a,b*.

Because of the inconsistencies presented by the nearly-infinite individual differences in the modes of conceptualization, expression, and vocabulary among users, even within a community of coinciding interests, similar notions can be described with vastly different terms and connotations, greatly complicating informon characterization. Mode variations can be even greater between disparate communities, discouraging interaction and knowledge-sharing among communities. Therefore, it is particularly preferred that processor **52** create a mode-invariant representation for each raw informon, thus allowing fast, accurate informon characterization and collaborative filtering. Mode-invariant representations tend to facilitate relevant informon selection and distribution within and among communities, thereby promoting knowledge-sharing, thereby benefiting the group of interlinked communities, i.e., a society, as well.

US 6,775,664 B2

9

First processor **52** also can be used to prevent duplicate informons, e.g., the same information from different sources, from further penetrating, and thus consuming the resources of, the filtering process. Other processors **53**,*a,b*, **54***a–d*, also may be used to perform the duplicate information elimination function, but additionally may measure the differences between the existing informon and new informons. That difference between the content of the informon the previous time the user reviewed it and the content of the informon in its present form is the "delta" of interest. Processors **53***a,b*, **54***a–d* may eliminate the informon from further processing, or direct the new, altered informon to the member client, in the event that nature or extent of the change exceeds a "delta" threshold. In general, from the notion of exceeding a preselected delta threshold, one may infer that the informon has changed to the extent that the change is interesting to the user. The nature of this change can be shared among all of a user's member clients. This delta threshold can be preselected by the user, or by the preselected learning technique. Such processing, or "delta learning" can be accomplished by second processors **53***a,b*, alone or in concert with third processors **54***a–d*. Indeed, third processor **54***a–d* can be the locus for delta learning, where processors **54***a–d* adapts a delta learning profile for each member client of the community, i.e. user, thus anticipating those changes in existing informons that the user may find "interesting."

Second processors **53***a,b* can filter raw informons **58** and extract proposed community informons **59***a,b* therefrom. Informons **59***a,b* are those predicted by processors **53***a,b* to be relevant to the respective communities, in response to community profiles **48***a,b* that are unique to the communities. Although only two second processors **53***a,b* are shown in FIG. **2**, system **51** can be scaled to support many more processors, and communities. It is presently preferred that second processors **53***a,b* extract community informons **59***a,b* using a two-step process. Where processor **52** has generated mode-invariant concept representations of the raw informons, processor **53***a,b* can perform concept-based indexing, and then provide detailed community filtering of each informon.

Third processors **54***a–d* can receive community informons **59***a,b* from processors **53***a,b*, and extract proposed member client informons **61***a–d* therefrom, responsive to unique member client profiles **62***a–d* for respective ones of member clients **63***a–d*. Each user can be represented by multiple member clients in multiple communities. For example, each of users **64***a,b* can maintain interests in each of the communities serviced by respective second processors **53***a,b*, and each receive separate member client informons **61***b,c* and **61***a,d*, respectively.

Each member client **63***a–d* provides respective member client feedback **65***a–d* to fourth processor **55**, responsive to the proposed member client informons **61***a–d*. Based upon the member client feedback **65***a–d*, processor **55** updates at least one of the preprocessing profile **49**, community profiles **48***a,b* and member client profiles **62***a–d*. Also, processor **55** adapts at least one of the adaptive content profile **68** and the adaptive collaboration profile **69**, responsive to profiles **49**, **48***a,b*, and **62***a–d*.

Fourth processor **55** can include a plurality of adaptive filters **66***a–d* for each of the aforementioned profiles and computer storage therefor. It is preferred that the plurality of adaptive filters **66***a–d* be self-optimizing adaptive filters. Self-optimization can be effected according to a preselected self-optimizing adaptation technique including, for example, one or more of a top-key-word-selection adaptation

10

technique, a nearest-neighbor adaptation technique, a term-weighting adaptation technique, and a probabilistic adaptation technique. Any of the adaptive filters **66***a–d* may include a neural network. In one present embodiment of the invention, the term-weighting adaptation technique is preferred to be a TF-IDF technique and the probabilistic adaptation technique is preferred to be a MDL technique.

An artisan would recognize that one or more of the processors **52–55** could be combined functionally so that the actual number of processors used in the apparatus **50** could be less than, or greater than, that illustrated in FIG. **2**. For example, in one embodiment of the present invention, first processor **52** can be in a single microcomputer workstation, with processors **53–55** being implemented in additional respective microcomputer systems. Suitable microcomputer systems can include those based upon the Intel® Pentium-Pro™ microprocessor. In fact, the flexibility of design presented by the invention allows for extensive scalability of apparatus **50**, in which the number of users, and the communities supported may be easily expanded by adding suitable processors. As described in the context of FIG. **1**, the interrelation of the several adaptive profiles and respective filters allow trends attributable to individual member clients, individual users, and individual communities in one domain of system **51** to be recognized by, and influence, similar entities in other domains, of system **51** to the extent that the respective entities in the different domains share common attributes.

The above described system operates in accordance with a method **100** for information filtering in a computer system, as illustrated in FIG. **3**, which includes providing a dynamic informon characterization (step **105**) having a plurality of profiles encoded therein, including an adaptive content profile and an adaptive collaboration profile; and adaptively filtering the raw informons (step **110**) responsive to the dynamic informon characterization, thereby producing a proposed informon. The method continues by presenting the proposed informon to the user (step **115**) and receiving a feedback profile from the user (step **120**), responsive to the proposed informon. Also, the method includes adapting at least one of the adaptive content profile (step **125**) and the adaptive collaboration profile responsive to the feedback profile; and updating the dynamic informon characterization (step **130**) responsive thereto.

The adaptive filtering (step **110**) in method **100** can be machine distributed adaptive filtering that includes community filtering (substep **135**), using a community profile for each community, and client filtering (substep **140**), similarly using a member client profile for each member client of each community. It is preferred that the filtering in substeps **135** and **140** be responsive to the adaptive content profile and the adaptive collaboration profile. Method **100** comprehends servicing multiple communities and multiple users. In turn, each user may be represented by multiple member clients, with each client having a unique member client profile and being a member of a selected community. It is preferred that updating the dynamic informon characterization (step **130**) further include predicting selected subsequent member client responses (step **150**).

Method **100** can also include credibility filtering (step **155**) of the raw informons responsive to an adaptive credibility profile and updating the credibility profile (step **160**) responsive to the user feedback profile. Method **100** further can include creating a consumer profile (step **165**) responsive to the user feedback profile. In general, the consumer profile is representative of predetermined consumer preference criteria relative to the communities of which the user is

**A237**

US 6,775,664 B2

11

a member client. Furthermore, grouping selected ones (step **170**) of the users into a preference cohort, responsive to the preselected consumer preference criteria, can facilitate providing a targeted informon (step **175**), such as an advertisement, to the preference cohort.

FIG. **4** illustrates yet another preferred method **200**. In general, method **200** includes partitioning (step **205**) each user into multiple member clients, each having a unique member client profile with multiple client attributes and grouping member clients (step **210**) to form multiple communities with each member client in a particular community sharing selected client attributes with other member clients, thereby providing each community with a unique community profile having common client attributes.

