Nos. 2013-1307, -1313

IN THE

# United States Court of Appeals
## FOR THE FEDERAL CIRCUIT

I/P ENGINE, INC.,

*Plaintiff-Cross Appellant,*

*v.*

AOL INC., GOOGLE INC., IAC SEARCH & MEDIA, INC.,
GANNETT COMPANY, INC., and TARGET CORPORATION,

*Defendant-Appellants.*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN
DISTRICT OF VIRGINIA IN CASE NO. 11-CV-512, JUDGE RAYMOND A. JACKSON.

**NONCONFIDENTIAL PRINCIPAL AND RESPONSIVE BRIEF OF
PLAINTIFF-CROSS APPELLANT I/P ENGINE, INC.**

JEFFREY K. SHERWOOD
FRANK C. CIMINO, JR.
KENNETH W. BROTHERS
DAWN RUDENKO ALBERT
CHARLES J. MONTERIO, JR.
JONATHAN L. FALKLER
**DICKSTEIN SHAPIRO LLP**
1825 Eye Street NW
Washington, DC 20006
(202) 420-2200

September 25, 2013

JOSEPH R. RE
 *Counsel of Record*
STEPHEN W. LARSON
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

*Attorneys for Plaintiff-Cross Appellant*

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Cross Appellant I/P Engine, Inc. certifies the following:

1.    The full name of every party being represented by me is:

I/P Engine, Inc.

2.    The real party in interest represented by me is:

Vringo, Inc.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by me are as follows:

Innovate/Protect, Inc., which is a wholly owned subsidiary of Vringo, Inc.

4.    The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

Joseph R. Re, Stephen W. Larson, KNOBBE, MARTENS, OLSON & BEAR, LLP; Donald C. Schultz, W. Ryan Snow, CRENSHAW, WARE & MARTIN PLC; Jeffrey K. Sherwood, Frank C. Cimino, Jr., Kenneth W. Brothers, Dawn Rudenko Albert, Charles J. Monterio, Jr., James Ryerson, Jonathan Falkler, Katie Scott, Krista Carter, Leslie Jacobs, Jr., DICKSTEIN SHAPIRO LLP; Richard H. Ottinger, Dustin M. Paul, VANDEVENTER BLACK LLP.

Dated: September 25, 2013          By: /s/ Joseph R. Re
                                                              Joseph R. Re
                                                        *Attorney for Plaintiff-Cross Appellant*
                                                        I/P ENGINE, INC.

# TABLE OF CONTENTS

**Page No.**

STATEMENT OF RELATED CASES ...................................................ix

JURISDICTIONAL STATEMENT ......................................................x

I.      ISSUES RAISED BY I/P ENGINE'S CROSS APPEAL.............................1

II.     INTRODUCTION ...........................................................2

III.    STATEMENT OF THE FACTS ................................................5

    A.      Background Of The Patented Technology...........................5

        1.      Conventional Search Technology ................................5

        2.      Lang And Kosak's Paradigm-Shifting Technology ..................8

    B.      The Infringing Advertising Technology .........................12

    C.      The Prior Art .................................................14

        1.      WebHound ....................................................16

        2.      Rose ........................................................17

        3.      Fab .........................................................18

        4.      Culliss......................................................18

    D.      Trial .........................................................19

        1.      Infringement And Validity....................................19

        2.      Laches And Damages ..........................................20

IV.     SUMMARY OF THE ARGUMENT ..............................................21

V.      ARGUMENT..............................................................24

    A.      The Jury's Infringement Verdict Is Supported By
Substantial Evidence ..........................................24

        1.      Substantial Evidence Supports The Jury's Finding
That The Accused System "Combines" Content
And Collaborative Data ........................................25

# TABLE OF CONTENTS
## *(cont'd)*

**Page No.**

2.    Substantial Evidence Supports The Jury's Finding That The Accused System Filters The Combined Information..............................................................30

3.    Substantial Evidence Supports The Jury's Finding That The Accused System "Scans A Network To Make A Demand Search" ......................................32

B.    Defendants' Arguments For A New Trial Are Meritless....................34

C.    The Asserted Claims Are Not Invalid For Obviousness Or Anticipation ......................................................................39

    1.    The District Court Properly Denied Defendants' JMOL Motion Regarding Obviousness ...................................39

        a.    The Prior Art Does Not Disclose Every Limitation Of The Asserted Claims ..............................39

        b.    Nothing Supports Defendants' Hindsight Addition Of Missing Limitations .................................42

        c.    Objective Considerations Support The Conclusion of Nonobviousness .......................................47

            i.    Commercial Success ...........................................47

            ii.    Long-Felt But Unmet Need..................................47

            iii.    Unsuccessful Attempts By Others .......................48

            iv.    Copying ...............................................................48

            v.    Unexpected Results .............................................49

            vi.    Acceptance By Others..........................................49

            vii.    Independent Invention..........................................49

    2.    The District Court Also Properly Denied Defendants' JMOL Motion And Motion For New Trial Regarding Anticipation .....................................50

D.    The Court Should Deny Defendants' Request For JMOL Of No Damages ............................................................57

# TABLE OF CONTENTS
### *(cont'd)*

**Page No.**

1.    I/P Engine Submitted Substantial Evidence Of Post-Complaint Damages..........................................57

2.    The District Court Did Not Abuse Its Discretion In Declining To Exclude Dr. Becker's Testimony......................62

    a.    Dr. Becker Properly Apportioned The Royalty Base.................................................62

    b.    Dr. Becker Relied On Comparable Licenses And Did Not Ignore Real-World Transactions...................................................65

3.    A New Trial On All Liability Issues Is Not Necessary Or Proper ...........................................67

VI.    CONCLUSION.................................................................68

CROSS APPEAL ..............................................................69

VII.    SUMMARY OF THE ARGUMENT ...............................69

VIII.    ARGUMENT....................................................................70

A.    This Court Should Overturn The District Court's Laches Ruling .........................................................70

    1.    The District Court Erred In Charging I/P Engine With Constructive Knowledge.................................70

    2.    The District Court Committed Legal Error In Implementing The Laches Presumption Contrary To *A.C. Aukerman*.....................................................76

B.    The District Court Erred In Denying I/P Engine's Motion For A New Trial On Past Damages...................................80

IX.    CONCLUSION.................................................................82

Confidential material subject to protective order has been deleted from the nonconfidential version of this brief. The deleted portion on page 28 describes Google source code designated confidential by Google. The deleted portion on page 57 describes financial information designated confidential by Google.

# TABLE OF AUTHORITIES

**Page No(s).**

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
  960 F.2d 1020 (Fed. Cir. 1992) (en banc) ................................................*passim*

*Amado v. Microsoft Corp.*,
  No. SACV 03-242, 2008 WL 8641264 (C.D. Cal Dec. 4, 2008)...................60

*Arnold v. Eastern Air Lines, Inc.*,
  681 F.2d 186 (4th Cir. 1982) ..........................................................34

*Austin v. Paramount Parks, Inc.*,
  195 F.3d 715 (4th Cir. 1999) ..........................................................48

*Broadcom Corp. v. Qualcomm, Inc.*,
  543 F.3d 683 (Fed. Cir. 2008) .........................................................25, 26, 30

*Commil USA, LLC v. Cisco Sys., Inc.*,
  720 F.3d 1361 (Fed. Cir. 2013) ......................................................68

*Constant v. Advanced Micro-Devices, Inc.*,
  848 F.2d 1560 (Fed. Cir. 1988) ......................................................53

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*,
  114 F.3d 1547 (Fed. Cir. 1997) ......................................................72

*Elan Pharms. Inc., v. Mayo Found.*,
  346 F.3d 1051 (Fed. Cir. 2003) ......................................................56

*Fromson v. Western Litho Plate & Supply Co.*,
  853 F.2d 1568 (Fed. Cir. 1988) ......................................................72

*Gasoline Prods. Co. v. Champlin Ref. Co.*,
  283 U.S. 494 (1931).......................................................................67

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  318 F. Supp. 1116 (S.D.N.Y. 1970) .............................................65

# TABLE OF AUTHORITIES
## *(cont'd)*

**Page No(s).**

*Hall v. Aqua Queen Mfg.*,
  93 F.3d 1548 (Fed. Cir. 1996) ...........................................................71, 72, 74

*Humanscale Corp. v. CompX Int'l Inc.*,
  No. 3:09-CV-86, 2010 WL 3222411 (E.D. Va. Aug. 16, 2010) ....................60

*In re Dow Chem. Co.*,
  837 F.2d 469 (Fed. Cir. 1988) .........................................................................47

*In re Innotron Diagnostics*,
  800 F.2d 1077 (Fed. Cir. 1986) .......................................................................67

*In re Wildewood Litig.*,
  52 F.3d 499 (4th Cir. 1995) ......................................................................25, 48

*Int'l Rectifier Corp. v. IXYS Corp.*,
  361 F.3d 1363 (Fed. Cir. 2004) ................................................................24, 25

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
  331 F.3d 860 (Fed. Cir. 2003), *vacated*, 545 U.S. 193 (2005) .......................66

*Intirtool, Ltd. v. Texar Corp.*,
  369 F.3d 1289 (Fed. Cir. 2004) ................................................................72, 76

*Kalman v. Kimberly-Clark Corp.*,
  713 F.2d 760 (Fed. Cir. 1983) .........................................................................44

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
  688 F.3d 1342 (Fed. Cir. 2012) ...............................................................*passim*

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)..........................................................................................44

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012)...............................................................64, 65, 67

# TABLE OF AUTHORITIES
### *(cont'd)*

**Page No(s).**

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
  545 F.3d 1359 (Fed. Cir. 2008) ...............................................................51, 54

*Perkin-Elmer Corp. v. Computervision Corp.*,
  732 F.2d 888 (Fed. Cir. 1984) .......................................................................37

*Pharmastem Therapeutics, Inc. v. Viacell, Inc.*,
  491 F.3d 1342 (Fed. Cir. 2007) ....................................................................30

*Plantronics, Inc. v. Aliph, Inc.*,
  --- F.3d ----, No. 2012-1355, 2013 WL 3927619 (Fed. Cir. July
  31, 2013) ...................................................................................................43, 45

*Power-One, Inc. v. Artesyn Techs., Inc.*,
  599 F.3d 1343 (Fed. Cir. 2010) ...............................................................31, 67

*Rice v. Cmty. Health Ass'n*,
  203 F.3d 283 (4th Cir. 2000) .........................................................................67

*Richardson-Vicks Inc. v. Upjohn Co.*,
  122 F.3d 1476 (Fed. Cir. 1997) ..............................................................80, 81

*Robert Bosch, LLC v. Pylon Mfg. Corp.*,
  719 F.3d 1305 (Fed. Cir. 2013) (en banc) .....................................................67

*SmithKline Beecham Corp. v. Apotex Corp.*,
  403 F.3d 1331 (Fed. Cir. 2005) ....................................................................53

*Sparks v. Gilley Trucking Co.*,
  992 F.2d 50 (4th Cir. 1993) ...........................................................................36

*Sulzer Textil A.G. v. Picanol N.V.*,
  358 F.3d 1356 (Fed. Cir. 2004) ...............................................................37, 38

*Trandes Corp. v. Guy F. Atkinson Co.*,
  996 F.2d 655 (4th Cir. 1993) .........................................................................42

## TABLE OF AUTHORITIES
### *(cont'd)*

**Page No(s).**

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
    587 F.3d 1339 (Fed. Cir. 2009) ......................................................73

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) .......................................24, 36, 65

*Uniloc USA, Inc. v. Microsoft Corp.*,
    640 F. Supp. 2d 150 (D.R.I. 2009) .................................................36

*Verizon Servs. Corp. v. Cox Fibernet Va., Inc.*,
    602 F.3d 1325 (Fed. Cir. 2010) .......................................34, 35, 36

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
    721 F.2d 1540 (Fed. Cir. 1983) ......................................................51

*Wanlass v. Fedders Corp.*,
    145 F.3d 1461 (Fed. Cir. 1998) .......................................73, 75, 76

*Wanlass v. General Elec. Co.*,
    148 F.3d 1334 (Fed. Cir. 1998) ....................................... 71, 73-75

*Weisgram v. Marley Co.*,
    528 U.S. 440 (2000) .................................................................61, 62

## OTHER AUTHORITIES

35 U.S.C. § 103 .................................................................................45

35 U.S.C. § 284 .................................................................................61

Fed. R. Civ. P. 49 .............................................................................42

Fed. R. Civ. P. 52 .............................................................................42

*Merriam Webster's Collegiate Dictionary* (10th ed. 1993)...............71, 72

## STATEMENT OF RELATED CASES

There has been and is no other appeal from the present civil action in this or any other appellate court. Counsel is unaware of any other case pending that will directly affect, or will be directly affected by, this Court's decision in the present appeal.

## JURISDICTIONAL STATEMENT

On April 3, 2013, I/P Engine timely filed its Notice of Appeal from the district court's April 3, 2013 final appealable judgment. This Court has jurisdiction over I/P Engine's Cross Appeal pursuant to 28 U.S.C. § 1295(a)(1).

# I.  ISSUES RAISED BY I/P ENGINE'S CROSS APPEAL

1.    Did the district court err by holding that the previous patent owner, though not a Google advertising customer, had "constructive knowledge" of Google's proprietary system based on a single sentence in a single blog post directed to Google advertising customers, thus commencing the laches period on the same day the blog post was posted on the Internet?

2.    In finding laches, did the district court incorrectly place the burden of proof on I/P Engine to show a lack of prejudice and prevent I/P Engine from rebutting a presumption of laches?

3.    In denying I/P Engine's post-trial motion on damages, did the district court err by holding the jury's total damages award of $30,496,155 was supported by the record, even though the award was inconsistent with the only damages evidence of record?

## II.  <u>INTRODUCTION</u>

After a twelve-day trial, the jury found that Defendants infringed each asserted claim of the '420 and '664 Patents ("the Patents-in-Suit"), and that the prior art does not invalidate the claimed inventions.  The district court correctly upheld the jury's factual findings.

Ignoring the standard of review and invading the province of the jury, Defendants now seek to relitigate the factual positions they unsuccessfully advocated to the fact-finder.  But the jury correctly found that the Accused System satisfies each of the claim limitations challenged by Defendants, and the jury's findings are supported by substantial evidence.

In an attempt to argue otherwise, Defendants engage in new and improper claim-construction arguments and challenge the use of Google's ***own documents***. But Defendants' claim-construction arguments are too late, and contradict both their own and their expert's admissions.  And, while Defendants argue that I/P Engine relied on "marketing" documents to prove infringement, the very precedent Defendants rely upon supports that such documents are valid evidence of infringement.  Nevertheless, I/P Engine did not rely solely on purported "marketing" documents, but also on internal Google documents, the admissions of Google's own engineers, and over 170 pages of Google's source code to support a

finding of infringement. The jury's infringement verdict cannot be disturbed on this record.

Defendants challenge validity by largely ignoring the jury's detailed special-verdict-form findings. The jury found that the prior art, separately and as a whole, does not disclose every limitation of the claims. Lacking prior-art support, Defendants contend that the missing limitations should be deemed found in the prior art as a matter of sheer common sense. But Defendants identify no evidence supporting this contention. Defendants instead attack a straw man, arguing the obviousness of combining "content" and "collaborative" data generally. But that is not the claimed invention.

Unable to prevail in the district court, Defendants' originally filed Brief asked this Court to adopt the interim reasoning of the U.S. Patent and Trademark Office ("PTO"), arguing that the PTO is the "only" entity that has "provided a reasoned analysis of obviousness . . . ." D.I. 40 at 4. But thereafter, the PTO changed its view and its final ruling *confirmed* the validity of all of the asserted '420 Patent claims for substantially the same reasons advocated by I/P Engine and adopted by the jury. A7899-A7906. Now that the PTO's "reasoned analysis" supports I/P Engine's position, Defendants have filed their current "Corrected" Brief that eliminates these arguments and any mention of the PTO Reexamination proceedings. D.I. 53; *see* D.I. 45-49.

Defendants also seek JMOL of zero damages. Defendants seek to penalize I/P Engine for not having offered, in its case-in-chief, an alternative damages theory that assumed laches applied. But I/P Engine had no such duty. Laches is an affirmative defense as to which Defendants always bore the burden of proof. Presenting alternative damages theories to the jury (which was not tasked with evaluating laches) prior to a laches decision by the court would have confused the jury. The better practice—routinely applied by district courts—would have been for the district court to resolve the equitable issue of laches and adjust the jury's damages award accordingly after trial.

Here, the district court decided laches the day before closing arguments, refused to allow I/P Engine to present rebuttal laches evidence, and then required the jury to determine damages for the shortened damages period based on its memory of the evidence. The ill-timed and prejudicial implementation of the district court's laches ruling resulted in an unsupported damages award. While this requires a remand to correct the amount of the award, it does not entitle Defendants to a take-nothing damages award for their adjudged infringement of I/P Engine's valid patents.

## III. STATEMENT OF THE FACTS

### A. Background Of The Patented Technology

#### 1. Conventional Search Technology

Each day, millions of people use the Internet to search for all kinds of content. Search engines generate substantial revenue by providing relevant advertisements alongside search results. A2912:5-6; A2687:11-13. Filtering vast amounts of information to identify specific items and advertisements of interest presents daunting scientific and technical challenges. A2126:11-17. The patented technology in this case relates to innovative search technologies that enable users to obtain high-quality search results from network databases and/or the Internet. A206 at 1:10-16; A233 at 1:19-25.

Before the inventors of the Patents-in-Suit pioneered their innovative technologies, there were primarily two types of systems: (i) query-based systems that processed information for relevance to a query and provided results responsive to a user's immediate information need, and (ii) profile-based systems that processed information for relevance to interests expressed in a user's profile and provided results responsive to those interests over long periods of time. A3685:20-A3686:4; A3689:9-13; A3690:11-15. The technologies were being developed on separate tracks and focused on different and conflicting information needs and timing requirements. *Id.*; *see also* A3685:19-A3693:22.

The query-based systems largely focused on analyzing the content of pre-indexed items and providing results based on that content-based analysis. A3686:9-22.   Profile systems, on the other hand, had started engaging in collaborative-based analysis, which attempts to predict whether information will be of interest to users based on their long-term shared interests with other users (determined, for example, by comparing user profiles).   A3687:12-A3689:6. Those working with profile systems had only a superficial understanding of how search queries worked, and those in the search field had little understanding of profile and collaborative technologies.  A3693:6-8.