Method **200** continues by predicting a community profile (step **215**) for each community using first prediction criteria, and predicting a member client profile (step **220**) for a member client in a particular community using second prediction criteria. Method **200** also includes the steps of extracting raw informons (step **225**) from a data stream and selecting proposed informons (step **230**) from raw informons. The proposed informons generally are correlated with one or more of the common client attributes of a community, and of the member client attributes of the particular member client to whom the proposed informon is offered. After providing the proposed informons to the user (step **235**), receiving user feedback (step **240**) in response to the proposed informons permits the updating of the first and second prediction criteria (step **245**) responsive to the user feedback.

Method **200** further may include prefiltering the data stream (step **250**) using the predicted community profile, with the predicted community profile identifying the raw informons in the data stream.

Step **230** of selecting proposed informons can include filtering the raw informons using an adaptive content filter (step **255**) responsive to the informon content; filtering the raw informons using an adaptive collaboration filter (step **260**) responsive to the common client attributes for the pertaining community; and filtering the raw informons using an adaptive member client filter (step **265**) responsive to the unique member client profile.

It is preferred that updating the first and second prediction criteria (step **245**) employ a self-optimizing adaptation technique, including, for example, one or more of a top-key-word-selection adaptation technique, a nearest-neighbor adaptation technique, a term-weighting adaptation technique, and a probabilistic adaptation technique. It is further preferred that the term-weighting adaptation technique be a TF-IDF technique and the probabilistic adaptation technique be a minimum description length technique.

The information filtering method shown in FIG. **5** provides rapid, efficient data reduction and routing, or filtering, to the appropriate member client. The method **300** includes parsing the data stream into tokens (step **301**); creating a mode-invariant (MI) profile of the informon (step **305**); selecting the most appropriate communities for each informon, based on the MI profile, using concept-based indexing (step **310**); detailed analysis (step **315**) of each informon with regard to its fit within each community; eliminating poor-fitting informons (step **320**); detailed filtering of each informon relative to fit for each member client (step **325**); eliminating poor-fitting informons (step **330**); presenting the informon to the member client/user (step **335**); and obtaining the member client/user response, including multiple ratings for different facets of the user's response to the informon (step **340**).

12

It is preferred that coherent portions of the data stream, i.e., potential raw informons, be first parsed (step **301**) into generalized words, called tokens. Tokens include punctuation and other specialized symbols that may be part of the structure found in the article headers. For example, in addition to typical words such as "seminar" counting as tokens, the punctuation mark "$" and the symbol "Newsgroup:comp.ai" are also tokens. Using noun phrases as tokens also can be useful.

Next a vector of token counts for the document is created. This vector is the size of the total vocabulary, with zeros for tokens not occurring in the document. Using this type of vector is sometimes called the bag-of-words model. While the bag-of-words model does not capture the order of the tokens in the document, which may be needed for linguistic or syntactic analysis, it captures most of the information needed for filtering purposes.

Although, it is common in information retrieval systems to group the tokens together by their common linguistic roots, called stemming, as a next step it is preferred in the present invention that the tokens be left in their unstemmed form. In this form, the tokens are amenable to being classified into mode-invariant concept components.

Creating a mode-invariant profile (step **305**), C, includes creating a conceptual representation for each informon, A, that is invariant with respect to the form-of-expression, e.g., vocabulary and conceptualization. Each community can consist of a "Meta-U-Zine" collection, M, of informons. Based upon profile C, the appropriate communities, if any, for each informon in the data stream are selected by concept-based indexing (step **310**) into each M. That is, for each concept C that describes A, put A into a queue $Q_M$, for each M which is related to C. It is preferred that there is a list of Ms that is stored for each concept and that can be easily index-searched. Each A that is determined to be a poor fit for a particular M is eliminated from further processing. Once A has been matched with a particular M, a more complex community profile $P_M$ is developed and maintained for each M (step **315**). If A has fallen into $Q_M$, then A is analyzed to determine whether it matches $P_M$ strongly enough to be retained or "weeded" out (step **325**) at this stage.

Each A for a particular M is sent to each user's personal agent, or member client U of M, for additional analysis based on the member client's profile (step **325**). Each A that fits U's interests sufficiently is selected for U's personal informon, or "U-Zine," collection, Z. Poor-fitting informons are eliminated from placement in Z (step **330**). This user-level stage of analysis and selection may be performed on a centralized server site or on the user's computer.

Next, the proposed informons are presented to user U (step **335**) for review. User U reads and rates each selected A found in Z (step **340**). The feedback from U can consist of a rating for how "interesting" U found A to be, as well as one or more of the following:

Opinion feedback: Did U agree, disagree, or have no opinion regarding the position of A?

Credibility Feedback: Did U find the facts, logic, sources, and quotes in A to be truthful and credible or not?

Informon Qualities: How does the user rate the informons qualities, for example, "interestingness," credibility, funniness, content value, writing quality, violence content, sexual content, profanity level, business importance, scientific merit, surprise/unexpectedness of information content, artistic quality, dramatic appeal, entertainment value, trendiness/importance to future directions, and opinion agreement.

US 6,775,664 B2

13 14

Specific Reason Feedback: Why did the user like or dislike A?

Because of the authority?

Because of the source?

Because A is out-of-date (e.g. weather report from 3 weeks ago?)

Because the information contained in A has been seen already? (i.e., the problem of duplicate information delivery)

Categorization Feedback: Did U liked A? Was it placed within the correct M and Z?

Such multi-faceted feedback queries can produce rich feedback profiles from U that can be used to adapt each of the profiles used in the filtering process to some optimal operating point.

One embodiment of creating a MI profile (step 305) for each concept can include concept profiling, creation, and optimization. Broad descriptors can be used to create a substantially-invariant concept profile, ideally without the word choice used to express concept C. A concept profile can include positive concept clues (PCC) and negative concept clues (NCC). The PCC and NCC can be combined by a processor to create a measure-of-fit that can be compared to a predetermined threshold. If the combined effect of the PCC and NCC exceeds the predetermined threshold, then inform on A can be assumed to be related to concept C; otherwise it is eliminated from further processing. PCC is a set of words, phrases, and other features, such as the source or the author, each with an associated weight, that tend to be in A which contains C. In contrast, NCC is a set of words, phrases, and other features, such as the source or the author, each with an associated weight that tend to make it more unlikely that A is contained in C. For example, if the term "car" is in A, then it is likely to be about automobiles. However, if the phrase "bumper car" also is in A, then it is more likely that A related to amusement parks. Therefore, "bumper car" would fall into the profile of negative concept clues for the concept "automobile."

Typically, concept profile C can be created by one or more means. First, C can be explicitly created by user U. Second, C can be created by an electronic thesaurus or similar device that can catalog and select from a set of concepts and the words that can be associated with that concept. Third, C can be created by using co-occurrence information that can be generated by analyzing the content of an informon. This means uses the fact that related features of a concept tend to occur more often within the same document than in general. Fourth, C can be created by the analysis of collections, H, of A that have been rated by one or more U. Combinations of features that tend to occur repeatedly in H can be grouped together as PCC for the analysis of a new concept. Also, an A that one or more U have rated and determined not to be within a particular Z can be used for the extraction of NCC.