Some prior-art profile systems contemplated using search engines (or "query" systems) as a way to collect documents for use in a profile-based analysis. A3689:13-A3690:15.  Such an approach first used a query-based system to collect documents, and then separately conducted a profile-based analysis on the documents collected by the query-based system.   Thus, these systems simply took the results from a query-based search engine and threw them over a proverbial wall to a separate profile-based system:



A9044; A3689:13-A3690:15.    Such systems performed a user-profile-based analysis on the data thrown "over the wall" from the query system, but did not consider the query itself.    A3689:23-3690:7.    That is because the profile-based systems were designed to address the user's long-term information needs, based on the user's profile, not an immediate need expressed in a search query.    A3690:11-15.    As such, "over the wall" systems omitted relevant information from the final results returned to a user.    A3692:10-21.

### 2.  **Lang And Kosak's Paradigm-Shifting Technology**

Ken Lang and Don Kosak, the inventors of the Patents-in-Suit, eliminated the proverbial wall that existed between query-based and profile-based technologies.  A3690:24-A3691:6.  At their own start-up company and, later, as the two top technical personnel of search-engine pioneer Lycos, Inc., they developed unique integrated search systems that combined content data and collaborative-feedback data and used that data together as a criterion to filter items for relevance to a query.  A3690:24-A3691:6; A2084:1-17; A2090:11-A2091:5; A3730:13-23; *see also* A7918-A7951.  Lang and Kosak's technology provided numerous advantages over prior technologies, including superior search results. A3731:4-11; A3739:13-25; A3692:16-21.

Figure 9 of the '420 and '664 Patents illustrates an example of Lang and Kosak's integration of content (blue) and collaborative feedback (green) data:



FIG. 9

A204 (highlighting added). As illustrated above, when a user (34C) performs a search, the system combines: (1) collaborative feedback data from a feedback processor (50C), and (2) content data from a content-based filter structure (40C). A search return processor (48C) operating in "demand mode" (48C2) uses the collaborative feedback data and content-based data together to filter potential results, such as advertisements, for relevance to the query entered by the user. A218 at 25:6-26:8.

Figure 6 illustrates an example of using both content data (405) (blue) and collaborative feedback data (415) (green) in search return processor (48C) to come up with a "Complete Rating Predictor" (432) for each piece of information:



A201 (highlighting added).  The Patents-in-Suit discuss a variety of ways in which content and collaborative feedback data can be combined.  For example, the combining of 427a-d above "can be from a simple, weighted, additive function to a far more complex neural network function."  A212 at 14:58-60.

Asserted Claim 10 of the '420 Patent is directed to:

> 10. A search engine system comprising:
>
> [a] a system for scanning a network to make a demand search for informons relevant to a query from an individual user;
>
> [b] a content-based filter system for receiving the informons from the scanning system and for filtering the informons on the basis of applicable content profile data for relevance to the query; and
>
> [c] a feedback system for receiving collaborative feedback data from system users relative to informons considered by such users;
>
> [d] the filter system *combining* pertaining *feedback data* from the feedback system with the *content profile data in filtering* each informon *for relevance to the query*.

A219 at 28:1-15 (emphasis and letters added). As emphasized above, Claim 10 is directed to a tightly integrated search system that "combin[es]" collaborative (*i.e.*, "feedback") data with "content" data "in filtering" each informon (*i.e.*, piece of information) for relevance to a "query."

Asserted Claim 1 of the '664 Patent is similarly directed to:

> 1. A search system comprising:
>
> [a] a scanning system for searching for information relevant to a query associated with a first user in a plurality of users;
>
> [b] a feedback system for receiving information found to be relevant to the query by other users; and

[c] a content-based filter system for ***combining*** the information from the ***feedback system*** with the information from the ***scanning system*** and ***for filtering*** the combined information for ***relevance to at least one of the query*** and the first user.

A246 at 27:27-37 (emphasis and letters added).  Thus, Claim 1 is directed to a tightly integrated search system for "combining" the "information from the feedback system" (collaborative data) with the "information from the scanning system" (content data) in "filtering" information for relevance to a "query."

**B.    The Infringing Advertising Technology**

The various implementations of Google's AdWords system (the "Accused System") combine collaborative feedback data and content data to filter advertisements for relevance to a search query.  When a user performs a search by entering a query, the Accused System presents paid-for advertisements (green below) alongside regular search results (red below):



A8940.  In both cases, the Accused System attempts to present relevant (*i.e.*, useful and interesting) information to the user.  A2285:22-A2286:4.  To remove low quality advertisements, the Accused System performs three filtering steps. A2312:21-A2315:19; A2346:8-10.

Each of the three filtering steps uses a predicted Click-Through Rate ("pCTR"), also referred to as a "Quality Score," to filter the advertisements. A2315:20-23.  To determine the pCTR, the Accused System first uses several

measures to determine how well the content of an advertisement (*i.e.*, the words in the advertisement) matches the user's query.  A2454:1-9; A2527:21-A2528:7.

For each measure, the Accused System produces a content-based data string used to determine a corresponding odds multiplier.  A2386:1-A2387:1; A2528:8-13; A2453:22-A2455:5.  The odds multiplier corresponds to the content-based data string and is based on feedback data found in query logs, *i.e.*, the extent to which other users that have entered that query have clicked on an advertisement. A2437:22-A2438:13; A2528:16-17.

The Accused System then sums numerous odds multipliers to determine the pCTR.  A2383:12-16.  This computation combines the content data (the content-based data string) and the collaborative feedback data (corresponding feedback derived from logs for that data string) into a single value, the pCTR, and filters the advertisements using that value.  A2434:7-11.

## C.    **The Prior Art**

As the PTO recently found when upholding the validity of all of the asserted claims of the '420 Patent, Lang and Kosak's inventions are patentably distinct from "over the wall" prior-art systems that merely provide content-based search results to a profile-based system.  A7899-A7906.  As the PTO found, "over the wall" systems, such as those relied on by Defendants in this Appeal, are

distinguished by not one, but at least *three* aspects of the claim language, even under the broadest reasonable construction of the claims:

- ***First***, the claims require the filter system to "combin[e] pertaining feedback data" (*i.e.*, collaborative data) with the "content profile data" for filtering, whereas "over the wall systems" perform content-based filtering and then send the results for separate collaborative filtering, A7899-A7900;

- ***Second***, the claims require the filter system to use the "combined" data in filtering "each informon" (*i.e.*, information entities such as news articles, websites, or advertisements), whereas in "over the wall" systems some informons would be filtered and lost during the initial content-based filtering, A7900; and

- ***Third***, "the claims require that the filter system use the combined content and feedback data 'in filtering . . . , for relevance to ***the query***," whereas in "over the wall" systems, the "profile system does not filter 'for relevance to the query.'" *Id.*[1]

---

[1]    The Reexamination contravenes Defendants' contention that the PTO has allowed the '420 Patent claims only because some of the claims refer to a "wire." Br. at 9; *see also* A8092-A8094 (PTO allowed '664 Patent based on step requiring filtering regarding combined collaborative and content data with respect to query).

-15-

None of Defendants' prior-art references discloses or suggests these claim limitations.

### 1.    WebHound

WebHound (also referred to at trial as "Lashkari") discloses a system in which users sign up to access a database of documents. A5480-81. Users rate "documents on a seven point scale" and WebHound compares the user's profile to the profile of other users to recommend documents:

```
7: Top notch! I WANT more documents like this!
6: Very interesting
5: Good stuff
4: Fair to middling
3: Doesn't do me
2: Not my type of document
1: BORING!
```

A5481; A5483.   WebHound postulates that "if the user had a WEBHOUND account, the resulting matches [obtained from a search engine] could be filtered through WEBHOUND and only the top ranked ones (in terms of predicted rating) need be returned."   A5502.   This postulates sending the "result[s]" of a search inquiry over the wall for use in the separate WEBHOUND profile-based analysis. A3735:8-19.

2.    **Rose**

Rose is also a profile-based system that discusses, for example, a "movie database" in which a user ranks a movie.  A5422 at 5:52-61.  That information is used to "rank that movie for viewing by other users whose interests in movies are similar":



A5419 (excerpted); A5422 at 5:57-60.  Like WebHound, Rose postulates that its user-profile-based analysis could be performed on the "search results obtained through an on-line text retrieval system."    A5420 at 2:54-55.    Thus, Rose postulates a system in which the "results" of a query are thrown over the wall to be analyzed by Rose's separate profile-based system.  A3760:21-25.

### 3.     Fab

Fab discloses a recommendation system that acquires information and employs user feedback to determine if an item liked by one user should be shown to another:



Figure 2. Overview of the Fab architecture

A3737:1-10; A5513-14.  Fab does not describe basing its recommendations on a search query, and therefore does not disclose filtering for relevance to a query, as required by the claims.  A3737:1-10.

### 4.     Culliss

Defendants' sole alleged anticipation reference is Culliss, which was *considered by the PTO during the prosecution of both Patents-in-Suit*. Defendants' Principal Brief, D.I. 53 ("Br.") at 34; *see* A5518; A3367:19-A3368:12; A5324; A8087.  Culliss proposes a query-based system that ranks search results based on feedback from users instead of the content of the items. A5519 at FIG. 1; A5521 at 4:20-49; A3715:9-A3716:3.  As users select items, the

system records those selections (user feedback) and then alters each of the items' scores.  A5519 at FIG. 1 (steps 30 and 40); A5521 at 4:43-45.  Items selected more often will move up in the rankings in subsequent searches.  A5521 at 4:56-64.

Culliss ranks items based on collaborative data in the form of user feedback, and not on a ***combination*** of content-based data and collaborative data, as required by the asserted claims.  A3710:25-A3711:4; A5520 at 2:62-64.  In addition, Culliss describes a system for ranking items, not filtering them, as required by the asserted claims.  A5519 at FIG. 1 ("Present Articles . . . ***Ranked*** by Scores in Index"); A3715:25-A3716:3.  Both parties' experts agreed that ranking is different from filtering.  A3366:18-21; A3701:17-A3706:5.

**D.    Trial**

**1.    Infringement And Validity**

The jury found that Defendants infringed all of the asserted claims.  A4164-68.  Further, the jury upheld the validity of the Patents-in-Suit, finding no prior-art reference anticipates any of the asserted claims of the Patents-in-Suit.  A4169.  The jury also made detailed factual findings related to obviousness on a special-verdict form.  A4170-72.  Based on the jury's factual findings, the district court held that none of the asserted claims is invalid for obviousness.  A39-40.

2.    **Laches And Damages**

Before trial, the district court determined that it, not the jury, would decide Defendants' laches defense.  A4547 at ¶ 2; A4550 at ¶ 2; A4555 at ¶ 2.  The district court did not explain, however, when it would take relevant evidence or when the record on the non-jury issues would be complete.  Just before Defendants rested, Defendants proffered eighty pages of deposition testimony in an attempt to show evidentiary prejudice.  A3625:22-24; A5717-A5719.

Immediately after Defendants rested, I/P Engine moved for JMOL on Defendants' affirmative defense of laches.  A3630:22-A3632:14.  The next morning, however, the district court announced it was finding laches against I/P Engine.  A3655:14-A3661:23.  In response to I/P Engine's repeated objection that it had not been fully heard, the district court refused to let I/P Engine put forward laches evidence as part of its rebuttal case.  A3662:1-25; A3721:21-A3723:23; A3789:22-A3790:21; A3799:24-A3800:8.

I/P Engine was understandably surprised by the district court's laches ruling.  A3789:22-A3790:21.  I/P Engine had already presented its damages case as if the damages period would commence on September 15, 2005.  A2686:20-A2687:23.  The district court denied I/P Engine's request to permit the jury to decide the case using the entire damages period and to have the district court subsequently adjust any damages award in view of laches.  A3666:19-A3672:18.  The district court

held there was sufficient evidence in the record for the jury to make a reasonable estimate of damages. A3819:10-15. The jury found damages of $30,496,155. *See* A4173.

## IV.  SUMMARY OF THE ARGUMENT

I.  This Court should affirm the jury's verdict of infringement as supported by substantial evidence.  Defendants ask for judgment of non-infringement as a matter of law, but do not even attempt to argue the jury's findings are unsupported by substantial evidence.  Instead, Defendants argue that non-infringement is established for three reasons, none of which supports overturning the jury's infringement verdict.

First, Defendants argue that the "combining" limitation is not satisfied because using one piece of data to "look up" another piece of data is not combining those pieces of data.  But the term "combining" was not construed, and the Accused System's use of ***both*** types of data ***together*** in filtering is a clear form of "combining" under the plain and ordinary meaning of that term.  In an attempt to avoid this result, Defendants argue that "combining" must be limited to "merging or blending."  But this is a new claim-construction argument in the guise of a non-infringement argument.  Defendants' new claim construction is improper because Defendants failed to assert it before the close of trial.  Moreover, Defendants' new claim-construction argument directly contradicts the testimony of Defendants'

technical expert and Defendants' argument during *Markman* that interpreting "combining" to require uniting into a single number or expression would be contrary to the ordinary usage of this term.

Second, Defendants argue that the Accused System does not "filter[] the combined information" in accordance with the asserted '664 Patent claims. But substantial evidence supports the jury's decision that this limitation is satisfied. Rather than address this evidence, Defendants again make an improper claim-construction argument they never raised before the close of trial. Defendants' claim construction is also incorrect. Indeed, Defendants' expert admitted that Defendants' construction would read out every embodiment of the '664 Patent. Moreover, even if Defendants' construction were correct, substantial evidence would still support the jury's verdict.

Third, Defendants argue that I/P Engine's expert ignored the limitation "scanning a network to make a demand search" in the '420 Patent claims. That is simply not true. I/P Engine's expert, Dr. Frieder, addressed this limitation extensively and explained why the Accused System satisfies this limitation. Dr. Frieder also applied the district court's claim construction requiring a "single search engine query performed upon a user request." Dr. Frieder relied on Google's own internal document explaining that the Accused System finds and displays ads that match a user's query.

Defendants also request a new trial on various grounds. Contrary to Defendants' arguments, I/P Engine never encouraged the jury to ignore the source code, never prejudiced the jury by improperly insinuating copying by Google, and presented sufficient evidence to warrant jury instructions on the doctrine of equivalents and indirect infringement.

II. This Court should affirm the district court's holding that the asserted claims are not invalid for obviousness and the jury's finding that the asserted claims are not anticipated. The jury found that the prior art, separately and as a whole, does not disclose every limitation of the claims, and those findings are supported by substantial evidence. With no finding of anticipation and lacking the evidentiary support to demonstrate that a combination of prior-art references discloses every limitation of the claims, Defendants resort to arguing that this Court should deem the missing limitations present in the prior art as a matter of sheer common sense. But Defendants have identified no evidence showing it would have been obvious to pluck the missing limitations out of thin air. Nor have they articulated any reason why a person of ordinary skill in the art would have combined the references or modified them to the configuration required by the claims. Instead, Defendants invite this Court to engage in appellate fact-finding and indulge in hindsight that grossly oversimplifies the differences between the

prior art and the patented inventions and contravenes the jury's findings that nearly every objective consideration supports the conclusion of nonobviousness.

III.  This Court should reject Defendants' request for JMOL of no damages. I/P Engine put forward evidence of the post-Complaint royalty base such that the jury could have reached a supported damages award.  Although the jury did not reach a supported damages award, that requires a remand for correction, as I/P Engine explains in its Cross Appeal.  That does not entitle Defendants to JMOL of no damages for Defendants' adjudged infringement of valid claims.  Moreover, contrary to Defendants' arguments, I/P Engine's damages expert properly apportioned the royalty base, properly relied on comparable third-party licenses, and considered all relevant real-world transactions involving the Patents-in-Suit.

## V.  <u>ARGUMENT</u>

### A.    <u>The Jury's Infringement Verdict Is Supported By Substantial Evidence</u>

Defendants appeal the district court's denial of JMOL of noninfringement, but largely ignore the applicable standard of review.  Defendants incorrectly argue that the infringement issue in this Appeal "turns on a straightforward application of the claim language to the undisputed facts."  Br. at 21.  But applying the claims to the accused system is a question of *fact* for the *jury*.  *See Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1369 (Fed. Cir. 2004).  This is so even where the structure of the accused system is undisputed.  *See Uniloc USA, Inc. v. Microsoft*

-24-

*Corp.*, 632 F.3d 1292, 1301-02 (Fed. Cir. 2011); *Int'l Rectifier*, 361 F.3d at 1375. The only question for this Court is whether substantial evidence supported the jury's verdict that each of the claim limitations challenged by Defendants is satisfied. *See In re Wildewood Litig.*, 52 F.3d 499, 502 (4th Cir. 1995). The evidence was more than substantial.

### 1.    <u>Substantial Evidence Supports The Jury's Finding That The Accused System "Combines" Content And Collaborative Data</u>

Defendants argue that the "combining" limitation is not satisfied because using one piece of data to "look up" another piece of data cannot "combine" those pieces of data under the asserted claims. Br. at 22-23. But the fact that ***both*** types of data are used ***together*** in the Accused System to obtain the final result (the pCTR) used to filter satisfies the requirement of "combining" in accordance with the plain and ordinary meaning of this term.

In an attempt to avoid this result, Defendants now argue that "combining" must be limited to "merging or blending." Br. at 22. But this is a claim-construction argument in the guise of a non-infringement argument. Defendants' claim-construction argument is improper because Defendants failed to assert it before the close of trial. *See Broadcom Corp. v. Qualcomm, Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008) (parties "cannot be allowed to create a new claim construction dispute following the close of the jury trial"). Indeed, during the *Markman* proceedings, Defendants urged the district court not to construe the word

"combining," and the district court adopted this position.    A5595-A5598;

A5618:22-5619:3; A2 n.1.  Defendants should not be permitted to reverse positions

and assert a new claim-construction argument after losing a jury verdict on the

position they advocated below.  *See Broadcom*, 543 F.3d at 694.

Defendants' untimely claim construction is also incorrect.  Nothing in the

ordinary meaning of "combining" limits this term in the manner Defendants

propose.  Defendants' expert, Dr. Ungar, even admitted that "combining" does not

require "merging."    A3254:1-3, 20-25.    Moreover, during the *Markman*

proceedings, Defendants argued that interpreting "combining" as requiring uniting

into a single number or expression would be "contrary to the ordinary usage of this

word."  A5595.  Defendants instead advocated that the district court should adopt

*no* construction for "combining" or, alternatively, should define this term as

"bringing together."  *Id.*  Defendants' examples of "combining" were: "a high

school curriculum might combine math and English, an Indiana Jones costume

may combine a fedora with a bullwhip, and a tropical vacation might combine

sunbathing with scuba diving."  *Id.*  None of these examples requires "merging or

blending."