Concept profiles can be optimized or learned continually after their creation, with the objective that nearly all As that Us have found interesting, and belonging in M, should pass the predetermined threshold of at least one C that can serve as an index into M. Another objective of concept profile management is that, for each A that does not fall into any of the one or more M that are indexed by C, the breadth of C is adjusted to preserve the first objective, insofar as possible. For example, if C's threshold is exceeded for a given A, C's breadth can be narrowed by reducing PCC, increasing NCC, or both, or by increasing the threshold for C.

In the next stage of filtering, one embodiment of content-based indexing takes an A that has been processed into the set of C that describe it, and determine which M should accept the article for subsequent filtering, for example, detailed indexing of incoming A. It is preferred that a data structure including a database be used, so that the vector of Ms, that are related to any concept C, may be looked-up. Furthermore, when a Z is created by U, the concept clues given by U to the information filter can be used to determine a set of likely concepts C that describe what U is seeking. For example, if U types in "basketball" as a likely word in the associated Z, then all concepts that have a high positive weight for the word "basketball" are associated with the new Z. If no such concepts C seem to pre-exist, an entirely new concept C is created that is endowed with the clues U has given as the starting profile.

To augment the effectiveness of concept-based indexing, it is preferred to provide continual optimization learning. In general, when a concept C no longer uniquely triggers any documents that have been classified and liked by member clients U in a particular community M, then that M is removed from the list of M indexed into by C. Also, when there appears to be significant overlap between articles fitting concept C, and articles that have been classified by users as belonging to M, and if C does not currently index into M, then M can be added to the list of M indexed into by C. The foregoing heuristic for expanding the concepts C that are covered by M, can potentially make M too broad and, thus, accept too many articles. Therefore, it is further preferred that a reasonable but arbitrary limit is set on the conceptual size covered by M.

With regard to the detailed analysis of each informon A with respect to the community profile for each M, each A must pass through this analysis for each U subscribing to a particular M, i.e., for each member client in a particular community. After A has passed that stage, it is then filtered at a more personal, member client level for each of those users. The profile and filtering process are very similar for both the community level and the member client level, except that at the community level, the empirical data obtained is for all U who subscribed to M, and not merely an individual U. Other information about the individual U can be used to help the filter, such as what U thinks of what a particular author writes in other Zs that the user reads, and articles that can't be used for the group-level M processing.

FIG. 6 illustrates the development of a profile, and its associated predictors. Typically, regarding the structure of a profile 400, the information into the structure can be divided into three broad categories: (1) Structured Feature Information (SFI) 405; (2) Unstructured Feature Information (UFI) 410; and (3) Collaborative Input (CI) 415. Features derived from combinations of these three types act as additional peer-level inputs for the next level of the rating prediction function, called (4) Correlated-Feature, Error-Correction Units (CFECU) 420. From inputs 405, 410, 415, 420, learning functions 425a–d can be applied to get two computed functions 426a–d, 428a–d of the inputs. These two functions are the Independent Rating Predictors (IRP) 426a–d, and the associated Uncertainty Predictors (UP) 428a–d. IRPs 426a–d can be weighted by dividing them by their respective UPs 428a–d, so that the more certain an IRP 426a–d is, the higher its weight. Each weighted IRP 429a–d is brought together with other IRPs 429a–d in a combination function 427a–d. This combination function 427a–d can be from a simple, weighted, additive function to a far more complex neural network function. The results from this are normalized by the total uncertainty across all UPs, from Certain=zero to Uncertain=infinity, and combined using the Certainty Weighting Function (CWF) 430. Once the CWF 430 has combined the IRPs 426a–d, it is preferred that result

US 6,775,664 B2

15

432 be shaped via a monotonically increasing function, to map to the range and distribution of the actual ratings. This function is called the Complete Rating Predictor (CRP) 432.

SFI 405 can include vectors of authors, sources, and other features of informon A that may be influential in determining the degree to which A falls into the categories in a given M. UFI 410 can include vectors of important words, phrases, and concepts that help to determine the degree to which A falls into a given M. Vectors can exist for different canonical parts of A. For example, individual vectors may be provided for subject/headings, content body, related information in other referenced informons, and the like. It is preferred that a positive and negative vector exists for each canonical part.

CI 415 is received from other Us who already have seen A and have rated it. The input used for CI 415 can include, for example, "interestingness," credibility, funniness, content value, writing quality, violence content, sexual content, profanity level, business importance, scientific merit, surprise/unexpectedness of information content, artistic quality, dramatic appeal, entertainment value, trendiness/ importance to future directions, and opinion agreement. Each CFECU 420 is a unit that can detect sets of specific feature combinations which are exceptions in combination. For example, author X's articles are generally disliked in the Z for woodworking, except when X writes about lathes. When an informon authored by X contains the concept of "lathes," then the appropriate CFECU 420 is triggered to signal that this is an exception, and accordingly a signal is sent to offset the general negative signal otherwise triggered because of the general dislike for X's informons in the woodworking Z.

As an example, the form of Structured Feature Information (SFI) 405 can include fields such as Author, Source, Information-Type, and other fields previously identified to be of particular value in the analysis. For simplicity, the exemplary SFI, below, accounts only for the Author field. For this example, assume three authors A, B, and C, have collectively submitted 10 articles that have been read, and have been rated as in TABLE 1 (following the text of this specification). In the accompanying rating scheme, a rating can vary between 1 and 5, with 5 indicating a "most interesting" article. If four new articles (11, 12, 13, 14) arrive that have not yet been rated, and, in addition to authors A, B, C, and a new author D has contributed, a simple IRP for the Author field, that just takes sums of the averages, would be as follows:

IRP (author)=weighted sum of
    average (ratings given the author so far)
    average (ratings given the author so far in this M)
    average (ratings given all authors so far in this M)
    average (ratings given all authors)
    average (ratings given the author so far by a particular user U)*
    average (ratings given the author so far in this M by a particular user U)*
    average (ratings given all authors so far in this M by a particular user U)*
    average (ratings given all authors by a particular user)*
    *(if for a personal Z)

The purpose of the weighted sum is to make use of broader, more general statistics, when strong statistics for a particular user reading an informon by a particular author, within a particular Z may not yet be available. When stronger statistics are available, the broader terms can be eliminated by using smaller weights. This weighting scheme is similar to that used for creating CWFs 430, for the profiles as a whole. Some of the averages may be left out in the actual storage

16

of the profile if, for example, an author's average rating for a particular M is not "significantly" different from the average for the author across all Ms. Here, "significance" is used is in a statistical sense, and frameworks such as the Minimum Description Length (MDL) Principle can be used to determine when to store or use a more "local" component of the IRP. As a simple example, the following IRP employs only two of the above terms:

IRP (author)=weighted sum of
    average (ratings given this author so far in this M)
    average (ratings given all authors so far in this M)

Table 2 gives the values attained for the four new articles.

It is preferred that an estimate of the uncertainty resulting from a positive or negative IRP be made, and a complex neural net approach could be used. However, a simpler method, useful for this example, is simply to repeat the same process that was used for the IRP but, instead of predicting the rating, it is preferred to predict the squared-error, given the feature vector. The exact square-error values can be used as the informon weights, instead of using a rating-weight lookup table. A more optimal mapping function could also be computed, if indicated by the application.

| | Token 1 | Token 2 | Token 3 | Token 4 |
|---|---|---|---|---|
| IRP pos. vector | 16.68 | 8.73 | 12.89 | 11.27 |
| IRP neg. vector | 15.20 | 8.87 | 4.27 | 5.04 |

The UPs then can be computed in a manner similar to the IRP's: comparisons with the actual document vectors can be made to get a similarity measure, and then a mapping function can be used to get an UP.