To support their new construction, Defendants point to Figure 6 of the

Patents-in-Suit and Dr. Frieder's testimony that mathematical combining is one

example of combining.  Br. at 23.  But the specification is clear that combining can

be performed in a variety of ways, ranging "from a simple, weighted, additive function to a far more complex neural network function." A212 at 14:58-60. Indeed, during the *Markman* proceedings, Defendants agreed that the "claims and specification . . . teach several non-mathematical combinations." A5597.

Defendants also rely on excerpts from I/P Engine's argument in its *Markman* brief. Br. at 23. But the district court did not adopt I/P Engine's proposed construction, and neither side challenges the district court's *Markman* decision on appeal. A2 n.1. Defendants similarly seize on a statement made by I/P Engine's counsel, Br. at 22-23, but I/P Engine's counsel was merely providing an example of "combining," not reconstruing the term. Ultimately, the variety of uses of the term "combining" by both parties and their experts supports the conclusion that the plain and ordinary meaning is not limited to "merging or blending."

But even if "combining" were limited to "merging or blending," substantial evidence would still support the jury's verdict. The jury heard evidence that a Quality Score or pCTR in the Accused System is a single numerical expression that incorporates (and thus merges or blends) both content and collaborative data. This is reflected in Google's internal documents, which explain that "Quality Score" "=" content data (*i.e.*, the "relevance of . . . ad text") "+" collaborative data (*i.e.*, "historical keyword performance"). A8504. Moreover, I/P Engine's expert, Dr. Frieder, testified that content and collaborative data are "merged" to perform

CONFIDENTIAL MATERIAL DELETED

filtering in the Accused System.   A2450:21-A2451:2 (discussing A8977 & A8353); *see also* A2453:22-A2455:5.

Under the ordinary meaning of "combining," the evidence of infringement is overwhelming.  Defendants incorrectly contend that I/P Engine relied on *ipse dixit* testimony.  Dr. Frieder, however, explained in detail how this limitation is satisfied in the Accused System.  Discussing Google's source code, Dr. Frieder testified that the Accused System:



Thus, the pCTR used for filtering is based on both content and collaborative data. A4141,139:03-139:11.  If either or both data changes, the filtering will change

because the final result (pCTR), on which filtering is based, changes. A plain and ordinary way to express this is to say that both types of data are "combined" to perform the accused filtering. Indeed, both parties agreed that the two types of data are associated with each other in the Accused System. A2544:20-23; A2992:12-13,23-24; A3254:15-19. The jury was free to conclude that the Accused System combines both types of data as required by the asserted claims.

Defendants contend that I/P Engine relied "primarily on high-level marketing materials," pointing to PX-338. Br. at 26. But PX-338 is not a "marketing" document. *See* A8867-A8870. Rather, it explains how Google's system works to existing advertising customers. A2339:11-12.

Nevertheless, I/P Engine did not rely solely on PX-338, but also on Google source code, other Google documents, and Defendants' own witnesses. *See, e.g.,* A2309:16-20 (Google internal document); A2387:17-A2390:15 (Google source code); A4128-A4145 (Google witness); A8132-A8143 (documents); A8146-A8217 (same); A8286-A8355 (same); A8356 (video); A8414-A8509 (documents); A8663-A8818 (same); A8891-A8892; *see also* A2263-A2349 (Frieder trial testimony); A2366-A2411 (same); A2416-A2507 (same); A2516-A2591 (same); A8918-A9009 (collecting evidence). Indeed, Defendants' expert described one of I/P Engine's primary sources of proof, PX-228, as "a Google internal document for Google engineers." A3273:9-12; *see* PX-228 (A8414-A8447).

Defendants cite *Pharmastem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1351 (Fed. Cir. 2007), to contend that "marketing materials cannot prove infringement as a matter of law." Br. at 27. But *Pharmastem* says the opposite— that "there is no prohibition against using the admissions of a party, whether in the form of marketing materials or otherwise, as evidence in an infringement action; such admissions are entitled to weight along with all other evidence of infringement." 491 F.3d at 1351.

### 2. Substantial Evidence Supports The Jury's Finding That The Accused System Filters The Combined Information

Defendants next challenge the limitation "filtering the combined information," which appears only in the '664 Patent claims. Br. at 29-30. But substantial evidence supports the jury's decision that this limitation is satisfied. A2557:1-7; A2465:6-18; A2466:8-9; A2555:15-A2556:8. Rather than address whether the evidence supports the jury's finding, Defendants contend that the claim language can only be interpreted to mean that the "combined information" itself is filtered, and the claims cannot be interpreted to encompass filtering "something else" associated with the "combined information." Br. at 28-29. As support, Defendants openly invoke claim-construction principles and precedent. *Id*. Defendants are precluded from making this new claim-construction argument because they did not raise it before the close of trial. *See Broadcom*, 543 F.3d at 694.

Regardless, Defendants' belated claim-construction argument is incorrect. Defendants' expert, Dr. Ungar, could not point to any specification support for Defendants' interpretation, and admitted that Defendants' interpretation is inconsistent with the specification and would exclude *every* embodiment of the '664 Patent. A3255:21-A3257:3. According to the specification, items are filtered based on a "Complete Rating Predictor" associated with each item, just like the Accused System filters advertisements based on their pCTR. A241 at 15:2-3; A2557:4-7 (discussing Figure 6 of the '664 Patent). Consistent with the specification and claims, I/P Engine's expert, Dr. Frieder, explained why the "filtering the combined information" limitation is satisfied. A2557:1-7; A2465:6-18; A2466:8-9; A2555:15-A2556:8. The jury was free to credit his testimony over the testimony of Dr. Ungar. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1351 (Fed. Cir. 2010).

Moreover, substantial evidence would support the jury's verdict even under Defendants' improper construction. According to Defendants, the Accused System must filter the pCTR values themselves (as the "combined information"), not just the advertisements associated with each pCTR value. There was substantial evidence that, by filtering the advertisements associated with pCTR values, the Accused System filters the advertisements *and* their corresponding pCTR values. *See, e.g.,* A2557:24-25. As Dr. Frieder explained, the "pCTR is the representation

of—the combined information in relation to a ***particular*** ad." *Id*. (emphasis added). As such, the pCTR values have no meaning separate and apart from their association with specific advertisements. A2558:6-10. Thus, by filtering out advertisements with pCTR values below a threshold, the Accused System filters both the advertisements and each of their respective pCTR values. *Id*.; A2556:5-6.

Defendants' non-infringement expert, Dr. Ungar, understood that there was trial testimony indicating that the pCTR itself is filtered. *See, e.g.,* A3110:13-14 (Dr. Frieder "says that the combined information is in the pCTR and that the ***pCTR is filtered***) (emphasis added); A3110:18-19 ("Dr. Frieder says you ***filter the pCTR*** based on the combination") (emphasis added). Although Dr. Ungar disagreed with this conclusion, the jury was free to conclude otherwise in accordance with the evidence of record. Thus, substantial evidence supports the jury's verdict that the Accused System satisfies the "filtering the combined information" limitation.

### 3.   Substantial Evidence Supports The Jury's Finding That The Accused System "Scans A Network To Make A Demand Search"

Defendants' final noninfringement challenge is to the limitation "scanning a network to make a demand search," which appears only in the '420 Patent claims. Defendants contend that I/P Engine made "no mention of 'demand search'" at trial. Br. at 30. But Dr. Frieder addressed this limitation in detail, testifying that the claims require "a system for looking for or examining items in a network, to make

a *demand search* for informons relative to the query from an individual user."
A2335:12-25 (emphasis added).

Defendants argue that Dr. Frieder did not apply the district court's
construction of "demand search" as "a single search engine query performed upon
a user request." Br. at 30. To the contrary, Dr. Frieder confirmed that he used the
district court's claim construction "throughout [the] process." A2276:19-22. Dr.
Frieder also explained how the district court's claim construction requiring a
"single search engine query" was satisfied. For example, Dr. Frieder relied on
Google's own internal document which states, "We apply Targeting to *find* ads
that match *the user's query*" and "Targeting means *finding* (and displaying) ads
that best match *the user's query*." A8415, A8417 (emphases added); *see*
A2423:22-A2424:19 (discussing A8414-A8447). Moreover, when testifying about
the "demand search" limitation, Dr. Frieder had previously testified that the
Accused System operates in "a definite search engine environment" and is "a
*search process*" because "[y]ou're entering a *search*." A2334:4-9 (emphases
added). Even Defendants' expert, Dr. Ungar, conceded that queries typed into the
Google search engine are demand searches. A3022:10-12.

Dr. Frieder also showed that the search-engine query is "performed upon a
user request," in accordance with the district court's claim construction. Dr.
Frieder explained, in reference to PX-228, that "[a]s you can see, you enter a

-33-

*search* and then you send it into the system." A2422:20-21 (emphasis added).

PX-228 demonstrates that the Accused System starts "with *end users* when they

enter a *search query*." A8415 (emphases added). And, Google's own engineer,

Mr. Furrow, agreed that the Accused System starts when a user inserts a query into

Google's search engine. A2982:6-9.

Defendants argue that I/P Engine "accused only advertising systems and

repeatedly stated that no search engine was accused." *Id.* at 30-31. But I/P Engine

was merely clarifying that it was targeting Google's technologies that search for

and display advertisements alongside search results. A1960:13-24; A1969:7-

A1970:5. As discussed above, I/P Engine's expert clearly testified that the

Accused System operated in a search-engine environment and is a search process.

A2334:4-9.

## B.    Defendants' Arguments For A New Trial Are Meritless

Defendants also appeal the district court's denial of a new trial on

infringement, which is reviewed for an abuse of discretion. *Verizon Servs. Corp. v.

Cox Fibernet Va., Inc.*, 602 F.3d 1325, 1334-35 (Fed. Cir. 2010) (applying *Arnold

v. Eastern Air Lines, Inc.*, 681 F.2d 186 (4th Cir. 1982)). A new trial is granted in

the Fourth Circuit only when there is conduct "so grievous as to have rendered the

trial unfair." *Id.* at 1331. Defendants identify three grounds for a new trial, but

none of them supports granting a new trial.

First, Defendants claim that I/P Engine encouraged the jury to ignore Google's source code. Br. at 27-28. Not so. I/P Engine's counsel correctly advised the jury that they need not be "expert[s] in source code . . . to decide this case" and that they could consider Google's own documents and descriptions of the Accused System. A1972:11-16. Moreover, I/P Engine's counsel did not criticize Dr. Ungar for using source code. A3856:16-23. Instead, he criticized Dr. Ungar for failing to point to *any* Google documents to support his non-infringement theories, and contrasted this with Dr. Frieder's analysis, which was based on over twenty Google documents *and* over 170 pages of source code. *Id.*

Moreover, Defendants' arguments are futile because Defendants failed to object to any of the relevant statements during trial. *See Verizon,* 602 F.3d at 1335. In addition, Defendants ignore that "counsel misconduct" in the form of attorney argument can only result in a new trial if there was an effective subversion of "the jury's reason or [of] its commitment to decide the issues on the evidence received and the law as given it by the trial court . . . ." *Id.* I/P Engine never engaged in any conduct that could possibly meet this standard.

Second, Defendants argue that I/P Engine improperly "insinuated" that Google copied the Patents-in-Suit. Br. at 32. Rather, I/P Engine properly discussed the hard work of the inventors in developing their patented inventions, and contrasted this with Defendants' failure to provide their own development

story.  A1975:4-13; A3841:8-A3842:2; A3851:18-A3852:17.  Defendants have not shown that the three snippets of argument they cite subverted the jury's reason or commitment to decide the issues on the evidence and the law.  *Verizon*, 602 F.3d at 1335 (citations omitted).  Moreover, Defendants' arguments are again futile because they failed to object to these statements on the ground that they insinuate copying.  *Verizon*, 602 F.3d at 1335.

Bereft of supporting authority, Defendants rely on a vacated order granting a new trial in *Uniloc USA, Inc. v. Microsoft Corp.*, 640 F. Supp. 2d 150, 184 (D.R.I. 2009), *vacated-in-part,* 632 F.3d 1292, 1309-10 (Fed. Cir. 2011).  Even ignoring the *vacatur*, that case is of little value.  There, the district court granted a new trial because the clear weight of the evidence established non-infringement, and the copying allegations were entirely irrelevant.  *Id.* at 183-84.  Here, substantial evidence establishes infringement, and copying by others was relevant to obviousness.  *See* A4171.  Defendants also cite *Sparks v. Gilley Trucking Co.*, 992 F.2d 50, 53 (4th Cir. 1993), but that case is wholly inapposite because, among other things, it concerned an admission of highly prejudicial evidence, not attorney argument or conduct.  Br. at 32-33.

Third, Defendants argue that the jury was improperly instructed on the doctrine of equivalents and indirect infringement when, according to Defendants, there was "no evidence" presented on these theories.  Br. at 33.  But Defendants'

"no evidence" argument is really one seeking JMOL on these theories. Even if Defendants were entitled to JMOL on these theories, the jury's verdict would still be supported by substantial evidence of literal and direct infringement, as discussed above, and could be sustained on that basis alone. *See Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984) (findings of fact are presumed where necessary to support jury's verdict).

Nonetheless, Defendants are incorrect that there was no evidence of infringement under the doctrine of equivalents and indirect infringement. The record contains evidence that each claim limitation is satisfied, either literally or, where necessary, by a substantial equivalent. *See, e.g.,* A3261:20-22 (use of keyword is equivalent to use of query); A2362:1-4 (same). There was also evidence that Google knowingly induced third-party publishers to directly infringe by instructing publishers how to use the Accused Systems. *See, e.g.,* A8663-A8818 (instructions); A4091 (Target infringement); A8637-A8642 (Google-Target Agreement); A8643-A8662 (same); A4095-96 (IAC infringement); A8510-A8588 (IAC Agreement); A2104:4-15 (Google's knowledge of '420 Patent); A8893 (same).

Moreover, even if Defendants were correct that the instructions should not have been included, Defendants have not shown, as they must, that the resulting instructions were "prejudicial." *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356,

1363 (Fed. Cir. 2004).  Instead, Defendants speculate that "[t]o the extent the jury *may* have answered the infringement questions in the affirmative based on either indirect infringement or DOE, a new trial is required."  Br. at 33 (emphasis added). Such "speculative and conclusory argument is not sufficient" to satisfy the burden of showing prejudice.  *Sulzer,* 358 F.3d at 1365.  If Defendants believed there was no evidence on certain theories of infringement, and that this could impact the outcome of the case, Defendants should have sought separate questions on the verdict form for each infringement theory.

Finally, Defendants state, in a footnote, that "[i]t is clear that the jury was confused" because the jury referred to "third-party infringement" when asking "Is there a date to use when considering the question of third-party infringement?" Br. at 33 n.7.  However, the district court addressed this issue, finding that the reference to "third-party infringement" was to the non-Google defendants on the issue of ***damages.***  The district court answered the jury's question: "The date of infringement for third-party infringement (defendants other than Google) is relevant only if you are calculating ***damages***."  A4001:9-13 (emphasis added). Defendants' counsel agreed that answering the jury's question in this manner "address[ed] the [jury's] question directly."  A4000:19-20.  Accordingly, this Court should reject Defendants' requests for a new trial and affirm the jury's verdict of infringement.

**C.**    **The Asserted Claims Are Not Invalid For Obviousness Or Anticipation**

    **1.**    **The District Court Properly Denied Defendants' JMOL Motion Regarding Obviousness**

In arguing obviousness, Defendants again ask this Court to provide no deference to the jury's findings of fact.  Defendants criticize the district court's obviousness decision as purportedly keeping its analysis "under wraps," Br. at 35, but the district court extensively quoted and relied on the jury's detailed factual findings regarding nonobviousness on the jury's special-verdict form.  A39-40.  A contrary decision would have required the district court to overturn nearly every jury factual finding.

    **a.**    **The Prior Art Does Not Disclose Every Limitation Of The Asserted Claims**

As the jury found, the prior art as a whole does not disclose every limitation of the claims.  A4170-72.  Thus, "this is not even a case where the inventions at issue are merely composed of elements that were known in the art."  *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369-70 (Fed. Cir. 2012) (claims not invalid for obviousness).  Remarkably, Defendants do not address the jury's detailed findings.

The jurors were asked, regarding each Patent-in-Suit, "What difference, if any, existed between the claimed invention and the prior art at the time of the claimed invention?"  A4170-71.  For both patents, the jury expressly found that

none of Defendants' references discloses a "tightly integrated search system" (*i.e.*, a system that combines content and collaborative data to filter items for relevance to a query).  The jury found:

> The [] references—Rose, Lashkari, and Fab, were profile systems that did not disclose a tightly integrated search system, and could not filter information relevant to the query.

A4170-A4172.

In their originally filed Brief, Defendants disputed that the claims require a "tightly integrated search system."  D.I. 40 at 38.  Defendants relied on the PTO's interim reexamination decision regarding the '420 Patent.  *Id.*  After the PTO issued a final decision agreeing that the claims require a tightly integrated search system and upholding validity, A7899-A7905, Defendants filed a "Corrected" brief removing these arguments from their Brief.  D.I. 45-3 at 38 (showing redline changes).  Thus, Defendants have expressly abandoned this argument.

Regardless, the only question is whether substantial evidence supports the jury's findings.  It does.  *See, e.g.*, A3730:34-A3731:12 (explaining "tight integration" required by claims);  A3756:8-22 (same);  A3760:14-17 (same).  I/P Engine's expert, Dr. Carbonell, testified that WebHound (called "Lashkari" in the jury's verdict) does not "teach to do anything with respect to the query.  It does not process the user's immediate information need."  A3734:5-7.  Instead, "[WebHound] constructs a profile of a user, a profile, not a query, long-term need,

long-term interest" and uses that for filtering by "compar[ing] the profile to the profile of other users . . . ." A3734:15-19.

Although WebHound mentions a search, as Dr. Carbonell explained, "[the search] results are then thrown over the wall to the [WebHound] system [which] then uses them as input to do its profile systems." A3735:8-15. In other words, "it's talking about putting one in front of the other for WebHound to then do its filtering on the output of a search engine." A3751:4-6. "It does not say anywhere that that filtering is done with respect to the query. . . ." A3751:6-7. "The query itself is not even accessed by [WebHound's] method." A3735:17-18.