Making effective use of collaborative input (CI) from other users U is a difficult problem because of the following seven issues. First, there generally is no a priori knowledge regarding which users already will have rated an informon A, before making a prediction for a user U, who hasn't yet read informon A. Therefore, a model for prediction must be operational no matter which subset of the inputs happen to be available, if any, at a given time. Second, computational efficiency must be maintained in light of a potentially very large set of users and informons. Third, incremental updates of rating predictions often are desired, as more feedback is reported from users regarding an informon. Fourth, in learning good models for making rating predictions, only very sparse data typically is available for each users rating of each document. Thus, a large "missing data" problem must be dealt with effectively.

Fifth, most potential solutions to the CI problem require independence assumptions that, when grossly violated, give very poor results. As an example of an independence assumption violation, assume that ten users of a collaborative filtering system, called the "B-Team," always rate all articles exactly in the same way, for example, because they think very much alike. Further assume that user A's ratings are correlated with the B-Team at the 0.5 level, and are correlated with user C at the 0.9 level. Now, suppose user C reads an article and rates it a "5". Based on that C's rating, it is reasonable to predict that A's rating also might be a "5". Further, suppose that a member of the B-Team reads the article, and rates it a "2". Existing collaborative filtering methods are likely to predict that A's rating R.sub.A would be:

$$R_A = (0.9 \times 5 + 0.5 \times 2)/(0.9 + 0.5) = 3.93$$

In principle, if other members of the B-Team then read and rate the article, it should not affect the prediction of A's

US 6,775,664 B2

17                                                  18

rating, R.sub.A, because it is known that other B-Team members always rate the article with the same value as the first member of the B-Team. However, the prediction for A by existing collaborative filtering schemes would tend to give 10 times this weight to the "2" rating, and would be:

$$R_A=(0.9\times5+10\times0.5\times2)/(0.9+10\times0.5)=2.46$$

Existing collaborative filtering schemes do not work well in this case because B-Team's ratings are not independent, and have a correlation among one another of 1. The information filter according to the present invention can recognize and compensate for such inter-user correlation.

Sixth, information about the community of people is known, other than each user's ratings of informons. This information can include the present topics the users like, what authors the users like, etc. This information can make the system more effective when it is used for learning stronger associations between community members. For example, because Users A and B in a particular community M have never yet read and rated an informon in common, no correlation between their likes and dislikes can be made, based on common ratings alone. However, users A and B have both read and liked several informons authored by the same author, X, although Users A and B each read a distinctly different Zs. Such information can be used to make the inference that there is a possible relationship between user A's interests and user B's interests. For the most part, existing collaborative filtering systems can not take advantage of this knowledge.

Seventh, information about the informon under consideration also is known, in addition to the ratings given it so far. For example, from knowing that informon A is about the concept of "gardening", better use can be made of which users' ratings are more relevant in the context of information in the informon. If user B's rating agrees with user D's rating of articles when the subject is about "politics", but B's ratings agree more with user D when informon A is about "gardening", then the relationship between User B's ratings and User D's ratings are preferred to be emphasized to a greater extent than the relationship between User B and User C when making predictions about informon A.

With regard to the aforementioned fourth, sixth and seventh issues namely, making effective use of sparse, but known, information about the community and the informon, it is possible to determine the influence of user A's rating of an informon on the predicted rating of the informon for a second user, B. For example, where user A and user B have read and rated in common a certain number of informons, the influence of user A's rating of informon D on the predicted rating of informon D for user B can be defined by a relationship that has two components. First, there can be a common "mindset," S.sub.M, between user A and user B and informon D, that may be expressed as:

$$M_S=profile(A)\times profile(B)\times DocumentProfile(D).$$

Second, a correlation may be taken between user A's past ratings and user B's past ratings with respect to informons that are similar to D. This correlation can be taken by weighting all informons E that A and B have rated in common by the similarity of E to D, $S_{ED}$:

$S_{ED}$=Weighted_Correlation (ratings (A), ratings (B))

Each of the examples can be weighted by

$W_{pr}$=weight for rating pair(rating A,D), rating (B,D))

=DocumentProfile(E)×DocumentProfile (D)

Note that the "X" in the above equation may not be a mere multiplication or cross-product, but rather be a method for comparing the similarity between the profiles. Next, the similarity of the member client profiles and informon content profiles can be compared. A neural network could be used to learn how to compare profiles so that the error in predicted ratings is minimized. However, the invention can be embodied with use of the invention can be embodied with use of a simple cosine similarity metric, like that previously considered in connection with Unstructured Feature Information (UFI) can be used.

The method used preferably includes more than just the tokens, such as the author and other SFI; and, it is preferred that the three vectors for component also are able to be compared. SFIs may be handled by transforming them into an entity that can be treated in comparable way to token frequencies that can be multiplied in the standard token frequency comparison method, which would be recognized by a skilled artisan.

Continuing in the ongoing example, the Author field may be used. Where user A and user B have rated authors K and L, the token frequency vector may appear as follows:

| User | Avg. Rating Given to Author K | # in sample | Avg. Rating Given to Author L | # in sample | Avg. Rating Given to Author M | # in sample |
|---|---|---|---|---|---|---|
| A | 3.1 | 21 | 1.2 | 5 | N/A | 0 |
| B | 4 | 1 | 1.3 | 7 | 5 | 2 |

Further, the author component of the member client profiles of user A and user B may be compared by taking a special weighted correlation of each author under comparison. In general, the weight is a function F of the sample sizes for user A's and user B's rating of the author, where F is the product of a monotonically-increasing function of the sample size for each of user A and user B. Also, a simple function G of whether the informon D is by the author or not is used. This function can be: G=q if so, and G=p<q if not, where p and q are optimized constraints according to the domain of the filtering system. When there has been no rating of an author by a user, then the function of the zero sample size is positive. This is because the fact that the user did not read anything by the author can signify some indication that the author might not produce an informon which would be highly rated by the user. In this case, the exact value is an increasing function H of the total articles read by a particular user so far, because it becomes more likely that the user is intentionally avoiding reading informons by that author with each subsequent article that has been read but is not prepared by the author. In general, the exact weighting function and parameters can be empirically derived rather than theoretically derived, and so is chosen by the optimization of the overall rating prediction functions. Continuing in the present example, a correlation can be computed with the following weights for the authors K, L and M.

| Author | Weight |
|---|---|
| K | F(21,1, not author) = log(21 + 1) × log(1 + 1) × G(not author) = 0.04 |

US 6,775,664 B2

19                                                                                    20

-continued

| Author | Weight |
|--------|--------|
| L | $F(5,7,$ author or D$)$ = $\log(5 + 1) \times \log(7 + 1) \times G(\text{author})$ = 0.70 |
| M | $F(0.2,$ not author$)$ = $H(26) \times \log(2 + 1) \times G$ (not author) = 0.02 |

It is preferred that the logarithm be used as the monotonically-increasing function and that p=1, q=0.1. Also used are H=log(sample_size*0.1) and an assumed rating, for those authors who are unrated by a user, to the value of "2." The correlation for the author SFI can be mapped to a non-zero range, so that it can be included in the cosine similarity metric. This mapping can be provided by a simple one-neuron neural network, or a linear function such as, (correlation+1)*$P_O$. Where the $P_O$ is an optimized parameter used to produce the predicted ratings with the lowest error in the given domain for filtering.