Similarly, as Dr. Carbonell explained, "Rose does not teach relevance to the query" and "[i]n fact, Rose doesn't have a query, doesn't have access to a query." A3732:13-16. Instead, similar to WebHound, Rose is a "basic profile system focusing on long-term likes, long-term needs, long-term interests of users." A3732:15-17. While Defendants suggest the "on-line text retrieval" mentioned in Rose discloses a query, the search merely collects items to provide an input to Rose's profile-based ranking system. A3762:10-19. It does not combine collaborative and content-based filtering for relevance to a query, as required by the asserted claims. A3733:12-15.

Regarding Fab, Dr. Carbonell testified that it does not disclose conducting a search using queries; it is "a profile system very similar to [Rose and

WebHound]."  A3737:8-10.  Since Fab does not even disclose determining if the content of an item matches a query, it cannot disclose filtering an item for relevance to a query using a combination of content and collaborative data. A3737:6-10.

### b.    Nothing Supports Defendants' Hindsight Addition Of Missing Limitations

Lacking support to argue that the claim limitations exist in the prior art, Defendants baldly posit that "sheer common sense" would lead a skilled artisan to add the missing claim limitations.  Br. at 38.  In so arguing, Defendants ask this Court to resolve a factual question on appeal: whether "common sense" would have taught a person of ordinary skill in the art to use the search query for collaborative filtering and combine content and collaborative data to filter items for relevance to a query.  *Id*.  Defendants contend that this Court can resolve this issue in the first instance because the jury was not asked to answer an interrogatory on this issue and "the district court did not answer this question any more than the jury did . . . ."  *Id.*  Defendants are incorrect.  Because Defendants never sought a special interrogatory on this factual issue, that issue is deemed to have been decided by the district court consistent with its judgment against Defendants, and this Court reviews that finding for clear error.  *See* Fed. R. Civ. P. 49(a)(3) & 52(a)(6); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 666 & n.12 (4th Cir. 1993).  Defendants do not come close to identifying any such error.

As this Court has observed, "the mere recitation of the words 'common sense' without any support adds nothing to the obviousness equation." *Plantronics, Inc. v. Aliph, Inc.*, --- F.3d ----, No. 2012-1355, 2013 WL 3927619, at *8 (Fed. Cir. July 31, 2013) (citations omitted). Thus, "obviousness findings grounded in 'common sense' must contain explicit and clear reasoning providing some rational underpinning why common sense compels a finding of obviousness." *Id.*

Here, Defendants have identified no evidence showing, or even intimating, that it would have been obvious as a matter of "common sense" to pluck the missing limitations out of thin air. Defendants make only two scant arguments, neither of which has any merit. First, Defendants point to a statement in the Patents-in-Suit that "conventional search engines initiate a search in response to an individual user's query and use content-based filtering to compare the query to accessed network informons . . . ." Br. at 38 (citing A206 at 2:15-18). But this discusses conventional "content-based filtering" in response to a query; it does not show or suggest using content and collaborative data together in filtering items for relevance to a query.

Second, Defendants cite a statement by their expert, Dr. Ungar, that "[i]f you ask a query of a search engine, you get a result, you just have the query sitting there with the result, why not use that also for filtering." A3172:24-A3173:7.

Such conclusory testimony—that certain subject matter is "there" so "why not" include it—cannot establish obviousness. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) ("obviousness [] cannot be sustained by mere conclusory statements").

Obviousness requires an explanation of "why," not a conclusory assertion of "why not." *See Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 774 (Fed. Cir. 1983) (rejecting "why not" argument as "nothing more than hindsight reconstructions" of the claimed invention). Thus, even if Dr. Ungar's conclusory testimony raised the issue of "common sense" at trial, the district court did not clearly err in rejecting that as a basis for obviousness.

Indeed, Dr. Ungar's testimony was most notable for what it did not address. Dr. Ungar did not testify that it would have been obvious to add the missing limitations as a matter of "common sense." Nor did he testify that it would have been obvious to a person of ordinary skill in the art to modify the references to filter for relevance to a query rather than for relevance to the user profile the systems were then using. Nor did he testify it would have been obvious to then filter items for relevance to the query using the ***combined*** collaborative and content-based analysis the jury found absent. Nor did he provide any reason to modify any of the cited references.

Where, as here, "[t]he record is devoid of any reason someone would combine [the] references," there is no basis for an obviousness finding. *Kinetic Concepts*, 688 F.3d at 1369. This Court must take care "not to allow hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention." *Id*. at 1368 (citations omitted). Indeed, where such reasoning is absent, "it is especially important to guard against the dangers of hindsight bias." *Plantronics,* 2013 WL 3927619, at *9.

Defendants improperly invite this Court to engage in such hindsight analysis, and answer "yes" to the question of whether "it <u>would</u> be obvious" to bridge the differences between the claims and the prior art. Br. at 38 (emphasis in original). But the question is not whether the invention "<u>would</u> be obvious," looking at the technology today in hindsight, but rather whether the invention "would <u>have been</u>" obvious to one of skill in the art in 1998, the time of the invention. 35 U.S.C. § 103 (emphasis added). Defendants cite no evidence that the claimed invention would have been obvious in 1998.

In 1998, the search-engine field was fledgling. Indeed, Google was not founded until 1998. A9088. In 1998, the existing systems were divided into two camps with ***conflicting*** goals: systems that "processed the query and provided immediate results based on the immediate needs of a user," A3689:9-13, and

"profile systems" that focused on "long-term information desires or preferences of that user . . . ." A3690:12-13. Given these divergent goals, it would not have been obvious to construct a tightly integrated search system that combined long-term information-need technology with filtering information for relevance to a specific query (an immediate information need). As Dr. Carbonell explained, one of skill in the art at the time would not have appreciated the advantages of "taking all of the different factors into account, especially the immediate information [need and] relevance to the query." A3739:15-18; *see also* A3727:13-A3763:13; A9041-A9045; A9069-A9086.

Moreover, as Dr. Carbonell explained, achieving the invention "required a skill that was not present by somebody of ordinary skill in the art" because such a person "certainly did not have the skill in all the different art that would have been required to perform the combination and to have invented the missing elements in the claims." A3740:16-25. Thus, "the technology at issue here is not the type of technology where common sense would provide the motivation to combine . . . ." *Kinetic Concepts*, 688 F.3d at 1369. In view of this overwhelming evidence of nonobviousness, Defendants' invocation of "common sense" and conclusory "why not" testimony falls far short of establishing obviousness.

### c.     Objective Considerations Support The Conclusion Of Nonobviousness

The jury also found that nearly every objective consideration of nonobviousness exists in this case.  Substantial evidence supports the jury's findings.

### i.     Commercial Success

There was substantial evidence of commercial success and of a nexus between this commercial success and the asserted claims.  A3741:20-A3742:5; A2756:11-20.  For example, the infringing technology increased Google's revenues by 20-40%.  A2756:11-20; A2664:2-9; A8840; *see* A8823-A8860.  Google itself referenced the infringing combination as the source of its high quality advertising results.  *See* A8140-A8141 (helps ensure system "works best for everybody [including] Google"); A8353 (same).  Google's engineer, Derek Leslie-Cook, testified that at least one of the filtering steps accused of infringement could not be removed from the Google system, despite his own efforts.  A4123, 131:7-17, 131:18-132:5; *see also* A8632-A8636.

### ii.     Long-Felt But Unmet Need

There was also substantial evidence of a long-felt but unmet need.  A3742:6-A3743:2.  The need was expressed and unfulfilled for nearly five years in references dated as early as 1994.  *Id*.; A5420 at 1:58-2:22; A5437-5440; *see In re*

*Dow Chem. Co.,* 837 F.2d 469, 473 (Fed. Cir. 1988) (nonobviousness based on five to six year long-felt need).

### iii.    <u>Unsuccessful Attempts By Others</u>

There was also substantial evidence of unsuccessful attempts by others to make the claimed invention.  A3743:7-14; A3742:9-18.  Defendants attempt to seize on the fact that the jury found this consideration supported nonobviousness for the '420 Patent but not the '664 Patent.  But the '664 Patent claims have fewer elements than the '420 Patent claims, and do not require the "scanning system" described in the '420 Patent.  Thus, the jury's answers are not necessarily inconsistent with each other.  Even if they were, Defendants waived their attempt to invoke Rule 49(b)(4) because they did not "object" to this alleged inconsistency "prior to the discharge of the jury."  *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 725 (4th Cir. 1999).  In any event, the jury's finding regarding the '420 Patent is supported by substantial evidence and should be sustained.  *See Wildewood*, 52 F.3d at 502.

### iv.    <u>Copying</u>

The jury heard evidence that Google knew of the '420 Patent, and that Google's system, once developed, incorporated all of the features of the asserted claims.  A2467:21-A2472:19 (system incorporated claim features); A2104:4-15 (Google's knowledge of '420 Patent); A8893 (same).  In contrast, Defendants

presented no evidence regarding how its technologies were developed, despite promising the jury it would do so.  A1995:15-17.

### v.    <u>Unexpected Results</u>

There also was substantial evidence of unexpected results flowing from the claimed inventions.  A3691:15-A3692:21; A3740:1-9.  Defendants' suggestion that I/P Engine's expert, Dr. Carbonell, had to use the word "unexpected" rather than "surprising" is without merit.  Br. at 42-43.  This Court has never required the incantation of particular words to establish nonobviousness.

### vi.    <u>Acceptance By Others</u>

There also was substantial evidence of acceptance of the claimed invention by others.  For example, other patentees, including Google, cited to Lang and Kosak's work and relied on concepts from that work in their own work.  A2105:24-A2106:12; A2104:4-15; A8893.

### vii.    <u>Independent Invention</u>

Defendants point to the jury's finding that, for the '664 Patent, there was independent invention by others.  Br. at 40-41.  But Defendants put forward no evidence of independent invention, and thus this finding is not supported by substantial evidence.  Regardless, this single finding, which is likely due to the later filing date (but not priority date) of the '664 Patent, cannot overcome the other overwhelming evidence of nonobviousness discussed above.

Defendants claim the jury should have also found independent invention of the '420 Patent because "neither party distinguished the two patents from each other for purposes of obviousness . . . ." *Id.* at 41. This argument, however, equally supports the opposite conclusion: that the jury should ***not*** have found independent invention for ***either*** of the patents. Nevertheless, I/P Engine presented evidence of differences between these patents. Dr. Frieder testified that the '420 Patent included additional claimed features not present in the '664 Patent. *See* A2455:8-A2456:8. Thus, the jury's findings are not inconsistent or unexplainable, and the evidence as a whole overwhelmingly supports the district court's conclusion that the asserted claims are not invalid for obviousness. *See* A39-40. This Court should affirm that decision.

### 2.     The District Court Also Properly Denied Defendants' JMOL Motion And Motion For New Trial Regarding Anticipation

In arguing anticipation, Defendants again ask this Court to provide no deference to the jury's verdict. Defendants claim that the "issue before the Court as to anticipation is limited to whether Culliss in fact discloses content analysis and filtering." Br. at 45. But that factual issue is not before this Court. The issue before this Court is whether the jury's verdict is supported by substantial evidence.

Moreover, the anticipation issue is not whether Culliss generally discloses "content analysis" and "filtering." The jury found on a special-verdict form that Culliss fails to disclose ***three*** separate claim limitations: limitations (b) and (d) of

Claims 10 and 25 of the '420 Patent, and limitation (c) of Claims 1 and 26 of the '664 Patent. A4170-72. Proving invalidity requires a comparison of the prior art to **every element** of the claims, not a comparison to what Defendants want this Court to believe is the "gist" or "thrust" of Lang and Kosak's invention. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1547-48 (Fed. Cir. 1983).

Furthermore, to anticipate, limitations disclosed in a reference must be "arranged or combined in the same way as recited in the claim." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). Claims cannot be "treated . . . as mere catalogs of separate parts, in disregard of the part-to-part relationships set forth in the claims and that give the claims their meaning . . . " *Id.* at 1370. Thus, while I/P Engine's technical experts referenced the claim limitations using short forms at times, they consistently tied their testimony to the actual claim language. *See, e.g.*, A2320:19-A2321:24 (infringement); A3710:11-13 (validity); A3719:19-A3721:3 (same); A3725:8-A3726:23 (same); *see also* A9046-A9068; A3709:12-A3727:10; A3779:20-A3788:2.

Building on the flawed premise that the prior art need only disclose "content analysis" generally, Defendants contend that Culliss anticipates because Culliss states that, during an initialization step, "scores can be initially set to correspond with the frequency of the term occurrence in the article." A5526 at 14:34-36. But Dr. Carbonell distinguished, from the perspective of one of skill in the art, and in

the context of the claims, initialization from operation, explaining that the "operation of the system is purely collaborative, pure profile, pure popularity-based system, and that's what governs." A3714:19-21.

Defendants claim that the content-based portions of the scores may remain during operation, even if "diluted to insignificance . . . ." Br. at 45. But, as Dr. Carbonell explained, Culliss contemplates "millions of people" selecting articles, resulting in "billions of click-throughs." A3714:8-14. The initialization scores are therefore immaterial to the operation of Culliss. A3714:16-21. Defendants claim that positive and negative feedback adjustments to the initial scores "can mostly cancel each other out" and that this may result in a "significant" role for the content score originating from the initialization step. Br. at 47. But Defendants cite no expert testimony or analysis to support this speculation, which is inconsistent with Culliss' stated goal of "organizing information by monitoring the *search activity* of users" and ranking articles based on users' selections. A5520 at 1:19-20 (emphasis added) & A5519, Fig. 1.

Moreover, even if Defendants were correct that content-based scores play some role during operation, Defendants fail to explain how this would satisfy any of the claim limitations the jury found absent. For example, Defendants fail to explain how a residual content score would establish, as a matter of law, that Culliss:

- is a "**content-based filter system**" that filters information "**on the basis of**" content data for relevance to a query (limitation (b) of Claims 10 and 25 of the '420 Patent);

- combines content data with collaborative data "**in filtering** each informon **for relevance to the query**," (limitation (d) of '420 Patent Claims 10 and 25); or

- combines such data "**for filtering**" for "**relevance**" to the "**query and [the] user**," (limitation (c) of '664 Patent Claims 1 and 26).

The claims require a "content-based filter system" that uses content data in a meaningful way, as the "basis of" the filtering, "in filtering" and/or "for filtering" for "relevance to the query." Defendants do not contend that Culliss discloses this. As Defendants' cited precedent confirms, "A claim is anticipated only if each and every element **as set forth in the claim** is found . . . ." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1988) (emphasis in original). Defendants turn a blind eye to the actual claim limitations found absent by the jury, while asking this Court to overturn the jury's verdict.

Defendants cite a chemical case, *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1345 (Fed. Cir. 2005), to argue that "even trace amounts of a claimed element in a prior-art reference suffices for anticipation." Br. at 45. But the existence of a "trace amount" of "content analysis" would hardly make Culliss

a disclosure of, for example, a "content-based filter system" that filters information "on the basis of" content data, as the claims require. *See Net MoneyIN,* 545 F.3d at 1371 (anticipation requires disclosure of all limitations "arranged or combined in the same way as recited in the claim").

Defendants also argue that Culliss discloses "filtering." But Culliss describes a system for ranking items, not filtering them, as required by the asserted claims. A5519, FIG. 1 (articles are "ranked by scores"). Both parties' experts agreed that "ranking" is ***not*** the same as "filtering." A3366:18-21; A3701:17-A3706:5.

In arguing that Culliss discloses "filtering," Defendants point exclusively to a particular "X-rated embodiment." Br. at 46-48. But that embodiment is separate from the embodiment in the specification that purportedly discloses content analysis. Moreover, as Dr. Carbonell explained, the "X-rated filtering" embodiment performs no ***content***-based filtering, as required by the claims, because it does not analyze the actual content of the item to determine if it is X-rated or G-rated. A3718:12-25. The scores are based entirely on user feedback. *Id.*

In an attempt to show content-based filtering in this embodiment, Defendants again point to the initialization stage described elsewhere in the specification and argue that the rating key terms could "initially" be associated

with the content of the article.  Br. at 47.  But that type of initialization (using the words of a document to populate the key terms in the rating table) cannot be used in the X-rated embodiment.  In the X-rated embodiment, the terms in the table are predetermined: they are "X-rated" and "G-rated."  A5525 at 11:9-15.  These predetermined key terms are not populated based on words found in a document, but are simply classifications.  *Id*.  The scores for "X-Rated" and "G-Rated" go up or down as users provide feedback regarding an article.  *Id*. at 11:47-51.  The system does not look to the content of the article to make this determination either at initialization or during operation.  *Id*. at 11:16-21,47-51.

Tellingly, even on direct examination, Defendants' expert, Dr. Ungar, could not explain how the X-rated embodiment of Culliss would analyze a document's content, saying that he did not want to "waste people's time" and that "people see it."  A3205:13-20 ("I'm not going to read them. I don't want to read it. People see it.").  Defendants' counsel then asked Dr. Ungar what portions of Culliss he was referring to, and he responded: "14:23-26, 11:47-51 and 12:1-15."  A3205:23-A3206:2.  But ***none*** of these portions describes how content analysis could be used in the X-rated embodiment.  Given its verdict, this was apparently quite clear to the jury.

Moreover, the X-rated embodiment cannot anticipate because it does not enable the claimed inventions.  As the jury was instructed, to anticipate, the prior

art must contain sufficient disclosure such that, "looking at that one reference [a] person [of skill in the art] could make and use the claimed invention." A3956:1-2; *see Elan Pharms. Inc., v. Mayo Found.*, 346 F.3d 1051, 1054 (Fed. Cir. 2003).

Here, as Dr. Carbonell explained, to the extent Culliss was attempting, via the X-rated embodiment, to come up with a way of rating items based on user feedback, the X-rated embodiment would not work. A3718:12-A3719:17. As Dr. Carbonell testified, the Culliss X-rated embodiment "rating system is absurd. It does not work. It does not provide what Culliss wishes." A3719:12-14.