An artisan skilled in information retrieval would recognize that there are numerous methods that can be used to effect informon comparisons, particularly document comparisons. One preferred method is to use a TF-IDF weighting technique in conjunction with the cosine similarity metric. SFI including author, can be handled by including them as another token in the vector. However, the token is preferred to be weighted by a factor that is empirically optimized rather than using a TF-IDF approach. Each component of the relationship between user A's and user B's can be combined to produce the function to predict the rating of informon D for user B. The combination function can be a simple additive function, a product function, or a complex function, including, for example, a neural network mapping function, depending upon computational efficiency constraints encountered in the application. Optimization of the combination function can be achieved by minimizing the predicted rating error as an objective.

In addition to determining the relationship between two user's ratings, a relationship that can be used and combined across a large population of users can be developed. This relationship is most susceptible to the aforementioned first, second, third, and fifth issues in the effective use of collaborative input. Specifically, the difficulty with specifying a user rating relationship across a large population of users is compounded by the lack of a priori knowledge regarding a large volume of dynamically changing information that may have unexpected correlation and therefore grossly violate independence assumptions.

In one embodiment of the present invention, it is preferred that users be broken into distributed groups called "mindpools." Mindpools can be purely hierarchical, purely parallel, or a combination of both. Mindpools can be similar to the aforementioned "community" or may instead be one of many subcommunities. These multiple hierarchies can be used to represent different qualities of an article. Some qualities that can be maintained in separate hierarchies include: interestingness; credibility; funniness; valuableness; writing quality; violence content; sexual content; profanity level; business importance; scientific merit; artistic quality; dramatic appeal; entertainment value; surprise or unexpectedness of information content; trendiness or importance to future directions; and opinion agreement. Each of these qualities can be optionally addressed by users with a rating feedback mechanism and, therefore, these qualities can be used to drive separate mindpool hierarchies. Also, the qualities can be used in combinations, if appropriate, to develop more complex composite informon qualities, and more sublime mindpools.

FIG. 7 illustrates a preferred embodiment of a mindpool system 500. It is preferred that all users be members of the uppermost portion of the hierarchy, namely, the top mindpool 501. Mindpool 501 can be broken into sub-mindpools 502a–c, which separate users into those having at least some common interests. Furthermore, each sub-mindpool 502a–c can be respectively broken into sub-sub-mindpools 503a–b, 503c–d, 503e,f,g to which users 504a–g are respective members. As used herein, mindpool 501 is the parent node to sub-mindpools 502a–c, and sub-mindpools 502a–c are the respective parent nodes to sub-sub-mindpools 503a–g. Sub-mindpools 502a–c are the child nodes to mindpool 501 and sub-sub-mindpools 503a–g are child nodes to respective mindpools 503a–c. Sub-sub-mindpools 503a–g can be considered to be end nodes. Users 505a,b can be members of sub-mindpool 502a, 502c, if such more closely matches their interests than would membership in a sub-sub-mindpool 503a–g. In general, the objective is to break down the entire population of users into subsets that are optimally similar. For example, the set of users who find the same articles about "gardening" by author A to be interesting but nevertheless found other articles by author A on "gardening" to be uninteresting may be joined in one subset.

A processing means or mindpool manager may be used to handle the management of each of the mindpools 501, 502a–c, and 503a–g. A mindpool manager performs the following functions: (1) receiving rating information from child-node mindpool managers and from those users coupled directly to the manager; (2) passing rating information or compiled statistics of the rating information up to the manager's parent node, if such exists; (3) receiving estimations of the mindpool consensus on the rating for an informon from the manager's parent mindpool, if such exists; and (4) making estimations of the mindpool consensus on the rating for a specific informon for the users that come under the manager's domain; and (5) passing the estimations from function 4 down to either a child-node mindpool or, if the manager is an end node in the hierarchy, to the respective user's CWF, for producing the user's predicted rating. Function 4 also can include combining the estimations received from the manager's parent node, and Uncertainty Predictions can be estimated based on sample size, standard deviation, etc. Furthermore, as alluded to above, users can be allowed to belong to more than one mindpool if they don't fit precisely into one mindpool but have multiple views regarding the conceptual domain of the informon. Also, it is preferred that lateral communication be provided between peer managers who have similar users beneath them to share estimation information. When a rating comes in from a user, it can be passed to the immediate manager(s) node above that user. It is preferred that the manager(s) first decide whether the rating will effect its current estimation or whether the statistics should be passed upward to a parent-node. If the manager estimation would change by an amount above an empirically-derived minimum threshold, then the manager should pass that estimation down to all of its child-nodes. In the event that the compiled statistics are changed by more than another minimum threshold amount, then the compiled statistics should be passed to the manager's parent-node, if any, and the process recurses upward and downward in the hierarchy.

Because no mindpool manager is required to have accurate information, but just an estimation of the rating and an uncertainty level, any manager may respond with a simple average of all previous documents, and with a higher degree

US 6,775,664 B2

21

of uncertainty, if none of its child-nodes has any rating information yet. The preferred distributed strategy tends to reduce the communication needed between processors, and the computation tends to be pooled, thereby eliminating a substantial degree of redundancy. Using this distributed strategy, the estimations tend to settle to the extent that the updating of other nodes, and the other users predictions are minimized. Therefore, as the number of informons and users becomes large, the computation and prediction updates grow as the sum of the number of informons and the number of users, rather than the product of the number of informons and the number of users. In addition, incremental updates can be accomplished by the passing of estimations up and down the hierarchy. Incremental updates of rating predictions continue to move until the prediction becomes stable due to the large sample size. The distributed division of users can reduce the effects of independent assumption violations. In the previous example with the B-Team of ten users, the B-Team can be organized as a particular mindpool. With the additional ratings from each of the B-Team members, the estimation from the B-Team mindpool typically does not change significantly because of the exact correlation between the members of that mindpool. This single estimation then can be combined with other estimations to achieve the desired result, regardless of how many B-Team members have read the article at any given time.

The mindpool hierarchies can be created by either computer-guided or human-guided methods. If the hierarchy creation is human-guided, there often is a natural breakdown of people based on information such as job position, common interests, or any other information that is known about them. Where the mindpool hierarchy is created automatically, the previously described measure of the collaborative input relationship between users can be employed in a standard hierarchical clustering algorithm to produce each group of users or nodes in the mindpool hierarchy. Such standard hierarchical clustering algorithms can include, for example, the agglomerative method, or the divide-and-conquer method. A skilled artisan would recognize that many other techniques also are available for incrementally-adjusting the clusters as new information is collected. Typically, clustering is intended to (1) bring together users whose rating information is clearly not independent; and (2) produce mindpool estimations that are substantially independent among one another.