For example, as Dr. Carbonell explained, the X-rated embodiment classifies an article, "A3," as "X-Rated," even though, as Culliss states, the article was "clearly of interest" to both a "G-Rated crowd" and an "X-Rated crowd." A5525 at 12:20-22. Dr. Carbonell opined that Culliss may have surmised that "just because the adults liked it, [] it must be X-rated." A3718:23-25. But, as Dr. Carbonell explained, adults can like all kinds of things that are not X-rated" such as "football" and "popcorn." A3719:1-7. That does not justify classifying football and popcorn as "X-rated." *Id.*

As Dr. Carbonell further explained, even if the X-rated embodiment worked as Culliss wished, it would require the "G-rated crowd" to view X-rated material "22 times prior to it being finally labeled X-rated." A3719:11. This is because, unlike Lang and Kosak's claimed inventions, Culliss' X-rated embodiment

CONFIDENTIAL MATERIAL DELETED

performs no content analysis of the articles—it relies *exclusively* on user feedback to categorize the articles. A3718:3-25. This Court should affirm the jury's verdict that the Patents-in-Suit are not invalid for anticipation.

**D.** **The Court Should Deny Defendants' Request For JMOL Of No Damages**

    **1.** **I/P Engine Submitted Substantial Evidence Of Post-Complaint Damages**

Defendants argue that I/P Engine failed to introduce "sufficient evidence" of damages from which the jury could calculate post-Complaint damages. Br. at 48. Defendants are incorrect. I/P Engine introduced evidence showing an overall apportioned royalty-base figure of approximately [      ] for the entire period of September 15, 2005 to September 30, 2012. A2686:20-A2687:13. I/P Engine's damages expert, Dr. Becker, applied a 3.5% royalty rate to this apportioned royalty base and testified that a reasonable royalty for this period would be approximately $493 million. A2698:25-A2700:17; A2702:11-21. Dr. Becker also testified with an accompanying exhibit regarding the reasonable-royalty damages by *quarter* throughout the full damages period, including the *post-Complaint* period:



 A9040; A2702:14-21 (explaining that PDX-83 "shows the amounts by quarter that you would have under a running royalty structure"). During closing arguments, after the district court had limited I/P Engine to post-Complaint damages, I/P Engine's counsel referenced the evidence and used a different version of the same demonstrative that emphasized the post-Complaint years:



A5562. I/P Engine's counsel explained that, as a result of the laches ruling, "the only royalties that are at issue here are the ones that are represented by the four bars on the far right." A3863:19-21.

Based on the evidence and Dr. Becker's presentation, which showed "amounts by quarter," the jury should have determined a royalty-damages award for the post-Complaint period of over $100 million. *See* A9040; A2702:14-21; A5562; A3863:19-24. The jury instead reached a figure of $30,496,155, which is not supported by the evidence. A4173. This award requires remand to correct it,

as I/P Engine explains in its Cross Appeal, not a mandate that I/P Engine take nothing.

Defendants argue that I/P Engine should have anticipated the district court's laches ruling and presented, in its case-in-chief, an alternative damages theory based solely on post-Complaint damages. Br. at 52. Defendants cite no precedent holding that a plaintiff is required to present alternative non-laches and laches damage theories to the jury to account for an equitable defense not yet decided by the district court, and that failing to do so is grounds for JMOL. Presenting alternative damages theories would have caused jury confusion. Moreover, laches is an affirmative defense on which Defendants bore the burden of proof. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039 (Fed. Cir. 1992) (en banc). I/P Engine was not required to anticipate this equitable defense in its case-in-chief and present an alternative damages theory based on laches.

Where laches is at issue, the common practice is for the jury to decide the damages due for the full damages period. *See, e.g.*, *Humanscale Corp. v. CompX Int'l Inc.*, No. 3:09-CV-86, 2010 WL 3222411, at *18-19 (E.D. Va. Aug. 16, 2010) (jury verdict covered damages period beginning six years prior to filing; court then denied laches). A9122-A9124. If the district court finds that laches applies, it then reduces the jury's damage award to reflect just the post-Complaint damages. *See, e.g., Amado v. Microsoft Corp.*, No. SACV 03-242, 2008 WL 8641264 at *1

(C.D. Cal. Dec. 4, 2008).  A9090-A9091.  Thus, I/P Engine was understandably surprised by the district court's laches ruling.  Indeed, the district court later admitted that it had mistakenly believed that Defendants had moved for JMOL on laches, when actually Defendants had "made no such . . . motion."  A41.

After the district court's ruling, I/P Engine explicitly sought the district court's guidance regarding how to proceed in view of the new damages period.  A3818:19-21.  I/P Engine observed that a specific damages number for the shortened period had not been separately explained to the jury.  A3817:11-A3818:21.  Nonetheless, the district court prohibited the parties from mentioning the damages numbers that applied to the shortened damages period.  A3818:22-24.  I/P Engine should not be stripped of *all* damages for Defendants' adjudged infringement of valid patents because of the ill-timed and prejudicial implementation of the district court's laches decision.  I/P Engine is entitled to no less than a reasonable royalty.  *See* 35 U.S.C. § 284.

Defendants cite *Weisgram v. Marley Co.*, 528 U.S. 440 (2000), but *Weisgram* is not a damages case and does not apply to the facts of this case.  Br. at 51-52.  In *Weisgram*, the Supreme Court upheld the Eighth Circuit's decision to enter judgment rather than remand for retrial because Plaintiff had rested its entire case on speculative expert testimony inconsistent with *Daubert* and there was *no evidence*, expert or otherwise, sufficient to support any liability

verdict. 528 U.S. at 456. Here, in contrast, there is substantial evidence of liability, and Dr. Becker's testimony fully adhered to *Daubert* and was strongly supported by considerable evidence.

### 2.   The District Court Did Not Abuse Its Discretion In Declining To Exclude Dr. Becker's Testimony

#### a.   Dr. Becker Properly Apportioned The Royalty Base

Defendants contend that the district court should have excluded I/P Engine's expert's testimony under *Daubert*. Defendants argue that I/P Engine's expert, Dr. Becker, "mis-apportioned" the royalty base. Br. at 53. Implicit in Defendants' argument is a concession: Dr. Becker *did* apportion the royalty base.

Defendants complain, however, that Dr. Becker relied on a "draft" Google document that shows the impact on revenue of various aspects of SmartAds, which is just one part of the larger Accused System. Br. at 55; *see* A8218-A8285. With no citation or support, Defendants argue that "manual measuring of bars in a draft chart with a ruler was not a valid economic technique." Br. at 55. This unsupported attack, however, goes to the weight to be given to the document and the testimony regarding it. Regardless, as discussed below, this document was not the sole basis for Dr. Becker's analysis. Moreover, Defendants proffered no evidence that this document was unreliable, though it is Google's own document. Nor did Defendants present a later or final version of this Google document at trial.

Furthermore, much of the data in the document reported actual past data. A3574:9-A3575:7; A5559; A8255.

Defendants argue that Dr. Becker's apportionment overstates the royalty base because "he failed to apportion out the value of . . . non-accused SmartAds technologies or their contribution to Defendants' revenues." Br. at 55. But Dr. Becker used Google's own document in which *Google* attributed a 20.9% increase in revenue to the accused SmartAds feature. A2764:19-A2765:15; A5559. I/P Engine did not "include revenue attributable to the *entire system* in the royalty base," as Defendants suggest. Br. at 53 (emphasis added).

Dr. Becker then used the 20.9% apportionment as the base to calculate royalties. A2656:24-A2661:20. As the district court summarized, I/P Engine introduced expert testimony that "the infringing components of the SmartAds system added 20.9% to Google's U.S. AdWords revenue and additional evidence is in the record to support this position." A7912. Thus, I/P Engine's 20.9% apportioned royalty base reflects the direct value that the infringing functionalities added to the pre-existing revenue stream. *See also* A2656:21-A2673:9 (Becker testimony discussing Google documents supporting 20.9% apportionment); A8145 ("turn[ing] on" functionality resulted in "immediate 20% gain in revenue"); A8144 (turning off functionality results in "double digit percentages" impact on revenue);

A8861 (functionality is "mission critical component to the overall Google revenue stream"); A8432 ("high impact on Google's revenue").

Moreover, I/P Engine was not required to "apportion out" every inseparable non-patented aspect of SmartAds in determining the royalty base. This Court permits royalties to be based on the "smallest salable patent-practicing unit," regardless of whether that unit also includes some inseparable sub-component purportedly not covered by the patents. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (royalty base was optical disc drive, even though optical disc drive included unpatented features). Here, the only revenue stream associated with the Accused System is the advertising revenue for advertisements served using the entire Accused System. Thus, the Accused System is the smallest salable patent-practicing unit, even if it includes non-patented features. Nevertheless, as set forth above, Dr. Becker did ***not*** apply the 3.5% royalty rate to the Accused System's total revenue. He applied this rate to the 20.9% apportionment attributed by ***Google*** to the accused SmartAds feature, which is only one part of the Accused System. A2656:24-A2661:20.

Defendants incorrectly claim that "Dr. Becker testified that he attempted to account for his overly broad royalty base, *i.e.*, all of Smart Ads' revenue, by adjusting his royalty rate down." Br. at 56. Dr. Becker's testimony was precisely the opposite. A2772:24-A2773:3 (rejecting this contention at trial). Defendants

quote Dr. Becker's testimony that he recognized that there were other things "that Google contributed, and that's why we're talking about a 3 and a half percent royalty . . . ." Br. at 56 (quoting A2773:9-13). But this testimony was relevant to *Georgia Pacific* factor 13, which reads "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements . . . ." *Georgia-Pacific Corp. v. U.S. Plywood Corp.,* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Thus, Dr. Becker properly applied the *Georgia Pacific* factors. He did not set or adjust his royalty rate due to any concern about an improper or over-inclusive royalty base. Accordingly, Defendants' comparisons to *LaserDynamics*, 694 F.3d at 67, and *Uniloc*, 632 F.3d at 1318-19, are misplaced.

### b. Dr. Becker Relied On Comparable Licenses And Did Not Ignore Real-World Transactions

Defendants also argue that Dr. Becker relied on "non-comparable" licenses, pointing to the Overture licenses. Br. at 57. But the evidence supports the opposite conclusion. First, Google licensed the technology of the Overture licenses relied on by Dr. Becker. A2694:4-8. Second, Dr. Frieder, I/P Engine's technical expert, testified that the '361 Patent, which is the subject of the Overture licenses, is a comparable technology. A2483:17-23; *see also* A8364-A8393. Dr. Becker properly relied on Dr. Frieder's technical opinions regarding comparability. A2778:20-A2779:5. Dr. Becker also considered the differences between the

negotiating positions of Lycos and Google, as compared to the Overture licensees. A3504:17-23; A2745:22-A2747:7; A2786:21-A2787:2.

Defendants contend that Dr. Becker ignored the Lycos transaction with I/P Engine in 2011. Br. at 57, 59. That is incorrect. Dr. Becker considered this transaction and Defendants cross-examined him at length regarding this transaction. A2779:6-23; *see also* A2708:12-A2709:3; A2716:8-24; A2722:12-A2723:13. Dr. Becker explained that the parties to the transaction did not know of Defendants' infringement nor of the "extent of use of it or the value that Google obtained." A2779:17-23. Moreover, this 2011 transaction was not in the relevant time period of the hypothetical negotiation—March 2004. A2706:19-24.

Dr. Becker also addressed Daum Communications' purchase of Lycos, explaining that, at the time of the hypothetical negotiation, the actual value of the license would have been unknown. A2720:15-21. Defendants cross-examined Dr. Becker at length regarding this transaction. A2717:13-A2720:21. As Defendants' own precedent confirms, the sale price of a company is merely one of "numerous factors" to be considered. *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003), *vacated on other grounds*, 545 U.S. 193 (2005).

Dr. Becker further considered all of the other licenses that Defendants identify in their Brief, and identified the evidence he believed to be most relevant to the hypothetical negotiation. *See, e.g.,* A2689:11-A2693:6; A2779:6-A2780:6;

A2784:2-17; *see also* A9010-A9040; A2616-A2675; A2680:11-A2681:2; A2684:20-A2789:20. Dr. Becker also addressed the advantages to a running royalty over a lump sum royalty in the hypothetical negotiation. A2626:13-21; A2699:3-17; *see also* A3538:14-19 (Lycos preferred a running royalty); A3539:7-A3540:17 (Google had no licensing policy). The jury was entitled to credit Dr. Becker's testimony over Dr. Ugone's. *Power-One*, 599 F.3d at 1351. Thus, Defendants' objections go to the weight of the evidence—exactly what the district court found in correctly declining to exclude Dr. Becker's testimony. A37-38.

### 3.    <u>A New Trial On All Liability Issues Is Not Necessary Or Proper</u>

Finally, Defendants argue that, should this Court order a new trial on damages, that trial must encompass all liability issues. Br. at 62-63. Defendants cite *Gasoline Prods. Co. v. Champlin Ref. Co.*, 283 U.S. 494, 500 (1931), but that case only precludes two juries from deciding the same essential issues. *See In re Innotron Diagnostics*, 800 F.2d 1077, 1086 (Fed. Cir. 1986). It is settled law that "district courts, in their discretion, may bifurcate . . . damages issues from liability issues in any given case." *Robert Bosch, LLC v. Pylon Mfg. Corp.*, 719 F.3d 1305, 1319 (Fed. Cir. 2013) (en banc). This Court has also repeatedly remanded cases for new trials regarding damages alone. *See, e.g., LaserDynamics*, 694 F.3d at 81-82; *see also Rice v. Cmty. Health Ass'n*, 203 F.3d 283, 290 (4th Cir. 2000).

Defendants contend that a limited trial on damages is forbidden because, when deciding damages, the jury would need to consider the existence of acceptable non-infringing alternatives. Br. at 63. But that is not the same essential issue as infringement. Defendants argue further that a damages determination would need to consider the "extent of Defendants' alleged infringement." *Id*. But even where an issue "look[s] at the merits of noninfringement," that issue is not the same essential issue as infringement. *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1372 (Fed. Cir. 2013) (separate juries may consider infringement and willfulness). Moreover, as discussed in I/P Engine's Cross Appeal, because substantial evidence supports the jury's selection of a running royalty and a reasonable-royalty rate of 3.5%, any remand should be limited to applying the adjudged royalty rate to a royalty base supported by the evidence of record. Defendants identify no overlap between the issues of infringement and the size of the royalty base.

## VI. <u>CONCLUSION</u>

This Court should affirm the district court's denial of Defendants' motions for JMOL and a new trial on liability, and reject Defendants' request for JMOL of no damages.

## CROSS APPEAL

## VII. <u>SUMMARY OF THE ARGUMENT</u>

I.  This Court should overturn the district court's laches ruling.  The district court erred in holding that a single sentence in a single 2005 blog post by Google regarding its proprietary AdWords system established constructive knowledge of infringement as of the day of the posting.  While constructive knowledge may be established by a defendant's infringement activities, those activities must be "pervasive, open and notorious."  Here, the alleged activities were not "pervasive, open and notorious," and the district court made no findings to support such a conclusion.

The district court's laches decision, if upheld, would impose on all owners of over a million-and-a-half patents a new and onerous burden to continuously monitor the Internet for any and all public activities, posts, and discussions relating to potential infringers, and then to investigate any information that might suggest possible infringement.

Moreover, after incorrectly imposing constructive knowledge to find a six-year delay and thus a presumption of laches, the district court erred in precluding I/P Engine from putting forward any further evidence to rebut the presumption of laches, and, contrary to precedent, placed the burden of proof on I/P Engine to rebut the presumption by a preponderance of evidence.

II. Even if laches were to apply, this Court should remand this case for a determination of total damages based on applying the adjudged royalty rate of 3.5% to the post-Complaint royalty base. While substantial evidence supports the jury's finding of a 3.5% running royalty-rate, the jury returned a verdict that does not reflect a reasonable base to which that rate could have been applied.

## VIII. ARGUMENT

### A. This Court Should Overturn The District Court's Laches Ruling

This Court reviews a laches ruling for an abuse of discretion, an erroneous interpretation of the law or a clearly erroneous factual underpinning. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039 (Fed. Cir. 1992) (en banc). Here, the district court erred in charging I/P Engine with constructive knowledge of infringement, and erred in implementing the laches presumption.

#### 1. The District Court Erred In Charging I/P Engine With Constructive Knowledge

The district court erred in holding that a single sentence[2] in a single 2005 blog post by Google regarding its proprietary AdWords system established constructive knowledge of infringement as of the day of the posting. A48-51.

---

[2]    The sentence was "The Quality Score is simply a new name for the predicted CTR, which is determined based on the CTR of your keyword, the relevance of your ad text, the historical keyword performance, and other relevancy facts." A5127.

Constructive knowledge may be established where facts "already known" to a plaintiff establish a duty to inquire. *See Wanlass v. General Elec. Co.*, 148 F.3d 1334, 1338 (Fed. Cir. 1998). But nothing of record suggests any "facts already known" to Lycos, the patentee at the time, that could or should have spurred it to inquire into Google's activities. *Id.* Nor did the district court identify any such facts. Defendants presented no evidence that Lycos even knew of the AdWords Blog, let alone the particular post on that blog, or had any reason to know of its existence.

Constructive knowledge may also be established by "pervasive, open, and notorious activities" that "a reasonable patentee would suspect were infringing." *Id.* But there was no evidence that the blog post was "pervasive, open and notorious." "Pervasive" means to be diffused throughout. *Merriam-Webster's Collegiate Dictionary* 868 (10th ed. 1993). As set forth in this Court's precedent, pervasive means the information is distributed throughout the industry via marketing campaigns and/or trade shows. *See Hall v. Aqua Queen Mfg.*, 93 F.3d 1548, 1553 (Fed. Cir. 1996). Here, the district court identified no facts to suggest the blog post was pervasive. A48-51. Google presented no evidence that anyone ever visited or viewed the blog post. Although the blog post invites visitors to "Post a Comment," the blog post itself records "0 Comments." A5127.

"Notorious" means to be widely known. *Merriam Webster's Collegiate Dictionary* 795 (10th ed. 1993). Defendants put forward no evidence that the blog in general, let alone the posting at issue, was widely known at the time. A mere blog post is far less conspicuous than activities this Court has previously held did ***not*** establish constructive knowledge. *See Hall*, 93 F.3d at 1555-56 (defendant displayed accused products at trade shows and met with the plaintiff at trade shows); *see also Intirtool, Ltd. v. Texar Corp.*, 369 F.3d 1289, 1297 (Fed. Cir. 2004) (communication by defendant to patentee suggesting defendant would continue selling patented product but purchase it from another vendor).