Estimations are made in a manner similar to other estimations described herein. For example, for each user or sub-mindpool (sub-informant), a similarity between the sub-informant and the centroid of the mindpool can be computed in order to determine how relevant the sub-informant is in computing the estimation. Uncertainty estimators also are associated with these sub-informants, so that they can be weighted with respect to their reliability in providing the most accurate estimation. Optionally, the informon under evaluation can be used to modulate the relevancy of a sub-informant. This type of evaluation also can take advantage of the two previously-determined collaborative information relationship components, thereby tending to magnify relationships that are stronger for particular types of informons than for others. Once a suitable set of weights are established for each user within a mindpool for a particular informon, a simple weighted-average can be used to make the estimation. It is preferred that the "simple" weighted average used be more conservative regarding input information that a simple independent linear regression. Also, the overall Uncertainty can be derived from the Uncertainty Predictions of the sub-informants, in a manner similar to the

22

production of other uncertainty combination methods described above. Approximations can be made by pre-computing all terms that do not change significantly, based on the particular informon, or the subset of actual ratings given so far to the mindpool manager. As stated previously, the correlated-feature error-correction units (CFECUs) are intended to detect irregularities or statistical exceptions. Indeed, two objectives of the CFECU units are to (1) find non-linear exception to the general structure of the three aforementioned types of inputs (SFI, UFI, and CI); and (2) find particular combinations of informon sub-features that statistically stand out as having special structure which is not captured by the rest of the general model; and (3) trigger an additional signal to the CFECU's conditions are met, in order to reduce prediction error. The following exemplifies the CFECU operation:

| | User B's Avg. Rating of informons About | |
|---|---|---|
| | Gardening | Politics |
| Author A's Article | 4.5 | 1.2 |
| Other Authors | 1.4 | 2 |
| Weighted by Topic | 1.68 | 1.87 |

| | User B's Number of Informons Read About | | |
|---|---|---|---|
| | Gardening | Politics | Average over Topics |
| Author A's Articles | 7 | 40 | 1.69 |
| Other Authors | 70 | 200 | 1.84 |

In this example, it is desired that author A's informon D about gardening have a high predicted rating for user B. However, because the average rating for author A by user B is only 1.69, and the average rating for the gardening concept is only 1.68, a three-part model (SFI-UFI-CI) that does not evaluate the informon features in combination would tend to not rank informon D very highly. In this case, the first CFECU would first find sources of error in past examples. This could include using the three-part model against the known examples that user B has rated so far. In this example, seven articles that user B has rated, have an average rating of 4.5, though even the three-part model only predicts a rating of about 1.68. When such a large error appears, and has statistical strength due to the number of examples with the common characteristics of, for example, the same author and topic, a CFECU is created to identify that this exception to the three-part model has been triggered and that a correction signal is needed. Second, it is preferred to index the new CFECU into a database so that, when triggering features appear in an informon, for example, author and topic, the correction signal is sent into the appropriate CWF. One method which can be used to effect the first step is a cascade correlation neural network, in which the neural net finds new connection neural net units to progressively reduce the prediction error. Another method is to search through each informon that has been rated but whose predicted rating has a high error, and storing the informons profile.

When "enough" informons have been found with high error and common characteristics, the common characteris-

**A243**

US 6,775,664 B2

23                                                    24

tics can be joined together as a candidate for a new CFECU. Next, the candidate can be tested on all the samples, whether they have a high prediction or a low prediction error associated with them. Then, the overall error change (reduction or increase) for all of the examples can be computed to determine if the CFECU should be added to the informon profile. If the estimated error reduction is greater than a minimum threshold level, the CFECU can be added to the profile. As successful CFECU are discovered for users' profiles, they also can be added to a database of CFECU's that may be useful for analyzing other profiles. If a particular CFECU has a sufficiently broad application, it can be moved up in the filtering process, so that it is computed for every entity once. Also, the particular CFECU can be included in the representation that is computed in the pre-processing stage as a new feature. In general, the estimation of the predicted rating from a particular CFECU can be made by taking the average of those informons for which the CFECU responds. Also, the Uncertainty can be chosen such that the CFECU signal optimally outweighs the other signals being sent to the CWF. One method of self-optimization that can be employed is, for example, the gradient descent method, although a skilled artisan would recognize that other appropriate optimization methods may be used.

The invention of this continuation-in-part application, as shown in FIGS. 8 and 9, provides a collaborative and preferably adaptive search engine system in which elements of the structure and principles of operation of the apparatus of FIGS. 1–7 are applied. Accordingly, a search engine system of the invention, as preferably embodied, integrates collaborative filtering with adaptive content-based filtering to provide improved search engine performance. The acronym "CASE" refers to a search engine system of the invention, i.e., a collaborative, adaptive search engine.

In the operation of conventional search engines at portal web sites, user queries are searched on demand to find relevant informons across the web. Content-based filtering is typically used in measuring the relevancy of informons, and the search results are resented in the form of a list of informons ranked by relevancy.

The present invention combines collaborative filtering with content-based filtering in measuring informons for relevancy, and further preferably applies adaptive updating of the content-based filtering operation. In providing these results, the invention can be embodied as a search engine system in accordance with different basic structures. In the presently preferred basic structure, an integrated collaborative/content-based filter (FIGS. 1–7) is operated to provide ongoing or continuous searching for selected user queries, with a "wire" being established for each query. On the other hand, a regular search engine is operated to make immediate or short-term "demand" searches for other user queries on the basis of content-based filtering. This basic structure of the invention is especially beneficial for use in applying the invention to existing search engine structure.

Demand search results can be returned if no wire exists for an input query. Otherwise, wire search results are returned if a wire does exist, or collaborative ranking data can be applied from the wire filter structure to improve the results of the demand search from the regular search engine.

In the currently preferred embodiment, wires are created for the most common queries received by the search engine system. A suitable analysis is applied to the search engine operations to determine which queries are most common, and respective wires are then created for each of these queries. An analysis update can be made from time to time to make wire additions or deletions as warranted.

When a user makes a query for which a wire already exists, wire search results are preferably returned instead of regular search engine results. As shown in the logic diagram of FIG. 7, a user provides a query as indicated by block **20**C. The query is applied to a Lookup Table, as indicated by block **22**C, block **24**C applies a test to determine from the table whether a wire already exists for the new query. If so, block **26**C returns results from the existing wire. Otherwise, block **28**C commands a demand search by a regular query engine.

With the use of wire search returns, each user can review the returned results and provide feedback data about reviewed documents. Such feedback data is incorporated in the filter profiles used in processing informons for the wire. Therefore, when a future user makes substantially the same query, the wire will have been improved by the incorporation of previous users' feedback data. By analyzing documents which users rate as meeting a particular quality such as 1 interestingness, the system can find common document features which can be used to return more like documents to future users who make substantially the same query.

Alternatively, all queries applied to a search engine system of the invention can set up new wires. After a search query is presented to the search engine system, a wire is created on the basis of the query terms, and all new documents subsequently received from the network are filtered by the new wire. A push-model may be used to send all passed, new documents to the user.

Among other basic search engine system structures, an integrated system can be employed in which collaborative and content-based filtering is structured to provide demand searches with or without collaborative filtering, or wire searches. In the operation of the preferred basic structure and other basic structures, a query processor can be employed, if needed, to make search-type assignments for user queries. Generally, basic search engine system structures of the invention are preferably embodied with the use of a programmed computer system.