As for openness, as the district court found, "Google considered its technology a trade secret and did not disclose its technical details . . . ." A54. It should be axiomatic that infringement is not open if it is undisclosed and closely guarded as a trade secret. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997) (no constructive knowledge because of the defendant's "policy of maintaining the secrecy of" the alleged infringement); *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1571 (Fed. Cir. 1988) (no laches where defendant "deliberately sought to conceal its process"). Google's Director of Product Management described the blog post as a "high level" description of AdWords (A2936:23-A2937:3) and the blog post by itself

disclosed no details to enable determining whether AdWords satisfies all of the claim limitations of the Patents-in-Suit.  *See* A5127.

Indeed, in their Appeal, Defendants strenuously argue that only Google's source code "defines and dictates the actual operation of a computer system," and that Google's other documents are "not probative of how the accused systems actually work . . . ."  Br. at 13, 28; *see Wanless v. Fedders Corp.*, 145 F.3d 1461, 1467 (Fed. Cir. 1998) ("*Wanless II*") (infringement not "open and notorious" where "infringement could not be determined without purchasing the accused [product], dismantling it, and testing the motor inside").

Moreover, even if Lycos had known of the blog post, and if the contents of the blog post had somehow created a duty of inquiry, Lycos could only be "chargeable with such knowledge as [it] might have obtained upon inquiry . . . ."  *Wanless*, 148 F.3d at 1338.  No evidence exists of any additional information that would have been available upon inquiry.  Though unrelated to the blog or any concerns regarding infringement, Lycos tried twice to find out from Google how AdWords worked, but without success.  A2205:17-24; *see Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1350 (Fed. Cir. 2009) (no constructive knowledge where "[w]ithout access to [defendant's] internal procedures, [plaintiff] could not have investigated [defendant's] methods to determine infringement").

In holding the 2005 Google blog post by itself established constructive knowledge, the district court relied heavily on the following statement in *Wanlass*:

> [S]ales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities, give rise to a duty to investigate whether there is infringement.

A49.   The district court found that the blog post was the "kind of marketing document" *Wanlass* "cited as putting a patentee on notice of possible infringement." A50.

But even if a blog post that lists questions and answers for existing advertisers, which did not include Lycos at the time, were the kind of "marketing" document contemplated by *Wanlass*, that case does not hold that constructive knowledge is established by the mere existence of a single document found somewhere on the Internet.   To the contrary, *Wanlass* quotes *Hall* and confirms that advertising or other relevant activities must be "pervasive, open and notorious."    *Wanlass*, 148 F.3d at 1338 (quoting *Hall*, 93 F.3d at 1553). Defendants provided no evidence to support the conclusion that the blog post was "pervasive, open and notorious."

Further, in *Wanlass,* unlike here, the facts strongly supported the conclusion that the plaintiff knew of infringement.   In *Wanlass*, the plaintiff had offered the defendant a license and the defendant had refused, responding that the patent was invalid and that it would continue to use the products.   148 F.3d at 1340.   In

addition, in *Wanlass*, this Court also identified other evidence showing "actual knowledge" of infringement. *Id*. at 1339 n.\*\*\*. No such evidence exists in this case.

The district court also relied on the statement in *Wanlass* that constructive knowledge may be established by "sales, marketing, publication, public use, or other conspicuous activities of potential infringement if these activities are sufficiently prevalent in the inventor's field of endeavor." *Wanlass*, 148 F.3d at 1338; *see* A50. The district court wrote that "Google's publication of information concerning new advances in their search and ad serving technologies is the kind of 'prevalent' activity in the field of Lang and Kosak's inventions that Lycos should have been aware of in determining whether to enforce their patents." A50 (quoting *Wanlass*, 148 F.3d at 1338). But there is no evidence of record that, in 2005, the blog post was "sufficiently prevalent" in any field. And it is undisputed that Lycos was not part of the intended audience for the AdWords blog, which was directed to pre-existing advertisers using AdWords.

Finally, as this Court has held, any duty of diligence imposed on a patentee to avoid laches must be "feasible and affordable and otherwise a reasonable burden to impose on the patentee." *Wanlass II*, 145 F.3d at 1465. The burden imposed by the district court here far exceeds what is feasible, affordable, and reasonable. Even in a particular field of endeavor, there is generally a vast amount of

information available on the Internet.  In charging Lycos with constructive knowledge, the district court provided no indication of what, if any, monitoring Lycos should or could have conducted to satisfy any burden of diligence.  The district court did not state whether Lycos should have examined the entire contents of every page on every potentially relevant website, every month, week or day.  A48-51.

Instead, the district court imposed constructive knowledge—effective the same day the blog post appeared on Google's website.  A51.  The district court then relied on that legally imposed knowledge on the day of the posting to find a delay of precisely six years, one month and twenty-eight days, narrowly establishing a presumption of laches.  *Id*.  That ruling imposes a legally untenable and unfair burden.  Under the district court's approach, the day information is first made available on the Internet is the day the laches clock starts running.  *See Intirtool*, 369 F.3d at 1298 (rejecting a "burden of policing" because this Court was "unwilling to stretch the concept of due diligence so far").

### 2.     The District Court Committed Legal Error In Implementing The Laches Presumption Contrary To *A.C. Aukerman*

Even if a presumption of laches were established by constructive knowledge, that presumption is a burstable "bubble" that is eliminated if the patentee offers a "minimum quantum of evidence" showing either that the delay was reasonable or that the defendant was not prejudiced because of the delay.  *A.C. Aukerman*, 960

F.2d at 1037. If the bubble is burst, the presumption "completely vanishes . . . ." *Id*. Importantly, "at all times, the defendant bears the ultimate burden of persuasion of the affirmative defense of laches." *Id*. at 1038.

Here, the district court failed to apply the proper standard and to provide I/P Engine the opportunity, in its rebuttal case, to put forward any further evidence before it made its laches ruling. After Defendants presented their case-in-chief, I/P Engine moved for JMOL on Defendants' affirmative defense of laches. A3630:22-A3632:14. The next morning, before I/P Engine's rebuttal case, the district court ruled that laches applied. A3655:14-A3661:25. Before the district court ruled, however, the district court should have provided I/P Engine the opportunity to respond to laches in its rebuttal case. But when I/P Engine asked for the opportunity to put forth rebuttal evidence, the district court refused. A3721:18-A3723:19; A3789:22-A3800:12.

In its written opinion after trial, the district court acknowledged that it had mistakenly believed that Defendants had moved for JMOL on laches, when Defendants actually "made no such . . . motion." A41. The district court nonetheless upheld its laches ruling by finding that I/P Engine's Rule 50(a) motion had been "inappropriate" because laches is a defense to be decided by the district court. *Id*. The district court held that this justified construing I/P Engine's motion as a motion for partial findings pursuant to Rule 52(c). *Id*. The district court

-77-

summarized: "[B]y making their inappropriate Rule 50(a) motion, the Court determined that Plaintiff had placed into evidence all relevant materials regarding laches . . . ." A41-42.

That was error. If I/P Engine's Rule 50(a) motion was not appropriate, the district court should have denied it, not found laches against I/P Engine on an incomplete record. Moreover, that I/P Engine filed a Rule 50(a) motion did not mean that I/P Engine believed the record was complete. To the contrary, I/P Engine was clear that its motion was "a Rule 50 motion with regard to the *case that defendants have submitted* . . . ." A3626:12-14 (emphasis added).

The district court's failure to adhere to the proper procedure and allocation of burdens is also reflected in the district court's written opinion. *See* A45. There, rather than simply require I/P Engine to burst the presumption, the district court incorrectly placed on I/P Engine the burden to *prove* a lack of prejudice by a *preponderance* of the evidence. *Id.* The district court wrote:

> Once this presumption is met, the patentee bears the burden of rebutting both elements of laches by a *preponderance of the evidence* by showing that their delay was reasonable and/or by showing a lack of prejudice as a result of any unreasonable delay.

*Id.* (emphasis added).

The district court's error is strikingly similar to the error this Court reversed *en banc* in *A.C. Aukerman,* 960 F.2d at 1039. In *A.C. Aukerman*, the district court

placed the "burden" on the patentee "of showing [that its] delay was not unreasonable and inexcusable." *Id*. This Court reversed, holding that "[t]his was a greater burden than the patentee had to bear to overcome the presumption." *Id.* Similarly, here, the district court improperly relied on the presumption of laches to place the burden of proof on I/P Engine, requiring I/P Engine to prove the absence of laches "by a preponderance of the evidence." A45. Yet, the district court never allowed I/P Engine to present such evidence and be "fully heard," as required by Rule 52(c).

Even without I/P Engine being afforded the opportunity to present rebuttal evidence, there was more than enough evidence already in the trial record to burst the bubble of any laches presumption. Google identified no economic prejudice. A53 n.13. As for evidentiary prejudice, there was far more than a minimum quantum of evidence showing Defendants were not prejudiced because of any alleged delay. This is *not* a case where the inventors are deceased, documents have been destroyed, or evidence is unavailable. I/P Engine made both inventors available for deposition and at trial, both inventors provided extensive testimony about their patented inventions and numerous other issues, and Defendants cross-examined them at length. *See* A2059:19-A2106:12; A2108:3-A2161:25; A2162:17-A2185:24; A2186:10-A2206:7. The inventors' testimony in this case consisted of over 100 pages of trial testimony. *See* A2059:19-A2206:7; A5811;

*see also* A5804-A5813.  Lycos and the inventors also produced all of the relevant documents in their possession, some of which became trial exhibits.  *See, e.g.,* A8357-A8363; A2093:1-5; A8394-A8412; A2069:24-A2070:4.  Having provided both inventors for deposition and at trial, and having produced relevant documents, there was much more than the "minimum quantum of evidence" necessary to "burst" any presumption of evidentiary prejudice.  The district court erred in holding that laches applied.

## B.    The District Court Erred In Denying I/P Engine's Motion For A New Trial On Past Damages

Even if this Court were to uphold the laches decision, as demonstrated above, the jury's damages award of $30,496,155 is not supported by the record, which necessitates a remand, not a take-nothing damages award for Defendants' adjudged infringement.  *See supra* at 59-60.  The scope of the remand can and should be limited to determining the post-Complaint royalty base, because the jury's responses in the special-verdict form localize the error.  *See Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1485 (Fed. Cir. 1997) (a "special verdict enables errors to be localized so that the sound portions of the verdict may be saved").

Using a special-verdict form, the jury found that a reasonable royalty should be a "running royalty," rather than the "lump sum royalty" proposed by Defendants.  A4173 (Answer to Question III.A).  The jury also answered the

question about the running royalty rate, finding it should be "3.5%." *Id.* (Answer to Question III.B). Both of those answers are supported by substantial evidence. *See, e.g.,* A2638:24-A2653:1; A2687:24-A2700:7. Thus, I/P Engine does not challenge these findings, and they should not be disturbed. *See Richardson-Vicks Inc.*, 122 F.3d at 1484-85.

I/P Engine challenges only the total damages award. As discussed in response to Defendants' Appeal, the jury could have arrived at a correct royalty-base figure based on the evidence and argument at trial. *See supra* at 59-60. That royalty-base figure, however, would have resulted in damages greater than the $30,496,155 awarded. *Id.* Because the jury agreed with I/P Engine's expert, Dr. Becker, regarding a running royalty and the royalty rate, Dr. Becker's evidence was the only evidence on which the jury could have relied to reach its total damages award, as Defendants only presented a lump-sum damages award. A3602:19-20. Under Dr. Becker's evidence and testimony, using a correct royalty base, the jury should have determined a royalty-damages award for the post-Complaint period of over $100 million. A2702:14-24; A9040; A5562; A3863:19-21. Because the $30,496,155 figure is not supported by the evidence, this Court should order a remand limited to applying the adjudged royalty rate to a supportable royalty base in the relevant time period.

# IX.  **CONCLUSION**

For the reasons discussed in this Cross Appeal, this Court should reverse the district court's laches ruling and remand for a determination of damages applying the adjudged royalty rate of 3.5% to the entire damages period.  If laches applies, this Court should order a remand limited to applying the 3.5% royalty rate to a supportable royalty base for the post-Complaint period.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated: September 25, 2013          By: /s/ Joseph R. Re
                                        Joseph R. Re

*Attorney for Plaintiff-Cross Appellant*
 I/P ENGINE, INC.

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i).  This brief contains 16,485 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This Brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14 point font New Times Roman.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: September 25, 2013          By: /s/ Joseph R. Re
                                             Joseph R. Re

*Attorney for Plaintiff-Cross Appellant*
 I/P ENGINE, INC.

# ADDENDUM

# TABLE TO ADDENDUM

1.  November 20, 2012 Memorandum Opinion and Order
    (Docket No. 800) ...................................................................... A41

2.  January 31, 2013 Order on Plaintiff's Motion for
    Judgment under Rule 52(b) and a New Trial (Docket
    No. 884) .................................................................................... A59

3.  April 2, 2013 Order on Plaintiff's Motion for a New
    Trial on the Dollar Amount of Past Damages (Docket
    No. 908) .................................................................................... A66

4.  November 6, 2012 Verdict Form (Docket No. 789) ........................... A4167

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

NOV 20 2012

CLERK, US DISTRICT COURT
NORFOLK. VA

I/P ENGINE, INC.,

        Plaintiff,

V.

                                CIVIL ACTION NO. 2:11cv512

AOL INC., *et al.*,

        Defendants.

## *MEMORANDUM OPINION AND ORDER*

Before the Court is the issue of whether the equitable defense of laches should apply in this case. The Court initially styled its ruling from the bench as a response to a renewed motion for a Judgment as a Matter of Law on Laches from the Defendants. However, in reviewing the trial transcript, the Court notes that Defendants made no such Rule 50(a) motion regarding laches. The Plaintiff, however, did make a Rule 50(a) motion regarding laches and provided argument on the matter. Furthermore, Defendants responded to this motion and proffered additional evidence for the Court's consideration, which Plaintiff received and had an opportunity to respond to, but did not. Creating additional confusions is the fact that because laches is an equitable defense to be resolved as to both fact and law by the Court, a Rule 50(a) motion is inappropriate from either party. In the end, however, the Court will not place form over substance, particularly when all parties have been given a fair opportunity to litigate on the issue. Accordingly, the Court construes Plaintiff's Rule 50(a) Motion for Judgment as a Matter of Law on Laches as a Motion for Partial Findings pursuant to Rule 52(c). By making their inappropriate Rule 50(a) Motion, the Court determined that Plaintiff had placed into evidence all

relevant materials regarding laches, a determination that was only questioned by Plaintiff after the Court provided its initial ruling against them on laches from the bench on October 31, 2012. Even when given an opportunity to proffer additional evidence with the benefit of consideration of the Court's ruling on the matter, the Plaintiff put forward a proffer that contains information already in the record or that is irrelevant in light of relevant case law.

Therefore, having taking evidence on laches concurrently with the jury trial on infringement, invalidity, and damages and after thoroughly reviewing the evidence, arguments (including those made on summary judgment), and record in this case, as well as considering Rule 52's advisory committee's notes, which "authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence," the Court found that this case was ripe for decision and ruled from the bench on the issue of laches. As the Court indicated when it ruled on laches, it reserved the right to further elaborate on its decision in a written opinion. For the reasons stated herein and on the record, the Court finds that the doctrine of laches should apply to all defendants in this case.

## I.      The Equitable Doctrine of Laches

The Patent Act does not provide a statute of limitations for infringement claims. However, it is well-established law that the equitable doctrine of laches may bar a patentee's recovery of pre-filing damages where (1) the patentee knew of his claim, but unreasonably delayed in filing suit and (2) that delay caused material prejudice to the alleged infringer. *See Hair v. United States*, 350 F.3d 1253, 1257 (Fed. Cir. 2003) ("Even without a specific statutory bar to call into play, courts will impose a parallel bar—under the rubric of laches—in cases in which the plaintiff has failed to act in a reasonably prudent manner to protect and enforce rights,

2

**A42**

and when a perceived injustice to the defendant exists."). With respect to the first requirement –
knowledge of infringement coupled with unreasonable delay in pursing claims against said
infringement – The Federal Circuit has held that "[t]he length of time which may be deemed
unreasonable has no fixed boundaries but rather depends on the circumstances." *A. C. Aukerman
Co. v. R. L. Chaides Constr. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992). Furthermore, "[t]he
period of delay is measured from the time the plaintiff knew or reasonably should have known of
the defendant's alleged infringing activities to the date of suit. However, the period does not
begin prior to issuance of the patent." *Id.* (citations omitted). Put another way, "[t]he period of
delay begins at the time the patentee has actual or *constructive knowledge* of the defendant's
potentially infringing activities." *Wanlass v. GE*, 148 F.3d 1334, 1337 (Fed. Cir. 1998)
(emphasis added).

 With respect to constructive knowledge, the Federal Circuit charges a patentee "with
making the inquiry that a diligent and reasonably prudent patentee would make to determine
whether another device infringes his patent." *Odetics, Inc. v. Storage Tech. Corp.*, 919 F. Supp.
911, 917 (E.D. Va. 1996) (citing *Jamesbury v. Litton Industrial Products*, Inc., 839 F.2d 1544,
1552 (Fed. Cir.), cert. denied, 488 U.S. 828 (1988)). Moreover, the Supreme Court holds that
"the plaintiff is chargeable with such knowledge as he might have obtained upon inquiry,
provided the facts already known by him were such as to put upon a man of ordinary intelligence
the duty of inquiry." *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370 (U.S. 1893). With
respect to the question of when a patentee has a duty to make inquiries as to whether its patents
are being infringed, the Court finds the standard laid out in *Odetics* to be persuasive and
applicable in this case:

3

**A43**

> If a patentee knows of the existence of a product or device that (i) embodies technology similar to that for which he holds a patent and (ii) uses that similar technology to accomplish a similar objective, he has a duty to examine the product or device more closely to ascertain whether it infringes his patent. If he shirks this duty, he does so on peril of triggering the laches period and perhaps ultimately losing his right to recover damages for the infringement.