Collaborative filtering employs additional data from other users to improve search results for an individual user for whom a search is being conducted. The collaborative data can be feedback informon rating data, and/or it can be content-profile data for agent mind melding which is more fully disclosed in Serial Number (Docket # LYC 4), entitled INTEGRATED COLLABORATIVE/CONTENT-BASED FILTER STRUCTURE EMPLOYING SELECTIVELY SHARED, CONTENT-BASED PROFILE DATA TO EVALUATE INFORMATION ENTITIES IN A MASSIVE INFORMATION NETWORK, filed by the current inventors on Nov. 19, 1998, and hereby incorporated by reference.

Many types of user rating information can be used. For example, users can sort documents which they have read from best to worst. Alternatively, users can select on a scale (numeric, such as 1 to 10, or worded, such as good, medium, poor) how much they enjoyed reading a document. Further, user monitoring can measure time spent by users on each document, thereby indicating user interest (normalized by document length). Among other possibilities, the choices of documents for reading by other users can be simply used as an indication of interesting documents. In all cases, the feedback rating data can be based on interestingness or any of a variety of other document qualities, as described in connection with FIGS. 1–7.

Feedback ranking information can be used in a number of ways, and the invention is not limited by the method of feedback information use. Use methods range in spectrum from weighting relative ranks by a set amount (possibly

**A244**

US 6,775,664 B2

25                                                                          26

equally, possibly heavy weighting one above the other) to dynamically adjusting the weight by measuring how statistically significant the user feedback is. For example, if only one person has ranked an article, it may not be significant. However, if many people have consistently ranked an article the same, more credibility may be placed on the user's weighting.

FIG. 9 shows a generalized embodiment of the invention in which system elements in a CASE system 30C are integrally configured to provide wire and/or demand searches. A query processor 32C receives queries from an individual user 34C and other users 36C. A mode selector 38C responds to the currently processed query to set a content-based filter structure 40C for wire search operation or demand search operation. In the preferred application of the invention, the wire mode is selected only if a wire already exists, and wires exist only for those queries found to be commonly entered as previously described. In the demand search mode, the filter structure 40C can function similarly to a normal search engine.

Otherwise, various schemes can be used for determining whether a wire search or a demand search is made. For example, every query can call for a wire search, with a demand search being made the first time a particular query is entered and with wire searches being made for subsequent entries of the same query. As another example, the user may select a demand search, or, if continuing network searching is desired, the user may select a wire search.

The filter structure 40C operates in its set wire search mode or demand search mode, arid employs content-based profiles 42C in content-based filtering (preferably multi-level as described in connection with FIGS. 1–7). Wire profiles 42C I are adaptively updated with informon evaluation, feedback data from users respectively associated therewith. These profiles are used by the filter structure 40C in wire searches in the wire mode.

Demand profiles 42C2 are used by the filter structure 40C in demand searches in the demand mode. Collaborative profile data can be integrated with the wire profiles through agent mind melding 43C as previously explained.

A spider system 46C scans a network 44C to find informons for a current demand search, and to find informons with continued network scanning for existing wires. In selecting available informons for return, the spider system 46C uses a content threshold derived from the content based profile for which an informon search is being conducted.

In many instances, it s preferable that the spider system 46C have a memory memory 46CM which holds an informon data base wherein index information is stored from informons previously collected from the network. In this manner, demand searches can be quickly made from the spider memory 46CM as opposed to making a time consuming search and downloading in response to a search demand query from the user search engine.

A search return processor 48C receives either demand search informons or wire search informons passed by the content-based filter structure 40C according to the operating mode of the latter, and includes an informon rating system which is like that of FIG. 6. The informon rating system combines content-based filtering data with collaborative feedback rating data, from users through a feedback processor 50C at least in the wire search mode and, if desired, in the demand search mode.

In the wire search mode, the processor 48C rates informons on a continuing basis as they are received from the network 44C through the spider system 46C as indicated by the reference character 48C1. In the demand search mode,

the processor 48C rates informons returned by the spider system 46C in a demand search as indicated by the reference character 48C2. Collaborative rating data is used in the informon rating process in the wire search mode, and if applied in the demand search mode, to the extent that collaborative data is available for the informons in the search return. Search results are returned to the users 34C and 36C from the search return processor 48C as shown in FIG. 9.

The invention is preferably embodied as shown in FIG. 10. A query processor 60C receives queries from an individual user 62C and other users 64C and determines whether a wire already exists for each entered query. If a wire exists, the query is routed to a collaborative/content-based filter structure 66C lice that of FIGS. 1–7. A spider system 68C continuously scans a network 70C for informons providing a threshold-level match for content based profiles (i.e., preprocessing profiles at the top level of the preferred multi-level filter structure, at least one of which reflects the content profile of a current wire query). Informons which are passed by the filter 66C for existing wires are stored in a memory 72C according to the wire or wires to which they belong.

A feedback processor 74C is structured like the mindpool system of FIG. 7 to provide collaborative feedback data for integration with the content-based data in the measurement of informon relevancy by the filter 66C. An informon rating structure like that of FIG. 6 is employed for this purpose. Adaptive feedback data is applied from the users to the filter 66C as shown in order to update content profiles as previously described.

If no wire exists for a currently input query, the query is sent to a regular search engine where a content profile is established for content based filtering of informons returned by a spider system 78C in a demand search of the network 70C. The spider system 78C can have its own memory system 78CM as considered in connection with the spider 46C of FIG. 9.

Once filtering is performed on returned informons, those informons which provide a satisfactory match to the query are returned as a list to the user through a search return processor 80C. The processor 80C creates a new wire for the current query for which a demand search was made, if a demand search memory 82C indicates that the current query has been made over time with sufficient frequency to qualify as a "common" query for which a wire is justified. As indicated by dashed connector line 80FD, collaborative feedback data can be, and preferably is, integrated into the demand search processing by the processor 80C.

Many alterations and modifications may be made by those having ordinary skill in the art without departing from the spirit and scope of the invention. Therefore, it must be understood that the illustrated embodiments have been set forth only for the purposes of example, and that it should not be taken as limiting the invention as defined by the following claims. The following claims are, therefore, to be read to include not only the combination of elements which are literally set forth but all equivalent elements for performing substantially the same function in substantially the same way to obtain substantially the same result. The claims are thus to be understood to include what is specifically illustrated and described above, what is conceptually equivalent, and also what incorporates the essential idea of the invention.

US 6,775,664 B2

27                                                        28

TABLE 1

| Article | Author | Rating Given |
|---------|--------|--------------|
| 1 | A | 5 |
| 2 | B | 1 |
| 3 | B | 2 |
| 4 | B | 5 |
| 5 | C | 2 |
| 6 | C | 2 |
| 7 | C | 1 |
| 8 | C | 2 |
| 9 | C | 2 |
| 10 | C | 2 |

TABLE 2

| Article Author IRP (author) | | avg (author) | | normalized weight | weight | avg (all auth) | normalized weight | weight |
|------|---|------|------|------|------|------|------|------|
| 11 | A | 5.00 | 3.12 | 0.86 | 2.40 | 0.49 | 0.14 | 4.65 |
| 12 | B | 2.67 | 0.23 | 0.32 | 2.40 | 0.49 | 0.66 | 2.49 |
| 13 | C | 1.83 | 6.00 | 0.92 | 2.40 | 0.49 | 0.06 | 1.86 |
| 14 | D | N/A | 0.00 | 0.00 | 2.40 | 0.49 | 1.00 | 2.40 |

What is claimed is:

1. A search system comprising:

a scanning system for searching for information relevant to a query associated with a first user in a plurality of users;

a feedback system for receiving information found to be relevant to the query by other users; and

a content-based filter system for combining the information from the feedback system with the information from the scanning system and for filtering the combined information for relevance to at least one of the query and the first user.