*Odetics*, 919 F. Supp. at 918. The Federal Circuit has further elaborated on the circumstances that necessitate inquiry by a patentee as to whether infringement is occurring: "[t]hese circumstances include "pervasive, open, and notorious activities" that a reasonable patentee would suspect were infringing." *Wanlass*, 148 F.3d at 1338 (quoting *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1553 (Fed. Cir. 1996). As indicated by the Federal Circuit, "sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities" certainly create a duty to investigate whether infringement of one's patents is occurring. *Id.* (internal citations omitted). Additionally, even if a patentee is not actually aware of these activities, "constructive knowledge of the infringement may be imputed to the patentee... if these activities are sufficiently prevalent in the inventor's field of endeavor." *Id. See also, Wollensak v. Reiher*, 115 U.S. 96, 99 (1885) ([T]he law imputes knowledge when opportunity and interest, combined with reasonable care, would necessarily impart it. Not to improve such opportunity, under the stimulus of self-interest, with reasonable diligence, constitutes laches which in equity disables the party who seeks to revive a right which he has allowed to lie unclaimed from enforcing it, to the detriment of those who have, in consequence, been led to act as though it were abandoned").

It is also widely accepted law that a presumption of laches arises if there is a delay of six years or more once a party has actual or constructive notice of possible infringement of their patents:

4

**A44**

> The presumption of laches arising from a more than six-year delay in filing suit is consonant with the mainstream of the law. The length of the time period--six years--is reasonable compared to the presumptions respecting laches in other situations, which may be as short as one year. Also the presumption provides a yardstick for reaching comparable results in comparable circumstances rather than leaving the matter without any guidelines to a district court's exercise of discretion. In any event, this court adopted a laches presumption seven years ago in *Leinoff*, 726 F.2d at 741-42, 220 USPQ at 850, agreeing with our sister circuits that the presumption represents an equitable balancing of the interests of the parties.

*A. C. Aukerman Co.*, 960 F.2d at 1035 (internal citations omitted). If the presumption of laches applies, it applies to both required elements of the doctrine – (1) that the delay was unreasonable and; (2) that the defendant must be prejudiced by the delay. *Odetics*, at 919 F. Supp at 918. Once this presumption is met, the patentee bears the burden of rebutting both elements of laches (by a preponderance of the evidence) by showing that their delay was reasonable and/or by showing a lack of prejudice as a result of any unreasonable delay. *Id.* If the presumption does not apply, the defendant seeking protection behind the shield of laches must make a showing by the preponderance of the evidence that the delay was unreasonable and that prejudice occurred as a result.

On a variety of occasions, the Federal Circuit and other federal courts of appeals have defined the circumstances in which delay is reasonable. *See* 6 CHISUM ON PATENTS § 19.05[b][i]-[vii]. The Plaintiff has principally argued that their delay was either the result of strategic indecision at Lycos (the predecessor-in-interest of the patents-in-suit) or that Lycos was unable to pursue litigation against the Defendants due to on-going lawsuits and negotiations involving *related* patents to those in suit. As a result, the Court focuses on relevant case law concerning the excuses for which evidence was admitted into the record: strategic indecision and ongoing lawsuits. With respect to reasonable delay due to other lawsuits, the *Odetics* Court summarizes

5

**A45**

the general boundaries of the "ongoing litigation" excuse:

> Thus, an ongoing litigation involving the patent at issue can excuse a delay in filing an infringement action against a putative infringer. In such cases, however, the patentee must give notice to the accused infringer, warning him that he might be subject to suit in the future, after resolution of the other litigation. Indeed, some form of notice to a putative infringer -- some signal that the patentee considers his rights to be infringed and intends to respond to the infringement -- is typically, though not invariably, required in connection with excusing a delay in initiating an infringement suit. For example, a patentee who gives notice of infringement to a suspected infringer may then delay suit until the extent of the infringement makes litigation financially feasible. A patentee may also excusably delay the onset of infringement litigation to negotiate with the accused infringer. Notice to an alleged infringer is the key to a finding of excusable delay, for notice allows the accused infringer to take steps to protect himself from liability -- to change his product or his activities, for instance, or to institute a declaratory judgment suit himself against the patentee.

*Odetics, Inc.*, 919 F. Supp. at 918-919 (internal citations omitted). The Court found no support in the case law for an excuse concerning "strategic indecision."

If a delay is considered unreasonable, a showing by the party with the burden must be made as to the existence of material prejudice. *A. C. Aukerman Co.*, 960 F.2d at 1033 ("Material prejudice to adverse parties resulting from the plaintiff's delay is essential to the laches defense"). Evidentiary prejudice occurs when a defendant is unable "to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts." *Id.* (internal citations omitted). Economic prejudice arises "where a defendant and possibly others will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." *Id.* The Federal Court, however, has been clear that "[s]uch damages or monetary losses are not merely those attributable to a finding of liability for infringement." *Id* (internal citation omitted). Instead, "[t]he courts must look for a change in the economic position

6

**A46**

of the alleged infringer during the period of delay." *Id.*

The authority to impose laches lies within the sound discretion of the district court. *See Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, 60 F.3d 770, 773 (Fed. Cir. 1995) ("Even if the elements of laches are established, however, a court need not bar a plaintiff's suit. The application of the laches defense is discretionary, and as an equitable matter, the district court is to look to all the facts and circumstances of the case and weigh the equities of the parties."). Finally, it is settled law in the United States "that in determining the length of delay, a transferee of the patent must accept the consequences of the dilatory conduct of immediate and remote transferors." 6 CHISUM ON PATENTS §19.05[2][a][ii]; *accord Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1559 (Fed. Cir. 1997), *rev'd on other grounds, Cybor Corp. v. Fas Techs.*, 138 F.3d 1448, 1455 (Fed. Cir. 1998).

Based on forgoing principles of law, the court turns to its findings of fact and conclusions of law regarding laches in this case.

## II.     Findings of Fact and Conclusions of Law

Looking to the totality of evidence presented, the Court finds it appropriate to limit I/P Engine's damages based upon the principle of laches. Specifically, the Court finds that a presumption of laches is applicable in this case as Plaintiff waited in excess of six years to file its lawsuit against Defendants after having constructive knowledge of Defendants' infringement activities. In light of the presumption of laches, the burden shifts to Plaintiff to show that its delay was reasonable and/or that no evidentiary or economic prejudice resulted from said delay. The Court finds the Plaintiff fails on both counts. As such, the presumption of laches does not fall. Finally, the weight of the equities in this case supports application of the equitable doctrine

7

of laches. Accordingly, Plaintiff's pre-filing damages are barred.

## A. Presumption of Laches Applies

Defendants have claimed throughout the trial and through presentation of evidence that a presumption of laches applies because Plaintiff's waited more than six years to file suit. The record establishes, and the Court finds, that Lycos (and thus I/P Engine) had constructive notice that the Google Adwords system potentially infringed its patents as of July 2005 and failed to undertake any reasonable investigation to further determine if infringement was occurring.

The source of Plaintiff's constructive knowledge of Google's infringement rests on disclosures made by Google itself. On July 18, 2005, Google published a post on its "Google Inside AdWords" Blog, its official blog with respect to the AdWords system. This post was entered into the record as PX-176 (the "AdWords Post"). In a series of questions, the AdWords Post described a set of changes to the AdWords system. Of particular relevance to the question of laches are Google's statements concerning how ads are ranked and the introduction of Quality Score:

> Question no. 1: Are you changing how you rank ads?
> Though you'll see new keyword states in your account, we want to assure you
> that the 'auction' will remain the same. We'll continue to rank your ads based on
> your maximum CPC and the Quality Score.
>
> Question no. 2: What is the Quality Score?
> The Quality Score is simply a new name for the predicated CTR, which is
> determined based on the CTR of your keyword, the relevance of your ad text, the
> historical keyword performance, and other relevancy facts.

(PX-176). In I/P Engine's complaint, filed September 15, 2011, the company's core allegations are as follows:

> 37. The accused systems in this litigation use the Lang/Kosak Relevance Filtering
> Technology by filtering and presenting search and search advertising results based

8

**A48**

on a combination of (i) an item's content relevance to a search query; and (ii) click-through-rates from prior users relative to that item.

[...]

43. For example, Google adopted the Lang/Kosak Relevance Filtering Technology with its use of "Quality Score." Google's search advertising systems filter advertisements by using "Quality Score" which is a combination of an advertisement's content relevance to a search query (e.g., the relevance of the keyword and the matched advertisement to the search query), and click-through-rates from prior users relative to that advertisement (e.g., the historical click-through rate of the keyword and matched advertisement).

(Complaint ¶ 37, 42). The language included in the AdWords Post quoted above is significantly similar to the language utilized by the Plaintiff in its complaint.

The Defendants argue that this similarity shows that as early as July 18, 2005, sufficient information had been made public by Google regarding the infringing technologies to put Lycos on notice that it should at the very least investigate for possible infringement or bring suit against Google because the same information eventually put I/P Engine on notice for their suit. I/P Engine refutes this point on two grounds. First, Plaintiff argues that the blog post was not a technically accurate description of the AdWords system by pointing to testimony by Jonathan Alferness, a Google employee. Second, Plaintiff argues that no one at Lycos was even aware of the AdWords Post and thus this is why they took no action to investigate. Both of these reasons lack merit. With respect to the first, the Federal Circuit does not require that perfect or exacting information being made public of a possibly infringing technology to place a patentee on notice. The *Wanlass* Court held that "sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of the defendant's potentially infringing activities, give rise to a duty to investigate whether there is infringement." *Wanlass*, 148 F.3d at 1338 (quoting *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d

9

**A49**

1548, 1553 (Fed. Cir. 1996). Given that Google described what Quality Score is in their AdWords Post and given that Quality Score is at the heart of the Plaintiff's claims against Defendants (as indicated by the substantial similarity of description of Quality Score in the complaint), the Court finds any argument that somehow Google's description of Quality Score as being too inaccurate to provide notice to Lycos in 2005 to be totally disingenuous and is rejected.[1] Even if the AdWords is technically inaccurate, it still serves as the kind of marketing document the Wanlass Court cited as putting a patentee on notice of possible infringement.

As to Plaintiff's second argument, that no one at Lycos was aware of the AdWords Post and that even if Lycos had been aware of the AdWords Post, it would not have engaged in an investigation, it also lacks merit and is contrary to established law. As the *Wanlass* Court also made clear, even if a patentee is not actually aware of activities that should put them on notice of infringement, like the AdWords Post, "constructive knowledge of the infringement may be imputed to the patentee... if these activities are sufficiently prevalent in the inventor's field of endeavor." Furthermore, questions of constructive knowledge are not answered through a subjective lens but rather from the perspective of a "man of ordinary intelligence." *Johnston v. Standard Mining Co.*, 148 U.S. 360, 370 (U.S. 1893). The fact that Lycos in 2005 had no actual knowledge of the AdWords Post is meaningless if it had constructive knowledge, which the Court finds that it did. Google's publication of information concerning new advances in their search and ad serving technologies is the kind of "prevalent" activity in the field of the Lang and Kosak's inventions that Lycos should have been aware of in determining whether to enforce their patents. As the record indicates, the inventors of the asserted patents did little to investigation

---

[1] There is also evidence on the record indicating that I/P Engine itself sought to use the Google AdWords Post to support its infringement claims at trial.

potential infringement despite being on notice and having the opportunity to do so. For example, when asked at trial, a co-inventor of the asserted patents, Dr. Kosak, when asked "[a]nd have you ever done anything personally while you were at Lycos to determine whether anyone was using the patents in this case," he responded "I did not." Trial Tr. at 353. Furthermore, Mr. Blais in a declaration submitted along with Plaintiff's Laches Proffer indicated that Lycos did not undertake any steps to investigate whether Google was infringing its patents. Plaintiff's Laches Proffer, Blais Dec. at ¶ 3).

Taken together, the Court concludes that I/P Engine (and Lycos as the predecessor-in-interest of the patents-in-suit) had constructive notice of possible infringement on the date Google published the AdWords Post on July 18, 2005. The Google AdWords Post contained information that serves as the heart of I/P Engine's claims against Google. If the information contained in the AdWords Post was sufficient to place I/P Engine on notice of infringement by Defendants in 2011, it was sufficient to place Lycos on notice in 2005. The record indicates that I/P Engine filed its lawsuit in the Eastern District of Virginia on September 15, 2011. Between July 18, 2005 and September 15, 2011, six years, one month, and 28 days passed. In short, more than six years passed before infringement claims were brought against Defendant. As a result, the presumption of laches applies in this case.

### B. Plaintiff Fails to Rebut Presumption of Laches

Because a presumption of laches arises in this case, the burden in on plaintiff to "introduce evidence sufficient to support a finding of nonexistence of the presumed facts." *Wanlass v. Fedders Corp.*, 145 F.3d 1462, 1464 (Fed. Cir. 1998) (en banc) (citing *A.C. Aukerman Co. v.* 960 F.2d at 1037). Specifically, the plaintiff must provide sufficient evidence

11

**A51**

to show that either their delay in filing their suit was reasonable and/or that no economic or evidentiary prejudice occurred. In this case, I/P Engine has failed on both counts.[2]

First, I/P Engine has failed to make its required showing that its delay was reasonable. I/P Engine essentially makes two arguments on this point. One, I/P Engine argues that strategic indecision at Lycos after a series of corporation ownership transfers made it impossible for the company to consider what to do with its patents. As the Court notes, Plaintiff has not provided a single case citation to support strategic indecision as a justification for sleeping on its rights to challenge infringement of its patents, nor has the Court discovered such a justification in the case law.[3] As such, strategic indecision provides no reasonable excuse to delay in bring their suit.

Second, I/P Engine argues ongoing litigation with respect to *related* patents to those in suit in this case provides a reasonable excuse for not filing suit sooner. Again, the Plaintiff has failed to provide any support in the case law that litigation concerning *related* patents is a reasonable excuse for dilatory conduct. Furthermore, a court in this jurisdiction has rejected the argument that patents other than those at suit can justify a delay in bringing litigation because to do so "would eviscerate the protection of laches." *Humanscale Corp. v. CompX Intern. Inc.*, No. 09-86, 2010 WL 3222411, *10 -11 (E.D.Va., 2010). However, assuming *arguendo*, that other litigation concerning related patents can serve as reasonable justification for delay in bringing suit, I /P Engine has still failed to provide any evidence to show that it gave notice of any kind to Defendants that it intended to bring suit for infringement at the resolution of its ongoing

---

[2] Plaintiff argues that the Court failed to give it sufficient opportunity to rebut the presumption of laches. This argument is without merit. The Plaintiff was aware before trial that the Defendants claimed a presumption of laches in this case. Plaintiff provided evidence on this issue before asking the Court to rule on laches. It is unclear why Plaintiff would seek resolution of the laches issue if it had not put into evidence all of its arguments on laches.
[3] Even if strategic indecision were an excuse, the Court notes that the record indicates that corporate ownership changes occurred prior to the delay period. Common sense dictates that when those transfers occurred, the purchasers involved engaged in said transactions with a purpose in mind for Lycos.

12

**A52**

litigation. As a result, Plaintiff has provided no evidence sufficient to justify the unreasonable delay.

Plaintiff must rebut the presumption of, in this case, evidentiary prejudice.[4] I/P Engine asserts that no evidentiary prejudice occurred as a result of the six year delay in bringing the case because the meaningful events in this case happened long before the start of the period of delay and that it is unlikely Mr. Lang, Mr. Kosak, or Mr. Blais (as Lycos's Rule 30(b)(6) representative) would have remembered any additional information if they had been questioned in 2005. I/P, however, has failed to provide any evidence (expert or otherwise) to support its contention that the memories of Mr. Lang, Mr. Kosak, or Lycos (institutionally) would be unimproved by being questioned earlier in relation to this suit. Defendants, on the other hand, have provided a number of examples in its Laches Proffer of what the Court finds to be critical questions regarding Defendants' defenses and damages that went unanswered by Lang Kosak, or Lycos at their depositions. *See* Defendants' Laches Proffer, Ex. A (Lang Dep.); Defendants' Laches Proffer, Ex. B (Kosak Dep.); Defendants' Laches Proffer Ex. C (Blais Dep.). Furthermore, had the suit been brought sooner, it quite probable that Lycos would have been able to produce an institutional representative with better knowledge of the period of time at issue in this case. As a result, Plaintiff has provided no evidence sufficient to rebut the presumption of laches.

### C. Equities Favor Application of Laches

As indicated above, the authority to impose laches lies within the sound discretion of the district court. Courts considering the question of laches are required to weight the totality of the

---

[4] Economic prejudice has not been at issue in this case.

13

**A53**

circumstance to determine whether laches should apply, even when the basic requirements are met. In this case, for all the reasons indicated above, the Court believes the equities favor application of the equitable doctrine of laches. Furthermore, there is also evidence on the record indicating that Lycos was a client of Google as early as 2003 and used the infringing technology during the course of their business relationship.[5] While it is true that Google considered its technology a trade secret and did not disclose its technical details, the Court finds its confounding that Lycos, while in possession of the Lang/Kosak patents, was never curious as to how Google AdWords worked and whether its patents were being infringed. Although the fog of litigation makes it highly unlikely that we will ever fully understand the motivations of the parties prior to the filing of this lawsuit, common sense dictates that Lycos didn't bring suit in 2005 because it did not believe its patents were being infringed and that the only thing that changed was that the patents-in-suit were purchased by I/P Engine, a non-practicing entity, for the sole purpose of bringing this litigation. Although Congress is best left to consider the merits of non-practicing patent entities in our patent system, the dilatory nature of this suit is precisely why the doctrine of laches has been applied to patent law. As a result, the weight of the equities in this case warrants the application of the doctrine of laches.