2. The search system of claim 1 wherein the content-based filter system filters information on a continuing basis.

3. The search system of claim 1 wherein the information comprises an informon.

4. The search engine of claim 1 wherein the filtered information relevant to at least one of the first user and the query is used to anticipate a future query by the first user.

5. The search system of claim 1 wherein the filtered information is an advertisement.

6. The search system of claim 1 further comprising an information delivery system for delivering the filtered information to the first user.

7. The search system of claim 1 further comprising feedback communication means for delivering information to at least one of the other users.

8. The search system of claim 7 wherein the information delivered to the at least one of the other users further comprises the filtered information.

9. The search system of claim 7 wherein the information delivered to the at least one of the other users further comprises a feedback query.

10. The search system of claim 9 wherein the information received by the feedback system found to be relevant to the query further comprises a feedback response to the feedback query.

11. The search system of claim 7 further comprising a monitor for measuring time spent by the at least one of the other users accessing the delivered information.

12. The search system of claim 11 wherein the content-based filter system uses the measured time spent accessing the delivered information to determine relevance to the at least one of the first user and the query.

13. The search system of claim 10 wherein the feedback response further comprises information rating data.

14. The search system of claim 13 further comprising a ranking module to apply a weight to the information rating data.

15. The search system of claim 13 wherein the information rating data is dynamically adjusted by measuring statistical significance of the information.

16. A web portal comprising the search system of claim 1 for providing information relevant to a query from the first user.

17. The search system of claim 1 wherein the plurality of users comprises at least one mindpool of users.

18. The search system of claim 17 wherein users in the mindpool of users are grouped into at least one distributed group.

19. The search system of claim 17 wherein the mindpool of users comprises at least one of a distributed group of users having a hierarchical structure, a distributed group of users having a parallel structure, and a distributed group of users having a combination of a hierarchical structure and a parallel structure.

20. The search system of claim 1 wherein the content-based filter system filters the combined information relevant to both the query and the first user.

21. The search system of claim 1 wherein the content-based filter system filters by extracting features from the information.

22. The search system of claim 21 wherein the extracted features comprise content data indicative of the relevance to the at least one of the query and the user.

23. The search system of claim 22 wherein the content data indicative of the relevance to the at least one of the query and the user comprises specific elements of information obtained from the information received from the feedback system.

24. The search system of claim 1 wherein the scanning system further comprises scanning a network upon a demand search request.

25. The search system of claim 22 wherein the search system applies adaptive user feedback data to the content-based filter system to provide a learning component for the content profile data.

26. A method for obtaining information relevant to a first user comprising:

searching for information relevant to a query associated with a first user in a plurality of users;

receiving information found to be relevant to the query by other users;

combining the information found to be relevant to the query by other users with the searched information; and

content-based filtering the combined information for relevance to at least one of the query and the first user.

27. The method of claim 26 further comprising the step of filtering information on a continuing basis.

US 6,775,664 B2

29

30

**28**. The method of claim **26** further comprising the step of delivering the filtered information to the first user.

**29**. The search system of claim **26** further comprising the step of delivering information to at least one of the other users.

**30**. The search system of claim **29** wherein the information delivered to the at least one of the other users further comprises the step of delivering the filtered information to the at least one of the other users.

**31**. The method of claim **29** further comprising the step of providing a feedback query to the at least one of the other users.

**32**. The method of claim **31** wherein the receiving of information found to be relevant to the query further comprises the step of receiving a feedback response to the feedback query.

**33**. The method of claim **29** further comprising the step of measuring time spent by the at least one of the other users accessing the delivered information.

**34**. The method of claim **33** further comprising the step of using the measured time spent to determine relevance of the at least one of the first user and the query.

**35**. The method of claim **32** further comprising the step of receiving a rating of the relevance of the delivered information to the query.

**36**. The method of claim **26** further comprising the step of grouping at least two users in the plurality of users into a mindpool.

**37**. The method of claim **36** further comprising the step of grouping the mindpool users into at least one of a hierarchical structure, a parallel structure, and a combination of a hierarchical structure and a parallel structure.

**38**. The method of claim **26** wherein the searching step comprises scanning a network in response to a demand search for the information relevant to the query associated with the first user.

\* \* \* \* \*

# <u>CERTIFICATE OF SERVICE</u>

I, David A. Perlson, hereby certify that on July 22, 2013, I will cause to be

served electronically on counsel of record as listed below the foregoing Brief for

Defendants-Appellants:

Attorneys for Plaintiff-Appellee

Jeffrey K. Sherwood
sherwoodj@dicksteinshapiro.com
Kenneth W. Brothers
brothersk@dicksteinshapiro.com
Frank C. Cimino, Jr.
CiminoF@dicksteinshapiro.com
Jonathan L. Falkler
FalklerJ@dicksteinshapiro.com
Charles J. Monterio, Jr.
MonterioC@dicksteinshapiro.com
Dawn L. Rudenko
AlbertD@dicksteinshapiro.com
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006
Telephone: (202) 420-2200
Facsimile: (202) 420-2201

Joseph R. Re
joe.re@knobbe.com, litigation@knobbe.com
Stephen W. Larson
stephen.larson@knobbe.com
KNOBBE MARTENS OLSON & BEAR LLP
2040 Main Street, 14th Floor
Irvine, CA 92614
Telephone: (949) 760-0404
Facsimile: (949) 760-9502

Dated:  July 22, 2013              __ */s/ David A. Perlson*_____

David A. Perlson
QUINN EMANUEL URQUHART &
SULLIVAN LLP
50 California Street, 22nd Floor
San Francisco, California 94111
(415) 875-6600
(415) 875-6700 (fax)
davidperlson@quinnemanuel.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the

undersigned certifies that this brief complies with the type-volume limitations of

Federal Rule of Appellate Procedure 32(a)(7)(B).

1.     Exclusive of the exempted portions of the brief, as provided in Fed. R.

App. Proc. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this brief includes

13,957 words.

2.     This brief has been prepared in proportionally spaced typeface using

Microsoft Word 2003 in 14 point Times New Roman font.  As permitted by Fed.

R. App. Proc. 32(a)(7)(C), the undersigned has relied upon the word count of this

word-processing system in preparing this certification.

Dated:  July 22, 2013              __*/s/ David A. Perlson*_____

                                                David A. Perlson
                                                QUINN EMANUEL URQUHART &
                                                SULLIVAN LLP
                                                50 California Street, 22nd Floor
                                                San Francisco, California 94111
                                                (415) 875-6600
                                                (415) 875-6700 (fax)
                                                davidperlson@quinnemanuel.com