### D. Laches Applies to Non-Google Defendants

Finally, at trial, Plaintiff raised the question of whether the non-Google Defendants should be protected by the doctrine of laches or whether it should apply only to Google, since the Federal Circuit cites laches as a personal defense. *See Israel Bio-Engineering Project v. Amgen Inc.*, 401 F.3d 1299, 1306 (Fed. Cir. 2005). However, as indicated by the record, Google's

---

[5] *See, e.g.* Trial Tr. at 352 (Q. Now, we talked a lot about Lycos and your work there. You're aware that Lycos was a AdSense customer? A. Yes. Q. And you understand that's one of the accused products in

14

**A54**

business relationship agreements with their co-defendants include an indemnification clause against suits for patent infringement. *See e.g.* Plaintiff's Trial Exhibit 242 ¶25.1 ("Google will defend…indemnify and hold harmless IAC…from and against any action…arising from a claim that…[t]he Services or any Google Brand Feature infringes any patent, copyright, trade secret or trade mark of such third party…"). In *Odetics, Inc. v. Storage Tech. Corp.*, Plaintiff similarly argued that the personal nature of the laches defense prevented the doctrine's application to customer co-defendants. *Odetics*, 919 F. Supp. at 925. In that case, the court determined that:

> This argument ignores the indemnity arrangements Storagetek has with its customers, and the importance of this fact to the equitable purposes of laches. If the benefit of laches is not extended to Storagetek's customers, Odetics would be able to recover indirectly from Storagetek for infringement for which it is barred by laches from recovering from Storagetek directly. More specifically, if the customer defendants cannot rely on laches, Odetics can recover infringement damages from them that they in turn can recover from Storagetek on the basis of the indemnity arrangements. This inequitable result effectively circumvents the laches ruling and thus defeats the doctrine's equitable purposes. If Odetics' delay warrants barring recovery from Storagetek, then because of the indemnity arrangements, Odetics should be barred from recovering the same damages from Storagetek's customers. Accordingly, the customer defendants are entitled to benefit from Storagetek's laches defense, and Odetics may recover no damages for the use of allegedly infringing ATLs the customer defendants purchased from Storagetek prior to the institution of this suit on June 29, 1995. Case law supports this result. *See, e.g., Van Alen v. Aluminum Co. of America*, 43 F. Supp. 833, 838 (S.D.N.Y. 1942) ("As far as [the infringer's customer] is concerned, since it is but a customer of defendant, it is covered by the protection which laches affords the latter."); *Boyle Leather Goods Co. v. Feldman*, 30 F. Supp. 914, 915 (S.D.N.Y. 1940) ("An unreasonable delay [exists] which sustains the defense of laches raised by both defendants, for Feldman's co-defendant is but a customer of his.").

*Id.*, 925-26. (alteration in original). This Court finds the indemnification concerns articulated in *Odetics* to be persuasive and applicable in this case. As a result, all customer co-defendants in this case deserve the benefit of the doctrine of laches.

---

this case? A. I believe so, yes.)  15

**A55**

## III.    Conclusion

In sum, a presumption of laches arises in this case, which I/P Engine was unable to rebut.

Therefore, I/P Engine is barred from recovering damages from any of the defendants for any

infringement occurring before September 15, 2011.

The Clerk is directed to send copies of this Memorandum Opinion and Order to all

counsel of record.

**IT IS SO ORDERED.**

Norfolk, Virginia
November 20 , 2012

Raymond A. Jackson
**United States District Judge**

16

**A56**

FILED

JAN 3 1 2013

CLERK, US DISTRICT COURT
NORFOLK, VA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

I/P ENGINE, INC.,

        **Plaintiff,**

V.                                      **CIVIL ACTION NO. 2:11cv512**

AOL INC., *et al.*,

        **Defendants.**

## *ORDER*

Before the Court is Plaintiff's Motion for Judgment under Rule 52(b) and a New Trial

under Rule 59 on Laches (ECF No. 835). Rule 52(b) dictates that "[o]n a party's motion filed no

later than 28 days after the entry of judgment, the court may amend its findings--or make

additional findings--and may amend the judgment accordingly. The motion may accompany a

motion for a new trial under Rule 59." As courts have noted, "[a]mong the purposes of such a

motion is to correct manifest errors of law or fact." *Morrow Corp. v. Harleysville Mut. Ins. Co.*,

110 F. Supp. 2d 441, 445 (E.D. Va. 2000). Furthermore, "[t]he purpose of Rule 52(b) is to allow

a court to correct manifest errors of law or fact, or in limited circumstances, to present newly

discovered evidence, but not to relitigate old issues, to advance new theories, or to secure a

rehearing on the merits." *U.S. v. Mathis*, No. 6:06-815, 2008 WL 906554, *1 (D.S.C., 2008).

Having reviewed the briefing by the parties, the Court finds no manifest errors of law or fact to

correct which would change its finding on laches. As a result, Plaintiff's Motion for Judgment

under Rule 52(b) and a New Trial under Rule 59 on Laches (ECF No. 835) is **DENIED**. The

Clerk is **DIRECTED** to send a copy of this Order to counsel and parties of record.

        IT IS SO ORDERED.

Norfolk, Virginia
January *3/* , 2013

                                     Raymond A. Jackson
                                     **United States District Judge**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**I/P ENGINE, INC.,**

           **Plaintiff,**

**V.**                                  **CIVIL ACTION NO. 2:11cv512**

**AOL INC.,** *et al.,*

           **Defendants.**

### *ORDER*

Before the Court is Plaintiff's Motion for a New Trial on the Dollar Amount of Past

Damage (ECF No. 825), pursuant to Rule 59(a) of the Federal Rules of Civil Procedure. Rule

59(a) instructs that "[t]he court may, on motion, grant a new trial on all or some of the issues--

and to any party… after a jury trial, for any reason for which a new trial has heretofore been

granted in an action at law in federal court[.]" As a general matter, disturbing a jury's verdict by

ordering a new trial under Rule 59(a) is an extreme remedy only warranted in a narrow set of

circumstances:

> On such a motion it is the duty of the judge to set aside the verdict and grant a
> new trial, if he is of the opinion that [1] the verdict is against the clear weight of
> the evidence, or [2] is based upon evidence which is false, or [3] will result in a
> miscarriage of justice, even though there may be substantial evidence which
> would prevent the direction of a verdict.

*Atlas Food Sys. & Servs. v. Crane Nat'l Vendors*, 99 F.3d 587, 594 (4th Cir. 1996). Further,

"[o]n a Rule 59 motion, courts may make credibility judgments in determining the clear weight

of the evidence." *Attard Indus. v. United States Fire Ins. Co.*, 2010 U.S. Dist. LEXIS 119119

(E.D. Va. Nov. 9, 2010) (citation omitted). Finally, "the court will search the record for

evidence that could reasonably lead the jury to reach its verdict, drawing all reasonable

**A66**

inferences in favor of the verdict winner." 12 MOORE'S FEDERAL PRACTICE - Civil § 59.13 (3d ed. 1997).

Having reviewed the parties' memoranda, the Court finds that the verdict is not against the clear weight of the evidence, nor was the verdict of the jury based on evidence that is false, or will a miscarriage of justice result. Accordingly, Plaintiff's Motion for a New Trial on the Dollar Amount of Past Damages (ECF No. 825) is **DENIED**. The Clerk is **DIRECTED** to send a copy of this Order to counsel and parties of record.

**IT IS SO ORDERED.**

Norfolk, Virginia
April 2 , 2013

/s/

Raymond A. Jackson
United States District Judge

2

**A67**



FILED
IN OPEN COURT

NOV - 6 2012

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

I/P ENGINE, INC.,

        **Plaintiff,**

v.
                                  **CIVIL ACTION NO. 2:11cv512**

AOL INC., *et al.*,

        **Defendants.**

## VERDICT FORM

**Instructions:** When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout the form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

    We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of this court as our verdict in this case.

**A4163**

## I.   INFRINGEMENT

### A. Infringement by Google Inc. ("Google")

**1. Has I/P Engine proven, by a preponderance of the evidence, that Google infringed claims 10, 14, 15, 25, 27 or 28 of the '420 patent?**

**Answer "Yes" or "No" for each claim.**

Claim 10: __YES__

Claim 14: __YES__

Claim 15: __YES__

Claim 25: __YES__

Claim 27: __YES__

Claim 28: __YES__

**2. Has I/P Engine proven, by a preponderance of the evidence, that Google infringed claims 1, 5, 6, 21, 22, 26, 28 or 38 of the '664 patent?**

**Answer "Yes" or "No" for each claim.**

Claim 1: __YES__

Claim 5: __YES__

Claim 6: __YES__

Claim 21: __YES__

Claim 22: __YES__

Claim 26: __YES__

Claim 28: __YES__

Claim 38: __YES__

2

A4164

## B. Infringement by AOL Inc. ("AOL")

**1. Has I/P Engine proven, by a preponderance of the evidence, that AOL infringed claims 10, 14, 15, 25, 27 or 28 of the '420 patent?**

**Answer "Yes" or "No" for each claim.**

Claim 10: _YES_

Claim 14: _YES_

Claim 15: _YES_

Claim 25: _YES_

Claim 27: _YES_

Claim 28: _YES_

**2. Has I/P Engine proven, by a preponderance of the evidence, that AOL infringed claims 1, 5, 6, 21, 22, 26, 28 or 38 of the '664 patent?**

**Answer "Yes" or "No" for each claim.**

Claim 1: _YES_

Claim 5: _YES_

Claim 6: _YES_

Claim 21: _YES_

Claim 22: _YES_

Claim 26: _YES_

Claim 28: _YES_

Claim 38: _YES_

3

**A4165**

## C. Infringement by IAC

1. Has I/P Engine proven, by a preponderance of the evidence, that IAC infringed claims 10, 14, 15, 25, 27 or 28 of the '420 patent?

**Answer "Yes" or "No" for each claim.**

Claim 10: YES

Claim 14: YES

Claim 15: YES

Claim 25: YES

Claim 27: YES

Claim 28: YES

2. Has I/P Engine proven, by a preponderance of the evidence, that IAC infringed claims 1, 5, 6, 21, 22, 26, 28 or 38 of the '664 patent?

**Answer "Yes" or "No" for each claim.**

Claim 1: YES

Claim 5: YES

Claim 6: YES

Claim 21: YES

Claim 22: YES

Claim 26: YES

Claim 28: YES

Claim 38: YES

4

**A4166**

**D. Infringement by Gannett**

    **1. Has I/P Engine proven, by a preponderance of the evidence, that Gannett infringed claims 10, 14, 15, 25, 27 or 28 of the '420 patent?**

    **Answer "Yes" or "No" for each claim.**

Claim 10: ___Yes___

Claim 14: ___Yes___

Claim 15: ___Yes___

Claim 25: ___Yes___

Claim 27: ___Yes___

Claim 28: ___Yes___

    **2. Has I/P Engine proven, by a preponderance of the evidence, that Gannett infringed claims 1, 5, 6, 21, 22, 26, 28 or 38 of the '664 patent?**

    **Answer "Yes" or "No" for each claim.**

Claim 1: ___Yes___

Claim 5: ___Yes___

Claim 6: ___Yes___

Claim 21: ___Yes___

Claim 22: ___Yes___

Claim 26: ___Yes___

Claim 28: ___Yes___

Claim 38: ___Yes___

**E. Infringement by Target**

1. Has I/P Engine proven, by a preponderance of the evidence, that Target infringed claims 10, 14, 15, 25, 27 or 28 of the '420 patent?

Answer "Yes" or "No" for each claim.

Claim 10: _Yes_

Claim 14: _Yes_

Claim 15: _Yes_

Claim 25: _Yes_

Claim 27: _Yes_

Claim 28: _Yes_

2. Has I/P Engine proven, by a preponderance of the evidence, that Target infringed claims 1, 5, 6, 21, 22, 26, 28 or 38 of the '664 patent?

Answer "Yes" or "No" for each claim.

Claim 1: _Yes_

Claim 5: _Yes_

Claim 6: _Yes_

Claim 21: _Yes_

Claim 22: _Yes_

Claim 26: _Yes_

Claim 28: _Yes_

Claim 38: _Yes_

6

A4168

## II.   VALIDITY

A. Have Defendants proven, by clear and convincing evidence, that claims 10, 14, 15, 25, 27 or 28 of the '420 patent are invalid? Answer "Yes" or "No" for each claim as to Anticipation. A "Yes" for means that you find the patent to be invalid.

Claim 10: Anticipation  No

Claim 14: Anticipation  No

Claim 15: Anticipation  No

Claim 25: Anticipation  No

Claim 27: Anticipation  No

Claim 28: Anticipation  No

B. Have Defendants proven, by clear and convincing evidence, that claims 1, 5, 6, 21, 22, 26, 28 or 38 of the '664 patent are invalid? Answer "Yes" or "No" for each claim as to Anticipation. A "Yes" for means that you find the patent to be invalid.

Claim 1: Anticipation  No

Claim 5: Anticipation  No

Claim 6: Anticipation  No

Claim 21: Anticipation  No

Claim 22: Anticipation  No

Claim 26: Anticipation  No

Claim 28: Anticipation  No

Claim 38: Anticipation  No

7

**C. Obviousness ('420 Patent) – The ultimate legal conclusion on the obviousness question will be made by the court. However, in order for the court to do so, you must answer the following preliminary factual questions:**

**1. What was the level of ordinary skill in the field that someone would have had at the time the claimed invention was made?**

> The parties in this case have stipulated that an individual with a bachelor's degree in computer science with at least 2 years of experience in the field would be someone of the ordinary skill in the field.

**2. What was the scope and content of the prior art at the time of the claimed invention? (Check the applicable answer)**

> _____ All elements of the asserted claims are found in the prior art.

> ___✓___ No prior art applies because (1) the Bowman and Culliss references identified by Defendants lack any content analysis and filtering for relevance to the query and (2) other references identified by Defendants relate to profile system that do not disclose a tightly integrated search systems and could not filter information relevant to the query.

> _____ [other, specify_____]

**3. What difference, if any, existed between the claimed invention and the prior art at the time of the claimed invention?**

> _____There are no patentable differences between the scope of the claimed invention and what was known in the prior art at the time of the claimed invention

> ___✓___ The Bowman and Culliss references did not disclose either limitation (b) (a content-based filter and could not filter information relevant to the query or (d) (combining feedback data with content profile data) of independent claims 10 and 25. The other asserted references – Rose, Lashkari, and Fab, were profile systems that did not disclose a tightly integrated search system, and could not filter information relevant to the query.

> _____[Other, specify                                                    ]

**4. Which of the following factors has been established by the evidence with respect to the claimed invention: (check those that apply)**

> ___✓___ Commercial success of a product due to the merits of the claimed invention

> ___✓___ A long felt need for the solution that is provided by the claimed invention

> ___✓___ Unsuccessful attempts by others to find the solution that is provided by the claimed invention

8

_____✓___Copying of the claimed invention by others

_____✓___Unexpected and superior results from the claimed invention

_____✓___Acceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention

_____Independent invention of the claimed invention by others before or at about the same time as the named inventor thought of it

_____[Other factor(s) indicating obviousness or nonobviousness—describe the factor(s)                                                                ]

**D. Obviousness ('664 Patent) – The ultimate legal conclusion on the obviousness question will be made by the court. However, in order for the court to do so, you must answer the following preliminary factual questions:**

**1. What was the level of ordinary skill in the field that someone would have had at the time the claimed invention was made?**

The parties in this case have stipulated that an individual with a bachelor's degree in computer science with at least 2 years of experience in the field would be someone of the ordinary skill in the field.

**2. What was the scope and content of the prior art at the time of the claimed invention? (Check the applicable answer)**

_____ All elements of the asserted claims are found in the prior art.

___✓___ No prior art applies because (1) the Bowman and Culliss references identified by Defendants lack any content analysis and filtering for relevance to the query and (2) other references identified by Defendants relate to profile system that do not disclose a tightly integrated search systems and could not filter information relevant to the query.

_____ [other, specify_____]

**3. What difference, if any, existed between the claimed invention and the prior art at the time of the claimed invention?**

_____There are no patentable differences between the scope of the claimed invention and what was known in the prior art at the time of the claimed invention

___✓___ The Bowman and Culliss references do not disclose limitation (c) of the independent claims 1 and 26, because those references do not have a content-based filter that could not filter information relevant to a query,  or combine information from a feedback system with content profile data. The other asserted references – Rose, Lashkari, and Fab, were profile systems that did not disclose a

9

**A4171**

tightly integrated search system, and could not filter information relevant to the query.

_____[Other, specify                                                    ]

**4. Which of the following factors has been established by the evidence with respect to the claimed invention: (check those that apply)**

✓ Commercial success of a product due to the merits of the claimed invention

✓ A long felt need for the solution that is provided by the claimed invention

_____ Unsuccessful attempts by others to find the solution that is provided by the claimed invention

✓ Copying of the claimed invention by others

✓ Unexpected and superior results from the claimed invention

✓ Acceptance by others of the claimed invention as shown by praise from others in the field or from the licensing of the claimed invention

✓ Independent invention of the claimed invention by others before or at about the same time as the named inventor thought of it

_____ [Other factor(s) indicating obviousness or nonobviousness—describe the factor(s)                                                    ]

10

A4172

pursuant to the E-Government Act,
·· original of this page has been filed
··der seal in the Clerk's Office.

**REDACTED COPY**

## III.   DAMAGES

   **A. If you have found any claim of the '420 patent or the '664 patent to be both valid and infringed by Google, should reasonable royalty damages be based on a "lump sum royalty" or a "running royalty"? ANSWER (CHECK ONLY ONE):**

   "Lump sum royalty" _____

   "Running royalty"  ✓

   **B. If you have found that damages should be based on a "running royalty," what should be the rate for that running royalty? ANSWER AS A PERCENTAGE.**

   Running Royalty Rate: ___3.5%___

   **C. If you have found any claim of the '420 patent or the '664 patent to be both valid and infringed by Defendants, what sum of money, if any, if paid now in cash, would reasonably compensate I/P Engine for any of defendants past infringement? ANSWER IN DOLLARS AND CENTS, IF ANY, AND FOR EACH DEFENDANT**

   GOOGLE, INC.: $15,800,000.00

   AOL, INC.: $7,943,000.00

   IAC SEARCH & MEDIA, INC.: $6,650,000.00

   GANNETT CO., INC.: ~~$98,833.00~~ $4,322.00

   TARGET CORP.: $98,833.00

Date: Nov. 6, 2012                    Foreperson: ████████████

11

A4173

## CERTIFICATE OF SERVICE

I certify that on September 25, 2013, this Nonconfidential Principal And Responsive Brief Of Plaintiff-Cross Appellant I/P Engine, Inc. was filed electronically using the CM/ECF system, which will send notification of such filing to counsel of record for Defendants-Appellants, AOL Inc., Google Inc., IAC Search & Media, Inc., Gannett Company, Inc., and Target Corporation, as follows:

David A. Perlson
David L. Bilsker
Margaret P. Kammerud
Antonio R. Sistos
Kevin A. Smith
Emily C. O'Brien
QUINN EMANUEL URQUHART & SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, CA  94111
davidperlson@quinnemanuel.com
davidbilsker@quinnemanuel.com
margaretkammerud@quinnemanuel.com
antoniosistos@quinnemanuel.com
kevinsmith@quinnemanuel.com
emilyobrien@quinnemanuel.com

David A. Nelson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 W. Madison Street, Suite 2450
Chicago, IL  60661
davenelson@quinnemanuel.com

Robert B. Wilson
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Floor
New York, NY  10010
robertwilson@quinnemanuel.com

/s/ Joseph R. Re
Joseph R. Re

15884231